```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3           Docket No. 6:11-cv-368-Orl-19-GJK

 4  . . . . . . . . . . . . . . .
    THE LEARNING CONNECTIONS,    :
 5  INC., A FOREIGN CORPORATION  :
    AND SYED HASNAIN, AN         :
 6  INDIVIDUAL                   :
                                 :
 7          Plaintiff            :        Orlando, Florida
                                 :        February 27, 2012
 8                               :        9:00 a.m.
                 v.              :
 9                               :
    KAUFMAN,ENGLETT & LYND,      :
10  PLLC F/K/A/ KAUFMAN, ENGLETT :
    & LYND, LLC, ET AL,          :
11                               :
             Defendant           :
12  . . . . . . . . . . . . . . .

13

14              TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE PATRICIA C. FAWSETT
15              UNITED STATES DISTRICT JUDGE

16

17  APPEARANCES:

18  For the Plaintiff:  Geoffrey Ittleman

19
    For the Defendant:  Richard Withers
20                      Jeffrey S. Kaufman

21
    Court Reporter:     Sandra K. Tremel, RMR/CRR
22                      407-245-3110

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.
```

```
1                         I N D E X

2

3   WITNESS              DIRECT      CROSS      REDIRECT

4   Syed Hasnain           93        181         233

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Well, good morning.

 3        We will call the case.

 4            THE DEPUTY CLERK:  Case number

 5   6:11-CV-368-ORL-19GJK.  Learning Connections, Inc., Syed

 6   Hasnain vs. Kaufman, Englett and Lynd, PLLC, formerly known

 7   as Kaufman, Englett and Lynd, LLC, et al.

 8            THE COURT:  And Mr. Kaufman.

 9            MR. KAUFMAN:  Yes, Your Honor.

10            THE COURT:  You're a defendant, aren't you?

11            MR. KAUFMAN:  Yes, I am.

12            THE COURT:  It's not named, you need to name him.

13            THE DEPUTY CLERK:  Jeffery S. Kaufman.

14            THE COURT:  Yes.  Okay.  All right.  If you will

15   state your appearances, please.  For the plaintiff.  Is the

16   plaintiff counsel not here?

17        Mr. Ittleman was here at 8:00, wasn't he?

18            THE DEPUTY CLERK:  Your Honor, he was here at

19   about 7:45.

20            THE COURT:  7:45.  Okay.  And for the defendant

21   who is representing the defendant?

22            MR. WILSON:  Curtis Wilson, Your Honor.

23            THE COURT:  Okay.  Mr. Wilson, you all could be

24   seated.

25            MR. WILSON:  Your Honor, Rich Withers is on his
```

```
 1  way in the street where the parking is closed off for
 2  traffic accident, so he's trying to find alternate parking.
 3           THE COURT:  You can proceed without him?
 4           MR. WILSON:  We can at least --
 5           THE COURT:  Because it's just preliminary stuff.
 6           MR. WILSON:  Preliminary.
 7           THE COURT:  So Mr. Ittleman should be here.  I
 8  wonder if he got caught in the same thing.
 9           MR. WILSON:  It's completely closed off, the
10  entire area from the Amway down for one accident.
11           THE COURT:  Well.  Let's -- he's five minutes late
12  almost.  Let me give him just another minute because I did
13  see him in here when I came in earlier, so I know he's
14  somewhere around here.
15      Where did you drive from?
16           MR. WILSON:  Mr. Withers actually dropped me off
17  at the front of the building.
18           THE COURT:  Are you from Orlando?
19           MR. WILSON:  Yes, from Orlando.
20           THE COURT:  Must be Mr. Withers.
21           MR. WITHERS:  Yes, Your Honor.
22           THE COURT:  All right.  Who technically will be
23  lead on this?
24           MR. WITHERS:  I am.
25           THE COURT:  You are.  Okay.
```

1          MR. WITHERS:  Mr. Kaufman will do the opening

2  statement and the accountant if he's permitted to testify.

3          THE COURT:  The local rules should be -- on trial

4  procedure should be there, I hope.  5.03.  So we follow

5  that.

6      Mr. Ittleman was here getting instructions this

7  morning.  I don't know where he went.  I was just going to

8  give a couple more minutes before I started then I'm

9  going -- because the jury's here.  So you can make yourself

10  at home.  Be seated.  You don't need to stand now.

11     Mr. Ittleman, you're late.  We started at 8:30.

12          MR. ITTLEMAN:  I'm sorry.

13          THE COURT:  So don't be late again.

14          MR. ITTLEMAN:  Yes.  I was just in the room.

15          THE COURT:  Come into this room at 8:30.

16          MR. ITTLEMAN:  Yes, ma'am.

17          THE COURT:  We don't go into that room.

18          MR. ITTLEMAN:  Okay.

19          THE COURT:  You want to state your appearance for

20  the plaintiff.

21          MR. ITTLEMAN:  Geoffrey Ittleman here on behalf

22  plaintiffs.

23          THE COURT:  Okay.  Mr. Ittleman, pronounce

24  Mr. Hasnain's name for him.

25          MR. ITTLEMAN:  Syed Hasnain.

1            THE COURT:  Okay.  Thank you.  All right.  Please
2    be seated and be comfortable.  I'm going to go through some
3    preliminary matters with you and then I'll see if you have
4    any concerns.
5        We don't have the number of jurors coming up yet, but
6    we estimate it will be between 20 and 24 and I will try to
7    select 8 but I'll have to let you know how many after I see
8    the challenges for cause and how many that we have.
9        I read the joint pretrial statement at docket 59, and
10   defendant's trial brief at docket 76.  You're admitted facts
11   on page 5 of your joint pretrial statement are way too
12   legalese for me to read to the jury, so you all need to get
13   together and tell me what, if any, stipulation of facts you
14   want me to read to the jury, and we will do that some time
15   during the course of taking evidence.
16       You reference in your joint pretrial stipulation that
17   you have certain exhibits admitted by stipulation.  You may
18   want to make a list of those and I will just announce them
19   to the jury.  That will save you time.  And we did mark them
20   on my sheets which I -- which I don't have a sheet yet?
21           THE DEPUTY CLERK:  We only have plaintiff's
22   counsel information.  The defense hadn't come to the
23   courtroom yet for me to retrieve it.
24           THE COURT:  Okay.  Mr. Withers, we need your sheet
25   for your exhibits that are marked.

```
 1              THE DEPUTY CLERK:  Your bench book and your
 2   exhibits.
 3              THE COURT:  Okay.  Let me go ahead because I need
 4   to cover this.  I want to tell you from reading the summary
 5   judgment material submitted that I am concerned about
 6   hearsay statements and I'm concerned, Mr. Ittleman, about
 7   your plaintiff expert testifying without a factual basis.
 8   So those are things just to be aware of.  And also the
 9   canons of ethics -- canons of professional responsibility I
10   think they're called now for both Florida and Tennessee
11   attorneys preclude filing of meritless pleadings, so that is
12   one area that I am concerned about.
13         Let me tell you if you haven't talked to -- because I
14   have tried a lot of cases -- but you may have talked to
15   other attorneys who have scared you to death in here -- I
16   hope that isn't so -- I do not like to have the jury wasted
17   while they're here.  So if you know of problems, you need to
18   bring them up with me.  I am yours during this trial and I
19   will come here as early as you need, stay for breaks.  I do
20   have one hearing scheduled in another case this week over
21   the lunch break and I will stay late in the afternoon after
22   the jury leaves, but I really do not like bench conferences,
23   and you should know enough about your case to know to bring
24   things up in advance with me so that we don't have to fiddle
25   around in here in the presence of the jury.
```

```
 1        The time for trial is three days.  Is that changed,
 2   Mr. Ittleman?
 3              MR. ITTLEMAN:  No, ma'am.
 4              THE COURT:  Mr. Withers?
 5              MR. WITHERS:  No, Your Honor.
 6              THE COURT:  Okay.  How long would you like for
 7   opening statement?
 8              MR. ITTLEMAN:  I would say 10 minutes.
 9              THE COURT:  Okay.  How about for the defense?
10              MR. WITHERS:  We need more.  I'll say Mr. Kaufman
11   can get it done in an hour.
12              THE COURT:  Well, an hour is too long on this
13   case.
14              MR. WITHERS:  What's the most you'll give us?
15              THE COURT:  Well, I mean, surely 30 minutes or
16   maximum 45, you know.
17              MR. WITHERS:  He thinks he can do it in 30
18   minutes.
19              THE COURT:  Thirty minutes then.  Both sides will
20   get 30 minutes.
21        You gave me jury instructions.  I hope you read those.
22   You were asking for personal injury damages and all sorts of
23   things in these jury instructions and I worry sometimes that
24   attorneys give them off to associates who may not have been
25   in the courtroom.  So what I've done -- and this is -- I'm
```

1  warning you -- is I've taken them and tried to fashion them

2  the way they should be.  And you should each have a copy.  I

3  think it's called draft 3.

4      Your verdict form was good.  And I think that's

5  pretty -- I don't think there was much of anything changed

6  on your verdict form, but your jury instructions would not

7  pass muster.  And also I left in, but I don't like to do

8  this, that long passage about the plaintiff contends this

9  and the defendant contends that.  When I charge the jury I

10  want to give them the law.  It's up to you to embroider what

11  that law is.  And I really think you ought to take that out.

12  I left it in because you stipulated to it, but that -- in

13  some ways it limits you and these jurors take -- I give them

14  to them in writing.  They go back in the jury room and they

15  underline just about every word and, you know, when I go

16  back in after they have been discharged when the case is

17  over and talk to them, they show me what they have done with

18  the jury instructions.

19      So these need to have attention, and if were going to

20  finish in three days, we will start the charge conference

21  probably today unless we go really late.

22      Juror -- the voir dire questions, I'm going to ask

23  some.  I am going to use my -- well, I'll go ahead and ask

24  some voir dire questions.  Then I'll give you each let's say

25  10 minutes per side to question the jury on areas where I

1  did not question them.  In other words, I don't want you to

2  repeat questions I asked, but if you want to get into an

3  area you can say, well, the judge asked you if you have ever

4  had a mortgage foreclosed on the house and then ask your

5  additional question, but don't ask the same question over

6  and over again.  And do not try to persuade the jury to your

7  point of view in the voir dire.

8      You know, a lot of judges over here will not let the

9  attorneys have voir dire because they feel they misuse it.

10  So I tell attorneys if I feel you're misusing, I'm going ask

11  you to sit down.  But you certainly are welcome to get facts

12  and feelings and that sort of things without trying to color

13  the water, let's say.  And I will also, if you wish, just

14  let me know if you want me to ask a question that you're

15  uncomfortable asking and I didn't ask it.  Just let me know

16  and I will try to do that.

17      Do you want to invoke the rule?

18          MR. WITHERS:  We do.

19          THE COURT:  Okay.  Then I'll make both sides

20  responsible because I do not know who your witnesses are.

21  You need to tell them they cannot discuss their testimony

22  with anyone, but of course you can talk to them.

23      Now at this point the trial has technically begun, but

24  please, attorneys, do not you be the vehicle of saying,

25  well, Joe got up on the witness stand and said this that and

1   the other and now what are you going to say to that because
2   that's just as much a violation of the rule as if the
3   witness talked about it.  So when you talk to your witnesses
4   after the trial has begun you need just say on this issue,
5   what is your testimony without feeding them what somebody
6   else has said.
7       I'm going to let you each read your witness list so I
8   don't mangle the names.  So Mr. Ittleman, you will stand
9   first and read the proposed witnesses so that I can inquire
10  if anybody knows them, and then Mr. Withers if you have
11  additional ones, you don't need to repeat the names.  But if
12  you have additional ones, then you will read that.
13      The local rule for our courtroom decorum is 5.03.  It's
14  on the desk in front of you.  I follow that faithfully.
15  Please do not violate it.  It's very embarrassing to me when
16  I go and talk to the jurors and they'll say, Judge, every
17  time you ruled, as soon as you looked away that attorney
18  rolled his eyes and made faces and so forth.  Not good.  And
19  if I see grins and expressions at counsel table, then I will
20  take care of that myself during the trial.
21      Okay.  Do you have any -- let me see if I missed
22  anything.  I think that is everything I've got.
23      Mr. Ittleman, do you have any questions, anything you
24  want to ask me?
25          MR. ITTLEMAN:  No, ma'am.

```
 1              THE COURT:  Okay.  And Mr. Withers?

 2              MR. WITHERS:  I do, Your Honor.

 3              THE COURT:  Okay.

 4              MR. WITHERS:  Couple of questions.  The Court

 5    touched on one of them.  That is these two expert witnesses

 6    the plaintiff's going to produce.  We're going want to voir

 7    dire them for certain because we have some real problems.

 8              THE COURT:  Are you talking about for their

 9    qualifications?

10              MR. WITHERS:  Right.

11              Well, that's typical 702.  That's a typical --

12              MR. WITHERS:  There's another problem if I may

13    address it at this point.

14        The Court will recall the affidavit in support of the

15    motion for summary judgment filed by Mr. Hasnain.  In that

16    affidavit he disclaimed knowledge of his right to bring an

17    injunction.

18              THE COURT:  Right.  And then in your trial brief

19    brought a letter where he -- written in February, I believe.

20              MR. WITHERS:  Yes, ma'am.

21        That's the basis for, we thought as we read it, that

22    was the basis for the Court's denial of our motion for

23    summary judgment.  That letter exists.  It's going to be in

24    evidence.

25              THE COURT:  Was that letter presented in your
```

 1  summary judgment material?

 2          MR. WITHERS:  No, because --

 3          THE COURT:  Because I sure didn't see it and I

 4  remarked -- I asked my law clerk to go back and she said she

 5  didn't see it either.

 6          MR. WITHERS:  Trust me, Your Honor, you would have

 7  if we had it.  We didn't get it because they didn't do their

 8  document production.

 9          THE COURT:  Well, what is the issue now?  It

10  sounds like it's an evidentiary matter.

11          MR. WITHERS:  Well, it is directly contradictory

12  to the affidavit.

13          THE COURT:  Well, that's going to -- you're going

14  to have cross-examination.

15          MR. WITHERS:  Well, the affidavit was prepared by

16  the attorney.  We don't know if this was the attorney's

17  words or --

18          THE COURT:  Well, you can ask him -- what is your

19  issue?  Tell me where we are going with your discussion.

20          MR. WITHERS:  Basically that the Court had this,

21  it probably would have granted a summary judgment.

22          THE COURT:  Well, we will see because we have an

23  affidavit and we have a letter and I have a big question

24  mark.  So --

25          MR. WITHERS:  Okay.

 1          THE COURT:  So you will have a -- you will have

 2  cross-examination.

 3          MR. WITHERS:  Thank you, Your Honor.

 4          THE COURT:  Is there anything else?

 5          MR. WITHERS:  Aside from those two voir dire, I

 6  can't think of anything else.

 7          THE COURT:  Okay.  No questions about jury

 8  selection?

 9          MR. ITTLEMAN:  I just have a question about --

10          THE COURT:  When you talk to me, you need to stand

11  up.

12          MR. ITTLEMAN:  Yes, ma'am.

13     Questions about who's going to be representing the

14  defendants.  I have received various notices of appearances.

15  I know Mr. Withers had filed a motion for substitution.

16          THE COURT:  Who is the attorney or who is the

17  representative of the law firm?  Who is the attorney?

18          MR. ITTLEMAN:  Who is the attorney for the law

19  firm?

20          THE COURT:  I understand that Mr. Withers and

21  Mr. Wilson are the attorneys and Mr. Kaufman also.

22          MR. ITTLEMAN:  Mr. Withers filed a motion to

23  appear on behalf of the defendants.  I think it was denied

24  as the general magistrate indicated that in questioning

25  Mr. Withers that Mr. Withers may not have been here and he

1   wasn't sure what his status was with his employment.  So

2   I --

3            THE COURT:  You mean that you're not admitted pro

4   hac vice?

5            MR. WITHERS:  Of course I'm admitted.  I'm a

6   member of the bar here in this district.  I'm real --

7        The thing is when we had Magistrate Kelly here, Your

8   Honor, I was a nominee for the job of school board attorney

9   in Hernando county.  Magistrate Kelly said I'll let Valdez,

10  the former attorney in this case, let him out, if you will

11  represent that this won't slow down the trial.  I couldn't

12  do it at that time.  I can do it now.  Valdez should be

13  discharged.  The motion was to substitute me for him.

14           THE COURT:  Okay.  Anything else on that, though,

15  Mr. Ittleman?

16           MR. ITTLEMAN:  I don't have an objection to -- I

17  just wanted to know who was going to be lead counsel.

18           THE COURT:  Okay.  Well, am I correct, Mr. Kaufman

19  you're going to participate because you're a defendant and

20  an attorney admitted to the bar here, correct?

21           MR. KAUFMAN:  Yes.

22           THE COURT:  Mr. Withers and Mr. Wilson you're both

23  admitted to the bar?

24           MR. WITHERS:  We are.

25           MR. WILSON:  Yes.

1          THE COURT:  So there we have it.

2          MR. ITTLEMAN:  So lead counsel is --

3          THE COURT:  Mr. Withers.

4          MR. ITTLEMAN:  Yes, ma'am.

5          THE COURT:  All right.  We're set?

6          MR. WITHERS:  I think so.

7          THE COURT:  Okay.  We will -- when the juror's

8  come in, they'll will be seated number 1 2, 3, 4, 5 and 6 in

9  the first row, correct?  And number 1 will be closest to me

10 and then they will come in, number 15 will be behind number

11 6.  And they'll -- 15, 14, 13, down so that there seated in

12 that matter because when we have the charge conference,

13 which will take place up here, that's one of the few things

14 from the bench.  I just want to make sure that you know who

15 you're going to be directing your remarks to.

16         MR. ITTLEMAN:  Please the Court, my witnesses or

17 the plaintiffs are in the witness room.  They have two young

18 children, so please the Court I'd like to just bring the

19 witnesses in at this time.

20         THE COURT:  Of course.  I mean -- witnesses?  You

21 mean your clients?

22         MR. ITTLEMAN:  My clients.

23         THE COURT:  Your client.

24         MR. ITTLEMAN:  Well, I have two clients.

25         THE COURT:  Okay.  Tell me who's going to

```
 1  represent The Learning Center.
 2          MR. ITTLEMAN:  I have Mrs. Hasnain and
 3  Mr. Hasnain.
 4          THE COURT:  Okay.
 5          MR. ITTLEMAN:  Is the corporate representative of
 6  The Learning Connections.
 7          THE COURT:  Okay.  Mr. Hasnain is a named party.
 8          MR. ITTLEMAN:  Correct.
 9          THE COURT:  And Mrs. Hasnain is what?
10          MR. ITTLEMAN:  A corporate representative of the
11  Learning Connections.
12          THE COURT:  All right.  Why don't you come in.  We
13  will have them introduced, and then I'll adjourn, and get
14  the jury up here.
15          MR. ITTLEMAN:  Thank you.
16          THE COURT:  Good morning.  Mr. Ittleman, you want
17  to make the introductions?
18          MR. ITTLEMAN:  Yes.  This is Nadira Hasnain.
19          THE COURT:  How do you do.
20          MR. ITTLEMAN:  And this is Syed Hasnain.
21          THE COURT:  How do you do Mr. Hasnain.
22      All right.  Mr. and Mrs. Hasnain, I am going to adjourn
23  now because we have completed the pretrial matters, and
24  we're going to wait and see when the jury clerk is ready to
25  send the jury up.  So just stay close by and you will be
```

 1   introduced to the jury.  Are you going to be able to leave

 2   your children all right?  And Mr. Ittleman, stay close

 3   because I don't know when it will be.  It could be five

 4   minutes ahead of time.

 5            MR. WITHERS:  Yes.

 6       In terms of scheduling, Your Honor, the days

 7   proceedings we anticipate a break around noon for lunch.

 8            THE COURT:  Well, I try to give -- if I can select

 9   this jury without a break, it is far better to do that.  So

10   I might today depending on whether we get them up here, not

11   have a morning break, and I would like to let the jury out

12   by quarter of 12 so they can beat the downtown crowd and

13   then come back maybe 1:15 or 1:30.  The first day give them

14   a little bit longer.  Then we go to around quarter of three

15   and then I try to get them on the road by quarter of five.

16   But -- and then I stay with you all to see what if anything

17   we need to prepare for the next day.  Today we will be

18   talking jury instructions, but that changes.  If I have

19   someone on the witness stand that looks like that person's

20   just about finished, I don't want to take a break and make

21   that person stay.  So we will accommodate people as much as

22   we can.  Does that answer it?

23            MR. WITHERS:  Thank you, Your Honor.

24            THE COURT:  All right.  I will see you shortly

25   then.

```
 1                        (Recess)
 2           THE DEPUTY MARSHAL:  The jury's outside.
 3           MR. WITHERS:  Your Honor?  May we address one or
 4  two --
 5           THE COURT:  Quick, Mr. Withers.  The jury's here.
 6  No, go ahead.  Quick.  Quick.
 7           MR. WITHERS:  We have three corporations involved
 8  in testimony most likely.  I would like an instruction that
 9  we should specify when a question is asked about the
10  Learning Academy and that it be the plaintiff, not some
11  company with a related name.
12           THE COURT:  We will see.  You stated your concern
13  and we will see what the questions are, and if you need to
14  object, then certainly you may.  We're ready.
15                  Jury present -- 9:18 a.m.
16           THE DEPUTY CLERK:  Cheryl Simpson.  Miss Simpson
17  come right here to this nice hard seat.  I tried to get in a
18  soft seat.  It didn't work.  You can be seated too.  Just
19  make yourself at ease here.
20      Barbara Ward, Clinton Thomas, Suzanne Johnson, Beverly
21  Obaseki, Michael Dietrick, William Hathaway, John Mallinson,
22  Joshua Cemelich, Janice Tessari, Jane Sarricchio, Jessica
23  Gibson, Doreen Phillips, William Hernandez, Dorothy
24  Hollinger, Christopher Perry, George Graboski, David
25  Feaganes, Jessica Bergeron, David Peeples.
```

1            THE COURT:  Let's see, Mr. Perry.  If you could

2    move down one seat.  That was your first test today.

3        All right.  That's set.

4        Thank you, ladies and gentlemen.  Well, I understand

5    you had -- I worried last night when I got the weather

6    report.  It was going to rain and make it difficult for you

7    and apparently I didn't have to worry about that.  I needed

8    to worry about accidents and all kind of things going on out

9    there that made it more difficult for you.  So we're very

10   grateful you're here.  Thank you.

11       And I know it's a new experience for many if not all of

12   you.  I hope -- if you are annoyed at being asked to come

13   here and participate in this trial, which is a going to be a

14   jury trial and it's a civil case -- just put your fears

15   aside.  It's estimated to be a three day trial which in the

16   federal context we often have very long trials.  So if you

17   are selected for this trial, it will be three days.  And

18   which is -- not to say this isn't important.  It is an

19   important trial.  And I hope that if you are feeling

20   annoyance that you will put that aside and view it as a

21   serious of matter to be presented to you.

22       I think based on the experience that I have had with

23   other jurors that when you are concluded you will feel that

24   you really have made a contribution and you have -- our

25   jurors over here are very highly regarded and especially by

1   me.

2        I am Patricia Fawsett and I am a senior judge in the

3   Middle District of Florida.  The Middle District of Florida

4   is a one of three trial courts.  Ana may have told you, but

5   we have three federal trial courts in this state:  The

6   Southern District, the Middle District we reside in, and the

7   Northern District.  The middle district has five

8   courthouses:  Tampa, Fort Pierce -- Fort Myers, Ocala

9   Orlando and Jacksonville, thirty-five of the 67 counties of

10  state.  It's a huge district and a very, very active trial

11  district.

12       And then cases after they're decided in our Court

13  Middle District go to appellate court.  We have 12 appellate

14  courts in the United States and our is the 11th Circuit in

15  Atlanta.  And from there cases sometimes go to the United

16  States Supreme Court.  I have people seated right where you

17  are, who were jurors in cases that have made law throughout

18  the entire country.  It's really in some respects a both

19  exciting and thoughtful endeavor.

20       So let me introduce a few people on my staff and then

21  I'm going to get into some questioning and you will meet the

22  participants in the trial.  Sherri is my courtroom deputy

23  and she handles witnesses and documents and will put the

24  witnesses under either an oath or affirmation and generally

25  keeps things running here, reminds me when I'm getting off

 1   track for which I am grateful.  This is Sandy Tremel who is

 2   our court reporter, a fabulous court reporter, and she is

 3   taking down every word that is said in this proceeding, and

 4   at some point there may be a transcript made.  I might tell

 5   you that we do not provide jurors with transcripts in this

 6   Court during the trial because to do that Sandy would have

 7   to work all day here and then she would have to stay up most

 8   of the night.  I think it's three hours for every one hour

 9   of testimony.  And so we just don't do that in federal

10   court.

11       Our courtroom security over here is George Feorinza who

12   I think you met recently.  And my law clerk here is Laura

13   McDonald.  And this is her first trial which she has been

14   just waiting for and waiting for and waiting for it.  She's

15   a graduate of Florida State University.

16       All right.  Ladies and gentlemen, what I'm going to do

17   is have you placed under oath to start what we call the

18   questioning process, that is a fancy name, voir dire.  I'm

19   going to ask you a series of questions.  In no way am I

20   intending, I mean in no way to embarrass you, or if there's

21   something that you just don't feel that you want to speak

22   about in front of others.  I'll let you -- you can just tell

23   me and I'll let you write it to me. I'll share it with

24   counsel and parties, of course.  But the purpose of voir

25   dire is to find out your background and your life

```
 1   experiences and so forth so that the parties to this case

 2   can select a jury which they feel as a group will most

 3   fairly and impartially and without sympathy or prejudice

 4   listen to the evidence and apply to the evidence presented

 5   in the courtroom the law that I will give you and come to a

 6   fair verdict and result.

 7        So let me tell you that in the process for selection of

 8   the jury if you are not selected, please don't think it's

 9   because you said something wrong.  A lot of selection has to

10   do with the order in which you're seated.

11        Miss Simpson, you're number one.  You have much greater

12   probability of being selected than Mr. Perry does who's back

13   there.  And the computer did that.  So that's how that works

14   out.

15        All right.  Let me have the jury sworn, Sherri, and

16   then we will -- I'll give more instructions and we will get

17   started.  If you will stand and we will all stand for the

18   jury swearing.

19                        (Jury sworn)

20        THE COURT:  Thank you.  Please be seated.

21        Ladies and gentlemen, if any of you did not take that

22   oath, if you didn't answer in words in the affirmative, I

23   do, yes, I will, and so forth, would you raise your hand.

24        The record should reflect that all jurors have been

25   duly sworn to participate in the voir dire process.
```

```
 1        All right.  Ladies and gentlemen, this is how I'm going
 2   to handle the voir dire, the questioning.  I'm going to ask
 3   you a question, such as the one I just did, and if you have
 4   any information to give, if you will raise your hand.  Then
 5   I'm going to go row by row.  I'll call your name, put your
 6   hand down until I get everybody so the people in the back
 7   row or are not holding their hands up, and then I'm going to
 8   come back after I've gotten all the people who are going to
 9   answer the question, I will come back and ask follow-up
10   questions on the general question that I asked you.
11        If you do have information to give, please hold your
12   hand up so I can see it, and don't put it down until I have
13   called your name.  If you did not raise your hand -- is
14   there a problem?
15             UNIDENTIFIED PERSON:  No.
16             THE COURT:  Okay.
17        If you do not raise your hand, then the record's going
18   to reflect that you had no information to give in the
19   matter.
20        So if you don't raise your hand, I move to another
21   subject and you remember, oh, gosh, I was in a lawsuit or
22   litigation or something like that I forgot to say it, raise
23   your hand.  The point is to get the information out, and you
24   know, it's human nature sometimes to forget things and
25   there's certainly no problem with that.
```

1       I'm going to have to ask you to help me with the

2   pronunciation of your names so I can make you comfortable in

3   that regard.  I also would like to try to get the jury

4   selected before we have to take a break, but if at any time

5   you feel you need to take a break, no problem at all.  Just

6   raise your hand, we will take a break.  We will all come

7   back and get going.

8       If we do have to take a break, please do not discuss

9   the case in any way when you are on break because when the

10  jury is a selected they will be told that they may not

11  discuss anything about the case until they're told to retire

12  and begin their deliberations as a group, as a whole jury.

13      So let me tell you that we appreciate your presence.

14  Thank you so much for being here with us, and let me get to

15  the business of the day.

16      Ladies and gentlemen, the case to be tried here

17  involves several parties.  The plaintiffs are The Learning

18  Connections -- almost got it correct -- The Learning

19  Connections, Inc. and Syed Hasnain, an individual, and the

20  defendants are Jeffrey S. Kaufman who is an attorney, and

21  Kaufman Englett and Lynd, PLLC, which was formally known as

22  Kaufman Englett and Lynd LLC.

23      So those are the parties in the case, and you're going

24  to get to meet them in just a moment.

25      Let me go through some preliminary matters.  First of

1   all, this is a civil case.  It is not a criminal case.  A

2   civil case.  And the burden of proof is on the party making

3   a contention.  The party making the contention has to prove

4   that contention by the greater weight of the evidence or the

5   preponderance of the evidence.  So that if you had scales

6   the party making the contention of the claim, it could be a

7   defense or it could be the complaint by the plaintiff, the

8   party making the contention must prove the contention by a

9   preponderance of the evidence making the scales tip in favor

10  of that party.

11      I go to lengths to explain this to you because you may

12  have heard in criminal cases how the proof is beyond and to

13  the exclusion of a reasonable doubt.  That is not the

14  standard in a civil case.  In a civil case the party making

15  the claim or contention must prove that claim or contention

16  by the preponderance of the evidence.

17      Let me ask to begin with if any you ever served on a

18  jury before.  Have you -- if you would raise your hands --

19  and this will be my -- have you ever been on a petit jury,

20  you know, a trial jury, or a grand jury in a state or

21  federal court?  All right.  Let me call the names.  When I

22  call your name, you can put your hand down.

23      Miss Hollinger and Mr. Hernandez.

24      Just a moment.  I'll get everybody's name and ask you a

25  follow-up question.  So Mr. Hernandez you can put your hand

1   down.  Miss Sarricchio, all right.  And Mr. Mallinson.  And

2   Mr. Hathaway, did you have your hand up?

3          THE JUROR:  No.

4          THE COURT:  In the back row no one.  On the front

5   row.  Let me find out where and when you served.  Was it a

6   criminal or civil case, and let me know if you reached a

7   verdict.  You don't need to tell me what the verdict was.

8   Miss Hollinger, we will start with you.

9          THE JUROR:  I served 17 times.  I served on all

10  forms including grand jury, only two ever made it to

11  deliberation.

12         THE COURT:  All right.  You served 17 times?

13         THE JUROR:  Yeah.

14         THE COURT:  Were you called 17 times?

15         THE WITNESS:  I have been called 35 times.

16         THE COURT:  Okay.  So you actually served criminal

17  and civil both?

18         THE JUROR:  Here and Miami.

19         THE COURT:  Okay.  All right.  And were verdicts

20  reached you said.

21         THE JUROR:  In two only.  All the rest of them

22  ended up plea bargaining or settling out.

23         THE COURT:  Or settling.

24         THE JUROR:  Yes, never find out.

25         THE COURT:  Okay.  Thank you.  Mr. Hernandez?

```
 1              THE JUROR:  Yes.  On city court in New York.

 2              THE COURT:  What kind of case was it?

 3              THE JUROR:  It was both civil and criminal.

 4              THE COURT:  All right.  Involving?

 5              THE JUROR:  One was tenant dispute, another one

 6     was I don't recall exactly.  But they dismissed us and never

 7     told us what happened.

 8              THE COURT:  Okay.  Same thing happened to you

 9     then.  All right.  Thank you.  Ms. Sarricchio?  I told you I

10     don't know that we need that mic.  Let's try without it

11     and -- because it's going to hold up this process.  If

12     somebody in particular needs it we will use it.  Ms.

13     Sarrichio.

14              THE JUROR:  I served on a grand jury in Maryland

15     and I served on a civil court proceeding in Texas.

16              THE COURT:  And what was the Texas case about?

17              THE JUROR:  In Texas?

18              THE COURT:  Texas.

19              THE JUROR:  It was about a hospital being sued by

20     a patient.

21              THE COURT:  All right.  Was there a verdict in the

22     case?

23              THE JUROR:  Yes.

24              THE COURT:  All right.  Thank you so much.

25          And Mr. Mallinson?
```

```
 1           THE JUROR:  Served on a jury in Orange County

 2  early 80s.  It was a criminal trial, murder, and it was a

 3  verdict reached.

 4           THE COURT:  Okay.  All right.  Thank you so much.

 5      All right.  Let me get a little case specific here and

 6  have some introductions.  This case involves a -- the

 7  plaintiffs are asserting a claim of legal malpractice and a

 8  claim of negligence failure to supervise, and the defendants

 9  are asserting that -- the defendant's deny the claims and

10  the defendants are asserting defenses of failure to mitigate

11  and negligence of plaintiffs and the statute of limitations

12  asserting it would bar the plaintiffs' claim.  The case

13  revolves around a foreclosure of a property that the

14  plaintiffs were involved in in the engagement of the

15  attorneys with reference to that foreclosure proceeding.

16  The case actually I believe is centered in Tennessee.  Is

17  that correct?  Where the land was located?

18           MR. ITTLEMAN:  Yes, ma'am.

19           THE COURT:  All right.  So my first question is,

20  if any of you have knowledge of this case.  Have you heard

21  about it or read about it or seen anything or had a neighbor

22  that mentioned it to you or overheard a conversation.  If

23  you have would you raise your hand if you know anything

24  about this case.

25      All right.  Thank you.
```

1      First off, I'm going to ask the attorneys to stand and

2   introduce themselves, then introduce their client or client

3   representatives seated with them.

4          MR. ITTLEMAN:  Good morning, ladies and gentlemen.

5   My name is Geoffery Ittleman.  I represent the plaintiffs.

6   The plaintiffs are the Learning Connections and Syed Hasnain

7   to my left is Mr. Hasnain, and with any corporation there's

8   a person that would be the designated person on behalf of

9   the corporation.  So we have designated Mrs. Hasnain as that

10  person who's the designated person on behalf of the Learning

11  Connection, and Mrs. Hasnain is to my right.

12         THE COURT:  All right.  Thank you.  And

13  Mr. Withers?

14         MR. WITHERS:  Thank you, Your Honor.

15      My name is Richard Withers.  I represent both the law

16  firm of Kaufman, Englett and Lynd and Mr. Jeff Kaufman who

17  is the one of the principal partners of that firm.

18         THE COURT:  All right.  Thank you.  And your

19  counsel behind you?

20         MR. WITHERS:  Yes.  Excuse me.  This is Curtis

21  Wilson, Your Honor.  Curtis is a new admitting to this Court

22  and this is his first trial.

23         THE COURT:  Okay.  Thank you very much.

24      All right.  Ladies and gentlemen, do any of you have or

25  your family members or your close friends know or have any

1   relationship with -- such as social or business -- know or

2   have any relationship with any of the attorneys or the law

3   firms or the persons who have been introduced to you?  If

4   you would raise your hands if you know.  Of course, you

5   know, when I ask you about family members or close personal

6   friends that you know.

7       All right.  Ladies and gentlemen, there are two

8   corporations involved here.  And I want to state up front

9   that under the law a corporation is a person.  It's treated

10  equally to a human being.  The law applies equally to a

11  human being as to a corporation, and there's no difference.

12  That will be something that the jurors will be expected to

13  apply when they apply the law to the facts.

14      And also Mr. and Mrs. Hasnain are from Bangladesh.  Is

15  there anyone who feels that he or she would not able to be

16  fair and impartial as a juror because of the origin of the

17  individual plaintiffs?  If you have any pause about that,

18  would you raise your hand, please.

19      All right.  Thank you.

20      I'm going to ask the attorneys to state the names of

21  the witnesses that they think they will call in the case for

22  purposes of asking you if you know or have any relationship

23  to them.  Mr. Ittleman will go first and then I have asked

24  Mr. Withers not to repeat names but they may call these

25  witnesses, and one party may name a witness and the other

1   person call it or maybe the witness won't even be called.

2   So if you will listen to the names of the witnesses and then

3   I'll ask you questions about whether you have any

4   association with them.  Mr. Ittleman.

5           MR. ITTLEMAN:  Yes, ma'am.  We're going to

6   probably or definitely going to be calling Syed Hasnain.

7   Also the corporate representative of the Learning

8   Connections which is going to be Nadira Hasnain.  Another

9   gentleman, his name is Trey Cain, he is an attorney in

10  Tennessee.  He's going to be called.  And the fourth

11  individual that's going to be called is Aurelio Piedra, a

12  CPA in Miami.

13          THE COURT:  Okay.  Thank you.  Mr. Withers?

14          MR. WITHERS:  Thank you, Your Honor.  Your Honor,

15  we will call Mr. Kaufman as a witness and in addition we

16  will call Christopher Hunt and we will probably call a lady

17  by the name of Kerry Adams.

18          THE COURT:  All right.  Ladies and gentlemen, do

19  any of you know or have any relationship with or have a

20  close personal friend involved with to your knowledge any of

21  the proposed witnesses?  You're related by blood or by

22  marriage by any kind of familial relationship to any of

23  witnesses would you raise your hand.

24      All right.  Thank you.

25      Do any of you know any other members of the jury panel

```
 1  before you came here?  Do you have any relationship?

 2      Let me ask if any of you have ever owned a small

 3  business.  Miss Simpson and I'm sorry -- Mr. Johnson,

 4  Mr. Deitrick, Miss Hollinger, is it Cemelich?

 5              THE JUROR:  Cemelich.

 6              THE COURT:  Thank you.  Mr. Hathaway.

 7              THE JUROR:  Yes.

 8              THE COURT:  Okay.  Back row, Mr. Perry.  Thank

 9  you.

10      All right.  Miss Simpson, when and what kind?

11              THE JUROR:  In Maine, it's an entertainment

12  complex.  We started out building houses and stuff like that

13  and so still have a development company and then the

14  entertainment complex is still a thriving business.  And I

15  got divorced three years ago, so I'm still part owner.  In

16  the divorce, the business up there, we sold it once, then

17  they had foreclosure on that and we had to take it back and

18  go through all that for two-and-a-half years, and so I'm

19  still in that.

20              THE COURT:  So did you have a small business loan

21  on the property?

22              THE JUROR:  Yes, at one time, yes.  But that was

23  all paid off.

24              THE COURT:  All right.  Thank you.  And Ms.

25  Johnson?
```

```
 1            THE JUROR:  Just in 1980 I had my own business
 2  doing computer software support for about a year.
 3            THE COURT:  All right.  Did you have any loans
 4  incident to the business?
 5            THE JUROR:  No.
 6            THE COURT:  And Mr. Deitrick?
 7            THE JUROR:  Yes.  I'm sorry.  Twenty years a
 8  wholesale in west Orlando.
 9            THE COURT:  Do you still own the business?
10            THE JUROR:  No.  We closed up in '07.
11            THE COURT:  Okay.  Did you have a small business
12  loan --
13            THE JUROR:  No.
14            THE COURT:  -- for that?  Thank you.
15       Miss Hollinger?
16            THE JUROR:  I own an escort service for oversize
17  load currently.  We have no loans.
18            THE COURT:  Okay.  Thank you.  Mr. Cemelich?
19            THE JUROR:  I own an online clothing company and I
20  have no loans.
21            THE COURT:  Okay.  Thank you.  Mr. Hathaway?
22            THE JUROR:  I run my own computer consulting
23  business and I don't have any loans.
24            THE COURT:  Okay.  Thank you.  And Mr. Perry?
25            THE JUROR:  I have a concrete company and I don't
```

```
 1  have any loans.
 2          THE COURT:  Okay.  All right.  Miss Hollinger -- I
 3  mean Miss Simpson, you mentioned this but let me ask
 4  everybody if any of you ever been involved in a foreclosure
 5  proceeding either yourself or a business or just in any way
 6  you have been involved in a foreclosure proceeding.  If you
 7  would raise your hand.  Miss Simpson and Miss Ferguson --
 8  Bergeron is that how you pronounce it?
 9          THE JUROR:  Bergeron.  Yes.
10          THE COURT:  Thank you.  I thought you were being
11  nice to me.
12      All right.  Did I get everyone?  I think I did.
13      Miss Simpson, this was the one that you just described
14  or were there more?
15          THE JUROR:  Yes, the one.
16          THE COURT:  Just the one that I just -- did that
17  end in a matter you felt satisfactory or not?
18          THE JUROR:  I got a divorce over it.
19          THE COURT:  Oh, gosh.  All right.  Well, I'm not
20  going any further there.
21      So Ms. Bergeron?
22          THE JUROR:  A home.  Our home.
23          THE COURT:  Your home.  And is that completed
24  or --
25          THE JUROR:  Yes, it's completed.
```

```
 1              THE COURT:  All right.  Thank you.

 2         Let me ask if any of you or family members or close

 3    personal friends have ever filed a complaint against an

 4    attorney or a law firm for malpractice?

 5         Ladies and gentlemen, have any of you been involved as

 6    a party or a witness in a legal proceeding or a lawsuit?

 7    Let me explain this question a little bit because I want it

 8    to be broadly viewed.  I would include of course criminal or

 9    civil cases in a courtroom, but you might have gotten a

10    subpoena not actually testified or you might have given a

11    deposition and not actually testified in the courtroom.  You

12    may have been involved in some sort of an administrative

13    hearing such as an arbitration or a mediation, workers'

14    comp, social security.  I just -- I want this broadly

15    addressed.  And although I'm not getting uncontested

16    divorces and adoptions, they're usually legal proceedings

17    also.  So just with that jogging your memory a little bit,

18    have any of you been involved as party or a witness in a

19    legal proceeding or a lawsuit?

20         Miss Simpson, I have you down already.

21         Let's see.  Ms. Johnson, Ms. Obaseki and Mr. Dietrick.

22    Thank you.  Mr. Hernandez.  Let me get the other people

23    first then I'll come back to you.  Miss Bergeron.  And

24    Mr. Feaganes.

25              THE JUROR:  Like Reagan.
```

```
 1            THE COURT:  It's so easy and it looks so hard.
 2   Thank you.  All right.
 3       I would like to know what kind of proceeding it was and
 4   give me an idea of when and where it occurred and I may have
 5   some other questions to follow-up.
 6       Miss Simpson, is that the same suit you told us about?
 7            THE JUROR:  Yes.  Basically they're all within the
 8   same.
 9            THE COURT:  Was this you had purchasers of the
10   business and they defaulted?
11            THE JUROR:  My ex-husband had sold the business to
12   another party, the building and the three businesses that
13   was in the building to them.  Three years later it came to
14   light that there was no taxes, no -- nothing was paid.
15   Nothing was ever paid and we got all the things because we
16   still had title to the --
17            THE COURT:  So you foreclosed.
18            THE JUROR:  Yeah.  The lawyers foreclosed on us.
19   I was not involved in none of the stuff because I get too
20   emotional and stuff.  So they kept me basically out of it,
21   but through the thing my husband and I did not agree on how
22   it could be our responsibility to pay all this.
23            THE COURT:  And you and your ex-husband now have a
24   property back.
25            THE JUROR:  We now have the property and I still
```

```
 1   have part of it that I get an income from.

 2           THE COURT:  Okay.  Thank you.  Ms. Johnson?

 3           THE JUROR:  I was just in a divorce proceeding

 4   back in the 80s.

 5           THE COURT:  Uncontested?

 6           THE JUROR:  Well, it was contested.

 7           THE COURT:  And is it completed?

 8           THE JUROR:  Oh, yeah.

 9           THE COURT:  Thank you.  And Ms. Obaseki.

10           THE JUROR:  Yeah.  I currently have a case in the

11   United States District Court of Washington, D.C.  It's an

12   employment matter.

13           THE COURT:  Okay.  Is it a federal labor standard

14   or what?

15           THE JUROR:  EEOC.

16           THE COURT:  All right.  Thank you.  And

17   Mr. Dietrick?

18           THE JUROR:  I was in a lawsuit about a bad

19   business deal and I got a judgment against a corporation.

20           THE COURT:  Okay.  It was a deal, an investment of

21   yours?

22           THE JUROR:  Yes.

23           THE COURT:  Okay.  Thank you.  And Mr. Hernandez?

24           THE JUROR:  Too numerous to name, Your Honor.  I'm

25   a retired police officer 26 years, so I have done --
```

```
 1              THE COURT:  A lot of testifying and --

 2              THE JUROR:  And lot of -- yes.

 3              THE COURT:  All right.  Thank you.  Where did you

 4    serve?

 5              THE JUROR:  In New York and New Jersey for the

 6    Port Authority police.

 7              THE COURT:  Miss Bergeron?

 8              THE JUROR:  A divorce in 80s and child support.

 9              THE COURT:  Was it a contested divorce?

10              THE JUROR:  No.

11              THE COURT:  But child support, was that contested?

12              THE JUROR:  Yes.

13              THE COURT:  Okay.  And is it completed now?

14              THE JUROR:  Yes.

15              THE COURT:  Okay.  Thank you.  Mr. Feaganes.

16              THE JUROR:  Civil trial, defendant to -- as a

17    plaintiff and the bottom line I was the wrong person to

18    start with and asking on Judge Judy to get some money out of

19    it.

20              THE COURT:  Really?  These were civil cases?

21              THE JUROR:  Yes.

22              THE COURT:  And were you the plaintiff in them?

23              THE JUROR:  First one I was the defendant,

24    restraining order.  Very difficult, had to get an attorney

25    because the potential criminal charges with that were very
```

1    serious, and the person who drew up the restraining order

2    did not do their homework very well.  There was more than

3    one David on my street.  So it was total nightmare.  Did not

4    come to my total satisfaction but the judgment did.  It was

5    a potential charge of capital aggravated sexual battery on a

6    minor, and I had nothing to do with it, but yet I have a

7    record now with a similar county and I'm not in jail.

8            THE COURT:  Okay.  And but the civil case, what

9    did they involve?

10           THE JUROR:  The one with restraining order because

11   of that and the civil cases was to get restitution from the

12   young lady who was basically judgment proof, so I had to go

13   to Judge Judy route to get something out of to clear my name

14   which they ended with a sealed record.  Since it was not a

15   criminal charge I was not able to get my record wiped

16   completely.  The Judge said you opened a large can of worms

17   to expunge me from the trial.  The civil cases would be --

18   he said would flood the courts with the complaints.  And so

19   I'm an innocent bystander to something that was going on,

20   but yet I have had damage out of the deal.

21           THE COURT:  Well, let me ask you, do you feel if

22   you have -- you were asked to serve on this case that you

23   could be a fair and impartial juror?

24           THE JUROR:  Yes.

25           THE COURT:  Okay.  And any of the others of you

1   whom -- with whom I've spoken about the lawsuits you have

2   been involved, do any of you feel that you couldn't be fair

3   and impartial if you were a juror on this case?  If you feel

4   you couldn't, would you raise your hand.

5        All right.  Thank you.

6        I hate to ask this question especially since I'm

7   getting old, but I have to ask it, and that is if any of

8   have you a physical impairment or a special disability or

9   problem that would make it difficult to impossible for you

10  to serve as member of the jury.  From observing you, I don't

11  think any of you fall into that category, but I should ask

12  the question.  If you do, would you raise your hand.

13       All right.  Thank you.

14       The case is expected to take three days to try, and I

15  will do my best not to waste your valuable time.  I'll keep

16  the attorneys from conferences.  I don't like benches

17  conferences during the trial.  I feel that you're here to

18  work and we should present it to you what is to be

19  presented.  So that is my hope for conducting this case, but

20  three days to try.  I'm not asking for jury excuses because

21  I'll note every single person on the panel has something

22  else that you probably would prefer to be doing today rather

23  than come over and meet us because if there's something

24  untoward, extraordinary, you're going in for surgery

25  tomorrow or something really unique that if you look at the

1  left and right and explained it to the people seated on

2  either side of you they would say, yes, you should go and I

3  should stay, do any of have anything untoward of that nature

4  that would interfere with your service for three days here?

5  If you would raise your hand.

6      Thank you.

7      Now, if you are selected to be jurors in this case you

8  will be directed to render your verdicts solely on the

9  evidence presented in this courtroom and to apply to that

10 evidence the law that I give to you.  You will be expected

11 to disregard any ideas or notions about what you thought the

12 law was or should be in reaching your verdict, and you will

13 be expected and required to apply the law that the Court

14 gives you to the evidence presented here in reaching your

15 verdict.  Is there anyone who will not do that?  If you

16 raise your hands if you will not do that.

17     This is -- coming into the courthouse in some ways is

18 stepping back in time and I now find that I have to tell

19 jurors they can't blog about the case and they can't twitter

20 and tweet and get on Facebook and so forth because during

21 the course of the trial you're expected just to listen

22 individually to the evidence and then wait to discuss it

23 until everybody is present.  So I just give that as a

24 caution to you.

25     I have tried to reach matters that might affect your

1    ability to serve fairly and impartially and without

2    prejudice or sympathy in these questions, but if I have

3    missed something is there anything that you know of that

4    would make it -- make you unable to serve on a jury fairly

5    and impartially in this case, if you will raise your hands

6    if I haven't addressed it.

7        All right.  I'm going to use the mic now.  What I'm

8    going to do is ask you to stand individually and give some

9    information.  Do you have that card that we use, Sherri?

10   Give it to Miss Simpson.  Do not worry if you get nervous

11   talking in front of people, we will pull you through this if

12   you get stuck somewhere, but I'd like for you to give the

13   people who are seated here at counsel table your name and

14   the area where you reside.  You don't have give your actual

15   resident address.  If you are working, if you give us your

16   occupation.  And if you're retired if you tell us what you

17   did before retirement.  If you're married, if you tell us

18   the occupation of your spouse or if your spouse's retired.

19   I'd like to know a little bit about your education and any

20   special training you may have had.  And if you have children

21   if you just give us the name and it's range of their ages:

22   Four children, ages 29 to 44, and so forth.

23       Again, please do not be nervous about this.  I will

24   help you.  We will go down the row back up this way and that

25   way.  So Miss Simpson, we will start with you.  I have to

```
 1   use the mic.  You don't have to.  That's really -- if you
 2   will stand and address the people in front of you there.
 3             THE JUROR:  My name is Cheryl Simpson.  I reside
 4   in Titusville, Florida.  I'm retired and that's mainly
 5   through a divorce.  We had owned construction companies
 6   started out doing small construction, then went into
 7   building million dollars homes and things like that there,
 8   and opened a billiard hall because it was something my ex
 9   really enjoyed was billiards.  He played with a lot of
10   professional pool players and stuff in his life.  So we
11   opened a big class A one that was very well known up in New
12   England, and then went into entertainment complexes which
13   have movie theaters, restaurants, bars, and billiards in
14   them.  We had three of those.
15       And then come through things like the foreclosure and
16   stuff the business after 20 years of owning those.  We left
17   in -- come to Florida for a winter, went back and built a
18   house there on the lake, then ended up taking back one of
19   the businesses there because of the guy not paying the
20   things.  And I'm one of these people I have to see things
21   and I ask.  As my ex-husband say you always ask a question
22   that never has an answer.  And I know the answer to every
23   question.  So that was where we were on that stuff there and
24   took the businesses back over, and then I came to Florida
25   after the divorce there and lived down here.
```

45

1      We had four children.  Two I had and two that he had

2  had by a previous marriage.  I had three of them in diapers

3  when I got them and just get home from having our fourth.

4  So that's why I had three.

5           THE COURT:  What is the range in their ages?

6           THE JUROR:  The oldest is 40 and the youngest is

7  34 now.  I have seven grandchildren and a new one coming in

8  August.

9           THE COURT:  And your educational background?

10          THE JUROR:  I went to as far as high school.  I

11  hold -- still hold a real estate license in the state of

12  Maine.  I did real estate for six years and was in the

13  million dollar club.  And I have done restaurant work.  I

14  have run full size restaurants and movie theaters, those

15  things.  And I'm basically familiar with a lot of different

16  things.

17          THE COURT:  Thank you.  If you will pass that mic

18  and that card to Miss Ward.

19          THE JUROR:  My name is Barbara Ward.  I'm married

20  46 years.  I reside in south Orlando.  I was school bus

21  driver and my husband is retired land surveyor.  New York

22  land surveyor.  I have three daughters, 39 to 46.  One is a

23  religious -- not a catholic nun -- and I had some college.

24          THE COURT:  Thank you.

25          THE JUROR:  I'm Clinton Thomas.  I live in St.

 1   Cloud, Florida.  I'm a finance manager with the parks and

 2   resorts.  I'm married.  My wife is a stay-at-home mom.  We

 3   have one child, a son who is eight and a half.  And I have a

 4   degree in finance from University of Central Florida.

 5           THE JUROR:  My name is Suzanne Johnson and I live

 6   in Merritt Island Florida.  I'm currently a program manager.

 7   I work at home for a software consulting company.  And I'm

 8   single, been single since 1980.  I have a daughter who's 38,

 9   soon to be 38, I guess, and she's got three boys and they

10   live in Cincinnati.  They left the Space Coast because of

11   the shuttle program shutting down.  And I have master's in

12   computer science from Stanford.

13           THE JUROR:  Good morning.  I'm Beverly Obaseki.  I

14   live in Orlando, Florida.  I work at Whitcliff Bible

15   Translators here mainly doing administrative work.  I have

16   an undergraduate agree.  I have a master's degree in

17   business.  I have been married for 27 years.  I have three

18   children ages 21 to 27.  My husband has an at-home business,

19   online businesses, and I gave you my educational background.

20           THE COURT:  That covered it.  Thank you.

21           THE JUROR:  My name is Mike Dietrick.  I live in

22   West Orlando, currently unemployed.  My fiance works at

23   Valencia.  She's been there 30 some years.  She's ready to

24   retire.  I have got one child, 29.  He's doing well.  He's

25   get a college education.  I did not.

```
1              THE COURT:  All right.  Is she a teacher?

2              THE JUROR:  She's in the finance department.

3              THE COURT:  What was your career prior to the

4   present time?

5              THE JUROR:  Myself?  I was in the car business all

6   my life.

7              THE COURT:  Okay.  Thank you so much.  If you will

8   pass that behind you to Mr. Hathaway.

9              THE JUROR:  I reside in Seminole county.  I built

10  my own business up from the ground.  I do computer

11  consulting and that kind of stuff.  Spouse's occupation, she

12  works at local 389 musicians.  We do not have any children.

13  College education and mostly self trained.

14             THE JUROR:  My name is John Mallinson.  I live in

15  Seminole County.  I work as a project accountant for an

16  engineering firm.  My wife is retired.  She's a former

17  circulation manager.  We have no children.  I have a college

18  degree.

19             THE JUROR:  My name is Josh Cemelich.  I live in

20  Deland.  I'm a small business owner since 2008 with my wife

21  who's recently left the business to go back to school

22  full-time.  I also deliver pizza to supplement my income.  I

23  have no children.  I have a bachelor's degree in Christian

24  studies.

25             THE COURT:  Your small business involved --
```

```
 1            THE JUROR:  It's an online clothing retail.

 2            THE COURT:  Okay.  Thank you.

 3            THE JUROR:  My name is Janice Tessari.

 4            THE COURT:  Miss Tessari, we cannot hear you.  If

 5  you will turn the mic on that will make it easier.  I don't

 6  want to make you strain.

 7            THE JUROR:  Yes, my name is Janice Tessari.  I

 8  live --

 9            THE COURT:  Could you go help her.  It's at the

10  bottom I think, but let me -- Sherri help you.  It's hard

11  for people with soft voices to project in this room.  I

12  don't want to you strain.

13            THE JUROR:  My name is Janice Tessari.  I live in

14  Brevard County.  I work in elementary school with special

15  needs children.  I have two children 26 and 24.  And I have

16  some college.  Is that loud enough?

17            THE COURT:  I think we heard you.  And do you have

18  a spouse?

19            THE JUROR:  I do not.

20            THE COURT:  Okay.  Thank you.

21            THE JUROR:  My name is Jane Sarricchio.  I live

22  In Daytona Beach.  I'm a RN.  I'm not married.  I have three

23  grown children, 37 to 32.  I have an associate's degree.

24            THE JUROR:  My name is Jessica Gipson.  I live in

25  Melbourne, Florida, but I'm a kindergarten and first grade
```

1  teacher in Titusville.  Not married.  No children.  And I

2  have a bachelor's degree from University of Florida.

3            THE JUROR:  Doreen Phillips.  I reside in

4  Kissimmee.  I retired from the city of Kissimmee fire

5  department.  I have a husband.  Three boys ranging from 42

6  to 36.  24 years of marriage.  I have six grandchildren.  I

7  have -- I'm graduated from high school.  I have some

8  college.

9            THE COURT:  Thank you.

10           THE JUROR:  I'm William Hernandez.  I live in

11 Seminole County.  I was a police officer with the Port

12 Authority of New York and New Jersey for 26 years.  After

13 9-11 I retired.  My spouse was a teacher.  She's also

14 retired.  I have four children.  Two girls and two boys

15 ranging from 35 to 28.  My education is bachelor's degree in

16 criminal justice and also a post graduate work, and that's

17 it.

18           THE COURT:  Thank you.

19           THE JUROR:  My name is Dorothy Hollinger. I live

20 in Port St. John.  I am currently an escort for oversize

21 loads.  My husband is a driver for oversized.  I have a

22 daughter that's going to be 30.  I have multiple degrees in

23 holistic science and natural medicine.

24           THE JUROR:  My name is David Peeples and I live in

25 Seminole County.  Currently I'm unemployed.  I have worked

1  in the electronics industry off and on for about 10 years.

2  Going to be laid off quite a bit, though, with the economy.

3  I have also worked in the printing industry and the grocery

4  store industry.

5       Currently single.  I don't have any kids right now.

6  Education, I have a high school diploma and working on a

7  double A degree.  I'm in that area where I'm trying to

8  decide which degree to get, which way to go.

9            THE COURT:  Thank you, Mr. Peeples.

10            THE JUROR:  My name is Jessica Bergeron.  I live

11  in Seminole County.  I work doing administrative work for a

12  construction company.  My husband is also works for -- in

13  construction.  He's a subcontractor.  We have -- we have

14  been married 15 years.  We have four children ranging from

15  the age 12 to 19.  And I have a four year college degree,

16  bachelor of business administration.

17            THE JUROR:  I'm David Feaganes.  I live in south

18  Orange County.  I'm an install technician for Pepsi Cola.

19  My wife is a part-time child care provider for a housewife.

20  My children range from 14 to 25.  And I have an associates

21  degree in maritime science.

22            THE JUROR:  George Graboski.  I live in Seminole

23  County.  I'm a registered nurse, at home care.  Graduate of

24  Penn State University.  And working on my masters.

25            THE JUROR:  My name is Chris Perry.  I live in

1    Melbourne, Florida.  I'm a billing accountant for the City

2    of Cocoa.  I also manage a Blockbusters as a supplement to

3    my income just for extra.  My wife is in property

4    management.  I have two kids, ages 4 and 6.  I have a degree

5    in IT.

6              THE COURT:  Thank you.

7         If you just pass that back and George will pick it up.

8    If you will turn the podium around.  Okay?

9         Counsel, do you have any questions you want me to ask

10   before I turn the podium over?  No?  All right.

11        Ladies and gentlemen, I'm going to give the attorneys

12   each the opportunity to ask follow-up questions.  They

13   should not repeat questions I have asked, but they may

14   certainly ask questions in areas they feel that perhaps I

15   missed or they want to follow-up and develop more

16   thoroughly.

17        So Mr. Ittleman, we will start with you if you have

18   any.

19             MR. ITTLEMAN:  We talked a little bit about the

20   fact this case is about a foreclosure defense issue.  Do you

21   think that just because a bank sends out a foreclosure

22   notice that the bank is always entitled to take your house

23   or property?

24        In other words, just because a bank says we're going to

25   foreclosure on your property, does that automatically -- do

```
 1  you think that would automatically entitle the bank to take
 2  your property?
 3       Anyone?
 4          THE COURT:  Just a moment, Mr. Ittleman.  We need
 5  to have a name before a voice speaks, so you need to ask for
 6  hands or something so we can get the record protected.
 7  Mr. Hathaway had just started speaking.
 8          MR. ITTLEMAN:  Thank you.  Mr. Hathaway?
 9          THE JUROR:  Yeah.  I mean if you're getting it in
10  the mail, obviously you're getting it because you're not
11  paying your bills on time.  So yes, I would say they can
12  foreclose on your property.
13          MR. ITTLEMAN:  Anyone else have any comments about
14  that question?
15          THE JUROR:  Do I thing a due process --
16          MR. ITTLEMAN:  Mr. Mallinson?
17          THE JUROR:  That's correct.  I think there's a due
18  process to it.  I think that what we've seen lately in the
19  news about the real estate and this kind of thing means it's
20  not a forgone conclusion.
21          MR. ITTLEMAN:  Anyone else?
22       Let me ask you a question about we have two kind of
23  different statements from Mr. Hathaway and Mr. Mallinson.
24  I'm going to ask if you want you can raise your hands, does
25  anyone agree or disagree with Mr. Hathaway's statement that
```

```
 1   typically a bank would be entitled to foreclose if they --
 2   if they're sending you notice that they want to foreclose?
 3   And you can raise your hands.
 4            THE COURT:  Well, what particularly is the
 5   question -- what is the question?  So they know.
 6            MR. ITTLEMAN:  Does anyone else agree with
 7   Mr. Hathaway's statement or his opinion that if a
 8   foreclosure notice is sent out that that typically means you
 9   owe the bank money and that's -- the bank is entitled to
10   foreclosure on someone's property?
11       Okay.  Miss Ward, you raised your hand.
12            THE JUROR:  Yes, I agree.
13            THE COURT:  You agree with Mr. Hathaway?
14            THE JUROR:  Yes.
15            MR. ITTLEMAN:  Does anyone disagree with that
16   statement?
17       Okay.  Does anyone want to express their opinion as far
18   as why they disagree with that statement?  Cheryl?
19            THE JUROR:  Well, sometimes there's mistakes made.
20   Sometimes there's circumstances that come up that has people
21   go into foreclosure and stuff and then there's -- or why
22   they didn't make a payment or something like that.  There's
23   just different circumstances to different things.  So it has
24   to be heard out on why.  As far as somebody just coming
25   right in and saying no if and/or buts, this is the way it
```

 1   is, I don't think that's right.

 2          MR. ITTLEMAN:  Okay.  Anyone else?  Sir?

 3   Mr. Hernandez?

 4          THE JUROR:  Due to procedural differences, like I

 5   remember hearing in a story in the news in reference to Bank

 6   of America refinancing the same client and the first Bank of

 7   America loan foreclosed on the second to Bank of America

 8   number 2.  So, you know, there should be some kind of

 9   procedure as to get to that point where they can foreclose

10   physically on you, not just sending you a notice.

11          MR. ITTLEMAN:  Anyone else.  Jessica?

12          THE JUROR:  I think it would be a combination

13   of --

14          THE COURT:  Just a moment.  We use formal names

15   here.  That's Miss Bergeron, number 17.

16          THE JUROR:  I'm thinking it would probably be a

17   combination of what a few people have said and that it's a

18   notice was sent, there's usually a reason it was sent.  It

19   would need to be followed by the due process of some sort,

20   even that though third might be real reasons, extenuating

21   circumstances.  It still may be a real thing that happened

22   from the bank's perspective.  So I think it would probably

23   be a combination of what many people here have said.

24          MR. ITTLEMAN:  So you will want to hear both

25   sides, what the letter's position was and what the person

```
 1   that they're sending it to is as well.

 2            THE JUROR:  Yes.

 3            MR. ITTLEMAN:  And you're nodding your head as

 4   well, Miss Hollinger.

 5            THE JUROR:  Yes, correct.  I want both sides.

 6            MR. ITTLEMAN:  You want both sides.

 7       Miss Simpson.

 8            THE JUROR:  Just scratching.

 9       Yes, sir.  Mr. Cemelich.

10            THE JUROR:  That's correct.  I failed --

11            THE COURT:  I'm sorry.  Could you speak up a

12   little more?

13            THE JUROR:  I didn't mention this.  I'm also a

14   landlord.  I failed to mention this earlier.  And personally

15   I have been trying to refinance.  I'm unable to, but at the

16   end of the day I feel personally I'm accountable to the

17   contract that I agreed to and I think that the law is best

18   with me in terms of the contract I signed and then following

19   due process.  So my personal feelings are meaningless in

20   terms of the contract.

21            MR. ITTLEMAN:  Would it be fair to say that we all

22   agree that due process would be important in any case

23   whether it's foreclosure or family or any sort of situation?

24   Can every one agree on that?

25       Miss Hathaway, would you agree that due process would
```

```
 1  be important?

 2           THE JUROR:  I'm sure, yes.

 3           MR. ITTLEMAN:  Miss Ward?

 4           THE JUROR:  Yes.

 5           MR. ITTLEMAN:  You want to hear from both sides.

 6           THE JUROR:  I would think foreclosure notice went

 7  out they would have advised them before time.

 8           MR. ITTLEMAN:  Uh-huh.  Okay.

 9           THE COURT:  Four minutes counsel.

10           MR. ITTLEMAN:  Yes.  So just in follow-up on that,

11  would it be fair to say that as part of the due process that

12  if you own property and you're receiving foreclosure notice

13  from the banks that the property owner is entitled to hire a

14  lawyer to represent the property owner?  Could we all agree

15  on that?

16      Does anyone think that the banks are at all responsible

17  for the foreclosure prices or does anyone believe that the

18  homeowners were irresponsible for buying property they could

19  not afford?

20      Miss Hathaway?

21           THE JUROR:  Yes.  Too many people blame banks for

22  all this problems that we're currently having.  People

23  should not have signed the contracts and purchased any of

24  this property without being able to afford it.  Personally,

25  I didn't buy anything I couldn't pay for up front.  So it
```

```
 1   makes my angry when I hear people crying about losing their
 2   job or foreclosed on.  I don't want to hear it.
 3               MR. ITTLEMAN:  Okay.  Does anyone agree with
 4   Miss Hathaway?
 5        Miss Ward?
 6               THE JUROR:  Yeah.  My husband and I have both
 7   worked two jobs to keep the house that we have.
 8               MR. ITTLEMAN:  Does anyone agree with Mr. Hathaway
 9   and Miss ward?
10        Mr. Cemelich.
11               THE JUROR:  I don't think I'll articulate the same
12   way.  I feel that the government's very culpable in this
13   matter and I think the media points the fingers at the banks
14   and with Fannie Mae and Freddy Mac and the programs that
15   were set up for -- forced the hands of banks.  And it's just
16   a big blame game.  And at the end of day in my own personal
17   circumstances of the property I'm very upside down on, I'm
18   struggling to make payments and working two jobs.  It's on
19   me because I signed the contract.
20               MR. ITTLEMAN:  Anyone else?
21        Anyone think that the banks are somewhat culpable for
22   giving out loans that -- to people that my not have been
23   able to afford those loans?  Raise your hands.
24        Sir?  I'm sorry.  Mr. Feaganes.
25               THE JUROR:  People were misled or like buying a
```

1  car, you can afford this.  You can make the payments without

2  realizing the responsibility and especially on variable rate

3  mortgages, people who were blind sided by that where they

4  could afford to get in there but once the mortgage went up,

5  it was impossible for them to take care of that.

6        MR. ITTLEMAN:  Raise your hands if you will -- if

7  you believe that lawyers have responsibilities to their

8  clients.  Could we all agree to that.

9        THE COURT:  All jurors I believe raised their

10  hands for the record.

11        MR. ITTLEMAN:  Thank you.

12     Does every one agree that if a lawyer does not do what

13  they're supposed to do that a client is entitled to file a

14  lawsuit against the lawyer and seek money?  Does everybody

15  agree with that?

16     Okay.  Who does not agree to that?

17     Mr. Hathaway, you do not agree with that?

18        THE JUROR:  I agree.

19        MR. ITTLEMAN:  You agree?  Okay.

20        THE COURT:  Counsel.  You're at your limit.  Do

21  you have anything else?

22        MR. ITTLEMAN:  Yes.

23     This case involves a law firm called Kaufman, Englett

24  and Lynd.  They're KEL attorneys.  Couple questions.  One,

25  whether any one of you has used the firm or knows of the

```
 1   firm or had a negative experience with the KEL attorneys.

 2       Mr. Cemelich?

 3           THE JUROR:  I know of the firm.  I see them.

 4           MR. ITTLEMAN:  Do we all know the firm because the

 5   firm -- because you listen to the talk radio?  Raise your

 6   hands if you heard of the firm just by listening to the

 7   radio.

 8           THE COURT:  All right.

 9           MR. ITTLEMAN:  Thank you.

10           THE COURT:  All right.

11           MR. ITTLEMAN:  If I could just get that last

12   answer, the names of the people that have heard of the firm.

13           THE COURT:  Ask them the ones who responded to

14   raise their hands and then we will call the names.

15           MR. ITTLEMAN:  Yes, please.

16           THE COURT:  Okay.  Those who have heard of the

17   defendant law firm, heard of it, if you would raise your

18   hands.  And let me do this for Mr. Ittleman.  Miss Simpson,

19   and Miss Phillips, Mr. Cemelich, Mr. Mallinson,

20   Mr. Hathaway, Mr. Dietrick, Miss Hollinger, and Mr. Perry.

21           MR. ITTLEMAN:  Thank you.

22           THE COURT:  All right.  For the defendant.

23           THE JUROR:  I have a question.

24           THE COURT:  Mr. Peeples.

25           THE JUROR:  When you say I have heard it, you mean
```

```
 1   like know a lot about it or?
 2           THE COURT:  No.  He's just asking -- they're on
 3   talk radio.  You just heard the name.  Have you heard the
 4   name.
 5           THE JUROR:  I have seen commercials on television.
 6           THE COURT:  So we'll put your name down.  Number
 7   16.
 8       Mr. Kaufman for the defendant.
 9       MR. KAUFMAN:  Good morning.  Let me apologize.
10   This isn't as interesting as a criminal case.  We're dealing
11   with foreclosures.
12       So you had heard the comment that opposing counsel has
13   suggested, that we believe that due process should be
14   afforded people who are going to get their property taken
15   whether that be their homes or their business, right?
16       The judge also mentioned something to you that is also
17   very important.  This is a Tennessee case.  This is not a
18   Florida case.  You are aware that the laws are different in
19   different states and that you have to be licensed in that
20   state to practice.  So, for example, I'm a Tennessee
21   attorney.  I am allowed to practice in Tennessee.  I'm also
22   a Florida attorney.  In a situation where the laws don't
23   afford for it, like, say, for example, in Tennessee where
24   you have what they call non judicial foreclosures where they
25   don't have to go to a Court to take your property, they just
```

```
 1   have to give you a notice of sale.  That doesn't seem fair,
 2   does it?
 3        Anybody think that's fair?
 4        Anybody think that's not fair?
 5        Okay.  I guess it's kind of a question, I guess we're
 6   in the middle of fairness.
 7        Let me ask this question:  Opposing counsel just
 8   mentioned that trying to issue blame on why something
 9   happened or doesn't happen.  Now, I believe Mr. Hathaway
10   said you owe the money, you should have paid.
11             THE JUROR:  Correct.
12             MR. KAUFMAN:  If we can show that he owed the
13   money and he didn't pay it, do you believe that's enough?
14   Put your hands up, please.
15        Miss Gipson.
16        Let me -- first off, let's say the law says that's
17   enough.  Would that be enough for you?
18             THE JUROR:  Yes.
19             THE COURT:  So let's say the law of Tennessee says
20   all we have to do is show a breach and we're going to take
21   your property.  And that's the law of Tennessee.  That's not
22   law of Florida.  When you talk about robosigners and
23   everything else that was mentioned, that's a Florida thing.
24   That also covers certainly judicial states around the
25   country.  But that's not a Tennessee issue.  So we can all
```

1  agree that we're going to follow the law of Tennessee not

2  the laws of Florida or our feelings about banks.

3          UNIDENTIFIED PERSON:  Why is it here in Florida?

4          THE COURT:  Let me make a statement here, ladies

5  and gentlemen of the jury.  I have told you that I will give

6  you the law, and I will give you the law and what I gave to

7  you is what you must follow.  Go ahead, counsel.

8          MR. KAUFMAN:  Because you are unlucky.  I think

9  that's why.

10     I don't mean to be flippant about that.  This is a case

11  dealing with negligence, meaning that our firm is more than

12  50 percent responsible for the damages that the plaintiff

13  has occurred.  Now, we can -- I need to know who can get

14  around the idea, well, we're going to blame the banks.  Is

15  anybody going to say, well, the banks did it so we think

16  they should be able to fight no matter the law in Tennessee?

17     So everyone's good with that?

18     The tough thing we have to do -- you're going have to

19  do is to be able to get over your feelings over how you

20  might feel bad for somebody.  Foreclosure and issues like

21  this as you went through a two year process, it seemed a lot

22  and it is a lot, but the same vain we can all agree that a

23  foreclosure is a contract.  They're suing on a contract.  Do

24  we all understand that?

25     And that they sue because one of the parties breached

```
 1  like you can sue the bank if they don't give you the money
 2  and they sue you if you don't give them the money.  So this
 3  is a breach of contract issue.  This isn't a national issue.
 4  We can all agree with that.  This case is going to exist on
 5  its own.  We're not going to take our own personal feelings.
 6  We're not going to go, well, the banks are terrible, the
 7  attorneys are terrible, and people are suffering.  We will
 8  be able to rule in this case as this case --
 9          THE COURT:  Is that question?
10          MR. KAUFMAN:  Yes.  I'm -- can anybody completely
11  wipe out their personal beliefs on banks, foreclosures,
12  personal feelings about duties and responsibilities and just
13  rule solely based on the facts of this case?  Could you put
14  your hands up, please.
15      Thank you very much.
16      Actually, last question.  Co-counsel gave me this
17  before.  He said I should ask this.
18      Should an attorney -- when opposing counsel mentioned
19  that should an attorney be able to be sued if they didn't do
20  what they were supposed to do, everyone said yes.  Should
21  they do something illegal or immoral in representing them?
22  Does anybody believe that they should -- that zealous
23  representation doesn't exclude filing something that you
24  believe you don't have the right to do legally?  Does
25  anybody believe that?
```

1        Should I file something illegally for a client?  Should

2   I file something that the model rules of professional

3   conduct don't allow me to do?

4        We're all aware that attorneys are bound to specific

5   rules.  Yes?

6        And following those rules might stop an attorney from

7   filing a bunch of filings and pleadings that they don't

8   believe is ethical.  Do you understand that?

9        All right.  No further questions.  Thank you very much.

10            THE COURT:  All right.  Thank you.

11        All right.  Ladies and gentlemen, what I'm going to do

12   is have the dreaded bench conference that I don't like to

13   have to do but this is the time when I have to do it because

14   we have to make the selection process out of your hearing.

15   So what I want you to do is to talk to everybody around you

16   and not hear what we're saying up here.  We're going to turn

17   the -- you can stand and stretch -- if you will stand in

18   your seats.  We kind of need to know where you are.  But I

19   just want you to enjoy yourself while we do this.  And I'm

20   going to get counsel up here and we're going put this white

21   noise on and try to get this done very, very, very quickly.

22   Thank you so much.

23        (Bench conference out of the hearing of the jury)

24            THE COURT:  Let's start with any challenges for

25   cause.  Mr. Ittleman, anything?

 1           MR. ITTLEMAN:  Yes.  Mr. Hathaway.

 2           THE COURT:  Hathaway.  Okay.  And anyone else?

 3           MR. ITTLEMAN:  Yes.  It's someone else, Miss Ward.

 4           THE COURT:  All right.  Anyone else?

 5           MR. ITTLEMAN:  No, ma'am.

 6           THE COURT:  Okay.  State the grounds for number

 7   15, Mr. Hathaway.

 8           MR. ITTLEMAN:  I don't believe he would be able to

 9   put aside with respect to the foreclosure and same with Miss

10   Ward.

11           THE COURT:  All right.  Is there objection?

12           MR. WITHERS:  Yes.  I think that both of them, the

13   way they answered the questions, they're capable of doing

14   it.

15           THE COURT:  I'm going to decline the challenge for

16   cause because both agreed with certain statements that

17   counteracted the statements that they made and they

18   indicated that they could be fair and impartial.

19       For cause, for the defendants.  Anyone?

20           MR. WITHERS:  No.

21           THE COURT:  Okay.  I'm drawing the box around the

22   first eight jurors.  That would be Miss Simpson is number

23   one and Mr. Hernandez is number 8.  So you will have three

24   challenges per side.  We will go sequentially.  I'll seat

25   all eight jurors that we end up with.  And you may challenge

1   any name that is put into those first eight seats.

2       So Mr. Ittleman, who would you like to challenge first

3   if anyone?  Miss Ward for sure.

4               MR. ITTLEMAN:  Yeah, Miss Ward.  Thank you.

5               THE COURT:  Okay.  The plaintiff challenges

6   Barbara Ann Ward, juror number 2.  So into her seat goes

7   juror number 9, Doreen Phillips.

8       For the defendant, first peremptory challenge?

9               MR. WITHERS:  I have Miss Obaseki, juror number 5.

10              THE COURT:  Juror number 5, Beverly Obaseki.

11              MR. WITHERS:  Yes.

12              THE COURT:  Is challenged by the defendants.  Into

13  her seat goes juror number 10, Jessica Rae Gipson.

14      The second peremptory challenge for the plaintiff.

15              MR. ITTLEMAN:  Miss Gipson.

16              THE COURT:  Juror number 10.

17              MR. ITTLEMAN:  Yes.

18              THE COURT:  Juror 10 Jessica Rae Gipson is

19  challenged by the plaintiff, and into her seat goes juror

20  number 11, Janet Sarricchio.

21      The second peremptory challenge for defendants.

22              MR. WITHERS:  Do I get to save it?

23              THE COURT:  No.  You mean tender?  You can tender,

24  but if Mr. Ittleman tenders, that's it for you.

25              MR. WITHERS:  Okay.

```
1              THE COURT:  Do you want to do that?

2              MR. WITHERS:  I'm satisfied.

3              THE COURT:  You're going to tender.  Okay.

4       Mr. Ittleman, let me explain to you, Mr. Ittleman, if

5   you challenge a juror then I will let him, Mr. Withers, the

6   defendants, use the remaining two challenges they have.  If

7   you don't exercise a challenge, we have got a jury.

8              MR. ITTLEMAN:  Okay.  I don't have a challenge.

9              THE COURT:  Okay.  The jury then will be comprised

10  of the following.  Cheryl Simpson, juror one; Doreen

11  Phillips, juror nine; Clinton Thomas, juror 3; Suzanne Marie

12  Johnson, juror 4; Jane Sarricchio, juror 11; Michael J.

13  Dietrick, juror 6; Dorothy Hollinger, juror 7; and William

14  Hernandez, juror 8.  Do you accept the jury Mr. Ittleman?

15             MR. ITTLEMAN:  Yes, ma'am.

16             THE COURT:  And do you accept?

17             MR. WITHERS:  Yes.

18             THE COURT:  All right.  Do you want the names

19  again?  I'll do it more slowly for you.

20      Okay.  It's Cheryl Simpson, juror one; Doreen Phillips

21  is juror 9.  She's seated next to Mr. Hernandez.  And then

22  Clinton Thomas who's in the first row, and Suzanne Marie

23  Johnson in the first row, Janet Sarricchio who is the lady

24  with the black hair and the white flower in it.  Is that

25  Jean?
```

```
 1              MR. ITTLEMAN:  Janet is it?  Janet?

 2              MR. WITHERS:  Jane I. Sarricchio.

 3              THE COURT:  Yes.  That's -- you're correct.  The

 4   lady in the white blouse.  I'm sorry.

 5              MR. ITTLEMAN:  Jane.

 6              THE COURT:  Jane?

 7              MR. WITHERS:  Jane, yeah.

 8              MR. ITTLEMAN:  I think it's Jane.

 9              MR. WITHERS:  She's our number five.

10              THE COURT:  Hold on everybody.  Let me make sure

11   we're -- you and I are on the same place.  I have Janet on

12   mine.

13              MR. WITHERS:  This says Jane.

14              THE COURT:  Am I not reading -- maybe it's Jane T.

15              MR. WITHERS:  Looks like Jane I to me.

16              THE COURT:  I'm sorry.  I scratched through it.

17   Let me make sure I have it.  Jane.  You're right.

18         So let me start over so we know that we're together.

19         Cheryl Simpson, Doreen Phillips, Clinton Thomas,

20   Suzanne Marie Johnson, Jane Sarricchio, then juror 6 Michael

21   Dietrick who's juror 6 here, and then Dorothy Ann Hollinger

22   who is the first lady in the second row, and Mr. William

23   Hernandez who is seated next to Miss Hollinger.

24         Okay?  Everybody set?

25              MR. ITTLEMAN:  Thank you.
```

1          THE COURT:  Okay.  I'm going let the jurors have a

2   break and we will get started with the openings and maybe we

3   will be able to finish them today before lunch which should

4   be good then we can start in the afternoon.

5          MR. WITHERS:  How much of a break are you going to

6   give now?

7          THE COURT:  I'm going give you a break now.

8          MR. WITHERS:  How long?

9          THE COURT:  It will be -- with the jury it will be

10  maybe 20 minutes, we will hope, because it's new to them.

11  Okay?

12              (Bench conference concluded)

13          THE COURT:  Well, that was record timing.  Thank

14  you so much.

15      Good talking so we can get everything done up here.

16  I'm going to state the names of the jurors who have been

17  selected and if your name is not called, you should go down

18  to the jury room and check in with Ana for your marching

19  orders for the future.

20      And I want to thank you so much for your participation

21  in this procedure here.

22      The jurors are as follows, Cheryl A. Simpson, juror

23  one; juror 9, Doreen I. Phillips; juror 3, Clinton G.

24  Thomas; juror 4, Suzannne Marie Johnson; jury 11, Jane

25  Sarricchio; juror 6, Michael J. Dietrick; juror 7, Dorothy

 1  Ann Hollinger, and juror 8, William Hernandez.

 2       So if you will stay seated if your name was called, and

 3  thank you to the rest of you.

 4       Just go outside the door and take the elevator down to

 5  the jury room.

 6       Thank you, counsel.  You can be seated.

 7       We're going to take a break and George will show you

 8  the jury room.  This juror room is yours for the duration of

 9  the trial.  You can leave -- inside, in there, you can leave

10  your things in there.  George will take care of what is

11  going on.  There are rest rooms.  I'm going to give a 20

12  minute break.  If you need longer, you can let me know, but

13  I hope that you won't try to go to the car and do all this

14  other stuff because I really do want to try to get us on

15  track.  And we're going to have the opening statements

16  before lunch, and then we will have lunch.  Then we'll get

17  into the evidence today.  And, you know, if I can keep this

18  on track, we will be finished, as the counsel predicted, in

19  three days.

20       So let's take a break and we will see you at 11:00.

21                      (Recess)

22            THE COURT:  I'm going to let you gentle people

23  have your break.  I want to tell you that I'm going to use

24  my own preliminary jury instructions.  They're pretty

25  similar to the stipulated ones that you gave, but they

1    elaborate a little more.  And I just feel more comfortable

2    using them because they explain to the jury in greater

3    detail their responsibilities.

4        So if there's anything after I read mine that you feel

5    I should add -- I don't think there's anything that's

6    omitted from what you submitted to me -- then please bring

7    it to my attention when I finish.  I'll give you that

8    opportunity.

9        So we will see you here a little before 11.

10                    (Recess for the staff)

11       (Whereupon the jury was sworn to be jurors in this

12   case.)

13                THE COURT:  All right.  Thank you.  If you will be

14   seated.

15       Let me ask first if there is anyone in the juror box

16   who did not take that oath or affirmation.  If you did not

17   take that oath and accept it, would you raise your hand.

18       The record should reflect that all jurors have been

19   duly sworn to participate in this cause.

20       Members of the jury, now that you have been sworn, I

21   will give you some preliminary instructions to guide you in

22   your participation in the trial.  It will be your duty to

23   find from the evidence what the facts are and you and you

24   alone are the judges of the facts.  You will then have to

25   apply to those facts the law as the Court will give it to

1   you and you must follow that law whether you agree with it

2   or not.  Nothing that I may say or do during the course of

3   this trial is intended to indicate to you or should be --

4   should not be taken by you as indicating what your verdict

5   should be.  That is your responsibility.

6       The evidence from which you will find the facts will

7   consist of the testimony of witnesses, documents and other

8   things received into the record as exhibits and any facts

9   that the lawyers agree or stipulate to or that the Court may

10  instruct you to find.  But there are certain things that are

11  not evidence and must not be considered by you and I will

12  list them for you now.  First of all, the statements and

13  argument of and questions by the lawyers are not evidence.

14  They are not sworn.  They do not take the witness stand and

15  so what they say is not evidence in the case.

16      Objections to questions are not evidence.  Lawyers have

17  an obligation to their respective clients to make an

18  objection when they believe that something is being offered

19  and properly under the rules of evidence that govern this

20  Court.  And I encourage them to do that because I want to

21  have the fairest trial I can possibly have.

22      You should not be influenced by the lawyers' objections

23  or by my rulings.  If the objection is sustained, that means

24  I agree with the objection.  If I sustain the objection,

25  then you should ignore the question, and if the witness has

1    slipped an answer in before I have ruled and I sustain the

2    objection, disregard that answer.  It is up to the lawyer to

3    ask the question properly if it can be answered.

4        If the objection is overruled, that means I do not

5    agree with the objection.  If the objection is overruled,

6    you should treat the answer like any other answer a witness

7    gives.  Just because there's an objection doesn't mean that

8    that's the most important answer in the whole case.

9        And if you are instructed by me that some item of

10   evidence or some testimony is to be received for a limited

11   purpose only, in other words, I'll let you hear this

12   evidence but you may consider only for blank, then I'll tell

13   you what I mean.  Then you must follow that instruction and

14   only consider it for that purpose.

15       Let me tell you in federal court that the lawyers who

16   have the rules of courtroom procedure in front of them

17   usually stand and will state objection, Your Honor, hearsay.

18   Then I may want them to give me more argument and it's to

19   save you going out and coming back and all of that which

20   just takes up time.  They may give it to me here, and that's

21   what I'm saying what they say is not evidence and shouldn't

22   influence you.

23       Thirdly, testimony that I have excluded or told you to

24   disregard is not evidence and must not be considered.  And

25   of course anything you may have seen or heard outside the

1   courtroom pertaining to this case is not evidence and must

2   be disregarded by you.  You are to decide the case solely on

3   the evidence presented here in the courtroom.

4       Now, there are two kinds of evidence:  Direct evidence

5   and circumstantial evidence.  Direct evidence is direct

6   proof of a fact such as the testimony of an eye witness who

7   said, for instance, somebody comes in and says, I saw him

8   trip on that curb with my own two eyes and then describes

9   the circumstances.  That's direct evidence.

10      Circumstantial evidence is proof of facts from which

11  you may infer or conclude that other facts exist.  For

12  instance, if you got up this morning and you walked outside

13  and there were big puddles and everything was sopping wet

14  and the skies were dark, dark, dark and you heard the

15  weather report anyway and it was supposed to rain, you might

16  conclude by circumstantial evidence even though you hadn't

17  seen it that it had rained some time recently, and that's

18  circumstantial evidence.

19      I'll give you further instruction on these as well as

20  other matters at the end of the case, but please bear in

21  mind that you may consider both kinds of evidence.  You may

22  consider direct evidence as well as circumstantial evidence.

23      Now, it will be up to you to decide which witnesses to

24  believe, which witnesses not to believe, and how much of any

25  witness's testimony to accept or reject.  At the end of the

 1  case I'll give you instructions that you will have to

 2  follow.  Right now I'm hearing the evidence with you, so I'm

 3  just giving you preliminary instructions, but at the end of

 4  case I'll give you the final instructions and I anticipate

 5  that I'll give you an instruction that goes somewhat like

 6  this:  Now, in saying that you must consider all of the

 7  evidence I do not mean that you must accept all of the

 8  evidence as true or accurate.  You should decide whether to

 9  believe what each witness had to say and how important that

10  testimony was and in making that decision you may believe or

11  disbelieve any witness in whole or in part.

12       Also, the number of witnesses testifying concerning any

13  particular dispute is not controlling.  You may decide that

14  the testimony of a smaller number of witnesses concerning

15  any fact in dispute is more believable than the testimony of

16  a larger number of witnesses.  To the contrary.  In deciding

17  whether you believe or do not believe any witness, I suggest

18  you ask yourself a few questions.  Did the witness impress

19  you as one who was telling truth.  Did the witness have any

20  particular reason not to tell the truth.  Did the witness

21  have a personal interest in the outcome of the case?  Did

22  the witness seem to have a good memory.  Did the witness

23  have the opportunity and ability to observe accurately the

24  things he or she testified about?  Did the witness appear to

25  understand the questions clearly and answer them directly?

1   And did witness's testimony differ from other testimony or

2   other evidence in the case.

3       Now, this is a civil case I explained to you during the

4   voir dire.  And the party making a claim or contention has

5   the burden of proving that claim or contention by the

6   preponderance of the evidence.  That means the party making

7   the claim or contention has to produce evidence which

8   considered in light of all the facts lead you to believe

9   that what that party claims is more likely true than not.

10      Again, for those of you who have heard about criminal

11  cases or perhaps been jurors in criminal cases, you have

12  heard the standard of proof beyond and to exclusion of a

13  reasonable doubt or to the exclusion of a reasonable doubt,

14  and that requirement does not apply to a civil case, so you

15  should put that out of your mind.

16      Let me give you a few words about your conduct as

17  jurors.  First, during this trial you are not to discuss

18  this case with anyone or permit anyone to discuss it with

19  you or in anywhere that you hear something until you retire

20  to the jury room all together at the end of the case to

21  deliberate on your verdict.  You simply should not talk

22  about this case.  Now that's hard at first because you don't

23  know each other.  This is the one thing that brings you

24  together.  This is just sort of a natural thing that you

25  want to talk about what you're doing here, but I caution you

1   not to do that because the whole -- one of the most

2   important things about the function of the jury system, and

3   our are Constitutional form of government, is that we have

4   people from very diverse areas of life who come together and

5   they should listen and hear each other together and discuss

6   it to come to the verdict.  If you start talking to each

7   other in ones and twos, you're forming subconscious

8   attitudes about things and others aren't there.  So it would

9   be inappropriate and wrong for you to do that.

10      Secondly, you should not read or listen to anything

11  touching on this case in any way.  And of course if someone

12  tries to talk to you about it, bring it to my attention

13  immediately.

14      Third, do not try to do any research or make any

15  investigation about this case on your own.

16      And finally, do not form any opinion until all the

17  evidence is presented.  You should keep an open mind until

18  you start your deliberations at the very end of the case.

19      Sometimes the case can't be presented to you in a

20  historical way because witnesses have problems so you may

21  have a little piece here and a little piece there, and you

22  should wait until the end to put that together.

23      Now, I do allow my jurors to take notes, and Sherri

24  will pass out pads.  These pads have been cleansed so

25  there's nothing in them.  And if any of would like to take

1  notes, I'm going to give you some instructions on this.

2  This is totally up to you and you might decide you want to

3  start taking notes and stop or not take notes at all or you

4  didn't want to take them to begin with, then you want do it

5  later.  That's fine, whatever you want to do.  If you do

6  take notes you will have -- you leave them in the jury room

7  when you leave at night.  And at the end of the case the

8  courtroom security officer will pick them up and shred them.

9  So they'll stay here in the courthouse until they're

10  shredded.  Your notes are for your own personal use.  They

11  are not to be given to or read by anyone else.  Notes are an

12  aid to your observation of the witness and your hearing of

13  the evidence and seeing the evidence.  So if your

14  recollection of the evidence is different from your notes,

15  you must rely on your recollection of the evidence.  You

16  know when you're writing fast how easy it is to leave a

17  crucial word like "not" out or something like that.  So if

18  there is any discrepancies between what you recall and what

19  your notes say, rely on your recollection.

20      And lastly, and remind myself of this because I'm a

21  note taker, don't be so involved in taking notes that you

22  are not watching what's going on in here because many times

23  the body language will tell you things.  If you have got

24  your head in your notes you're miss something.

25      The trial is going to begin.  We're going to start with

1   the opening statements this morning, and each side will be

2   given the opportunity to make an opening statement.  An

3   opening statement is not evidence and it's not supposed to

4   be argument.  An opening statement is simply an outline of

5   what that party expects the evidence to prove in the case

6   and it's offered to help you follow the evidence.

7        After that the plaintiff will present their witnesses,

8   and the defendants may cross-examine those witnesses.  And I

9   let the presenting party, in this case the plaintiffs, have

10  limited redirect examination in the area of

11  cross-examination.  And then after the plaintiffs rest their

12  case, they presented all the evidence they want to, then the

13  defendants will present witnesses and exhibits, and the

14  plaintiff's may cross examine those witnesses.  And again,

15  there would be limited rebuttal evidence in the area of the

16  or -- redirect examination of the area of cross-examination.

17  And then after all the evidence has been presented, the

18  attorney will be given an opportunity to make a closing

19  argument to you to summarize and interpret the law and to I

20  anticipate persuade you to that particular point of view.

21  And following the closing arguments, I will then give you

22  instructions on the law and you will then retire to the jury

23  room to begin your deliberations on your verdicts.

24       I mentioned during voir dire that we will not have

25  transcripts.  So you will need to rely on your recollection

1   of the testimony.

2        Counsel, is there anything else you want me to add or,

3   Mr. Ittleman, anything you want me to add or any objection?

4             MR. ITTLEMAN:  No, ma'am.

5             MR. WITHERS:  Nothing, Your Honor.

6             THE COURT:  Okay.  We're set up to begin our

7   opening statements.  I have given each side up to 30 minutes

8   for their opening statement.

9        And, Mr. Ittleman, when you're ready, I'll start the

10  clock.

11            MR. ITTLEMAN:  Thank you.

12       Good morning.  This is case is about broken promises.

13  This is a case about the trust that a client needs to have

14  with their lawyers, and this is a case about the lawyers

15  failing to live up to their client's trust.

16       My name is Geoffrey Ittleman and I represent the

17  plaintiffs, the Learning Connections Inc. and Syed Hasnain.

18       The evidence will show that the Learning Connections,

19  Inc. was the owner of commercial property located in the

20  state of Tennessee.  Like any other corporation, the

21  Learning Connections Inc. had shareholders.  The

22  shareholders were Fred and Linda Gentry and Syed Hasnain and

23  Nadira Hasnain.  The shareholders together decided to

24  purchase commercial property through their corporation the

25  Learning Connections.  It did so by taking out a loan with

1  Fifth Third Bank.  The loan required the Learning

2  Connections to pay Fifth Third Bank over $5,000 per month.

3  In order to repay the loan, the Learning Connections

4  established a business in their commercial property.  The

5  business was a daycare center.  The daycare center was

6  extremely successful.  The parents were paying the Learning

7  Connections a lot of money to send their children to the

8  daycare center.  The Learning Connections was using the

9  money it was receiving to pay its bills and expenses

10 including its loan obligations with Fifth Third Bank.

11     A problem arose, however.  The problem had nothing to

12 do with the amount of money that Learning Connections had or

13 whether the learning connections could meet their monthly

14 mortgage obligations.  The problem arose in July of 2008.

15 Mr. and Mrs. Gentry were involved in a serious car accident

16 and were hospitalized during that time.  Mr. and

17 Mrs. Hasnain lost a loved one and we're required to travel

18 to Pakistan during that time to grieve with their family.

19 The Gentrys were not aware that the Hasnains were in

20 Pakistan.  The Hasnains were not aware that Gentrys were

21 involved in a serious car accident.  As a result two

22 mortgages payments were not made.  The first missed mortgage

23 payment occurred in August of 2008.  The second missed

24 mortgage payment occurred in September of 2008.  Hasnains

25 returned to the states from Pakistan and learned about the

 1  Gentrys' car accident.

 2      They attempted to bring the loan with the Fifth Third

 3  Bank current.  It did so by sending payments to Fifth Third

 4  Bank.  Fifth Third Bank, however, refused to accept the

 5  payments.  The bank stated in writing that it would only

 6  accept the payments from the Learning Connections if the

 7  Learning Connections filled out a lot of financial

 8  information.  That included information from Mr. and

 9  Mrs. Gentry.  But they were in the hospital and the Learning

10  Connections was unable to provide the information from

11  Mr. and Mrs. Gentry as a result.

12      Fifth Third Bank continued to refuse to accept the

13  Learning Connections' payments on the loan and sent the

14  Learning Connections a letter in November of 2009 that it

15  would be foreclosing on the Learning Connections commercial

16  property in three weeks.

17      The Learning Connections and the Hasnains did

18  everything they could to stop the foreclosure sale.  And

19  you're going to hear this.  They were not successful,

20  however.  They decided to hire a law firm to represent them.

21  The Hasnains searched the Internet for foreclosure defense

22  attorneys.  They located the defendants Kaufman, Englett and

23  Lynd.  They call themselves the KEL attorneys.  They

24  advertise themselves as being a large national foreclosure

25  defense law firm that is licensed to practice foreclosure

1    defense law in 20 different states including the state of

2    Tennessee.

3        Jeffrey S. Kaufman, Esquire, is the K for KEL

4    attorneys.  Mr. Kaufman is licensed to practice law in the

5    state of Tennessee.  The Hasnains saw all this information

6    over the Internet and they were impressed.  They called the

7    KEL attorneys.  The KEL attorneys told the Hasnains they

8    would be able to either stop or delay the foreclosure sale

9    scheduled for December 2009.

10           MR. WITHERS:  Your Honor, we object.  The

11   testimony is not going to show that.

12           THE COURT:  That's inappropriate on opening

13   statement that the jury will determine that.  Proceed, sir.

14           MR. ITTLEMAN:  Thank you.

15       The Hasnains were impressed.  They hired the KEL law

16   firm.  After the Hasnains hired the KEL law firm, the KEL

17   law firm told the Hasnains that they would be able to stop

18   the foreclosure.

19           MR. WITHERS:  Objection, Your Honor.

20           THE COURT:  Overruled.  Proceed.

21           MR. ITTLEMAN:  After the Hasnains hired the KEL

22   law firm, the KEL law firm told the Hasnains that they would

23   be able to stop the foreclosure sale if the Hasnains filled

24   out a lot of financial information.  The Hasnains complied.

25   In fact, the KEL attorneys told the Hasnains they would be

1    able to stop the foreclosure sale from occurring on

2    December 9, 2009, and requested additional financial

3    information from the Hasnains during that time.

4        The Hasnains cooperated with their lawyers.  The KEL

5    attorneys told the Hasnains that the foreclosure sale did

6    not occur on December 9, 2009.  Unfortunately, it did.  The

7    Hasnains lost their commercial property.  The KEL attorneys

8    did not tell Mr. and Mrs. Hasnain and the Learning

9    Connections that they had lost their commercial property

10   until January of 2010.

11       You will hear evidence that the KEL attorneys told the

12   Hasnains that it was not their fault that the Learning

13   Connections lost the commercial property in January of 2010

14   because they were powerless to prevent the foreclosure sale

15   from taking place at the time that the KEL attorneys were

16   hired by the Learning Connections.

17       Mr. and Mrs. Hasnain and the Learning Connections

18   believed their lawyers.  They believed that Fifth Third Bank

19   wrongfully foreclosed on their property and they trusted and

20   relied on statements made by the KEL law firm that they were

21   powerless to stop their foreclosure sale at the time they

22   were hired.

23       They believe that the Fifth Third Bank attempted to,

24   quote, pull a fast one on their attorneys, the KEL law firm.

25   In fact, the Learning Connections and Mr. Hasnain trusted

1    their attorney so much that they decided to continue to let

2    the attorneys from KEL negotiate a resolution with Fifth

3    Third Bank that would require Fifth Third Bank to sell the

4    property back to the Learning Connections.  The negotiations

5    were not successful.

6        The KEL attorneys and Jeffery Kaufman sent the Learning

7    Connections and Mr. and Mrs. Hasnain a letter in June of

8    2010.  The letter confirms that Mr. Kaufman and the KEL law

9    firm tried their best but there was nothing else that they

10   could do for the Learning Connections.

11       After Mr. and Mrs. Hasnain received the letter from

12   Mr. Kaufman and the KEL law firm, they started to

13   investigate why it was that they lost their commercial

14   property.  While the KEL attorneys told the Hasnains that

15   Tennessee law did not permit the KEL attorneys to file a

16   lawsuit to stop the foreclosure sale, the Hasnains learned

17   for the first time after June of 2010, that the KEL

18   attorneys lied to them.  They learned for the first time

19   after June of 2010 that the KEL attorneys were required to

20   file a lawsuit to stop the foreclosure sale.

21       The KEL attorneys' failure to file a lawsuit to stop

22   the foreclosure sale was wrong.  It was negligence.  It

23   resulted in the Learning Connections Inc. losing its

24   commercial property.

25       You will hear from an attorney Trey Cain.  He is an

1   attorney that maintains his office in the state of Tennessee

2   and practices in foreclosure defense work in the state of

3   Tennessee.  Mr. Cain will explain to you that the KEL

4   attorneys were professionally negligent in failing to file

5   lawsuit to stop the foreclosure sale.  You will hear from

6   another expert, Aurelio Piedra, who's an accountant and he's

7   a certified evaluation expert.  Mr. Piedra has provided

8   expert testimony in number of other matters.  It was his job

9   to determine the amount of money that the Learning

10  Connections lost as a result of the KEL attorneys'

11  professional malpractice.  It was also his job to determine

12  whether the Learning Connections Inc. had enough money to

13  pay the mortgage with Fifth Third Bank.

14      Mr. Piedra will explain to you that the Learning

15  Connection lost $784,360 as a result of the KEL attorneys'

16  professional malpractice.

17      The KEL attorneys promised the Learning Connections

18  that they would do their job and provide the Learning

19  Connections with proper legal advice.  Jeffrey S. Kaufman

20  was in charge.  He was responsible for making sure that his

21  law firm provided the Learning Connections with proper legal

22  advice.  The KEL attorneys broke their promises.  They

23  provided incorrect legal advice to the Learning Connections.

24  Mr. Kaufman as the attorney in charge should have known that

25  the advice they were providing was incorrect.  The KEL

1   attorneys and Mr. Kaufman failed to act professionally.

2   Their conduct was negligence.  Their conduct was

3   malpractice.

4        Thank you.

5             THE COURT:  Thank you, Mr. Ittleman.

6        On behalf of the defendant.  Mr. Kaufman for the

7   defendants.

8             MR. KAUFMAN:  Good morning.  This will be a little

9   longer.  My name is Jeff Kaufman.  I'm licensed in 18 states

10  across this country, 29 federal bars.  I have taken five

11  bars and I have taken the rules of professional conduct

12  three times in the last 10 years because of the different

13  states' requirements.  I'm founder of Kaufman, Englett and

14  Lynd with my partner Matt Englett and Craig Lynd.

15       This lawsuit is for professional negligence.

16  Mr. Hasnain is suing our firm because he's claiming that he

17  was damaged.  That all of his damages occurred because of

18  hiring of Kaufman Englett.  Let's break down this timeline a

19  little differently.  We're going to -- I'm going to go a lot

20  more forward on it.

21       February of 2007, they did borrow $525,000.  We're

22  going to show that.  The loan was collateralized using --

23  meaning with all the inventory and TVs, chairs, everything

24  else was included in that mortgage.

25       Loans were simple.  They were 60 payments supposed to

 1   be made.  After making approximately 17 they stopped paying

 2   on August of 2008.  Now, what was failed to mention that we

 3   will show you is that this corporation was dissolved twice

 4   before we were even hired.  In 2008 it was dissolved because

 5   of -- we are going to show you their attorney supposedly

 6   didn't file the documents.  In 2009 the state department of

 7   health services shut them down for mismanagement all before

 8   they hired KEL.

 9       As far as profitability, we're going to show you based

10   on the plaintiffs' own filings, 2006, company wasn't

11   profitable.  We're going to show you 2007, it wasn't

12   profitable.  2008 it wasn't profitable.  We're also going to

13   show you that the bank did offer them a forbearance

14   agreement.  And that the bank did work face-to-face with

15   them and came up with an agreement.  We're going to show you

16   they refused to sign it.  We're also going to show you just

17   because shareholders in the corporation don't help out isn't

18   an excuse for something not happening.

19       Seventeen payments were missed before they finally

20   hired us on November 29, 2009, eight days before the sale.

21   We're going to show you we requested multiple documents.

22   We're also going to show that we never, ever promised that

23   we could stop that sale.  In the contract it makes it very

24   clear we will do what we can to help you out.  That's

25   through modification, possible litigation issues, and in

1  this case, there were none.  We're going to show based on

2  the information they provided us that there was nothing we

3  could do as as far as litigation.

4      Now, what we're going to do is get them a deal from the

5  bank.  The bank actually did offer if they were willing to

6  pay what they owed.  Not any more, but just paid what they

7  owed, and that amount was around a little over 600,000

8  because of the 17 missed payments, the late payments, the

9  failure to pay taxes over a 17 month period.

10     Now we're going to show you that they didn't want to

11 pay what they owed.  We're going to show you that they

12 counter offered with $500,000, even though they owed over

13 $600,000.  We are going to show you the bank turned it down.

14     So they were given two opportunities to negotiate with

15 the bank and failed in both.  On January 2010, approximately

16 one month after the sale, we were still working with the

17 bank trying to get the information they needed for us to be

18 able to modify this loan.  And, actually, it's not a

19 modification.  It's a repurchase agreement.  We're going to

20 show you the reason why we couldn't dispute this history.

21 We're going to show you based on Tennessee law it was very

22 clear what we could do and couldn't do.  In Tennessee you

23 are not allowed to file a lawsuit for it to show just to

24 delay.  It violates the rules of professional conduct in

25 Tennessee, and it also opens you up to a fine that the --

1    that based -- hold on one second -- TCA statute 2923103

2    we're going to show you, it states, where an injunction to

3    stay proceeds on a judgment is dissolved on a final hearing,

4    the Court may decree 6 percent on the amount of the judgment

5    of damages.  So not only are you not supposed to do it, but

6    you can get penalized for doing it.  That could be

7    everything from sanctions to bar issues to possibly even

8    suspension from the bar for doing it.

9         What we're going to show is this, is not once in the

10   history of this company were they profitable.  And the

11   idea -- we're going to show you the idea is ludicrous.  In

12   2008 they stopped paying as of August.  The payment was

13   approximately 5,000 a month.  So in August of 2008 for the

14   year 2008, they failed to make $25,000 in payments.  In 2009

15   they failed to make over 60,000 in payments.  That was all

16   before they came to KEL.  They had 17 months to fight this

17   legally, to contact an attorney, and contacting an attorney

18   eight days, hired an attorney eight days before a sale takes

19   place, there's only so much that a firm can do based on

20   Tennessee law.  There are filing issues.  There are a lot of

21   things that come up.  And while I feel bad about what

22   happened, the responsibility of it lies on the business

23   owner.

24        They will show they were provided a deal first and they

25   didn't want to take it.  The second time they were --

1  another modification and wanted a profit on it.  They didn't
2  want to pay what they owed.  We're going to show that.
3  Offering $500,000 after the property is already sold and
4  you're -- and you owe 600 something thousand dollars, the
5  bank doesn't have to accept it.
6      We're also going to show you that they defaulted not
7  only financially as part of their mortgage and note, but by
8  just being out of business, by the company being dissolved
9  breached the contract.
10     We're going to show you when they first hired us they
11 failed to disclose a significant amount of information and
12 that information would have helped us be able to give them
13 the proper advice they might have needed to say, well, they
14 offered you a forbearance agreement.  We don't know if
15 they're going to offer it again.  We're going to show being
16 straightforward and honest with your attorney is the only
17 way that an attorney can properly defend you.  And in this
18 situation we're going to show you that the Hasnains have a
19 habit of blaming everyone else for their failures.  They
20 blamed their first attorney for the reason why the company
21 got shut down the first time.  They blame people in the bank
22 for being racist for not taking their payments.  For not --
23 and we have letters from the bank.  We have their response
24 and we will show that to you.  What we're only going to do,
25 we're going to keep -- this is the only evidence we're going

```
 1   to put forward, are facts.  We're not going to put opinion.
 2   We're not going to say but for this situation.  We're going
 3   to show you that $700,000 is impossible for a business that
 4   doesn't exist to make.
 5       The business was shut down four months before they
 6   hired us.  How that business had the ability to make
 7   $700,000 after it was already dissolved before it came to
 8   us?  We're going have to hear that.  Thank you very much.
 9           THE COURT:  Well, it's -- we can get started with
10   a little bit of evidence.  I think let's use your time
11   wisely, ladies and gentlemen.  I expected us to be finished
12   a little bit closer to noon, but let's call your first
13   witness.
14       Mr. Ittleman.
15           MR. ITTLEMAN:  Plaintiff calls Syed Hasnain to the
16   stand.
17           THE COURT:  All right.  Thank you.
18                       (WITNESS SWORN)
19           THE WITNESS:  Yes, ma'am.
20           THE DEPUTY CLERK:  Please have a seat.
21           THE WITNESS:  Thank you.
22       If you could please state your full name for the record
23   and spell your last name.
24           THE WITNESS:  My first name is Syed and last name
25   Hasnain, HASNAIN.
```

Direct Examination - Syed Hasnain

```
 1                    DIRECT EXAMINATION
 2   BY MR. ITTLEMAN:
 3   Q      Good morning.  Syed, I'm going to ask you some
 4   questions regarding your background and experience.  What is
 5   your background, please?
 6   A      Sir, I start -- my father when I was very young he
 7   told me, okay, that if valor is lost, nothing is lost.  If
 8   health is lost, something is lost.  If correcter is lost,
 9   everything is lost.  When I came in this country I was very
10   young.  But my wife -- my father his works was always with
11   me.  He was not here.  He was not watching me.  But I know
12   what my father expectations are.  But when I came here I
13   finished my master's -- bachelor's in electronics
14   engineering.  I did my master's in computer science.  I was
15   working on my Ph.D. from University of Memphis in
16   instructional design and technology and educator.  I have
17   experience teaching from preK to high school, from two year
18   colleges to four year colleges.  And then God blessed me
19   that I was working as an executive director for the
20   Tennessee Board of Regents.  Tennessee Board of Regents is
21   over all the universities and colleges.  And I was in the
22   training for the staff over 500.  I have more than 5,000
23   students in Tennessee.  Okay?  Where I educate them.  I
24   believe on John F. Kennedy when he said, change is the love
25   of life.  I want to make a change and therefore I am here.
```

Direct Examination – Syed Hasnain

1   I have a lot of my experiences not just as an educator.  We

2   have a family business.  My wife and I was running over the

3   daycare center preschool and we were doing very good.  And

4   after that --

5   Q    I'm going to ask you a couple questions about your

6   business.  You had mentioned that you and your wife were

7   running a daycare center.  Can you tell me the name of the

8   company?

9   A    Yes, sir.  Name of the company was the Learning

10  Connection because I believe on learning for every single

11  child, therefore we give them the right correction.

12          MR. WITHERS:  Your Honor, I hate to object to his

13  testimony, but is it not responsive.

14          THE COURT:  Yes.

15      Mr. Hasnain, your attorney will ask you a question and

16  if you will answer the question that he asks, please.

17      Go ahead.

18          THE WITNESS:  I do, sir, and I will, ma'am.

19  BY MR. ITTLEMAN:

20  Q    Now, with respect to your involvement with the

21  Learning Connections, what was your interest in the company?

22  A    I was one of shareholders where Narida was 25 percent

23  and then Fred Gentry and his wife Linda Gentry.

24  Q    So what percent interest did you have in the company,

25  sir?

Direct Examination – Syed Hasnain

1  A      25 percent.

2  Q      Why did you organize and form the Learning Connections

3  Inc.?

4  A      We -- when we met, okay, with Mr. Fred Gentry and with

5  his wife, we decided, okay, to start a preschool and then we

6  have a plan for -- the future plans also.  We'd like to have

7  a college.  So in order to buy the building, we establish

8  that Learning Connection Inc. and under the Learning

9  Connection Inc. we applied for a loan.

10  Q      Okay.  Before we talk about the loan and buying it,

11  did you do anything with the Learning Connections and prior

12  to purchasing the commercial property?

13  A      Yes, sir.  Okay.  We started looking, okay, for

14  different areas to buy the building.  So we did the survey

15  ourself and also talk to some other, you know, experts in

16  the area, which area which location would be the best to

17  open the preschool.  And we found the location in

18  Murfreesboro, Tennessee, 162 Heritage Park Drive.  So what

19  we did, okay, we went over there.  It was an existing

20  preschool, okay, in daycare center, so we talked to the

21  owner Mr. -- I cannot remember his name, okay?  So we did

22  the lease purchase.

23  Q      Okay.  We're going to -- I'm going to ask you some

24  questions about that lease purchase.

25          MR. ITTLEMAN:  And if I may I'd like to approach

Direct Examination – Syed Hasnain

 1  opposing counsel.

 2          THE COURT:  Do you have all your exhibits together

 3  so you don't have to keep walking back and forth?  That's

 4  why you're approaching opposing counsel?

 5          MR. ITTLEMAN:  Yes.

 6          THE COURT:  Okay.  Just so you don't have to walk

 7  back and forth and take up time, just show him everything or

 8  you can give him a list.

 9          MR. ITTLEMAN:  Yes.  I'm referring to Exhibit 77

10  to opposing counsel.  Exhibit No. 77.

11          THE COURT:  Are you going to show this witness

12  more than one exhibit?

13          MR. ITTLEMAN:  Yes.

14          THE COURT:  Do you have them altogether so we can

15  put them up there and you don't have to keep walking back

16  and forth?

17          MR. ITTLEMAN:  Right.

18          THE COURT:  You're not ready to do that?

19          MR. ITTLEMAN:  Can I approach?

20          THE COURT:  Your witness?

21          MR. ITTLEMAN:  No.  Your Honor.

22          THE COURT:  No.

23          MR. ITTLEMAN:  Unfortunately, we were going to do

24  that after lunch.

25          THE COURT:  Okay.  Then let's go ahead because I

Direct Examination - Syed Hasnain

1    did want to start this after lunch and I told counsel we'd

2    start after lunch because I thought they were going to take

3    longer in their openings, but then when they didn't -- I

4    don't want to waste your time here.  So we will do this and

5    after lunch we will get that straighted on out.

6              MR. ITTLEMAN:  Thank you, ma'am.

7              THE COURT:  Go ahead.

8              MR. ITTLEMAN:  May I approach the witness?

9              THE COURT:  You may.

10             MR. ITTLEMAN:  Thank you.

11   BY MR. ITTLEMAN:

12   Q     I'm showing the witness what's been marked as

13   Plaintiff's Exhibit 77.

14         Sir, can you tell me what that document is?

15   A     This is the lease agreement which we have with

16   Mr. Lawson who I was expressing to you before.

17   Q     Sure.  Now, is that a signed agreement?

18   A     No, sir.  This is a copy of which I have, you know, by

19   printing through my computer.

20   Q     And what does that show -- document show, sir?

21   A     Okay.  This document shows, okay, that Mr. Lawson and

22   Nadira and Mr. Fred Gentry, okay, they were buying the

23   property in 24th day of May 2006.  And they made the

24   promise, okay, to lease purchase for six months and after

25   that they want to refinance from the bank the whole

Direct Examination - Syed Hasnain

1  property.  And if I'm not making a mistake, okay, there

2  was -- it was 5200 square feet, the property, and the

3  monthly mortgage payment is $5,400.  We paid the down

4  payment of $40,000 and we were paying to him, okay,

5  5 percent -- $5,400 per month as a lease purchase.

6  Q    Is that in rent or was that to purchase it?

7  A    It was for the lease purchase agreement.

8  Q    Okay.  But you were renting the property during that

9  time?

10  A    Yes, sir.

11  Q    And that's time is in May of 2006?

12  A    Yes, sir, in May of 2006.

13       MR. ITTLEMAN:  Offer Exhibit 77 into evidence,

14  Your Honor.

15       THE COURT:  Isn't this a stipulated exhibit?  Yes?

16  It's stipulated.

17       MR. ITTLEMAN:  Yes.

18       THE COURT:  Okay.  It will be admitted.  Maybe

19  after lunch you all can get the list of exhibits that you

20  agree to and I'll just read them to the jury and mark them

21  on my sheet then you can just go.  Okay?

22       MR. ITTLEMAN:  Great.

23       THE COURT:  So admitted, no objection.

24  BY MR. ITTLEMAN:

25  Q    Now, what happened after the company signed that lease

Direct Examination - Syed Hasnain

1  agreement and starting operating the daycare center within

2  that commercial property?

3  A     After that, okay, they applied for the license for the

4  daycare center.  Okay.  And once they receive the license

5  they start operating the business and under the name of

6  Learning Connection.  The building was licensed for 99

7  children.  They were making the profit.

8  Q     Let's talk about the license issue.  And before we

9  talk about the license issue, I just want to make sure that

10  we understand when the Learning Connections took over that

11  commercial property, was there a license with that

12  commercial property?

13  A     It was already a license, okay, under the name of

14  Mr. Lawson.

15  Q     And what was the license to do?

16  A     Okay, the license was allow you to run the business.

17  Q     What business?

18  A     Preschool and daycare center, and it was licensed for

19  99 children.

20  Q     So prior to the Learning Connections taking over the

21  business it was already licensed as a daycare center for 99

22  children?

23  A     Yes, sir.

24  Q     Is that correct?

25  A     Yes, sir.

Direct Examination – Syed Hasnain

1    Q      Now, in 2006 what happened after the Learning

2    Connections agreed to rent the commercial property from

3    Mr. Lawson?

4    A      The company was making a profit.  We start doing

5    renovations because we were educators. I would expect --

6    Q      Before we talk about your expectations, there was a

7    license with the prior owner to operate the daycare center,

8    correct?

9    A      Yes, sir.

10   Q      Did the Learning Connections obtain a license to

11   operate the daycare center?

12   A      Yes, sir.

13   Q      And when was that?  Was that during the time that you

14   were leasing the property?

15   A      Yes, sir.

16   Q      And how many children was the company allowed to have

17   at the daycare center at the time that you were leasing the

18   property?

19   A      99 children.

20   Q      Now, was the number of children that Learning

21   Connections was allowed to maintain important to the

22   company?

23   A      Yes, sir, it was very important.

24   Q      Why was it important?

25   A      It was important, okay, because with the number of

1   childrens that would be generated by revenue, every child

2   was coming, okay, he was a customer.  We were trying to do

3   the marketing, okay.  We were building a relationship with

4   MTSU.  We were going to build a relationship with the

5   hospitals -- area hospitals.

6   Q    Now, Syed, when you say MTSU, right now we are in

7   Florida, so tell us what MTSU means.

8   A    MTSU, the Middle Tennessee University and the Middle

9   Tennessee University had a program so we tried to build our

10  relationship with them also because they can also send over

11  their students for internship.

12       So the company was making the revenue.  Okay?  Not just

13  having the children, okay, as preschool and daycare centers.

14  We were opening training session on Saturdays and Sundays

15  for the teachers in the same building.  In the evenings,

16  okay, we were using the same building for the children

17  services.  As we both educator.  We are educators.  We have

18  professors who are going to be in the evening times and they

19  were coming and they were doing the training sessions, okay?

20  Training session and the children.  So they were using,

21  okay, after 6:00 p.m. when the building was closed for the

22  other purposes.

23  Q    Now, and directing your attention back to the number

24  of children, would the revenues be higher if you had 99

25  children or if you had 50 children that were allowed to be

Direct Examination - Syed Hasnain

1   at the daycare center at any one particular time?

2   A      Could you please explain to me the question again.

3   Q      You had 99 percent, correct?

4   A      Yes, sir.

5   Q      Now, would the revenues be higher if you had 99

6   children or if you had 50 children?

7   A      No.  When we have 99 children our revenue was higher.

8   Okay?  So we were always trying to relocate more and more

9   children, okay?  We were trying to give our best service

10  and, therefore, okay, my wife, because she quit her job from

11  MTSU, and she was the manager of the center because she

12  wanted to observe herself, okay, the daycare center.

13  Q      Now, Mr. Hasnain, did you make a decision during that

14  time on whether to exercise your options to purchase the

15  commercial property?

16  A      Yes, sir.  If you notice we were being paying to

17  Mr. Lawson $5,400 a month.  But -- and we were paying always

18  on time.  There was no late payments.  And this -- the

19  checks was going through the bank.  Okay?  To Mr. Lawson.

20  So it makes sense, okay, for me as an educator, okay, and as

21  a businessman if -- why don't you take a loan from the bank

22  and build a relationship with the bank.  Okay?  Because when

23  we are dealing with Mr. Lawson, we were not building the

24  credit.  But once you are taking the loan from the bank

25  you're building the credit for the future, because our

1    future plans was to open more and more branches.

2    Q    Okay.  So, let's talk about the purchasing of the

3    commercial property.  Was the company able to purchase the

4    commercial property?

5    A    Sir, I am proud to say one thing, okay.  That the

6    Fifth Third Bank, okay, their loan officers came to my desk

7    and they were begging me and begging me to take the loan

8    from the bank.

9         MR. WITHERS:  Your Honor, I have to object to

10   this.

11        THE COURT:  Okay.  I'm going to sustain the

12   objection.  But we will stop there.

13        Mr. Ittleman, we will break for lunch now.

14        Ladies and gentlemen, the downtown area has a lot of

15   restaurants and maybe Ana has given you some ideas if you

16   want to go.  Out, as I said, you're free to bring food to

17   eat in the jury room.

18        I'd like for us to -- let's try for 1:30 today because

19   you're remember not familiar with this, so I will give you

20   ample time.  Once you get back and everybody is here and the

21   attorneys are here, I'll start earlier, but I just don't

22   want you to feel like you got to gulp your food down to get

23   back.

24        So if you want to take them out, George, and you all

25   have a nice lunch.  See you at 1:30.  Just come a little bit

 1  earlier so George can line you up.  I'd like to start on

 2  time.

 3                    (Recess for the jury)

 4            THE COURT:  Mr. Hasnain, step down.  Make yourself

 5  comfortable.

 6       And we will get from you the list of exhibits and one

 7  of could read it or I'll read it and just say these exhibits

 8  are admitted and I'll put it on my sheet and then when you

 9  reference it we will know it's admitted.  And what was the

10  other thing you were going to do?

11            MR. ITTLEMAN:  I was going to give all the

12  exhibits to the --

13            THE COURT:  If both sides will do that, when you

14  have a witness read you can tell the other side the numbers

15  of the documents you're going to put in with that witness or

16  ask him to look at, and then just if you don't want the

17  witness to see it, turn them upside down and put and have

18  them in the order you want but just give it all, then you

19  won't not -- you know, just makes for a faster flow.

20            MR. ITTLEMAN:  Sure.

21            THE COURT:  Anything, Mr. Ittleman, for the good

22  of the order?

23            MR. ITTLEMAN:  No, ma'am.

24            THE COURT:  Okay.  From the defense?

25            MR. WITHERS:  I think perhaps the plaintiff needs

Direct Examination – Syed Hasnain

 1   some instructions, Your Honor, to limit his testimony.  I

 2   hate to keep jumping up and objecting because he's not being

 3   responsive.

 4        THE COURT:  I think he's honing in there and I

 5   have already cautioned him to answer the questions.  So I

 6   think we will be okay.

 7        All right.

 8        I'll see you after lunch.  You all come back before

 9   1:30 too, please.

10                  (luncheon recess for the staff)

11        THE COURT:  Mr. Withers has been making the

12   objections, so he has to conduct the cross.

13        MR. WILSON:  I'm sorry he's late.  I guess we have

14   to wait for him.

15        THE COURT:  Well, I'll wait a few minutes, then

16   we're going to go ahead.

17        Mr. Hasnain, you can take a seat in that very

18   uncomfortable chair or you can sit back there for a few

19   moments with your attorney, whatever you prefer.

20        Do you have your exhibit list together?

21        MR. ITTLEMAN:  Because I have so many of my

22   exhibits through Mr. Hasnain and I have copies of these

23   exhibits in my bench book, so I'm trying to take them out

24   one by one.  There's about 80 of them, so --

25        THE COURT:  We'll get the first group up here and

Direct Examination - Syed Hasnain

```
 1   we will start with that because you may not finish, you
 2   know, if you have got that many.
 3        And Mr. Withers is here, so we can bring the jury in.
 4                    Jury present -- 1:28 p.m.
 5        THE COURT:  All right.  Are you comfortable, and
 6   was that more than ample time for lunch?
 7        Okay.  I'll shorten it a little bit tomorrow.
 8        You're welcome to bring water into the courtroom if
 9   you'd like, and we will take a break probably about quarter
10   of three, but I don't want to interrupt testimony if we're
11   in the middle of a subject, so I'll work around that.
12        Mr. Ittleman will proceed with the testimony of
13   Mr. Hasnain.
14             MR. ITTLEMAN:  Yes.
15        Before we start, I have a question for Sherri.
16             THE COURT:  What's the question?
17             MR. ITTLEMAN:  Can I approach?
18             THE COURT:  Just say it from there.
19             MR. ITTLEMAN:  With respect to the Elmo.
20             THE DEPUTY CLERK:  Yes, it's ready.
21             MR. ITTLEMAN:  Is it on?
22             THE DEPUTY CLERK:  Yes.  I'm just turning on the
23   light.
24             MR. ITTLEMAN:  Thank you.
25             THE DEPUTY CLERK:  You're welcome.
```

Direct Examination - Syed Hasnain

```
 1                CONTINUED DIRECT EXAMINATION
 2   BY MR. ITTLEMAN:
 3   Q    Mr. Hasnain, before the break, we were talking a
 4   little bit about your decision to purchase the commercial
 5   property.
 6        Do you recall that?
 7   A    Yes, sir.
 8   Q    And during the break, I provided some exhibits that
 9   had already been agreed to.  I'm going to ask you to pull up
10   Exhibit 71 from your stack of exhibits.
11             THE COURT:  That's right.  The stipulation, did
12   you all do a stipulation on these exhibits?
13             THE WITNESS:  Yes, I have them in front of me.
14             MR. WITHERS:  Oh, you mean a handwritten
15   stipulation?
16             THE COURT:  No.  Did you agree?  Because I need to
17   put it in my notes and Sherri needs to have it.  Otherwise,
18   we have got to go through this procedure where you pass them
19   up here and you know just --
20             MR. ITTLEMAN:  Yeah, we --
21             THE COURT:  Did you do one?
22             MR. ITTLEMAN:  The exhibits that they are going to
23   object to?
24             THE COURT:  The ones that are agreed to.
25             MR. ITTLEMAN:  Correct.  But there's very limited
```

Direct Examination - Syed Hasnain

1  amounts of exhibits that they objected to, so I'll make sure

2  that it's noted to the Court prior to me trying to introduce

3  that exhibit.

4        THE COURT:  Well, maybe the way to handle it until

5  you get me what I want, is for you to say, the stipulated

6  exhibit to me, then I'll know and you don't have to

7  interrupt.

8     So if you want him to look at an exhibit, if it's

9  stipulated, just say the stipulated exhibit.

10       MR. ITTLEMAN:  Yes, ma'am.  Thank you.

11       THE COURT:  So it's number 77?

12       MR. ITTLEMAN:  71.

13       THE COURT:  71.

14       MR. ITTLEMAN:  And it's a stipulated exhibit.

15       THE COURT:  Proceed.

16  BY MR. ITTLEMAN:

17  Q    Can you tell me what that document is?

18  A    Yes, sir.  I'm looking on the other page.  It shows

19  this is the -- when you're purchasing a property, okay.  At

20  that time, okay, this is like a -- some sort of document,

21  note it shows, okay.

22  Q    What is the document called, Mr. Hasnain?

23  A    It's saying it's a document, a statement.

24  Q    Settlement statements?  Correct?

25  A    Yes, sir.

Direct Examination – Syed Hasnain

1   Q     Okay.  And what is the settlement statement

2   demonstrate with respect to the Learning Connections?

3   A     It shows that we purchased the property on

4   February 15, 2007.

5   Q     And what was the purchase price for the commercial

6   property?

7   A     The purchase price for the commercial property was 520

8   or something like that.

9   Q     $520,000?

10  A     Yes, sir.

11  Q     Okay.  And do you know where the commercial property

12  was located?

13  A     It was located in 162 Heritage Park Drive,

14  Murfreesboro, Tennessee 37129.

15        MR. ITTLEMAN:  Your Honor, it's a stipulated

16  exhibit.

17        THE COURT:  You have to offer it.

18        MR. ITTLEMAN:  Thank you.

19        THE COURT:  Let me explain to the jury, what I

20  want counsel to do is to make a list of these exhibits if

21  they are not going to object to, so we don't have to go

22  through -- there's a formality we have to go through if they

23  are objected to.  And that way I can just say to you,

24  they're admitted, we will go on and that will save us a lot

25  of time.  And what I'm asking counsel to do is, since I

 1  don't have this list and I can't read it, just to say it's a

 2  stipulated exhibit when he first mentions it and then we

 3  will go on from there.

 4  BY MR. ITTLEMAN:

 5  Q     Syed, do you recall how the Learning Connections was

 6  going to pay for the commercial -- for the purchase of the

 7  commercial property?

 8  A     We obtained a loan through the Fifth Third Bank.

 9  Q     If you could take out stipulated Exhibit No. 72.

10  A     Yes, sir.

11  Q     Can you tell me what that document is?

12  A     This is a promissory note, okay, between the Fifth

13  Third Bank and the Learning Connection.

14  Q     And how much money did the Learning Connection agree

15  to borrow from Fifth Third Bank?

16  A     The monthly payment was $5,093.  It was drawn on

17  February 15, 2012.  And the total amount was $525,000.

18  Q     Okay.  So just so I understand, would it be fair to

19  say that when the Learning Connections purchased the

20  commercial property on February 15, 2007, it used the money

21  from Fifth Third Bank to pay the purchase price for the

22  commercial property?

23  A     Yes, sir.

24  Q     All right.  What happened after the Learning

25  Connections purchased the commercial property?

Direct Examination - Syed Hasnain

1   A      Once we purchased the property, we were -- continued

2   running the daycare center in the building, and also some

3   other activities we were doing in the weekends and the

4   evenings.  And the money which we were generating from there

5   we were paying the salaries to the teachers, we were

6   spending the money, okay, to upgrade the systems, we put

7   camera system in there.

8   Q      We're going to get to all of that, but --

9   A      And we were generating the profit.

10  Q      Okay.  And before we talk about the profits and the --

11  some of the monies that the company was making, was the

12  company required to renew its license?

13  A      Yes, sir.

14  Q      Okay.  I'm going to ask you to review your stack and

15  find stipulated Exhibit No. 73.

16  A      Yes, sir.

17  Q      What is stipulated Exhibit 73?

18  A      Sir, this shows, okay, that the Learning Connection

19  Academy, which was located at 162 Heritage Park Drive,

20  Murfreesboro, Tennessee, was licensed for 99 children.

21  Q      I'm sorry.  Go ahead.

22  A      And it was issued on October 2007.

23  Q      Is there an effective date on the license?  An

24  effective date?

25  A      September 30, 2008.  It expired on September 30, 2008.

Direct Examination – Syed Hasnain

1   Q      Okay.

2   A      And --

3   Q      How many children are -- by the state, does the

4   license maintain at the daycare center?

5   A      99 children, sir.

6   Q      Was that the same amount of children, more or less,

7   than the number of children that the State of Tennessee

8   allowed your company when you were leasing the property in

9   2006?

10  A      Sir, it was the same amount of number.

11  Q      How was the Learning Connections doing financially

12  during that time in 2007?

13  A      Sir, I would say the business was booming, okay.  And

14  the reason was, okay, we were taking care of children just

15  like we take care of our own children in the center.  We

16  were providing the services which no one else was providing

17  in the area.  Everybody was opening their businesses at

18  6:00 a.m.

19          MR. WITHERS:  Yes.

20          THE COURT:  The witness should answer the

21  questions specifically asked.

22      Proceed.

23          THE WITNESS:  Thank you very much, Your Honor.

24  BY MR. ITTLEMAN:

25  Q      In 2007 how was the Learning Connections doing

Direct Examination - Syed Hasnain

1    financially?

2    A    I'll say that the business was booming.  We were doing

3    excellent financially, and with the service.  Parents was

4    coming, okay, from everywhere to our preschool and daycare

5    center because we were taking care of children just like we

6    take care of our own children in the daycare center.

7             MR. WITHERS:  Objection, Your Honor.

8             MR. ITTLEMAN:  I'm going to ask you another

9    question.

10            THE COURT:  I'll overrule the objection.  That was

11   within the realm of the question that was asked.  Go ahead.

12            MR. ITTLEMAN:  Thank you.

13   BY MR. ITTLEMAN:

14   Q    In your stack of documents there's stipulated Exhibit

15   74.

16   A    Yes, sir.

17   Q    All right.  Now, what is stipulated Exhibit 74?

18   A    Sir, it shows an income tax returns for 2006, '7 and

19   '8.

20   Q    Now, I want you to review the total revenues that the

21   Learning Connections made in 2006.

22   A    If I'm not making a mistake looking on those --

23            THE COURT:  There's no question pending.  I want

24   you -- he said, I want you to review the income tax returns

25   for 2006, correct?

Direct Examination - Syed Hasnain

1           MR. ITTLEMAN:  Correct.

2           THE COURT:  What is the question?

3  BY MR. ITTLEMAN:

4  Q     Did you find the total revenues that the Learning

5  Connections made in the year 2006, according to the tax

6  return?

7  A     It was -- was close to 115 to $134,000.

8  Q     Okay.  Now, with respect to the total revenues that

9  the company made in 2007, I'm going to ask you to review

10 that and tell us what those revenues were.

11 A     If I'm not making a mistake by looking on those tax

12 returns, okay, in 2007 it was from $100,000 reach to 300 --

13 close to $350,000.

14 Q     Okay.  I'm going to show the jury on the Elmo screen

15 the revenues from 2006.

16      Do you see that, Mr. Hasnain, on your screen?

17 A     Yes, sir.

18 Q     You see where it says $115,748?

19 A     Yes, sir.

20 Q     Okay.  And that was the total revenues for the company

21 during the time, correct?

22 A     Yes, sir.

23 Q     And you had mentioned total revenues in 2007, and

24 we're going to publish that to the jury so the jury can see

25 that as well.

Direct Examination – Syed Hasnain

1          Can you tell us what the total revenues were in the

2     year 2007?

3     A      Sir, if I'm not making a mistake, it was $344,220.

4     Q      Was Learning Connections happy that it made over

5     $200,000 more in 2007 than it did in 2006?

6     A      We were enjoying and we were very comfortable.  We

7     were celebrating because it's a good success for the

8     educators because you are coming, okay, from zero and.

9     Q      Okay thank you for the answer.

10          Now, Mr. Hasnain, how was the Learning Connections

11     doing financially in the year 2008?

12     A      In the same thing, okay, as we were growing, we were

13     building more and more relationship with the parents and the

14     parents were giving -- they were a marketing piece.  The

15     parents.  We were not the big company like a Primrose or any

16     other company who was spending too much money --

17     Q     Mr. Hasnain, just the company was doing how in 2008

18     financially?

19     A      Financially, okay.  We were doing excellent, okay.  We

20     were close to $400,000.

21     Q     Okay.  We're going to talk about that number, okay?

22          The stipulated exhibit in your tax returns from 2008,

23     I'd like to have you review that and show you what the

24     revenues were.

25               THE COURT:  Why don't you put that up on the

Direct Examination - Syed Hasnain

```
 1  screen, if it's stipulated, right now so you don't have do
 2  the same questions twice.
 3            MR. ITTLEMAN:  Sure.  Thank you.
 4            THE COURT:  I thought you were going put that up
 5  there.
 6            MR. ITTLEMAN:  Yeah, I'm working on it, Your
 7  Honor, these binders --
 8            THE COURT:  I didn't mean -- I didn't mean to put
 9  you in an awkward position if you weren't going to put it up
10  there.
11            MR. ITTLEMAN:  That's quite okay.  I was going to
12  do it but sometimes these papers are a little thick.
13  BY MR. ITTLEMAN:
14  Q    Mr. Hasnain, I'm going to put the first page of the
15  tax return from 2008 on the screen.
16  A    Yes, sir.
17  Q    And what were the revenues, according to the tax
18  statement in 2008?
19  A    It was, if I'm not making a mistake, it was $261,470.
20  Q    Now, this is the U.S. income tax returns for the
21  Learning Connections, Inc., correct?
22  A    Yes, sir.
23  Q    Now, you had mentioned before that the Learning
24  Connections, Inc. had a business inside the commercial
25  property, correct?
```

Direct Examination - Syed Hasnain

1   A     Yes, sir.

2   Q     Now, what was the status of that business in 2008?

3   A      In 2008, okay, we have the Learning Connection

4   Academy.  We had until September of -- if I'm not making a

5   mistake, until the September of 2008, we were running the

6   business under the name of Learning Connections.

7       In September of 2008, we decide, okay, to have the

8   Learning Connection Academy.

9   Q     And let's talk about the Learning Connection Academy.

10            MR. WITHERS:  Your Honor, we would object to any

11   testimony concerning the Learning Connection Academy.  It is

12   not party to this case.  That's not -- could not possibly be

13   relevant to what we're doing here today.

14            THE COURT:  What is the relevance?

15            MR. ITTLEMAN:  The relevance is that they changed

16   their license to this new company and the company was

17   running under the new license and it generated revenues, and

18   the proposed testimony is going to be what the revenues of

19   this new company was underneath that commercial property and

20   those revenues were being used to pay the mortgage that they

21   had with Fifth Third Bank.

22            THE COURT:  I'll overrule the objection.

23            MR. ITTLEMAN:  Thank you.

24       Madam court reporter, can you read the question to the

25   witness?

Direct Examination – Syed Hasnain

```
 1              THE COURT:  No, we don't read back.
 2              MR. ITTLEMAN:  Okay.
 3  BY MR. ITTLEMAN:
 4  Q     What was the status of the Learning Connection Academy
 5  in 2008?
 6  A     The Learning Connection Academy, okay, was running,
 7  okay, a number of activities.  Okay.  Because we were –– we
 8  learned a lot during the last three years.  From 2006 ––
 9              THE COURT:  Just a moment, please.
10       The question is, what was the status of the Learning
11  Connection Academy there.
12       So was it active?
13              THE WITNESS:  It was active, and it was good.
14  BY MR. ITTLEMAN:
15  Q     Now, why did –– why was there a change in the status
16  from the Learning Connection –– the Learning Connections,
17  Inc. to the Learning Connections Academy in 2008?
18  A     The one reason was, okay, the Learning Connection, the
19  director of the Learning Connection was my wife, Nadira
20  Hasnain.  And we were moving over the summer from Tennessee
21  to Georgia.  The reason was, okay, my son, okay, he was to
22  be a from the magnet high school with his dual degree, with
23  the high school and the college of two years.  So at that
24  time we decide, okay, that my wife can still instruct,
25  staying all time in Tennessee.  She can still some of the
```

Direct Examination – Syed Hasnain

 1  time in Tennessee and some of the time in Georgia.

 2  Q    So, Mr. Hasnain, let me just understand what was

 3  happening.

 4       Who was primarily -- who was the license holder of the

 5  Learning Connections, Inc. that entitled the company to

 6  maintain the 99 children with the Learning Connections,

 7  Inc.?

 8  A    Okay.  For the day-to-day activities, for the daycare

 9  center, Ms. Debra Cameron, she was a director and Nadira

10  Hasnain, okay, my wife, she was taking care of for the

11  curriculum part of the project.

12  Q    Now, Mr. Hasnain, is that for the Learning

13  Connections, Inc. or the Learning Connections Academy?

14  A    Learning Connection Academy.

15  Q    Okay.  So your wife was involved in the Learning

16  Connections Academy.

17  A    Yes, sir.

18  Q    And is it fair to say that a business decision was

19  made to change the license from the Learning Connections,

20  Inc. to the Learning Connections Academy during that time?

21  A    Yes, sir.

22  Q    Okay.  And the reason for the change, if I'm not

23  mistaken, is because your wife was -- wanted to have less

24  involvement in the company.

25  A    As the director, you are supposed to be there, okay,

Direct Examination – Syed Hasnain

1   like a minimum 40 hours.  And if -- so, she could not

2   maintain the 40 hours to be stay.  Therefore, we decide to

3   have a director over there and my wife, okay, but she will

4   be maintaining of the daily activities, okay.  We were going

5   to weekend also to see okay and sometimes during the

6   weekdays.

7   Q    So as a result, you decided to change the license to

8   the Learning Connections Academy.

9   A    Yes, sir.

10  Q    Okay.  Now, who was responsible for -- well, when the

11  decision was made to change the license to the Learning

12  Connections Academy, did that change your business at all?

13  Were the children still coming in?

14  A    Sir, the children was still coming because in daycare

15  centers, when they're giving the license, they're not giving

16  the license.

17           MR. WITHERS:  Your Honor, please.

18           THE COURT:  Yes, it's a yes or no answer to the

19  question.

20  BY MR. ITTLEMAN:

21  Q    Sir, were the children still coming into the daycare

22  center?

23  A    Yes, sir.

24  Q    Okay.  So did it matter for the children that they

25  were now going to the Learning Connections Academy?

```
 1              THE COURT:  Counsel, he can't speculate as to what

 2  the children thought.

 3              MR. ITTLEMAN:  Thank you, Your Honor.

 4  BY MR. ITTLEMAN:

 5  Q    Now, during that time in 2008, were there revenues

 6  being generated from your business inside the commercial

 7  property?

 8  A    Yes.  Definitely, sir.

 9  Q    And who was maintaining the books, the books and the

10  accounting with respect to the finances of the Learning

11  Connections Academy?

12  A    I was the responsible person.

13  Q    And with respect to the monies being generated, how

14  were you maintaining those books and records?

15  A    I am a computer science major, okay, and my degree

16  was -- my first degree was computer science and the second

17  was MBA.  So I was very much familiar, okay, with the number

18  of software packages and I was maintaining myself.

19  Q    Okay.  I'm going to ask you to review the package and

20  go to Exhibit No. 1.  I don't believe it's stipulated.

21              THE COURT:  Don't put it on the Elmo then until

22  it's --

23              MR. ITTLEMAN:  Yes, ma'am.

24              THE COURT:  -- admitted.

25          The question then?
```

Direct Examination – Syed Hasnain

1    BY MR. ITTLEMAN:

2    Q    The document marked Exhibit 1, is that exhibits or is

3    that a document that you prepared?

4    A    I don't know what the difference is between that.

5    Q    Did you prepare the financial statements of the

6    Learning Connections Academy for 2008?

7    A    Yes, sir.

8    Q    Okay.  And what was your role with the Learning

9    Connections Academy during that time?

10   A    I was one of the owners.

11   Q    And were these -- was the financial information that

12   you prepared for the Learning Connections Academy being

13   prepared contemporaneously with the children that were

14   coming in and the amount of money that the company was

15   making?

16   A    Yes, sir.

17           MR. ITTLEMAN:  At this time I'd like to move and

18   introduce Exhibit 1 into evidence.

19           THE COURT:  Yes.

20           MR. WITHERS:  We will object to its relevancy,

21   competency.  The document is, first of all, a self-serving

22   document.  It's not audited.  And apparently it's prepared

23   by Mr. Hasnain himself.

24           THE COURT:  That's correct.  That's what he said.

25       Well, I'll overrule relevancy, and self-serving is not

Direct Examination – Syed Hasnain

1    a basis to deny admission.  The witness is present and

2    available for cross-examination, so objection overruled.

3              MR. WITHERS:  May I make an additional objection?

4              THE COURT:  Yes.

5              MR. WITHERS:  That is, the one I made earlier,

6    this is about the Learning Connections Academy.

7              THE COURT:  Yes, I thought that was your first

8    objection was -- okay.  I have overruled that.

9         Proceed.

10   BY MR. ITTLEMAN:

11   Q    In the package of materials, Mr. Hasnain, there's a

12   document marked Exhibit 1.

13   A    Yes, sir.

14   Q    Okay.  And do you have that in front of you?

15   A    Yes, sir.

16             THE COURT:  I'm sorry.  I thought you were asking

17   him about 1, and he said he prepared this.

18        Am I incorrect?

19             MR. ITTLEMAN:  Correct.

20             THE COURT:  I'm correct?

21             MR. ITTLEMAN:  Yeah, he prepared it.

22             THE COURT:  All right.

23             MR. ITTLEMAN:  I just want to make sure I was

24   going to lay the proper predicate.  Thank you.

25             THE COURT:  You have offered that and it's been

Direct Examination – Syed Hasnain

 1  admitted over objection.  So you can put it on the Elmo.

 2          MR. ITTLEMAN:  Thank you.

 3  BY MR. ITTLEMAN:

 4  Q    With respect to Exhibit 1, what does this document

 5  show?

 6  A    This shows, okay, the number of children by their ages

 7  and by week what we were collecting from each child.

 8  Q    Let me ask you this, Mr. Hasnain:  Is there a reason

 9  that the company decided to group the children by age?

10  A    Yes, sir.  In every daycare center, okay, they charge

11  by the ages.

12  Q    Okay.  So there's a different price for different

13  children.

14  A    Yes, sir.

15  Q    Yes?

16  A    Yes, sir.

17  Q    And there's a total monthly received.

18       Do you see that --

19  A    Yes, sir.

20  Q    -- for September, October, November, December?

21  A    Yes, sir.

22  Q    And what was the total amount of revenues received in

23  the month of September of 2008?

24  A    Which was $37,820.

25  Q    And what about in October of 2008?

Direct Examination - Syed Hasnain

1   A      $38,520.

2   Q      And November of 2008.

3   A      $39,360.

4   Q      And what about December of 2008?

5   A      $36,600.

6   Q      Now, under the revenues that were received, are

7   there -- you have a bold mark monthly expenses.

8   A      Yes, sir.

9   Q      Okay.  And there's rents, right, associated with that?

10  A      Yes, sir.  Okay.  What we decide, okay, typically I'm

11  showing the reasons here.  Because we have a note from the

12  Learning Connection for 5,000 -- $5,029 and something cents,

13  throws a $540 in round.  So we decide, okay, this money,

14  okay, can go, okay, we can keep, okay, separate, okay, for

15  paying the mortgage for the Learning Connection.

16  Q      Okay.  I just want to make sure that's -- we slow that

17  down so we understand.

18        The promissory note or the debt between -- with Fifth

19  Third Bank was with the Learning Connection, correct?

20  A      Yes, sir.

21  Q      All right.  So the Learning Connections Academy was

22  paying rent to the Learning Connections; is that correct?

23  A      Yes, sir.

24  Q      Is that correct?

25  A      That's right, sir.

Direct Examination – Syed Hasnain

1   Q     All right.  And there's a line on the bottom that's

2   entitled "Net Income."

3   A     Yes, sir.

4   Q     Okay.  So after everything was paid, would it be fair

5   to say that the Learning Connections Academy made money from

6   September of 2008 through December of 2008?

7   A     Yes, sir.

8   Q     And when I say everything, that includes the rent that

9   the company was paying to the Learning Connections, Inc.?

10  A     That's true, sir.

11  Q     Now, we talked about your tax income statements from

12  2008.  And the tax income statement from 2008 shows

13  revenues, does it not?

14        Shows a total amount of revenues from the Learning

15  Connections.

16  A     Yes, sir.

17  Q     Okay.  Please go back to the tax statement from 2008.

18        THE COURT:  Meaning Plaintiff's 74?

19        MR. ITTLEMAN:  Correct.  Thank you.

20  BY MR. ITTLEMAN:

21  Q     You see the total revenues from for the Learning

22  Connections, Inc. from 2008?

23  A     Yes, sir.

24  Q     It was 261,000, correct?

25  A     Yes, sir.

Direct Examination - Syed Hasnain

1          THE COURT:  Counsel, you have already asked these

2   questions on this.

3          MR. ITTLEMAN:  Okay.

4          THE COURT:  Go ahead.  Get something new here.

5          MR. ITTLEMAN:  Yes.

6   BY MR. ITTLEMAN:

7   Q     So arrive at the amount of money that the commercial

8   property generated from 2008, what -- how did we come to

9   that number?

10  A     We came, okay, from January of 2008 to September of

11  2008, if I'm not making a mistake.

12  Q     Which gives you the 261,000?

13  A     Yes, sir.

14  Q     And then we added, correct, what the Learning

15  Connections Academy made from September through December of

16  2008 --

17  A     Yes, sir.

18  Q     -- correct?

19        And do you know what that number is?

20  A     I don't have it in front of me right now.

21  Q     Were you aware that's the number of the total revenues

22  from 2008, was in excess of $400,000 of money that was

23  generated from the commercial property?

24  A     Yes, sir.

25  Q     Okay.  Now, is that more or less than the amount of

Direct Examination - Syed Hasnain

1   money that's -- the commercial property generated in the

2   year 2007?

3   A     Sir, it was more.  If you see from 2006, '7 and '8,

4   every year it was, you know, going up.

5   Q     So it's fair to say that during this time, the

6   company's revenues increased per year?

7   A     Yes, sir.

8   Q     Okay.  And in 2007, do you recall where the company

9   was banking?  The Learning Connections?

10  A     We have a three different banks.

11  Q     Okay.

12  A     Okay.  One was with Fifth Third Bank.  We were doing

13  the business with Fifth Third Bank.  The second one, okay,

14  we were doing, okay, with SunTrust Bank also.  And also

15  because we were dealing with Green Bank.

16  Q     Now I'm going to show you stipulated Exhibit No. 30 on

17  the Elmo screen, Mr. Hasnain.  Please tell me what document

18  this is.

19  A     This is a banking statement, okay, which are under my

20  wife's name, Nadir's name.

21  Q     And that's with what bank?

22  A     It was with Green Bank.

23  Q     Green Bank?

24        Is it Green Bank?

25  A     Yes, sir.

Direct Examination – Syed Hasnain

1  Q     And as of September of 2007, how much money were you

2  maintaining with Green Bank?

3  A     In checking account was 1 -- close to $140,000.

4  Q     Okay.  It says $139,924.21.

5  A     Yes, sir.

6  Q     Is that correct?

7  A     That's right.

8  Q     Now if there was an issue with the mortgage,

9  Mr. Hasnain, could the money that you had or that the

10  company had with Green Bank had been used to pay a mortgage

11  payment?

12  A     Any issues?

13  Q     If there was an issue with your mortgage payments,

14  could you --

15  A     We can utilize any of our accounts.

16  Q     Okay.  I'm going to ask the question again.

17      If there's an issue with the mortgage payments with

18  Fifth Third Bank in September of 2007, could you have used

19  the money that you had --

20  A     Yes.

21  Q     -- with Green Bank to pay the mortgage?

22  A     100 percent, sir.

23  Q     Okay.

24          THE COURT:  Counsel, we need a question.

25          MR. ITTLEMAN:  Yes, thank you.

Direct Examination – Syed Hasnain

1    BY MR. ITTLEMAN:

2    Q    However, in 2008, did the Learning Connections have

3    any issues with Fifth Third Bank that was not related to the

4    Learning Connections' ability to pay the monthly amounts of

5    the promissory note?

6    A    We were --

7           MR. WITHERS:  Your Honor, let me object to that

8    question.  That's sounds like a question that suggests an

9    answer.  I object to it.

10          THE COURT:  Counsel, I'm concerned that the

11   witness is not going to understand and we're going to go on

12   along --

13          MR. ITTLEMAN:  Right.

14          THE COURT:  So just ask straight out what you

15   want.

16   BY MR. ITTLEMAN:

17   Q    Did the company have an issue with Fifth Third Bank in

18   2008?

19   A    In 2008, okay, there was a one short, right?  Okay.

20   Q    I just want to know if the Learning Connections had an

21   issue with Fifth Third Bank in 2008.

22   A    Yes, sir.

23   Q    Okay.  Now, was the issue in any way related to the

24   company's ability to pay its mortgage with the Fifth Third

25   Bank?

Direct Examination - Syed Hasnain

```
 1  A     Not at all, sir.

 2  Q     Okay.  And when in 2008 did the issue arise?

 3  A     It happened, okay, when I had --

 4  Q     What month did it arise?

 5  A     It was in August.  Okay?  If I'm -- you know, let me

 6  recall my memory.

 7  Q     Okay.

 8  A     Okay.

 9  Q     And can we say the summer of 2008?

10  A     Yes, sir.

11  Q     That there was a problem.

12  A     Yes, sir.

13  Q     And tell us what happened.

14  A     Actually, my father, okay, when he passed away, so we

15  had -- my wife and me, we had to go back home to take care

16  of funeral services.

17  Q     When you say back home, where is that, Mr. Hasnain?

18  A     I am from Pakistan; my wife is from Bangladesh.

19  Q     Okay.  So when you say that you had to go back home to

20  be with your family, where was that; in Pakistan or

21  Bangladesh?

22  A     In Pakistan, then we went to Bangladesh, also.

23  Q     And --

24            MR. ITTLEMAN:  May I approach, Your Honor?

25            THE COURT:  Yes.
```

Direct Examination – Syed Hasnain

```
 1        Well, no, no, my courtroom deputy will take care of
 2   that.
 3             MR. ITTLEMAN:  Go ahead.
 4             THE COURT:  Next question, please.
 5   BY MR. ITTLEMAN:
 6   Q    I'll let the witness kind of --
 7   A    Sorry about that.
 8             MR. ITTLEMAN:  Have a second, Your Honor?
 9             THE WITNESS:  Thank you very much, ma'am.
10             THE COURT:  Mr. Hasnain, the Kleenex are to the
11   left there.
12        Does he have water?
13             THE DEPUTY CLERK:  Yes, he does.
14             THE COURT:  Next question, please.
15   BY MR. ITTLEMAN:
16   Q    Sir, you mentioned the fact that you traveled to
17   Pakistan in the summer of 2008, correct?
18   A    Yes, sir.
19   Q    Now, there were two other shareholders of the Learning
20   Connections, correct?
21   A    Yes, sir.
22   Q    And who are the other shareholders?
23   A    Mr. Fred Gentry and Ms. Linda Gentry, his wife.
24   Q    Do you know what happened to Mr. and Mrs. Gentry in
25   July of 2008?
```

1   A     They have a major accident, which I heard later on,

2   there in Nashville, Tennessee, where they have to go through

3   the helicopter to the hospital.  In this accident,

4   Mr. Gentry, he lost one of eyes and his wife is still

5   hospitalized.

6   Q     Okay.  When you were in Pakistan, were you aware that

7   the Gentrys were involved in this very serious accident?

8   A     No, sir.

9   Q     Okay.

10  A     Because he had little children, okay, in the age of

11  like 7, 8 years old.

12  Q     When the Gentrys were involved in this very serious

13  accident, were they aware that you and your wife were in

14  Pakistan?

15  A     No, sir.

16  Q     What happened regarding the mortgage payments with

17  Fifth Third Bank as a result of you being in Pakistan and

18  the Gentrys being hospitalized?

19  A     We had an assistant director, okay, and we rely on

20  her, okay.  Because she did not meet the, you know, payments

21  on time, okay, and she got behind.  She was not

22  following that -- she not follow the rules and procedures

23  which we have set up for her.

24  Q     Okay.  When you say the payments, the Learning

25  Connections had a loan with Fifth Third Bank?

Direct Examination - Syed Hasnain

1   A      Yes, sir.

2   Q      Now, were any statements missed with Fifth Third Bank

3   during that time?

4   A      Yes, sir.

5   Q      Can you tell me what months those payments were

6   missed?

7   A      If I'm not making a mistake, it was August and

8   September, something like this.  Because I don't have a

9   document in front of me.

10  Q      Now what happened after you and your wife returned

11  from Pakistan?

12  A      I -- as soon as I find out, okay, that we are behind,

13  okay, in the payment, I went to the Fifth Third Bank, okay,

14  and I asked the -- on the teller to give them a check.

15  Okay, the lady, okay, she told me that I need to talk, okay,

16  to the loan officer.

17           MR. WITHERS:  Your Honor, we're going to object to

18  any hearsay.

19           THE COURT:  Yes, it is hearsay.

20  BY MR. ITTLEMAN:

21  Q      Now, at any time did you try to pay that -- missed

22  payments?

23  A      Not only that, sir --

24  Q      Just answer that question.

25  A      Yes, sir.

Direct Examination - Syed Hasnain

1   Q     Yes?

2   A     Yes.

3   Q     Mr. Hasnain, I believe stipulated to Exhibit No. 78,

4   please refer to it in your package.

5         It's on your Elmo screen, too, sir.

6   A     Yes, sir.

7   Q     Do you see Exhibit No. 78?

8   A     Yes, sir.

9   Q     And what is Exhibit No. 78?

10  A     Sir, this is the letter, okay, which I received, okay,

11  from Ms. Leslie Jones.

12  Q     Okay.  And who does Leslie Jones work for?

13  A     She was working for Fifth Third Bank and she was

14  the -- she was the lady who was handling our mortgage loan.

15  Q     Okay.  Now, I'm going to ask you to review the second

16  to last paragraph.

17  A     Yes, sir.

18  Q     Do you see "Additionally"?

19  A     Yes, sir.

20  Q     Additionally, your payment was received in the amount

21  of 5,000.

22            THE COURT:  You don't need read it if it's on

23  Elmo.

24            MR. ITTLEMAN:  All right.

25            THE COURT:  What is the question?

Direct Examination - Syed Hasnain

1  BY MR. ITTLEMAN:

2  Q    Do you know why Fifth Third Bank refused to credit

3  your accounts in the amount $5,000?

4  A    Yes, sir.

5         MR. WITHERS:  Your Honor --

6  BY MR. ITTLEMAN:

7  Q    For the --

8         THE COURT:  Just a moment.  It appears that that's

9  hearsay, counsel.  You will have lay a foundation.

10        MR. ITTLEMAN:  Sure.

11 BY MR. ITTLEMAN:

12 Q    You received a letter from Fifth Third Bank, correct?

13 A    Yes, sir.

14 Q    The letter states, and you can see it, that you had

15 paid $5500 to Fifth Third Bank, correct?

16 A    Yes.  Yes, sir.  Actually, you know, I want to express

17 my feelings at this point, if you kindly --

18 Q    Just answer the question.

19    The amount of $5500 had been paid by the Learning

20 Connection to Fifth Third Bank.

21 A    Yes, sir.

22 Q    Okay.  And the payment was not applied by Fifth Third

23 Bank, correct?

24 A    Sir, no, they were not crediting in that account.

25 Q    Because it states that they wanted a complete review

Direct Examination – Syed Hasnain

1   of your account and they wanted to documentation from you.

2   A     Yes, sir.

3       Okay.  My wife and I complete all the documentations

4   and we sent to the bank.  But they were requesting, okay,

5   from my other two partners, and I was unable to bring them,

6   okay.  And this was a major issue, okay, with the Fifth

7   Third Bank, was -- this was a major issue that the Fifth

8   Third Bank was asking me to bring something of which I could

9   not bring it.  Okay, if I cannot go to my partner, they're

10  sick, they're in the hospital, how I can get their

11  signatures?  And they were saying, okay, I need bring those

12  signatures unless -- before they'll start billing over the

13  penalties.  They were --

14          THE COURT:  Just a moment please.

15          MR. WITHERS:  Your Honor, I have to object.  This

16  letter speaks for itself.

17          THE COURT:  All right.  The witness, however, is

18  relating his personal inability.  I'll overrule the

19  objection to the extent it is to the last testimony.

20      Next question, please.

21          MR. ITTLEMAN:  Thank you.

22  BY MR. ITTLEMAN:

23  Q    What happened after the company received the letter

24  from Fifth Third Bank that it was essentially refusing to

25  accept the money from the Learning Connections?

Direct Examination - Syed Hasnain

1          MR. WITHERS:  Your Honor, I hate to keep

2    objecting.  That's a mischaracterization of what that letter

3    says.

4          THE COURT:  Counsel, that would be a leading

5    question as well.

6       First of all, are you referring to Exhibit 78?

7          MR. ITTLEMAN:  Yes, ma'am.

8          THE COURT:  All right.  Then what happened after

9    Exhibit 78 was received?

10          MR. ITTLEMAN:  Right.  Yes.

11          THE COURT:  Is that the question?

12          MR. ITTLEMAN:  That's the question.

13   BY MR. ITTLEMAN:

14   Q    What happened after -- after that -- during this time,

15   what was happening with the business of the Learning

16   Connections?

17   A    The Learning Connection was a still running the

18   business.  Okay.  And I was continue, and the letter shows,

19   that I had to reach over to the president's office and I

20   request, if you would please kindly start taking the

21   payments and soon I will receive, okay, the signatures from

22   the Gentrys.  And --

23          MR. WITHERS:  Gosh, Your Honor.

24          MR. ITTLEMAN:  Sir.

25          MR. WITHERS:  Same objection as before.

Direct Examination - Syed Hasnain

```
 1            THE WITNESS:  Your Honor, I need to express --
 2            THE COURT:  Just a moment, please.
 3            THE WITNESS:  I don't know how I can express --
 4            THE COURT:  Just a moment, please.
 5       All right.  I have two issues, Mr. Ittleman.  One is, I
 6  think you need to ask short questions and get answers.  I
 7  believe the witness is relating what he did, but it is so
 8  vague that I can't be sure and, therefore, we have an
 9  objection, which I think is well taken.  So start over and
10  let's try to get you going a little faster, too --
11            MR. ITTLEMAN:  Sure.
12            THE COURT:  -- and hone in.
13            MR. ITTLEMAN:  Yes.
14  BY MR. ITTLEMAN:
15  Q    What was happening with your business during that time
16  with Fifth Third Bank?
17       We have a letter from Fifth Third Bank that it refused
18  to accept your money --
19  A    Yes.
20  Q    -- correct?
21  A    Yes, sir.
22  Q    Was Fifth Third Bank, did they refuse to accept other
23  payments that you had as well?
24  A    Yes.  I sent them the other payments too, and they
25  refused everything.
```

Direct Examination - Syed Hasnain

1  Q     Now what was the Learning Connections doing during

2  that time?  Was it -- as far as its business?

3  A     It was active.

4  Q     Okay.  Now, in your package, I'm going to ask you to

5  review stipulated Exhibit No. 75.

6  A     Yes, sir.  Yes, sir.

7  Q     Okay.  Now, can you tell me what stipulated Exhibit 75

8  is, sir?

9  A     Sir, it shows that Learning Connections, Inc. received

10 notice of foreclosure on November 12, 2009.

11 Q     November 12?

12 A     Yes, sir.

13 Q     Because I have a letter from Stites and Harbison.  Do

14 you know who they are?

15 A     Sir, this is the law firm which you are representing

16 to the Fifth Third Bank.

17 Q     Okay.  Now, the letter says November 12, 2009.  And it

18 says that it was sent certified mail, return receipt

19 requested, correct?

20 A     Yes, sir.

21 Q     Do you know when you received this letter?

22 A     We received after a few days.

23 Q     Okay.  Now, the letter had a notice of foreclosure,

24 correct --

25 A     That's --

1   Q      -- attached to it?

2   A      That's right, sir.

3   Q      Now I'm going to show you page 1 of the notice of

4   foreclosure.

5          Do you see that?

6   A      Yes, sir.

7   Q      Do you see where it says, "Now therefore"?

8   A      Yes, sir.

9   Q      When was -- when did the bank tell you that they were

10  going to sell your commercial property through foreclosure?

11  A      Sir, it shows on December 9, 2009 at 10:15 a.m.

12  Q      Okay.  So would be fair to say that you received the

13  letter from the law firm telling you that they were going to

14  foreclose on your property around November 15?

15  A      That's right too, sir.

16  Q      And foreclosure was scheduled for December 9th.

17  A      Yes, sir.

18  Q      About how many weeks did you have between the time

19  that they told you that they were going take your property

20  to the time of the actual sale?

21  A      About three to four weeks.

22  Q      Is it three weeks or four weeks between November 15,

23  2009 and December 9, 2009?

24  A      About three weeks.

25          MR. WITHERS:  Your Honor, I think the Court can

Direct Examination – Syed Hasnain

1  take judicial notice of the calendar.

2          THE COURT:  Counsel, the witness may answer, but

3  we can all calculate.

4          MR. ITTLEMAN:  Sure.

5  BY MR. ITTLEMAN:

6  Q    About three weeks?

7  A    Yes.

8  Q    And during those three weeks, did you try to do

9  something to make sure that this would not, in fact, occur?

10 A    Definitely, sir.  Okay, we did number of -- we took

11 number of steps.

12 Q    Okay.  We're going to go through some of those steps,

13 okay?

14     You had mentioned that there were a few things that you

15 tried to do.

16 A    Yes, sir.

17 Q    What do you recall being one of the first things that

18 you tried to do to deal with the foreclosure notice from the

19 bank?

20 A    I cannot remember the sequence, okay, because one of

21 the things was, okay, that we contacted, okay, our family

22 back home, okay?

23 Q    Now, let's kind of talk about that, that you tried to

24 contact your family back home.

25 A    Yes.

Direct Examination - Syed Hasnain

1  Q     I'm going to show you stipulated Exhibit No. 2 in your

2  package.

3  A     Yes, sir.

4  Q     Now, can you tell me what this document is?

5  A     Yes, sir.

6  Q     And what is it?

7  A     It's -- sir, we can take to the one of the title

8  company, okay, in Murfreesboro, Tennessee.

9  Q     Okay.  And what is this stipulated Exhibit 2 saying?

10 A     It's showing, okay, that my brother-in-law, Dr. Hauk,

11 he was interested, okay, to purchase the property and

12 running the same business in the building.

13 Q     Okay.  And who is Heather Baxter?

14 A     Heather Baxter, she was the lady who was working for

15 the title company.

16 Q     What was she trying to do for the Learning

17 Connections?

18 A     Because in order for my brother-in-law to send a --

19 transfer the -- wire transfer the money from Bangladesh to

20 American account, he need to know the total figure to

21 deposit the money, okay, in that account so to purchase the

22 property -- to purchase the property and secure the property

23 from the foreclosure.

24 Q     Okay.  Did you -- and she's saying here, I'm trying to

25 get some figures together for you now.

Direct Examination - Syed Hasnain

1      Do you know what that meant?

2   A    Yes.  She was trying to see, okay, she can contact the

3   Fifth Third Bank and get the exact figure.

4   Q    Exact figure to do what?

5   A    Exact figure, okay, to pay to the Fifth Third Bank

6   and -- from my brother-in-law to purchase the property.

7   Q    Okay.  Because the Learning Connections had a loan

8   with the bank.

9   A    Yes, sir.  To the pay off the loan.

10  Q    Your brother-in-law wanted to pay off the entire

11  amount of loan.

12  A    That's very true, sir.

13      MR. WITHERS:  Your Honor, I'm going to have to

14  object and ask for the court to strike that testimony.

15      He doesn't know what his brother-in-law wanted.

16      THE COURT:  The testimony is hearsay.  The

17  objection is well taken.  I sustain it, and the jury should

18  disregard the statement of counsel as well as the last

19  statement of the witness.

20      Next question, please.

21      MR. ITTLEMAN:  Sure.

22  BY MR. ITTLEMAN:

23  Q    Did you ever receive a response from Heather Baxter

24  from the title company?

25      MR. WITHERS:  Objection.  Hearsay.

Direct Examination - Syed Hasnain

1          THE COURT:  Well, yes or no, and then we will find

2    out if it's something that's admitted or not.  If it's

3    hearsay...

4          THE WITNESS:  Yes.

5    BY MR. ITTLEMAN:

6    Q    There was a response?

7    A    Yes.

8    Q    Were you receiving any further information from your

9    brother-in-law regarding his purchase of the property?

10   A    Repeat the question, please.

11   Q    Were you receiving any further information from

12   Dr. Hauk, your brother-in-law, regarding his purchase of the

13   property?

14   A    Yes, sir.

15         MR. WITHERS:  Object to that as hearsay, too,

16   unless they can point to a document in evidence.

17         THE COURT:  Well, let me hear what the next

18   question is.

19   BY MR. ITTLEMAN:

20   Q    I'm going to show you what's been stipulated, Exhibit

21   No. 4.

22      Can you tell me what this document is, sir?

23   A    Yes, sir.

24   Q    What is it?

25   A    Okay.  This document shows, okay, that --

Direct Examination – Syed Hasnain

1    Q     Well, first of all, identify the document for us.

2    A     Yes, sir.

3    Q     Is it a letter, an e-mail or what is it?

4    A     It is an e-mail.

5    Q     An e-mail from who?

6    A     From my brother-in-law, okay.

7    Q     Dr. Nasar Hauk.  Okay.

8             THE COURT:  The last objection is overruled.

9        Proceed.

10            MR. ITTLEMAN:  Thank you.

11   BY MR. ITTLEMAN:

12   Q     And who is the e-mail to?

13   A     He's sent the e-mail, okay, "to my dear friend, Syed

14   Hasnain, the Learning Connection."

15   Q     One e-mail address.

16   A     Yes, sir.

17   Q     Okay.  Now, what is the subject of the e-mail?

18   A     The subject of the e-mail is payoff letter.

19   Q     And when was the e-mail sent?

20   A     The e-mail was sent on November 24, 2009 at 5:45 p.m.

21   Q     Okay.  Now -- and the subject is payoff letter,

22   correct?

23   A     Yes, sir.

24   Q     All right.  So what was the intent of your

25   brother-in-law sending you this e-mail?

1          MR. WITHERS:  Objection.

2          THE COURT:  Counsel, he can't speculate on someone

3    else's mental state.

4          MR. ITTLEMAN:  Okay.

5    BY MR. ITTLEMAN:

6    Q    When you received this e-mail, what happened?

7    A    Once we received the e-mail, okay, there was a time,

8    okay, when you can transfer the money, okay, just in

9    seconds.  But after September 11th, things are change.

10   Okay, now you start taking the time, okay, to send the money

11   from one country to another country, therefore, my

12   brother-in-law, okay, because he has the money, okay --

13         MR. WITHERS:  Objection, hearsay, whatever the

14   brother-in-law said.

15         THE COURT:  Okay.  Counsel, I think you need to

16   ask this witness short, staccato questions so we don't have

17   all of the time on objections because of hearsay.

18         MR. ITTLEMAN:  Yes, ma'am.

19   BY MR. ITTLEMAN:

20   Q    You received that letter from your brother-in-law.

21   A    Yes, sir.

22   Q    Regarding a payoff of the loan.

23   A    Yes.  Then we contact --

24   Q    No, just answer the question.

25         Regarding the payoff of the loan, right?

1   A      Correct.

2   Q      Now going back to Exhibit 4.

3   A      Yes, sir.

4   Q      There's the first paragraph.

5          Do you see that?

6   A      Yes, sir.

7   Q      "But I need at least four months' time to close the

8   deal"?

9   A      Yes, sir.

10  Q      "Because it is an overseas transaction for me."

11  A      Yes, sir.

12  Q      Now, after you received -- after the Learning

13  Connection and you and your wife received that e-mail on

14  November 24, 2009 --

15  A      Yes, sir.

16  Q      -- did you -- did you think that the company was going

17  to be able to resolve the foreclosure sale for December 9,

18  2009?

19  A      We were trying our best and then we contacted the

20  Fifth Third Bank, their head officer.

21  Q      And before you contacted Fifth Third Bank, did you

22  believe that you were going to be able to get the amount of

23  money to pay off the loan prior to December 9, 2009, when

24  you received the e-mail on November 24, 2009?

25  A      We needed time for at least four months.

Direct Examination – Syed Hasnain

1   Q      All right.

2   A      Two to four months.

3   Q      So because you believed that you needed time to pay

4   **off the amount of money that the company owed First Third**

5   **Bank** --

6   A      Yes, sir.

7   Q      -- what did the Learning Connections do next?

8   A      We contacted the Fifth Third Bank.

9          MR. WITHERS:  Object to the form of the question.

10  It is leading.  Once again, it suggests an answer.

11         THE COURT:  The witness has already stated what

12  counsel contained in his question.  Overruled.

13     You may answer.

14         THE WITNESS:  I contact my wife and I contact

15  okay, the higher officials of the Fifth Third Bank in Ohio,

16  and we get them number of options.

17  BY MR. ITTLEMAN:

18  Q      Before we get do that, I'm going to ask you to review

19  the stipulated Exhibit No. 3 in your package.

20     Do you see Exhibit No. 3?

21  A      Yes, sir.

22  Q      I'm going to show you page 2 of Exhibit No. 3, where

23  it says, "Sincerely yours."

24  A      Yes, sir.

25  Q      Now, is that you, Syed?

Direct Examination - Syed Hasnain

1    A      Yes, sir.

2    Q      Hasnain?

3    A      Yes, sir.

4    Q      Now, we're talking about options that the Learning

5    Connections was trying to provide to Fifth Third Bank during

6    that time.

7    A      That's true, sir.

8    Q      And you have option 1 listed here, correct?

9    A      Yes, very true, sir.

10   Q      And just summarize for the jury what option number 1

11   meant.

12   A      What option number 1 means was, that I want -- okay,

13   that they were asking -- they needed the signature of the

14   other two partners.  And I wanted them to just take the

15   signature of my signature and my wife's signature and

16   withdrawing the money from the -- from our account.

17   Q      When you say "from our account," you have here that

18   will allow the bank to withdraw monthly mortgage payments

19   directly from the account of Mr. Syed Hasnain.

20          That's you, correct?

21   A      That's very true, sir.

22   Q      Okay.  So you were giving the bank the option of

23   taking money directly out of your account.

24   A      Very true, sir.  And I would like to explain one thing

25   right here, okay, to you, to the respectable Judge and the

Direct Examination - Syed Hasnain

1    jury.

2    Q    I just want to know what the options were.

3    A    Yes, sir.

4    Q    Okay?

5         You -- and as part of option 1, what else are you

6    saying to the bank about the reason that the loan was in

7    foreclosure?

8         You say today this loan in foreclosure because why?

9    A    Because they were not taking the monthly payment.

10   Q    Fifth Third Bank?

11   A    Fifth Third Bank.

12   Q    What was option number 2?

13   A    I have excellent credit and I say, if you like, you

14   can put just on my name and the entire loan.

15   Q    All right.  For how much?

16   A    $600,000.

17   Q    So you would be willing to give the bank $600,000?

18   A    Very, very true.

19   Q    And you gave the bank a third option, did you not?

20   Option 3?

21   A    Yes, sir.

22   Q    What is option 3?

23   A    The option 3 was, okay we, have 90 days when we can

24   bring the money, okay, from the back home and we can pay off

25   the loan.

Direct Examination - Syed Hasnain

1  Q    Okay.  And you also gave the reason that you needed

2  the 90 days, option 3.

3  A    Yes, sir.

4  Q    And what was that reason?

5  A    The reason was, okay, that -- let me to explain, okay.

6      It happened during the same time of when in our,  okay,

7  country we have religious holidays.  It's called the Eid.

8  Okay, the banks and most of the things are closed.  And the

9  other thing is, when you have -- you're taking, okay, the

10  money, okay, the currency in Bangladesh currency and you

11  want to convert that into the foreign exchange, that takes

12  time.  This was the reason.

13  Q    Okay.  Sir, just to summarize where you're at, as of

14  November 25, you're trying to obtain a payoff of your loan.

15  A    Yes, sir.

16  Q    You're speaking to your family regarding having them

17  pay off the loan.

18  A    That's very true.

19  Q    And you're speaking to the bank regarding a resolution

20  of the loan.

21  A    That's true, sir.

22  Q    And -- but you didn't stop there.  The Learning

23  Connections did not stop there.  Did it?

24  A    No, sir.

25  Q    If fact, it did more, right?

Direct Examination - Syed Hasnain

1   A      Yes.

2   Q      All right.  What else did the Learning Connections do

3   during that time?

4   A      Okay.  After that, okay, we start looking, okay, for

5   the attorney, okay, in the U.S.

6   Q      Okay.

7   A      Okay?  Who can represent us and help us, okay, to stop

8   the foreclosure or at least we can get 90 days, okay, so --

9   which can help us, okay, to bring the money in the country.

10  Q      Okay.  And when you were looking for a lawyer to help

11  you, did you find -- how did you go about searching for the

12  attorney?

13  A      Because when we went -- when we went on the Internet,

14  I was searching for the attorney, okay, who need to be the

15  top -- the top attorney in the world.  This was my

16  intention, to find someone, okay, who is the top in the

17  world.  Not just in Nashville or Tennessee or Murfreesboro.

18  Okay?  So when I looked on the Internet, I found, okay, the

19  KEL Attorneys, and on their website, okay, it was, okay,

20  that they are the master of stopping the foreclosure.

21  They're all over the nation.

22          MR. WITHERS:  Your Honor, I'm going have to

23  object.  This is -- that's not in evidence and hearsay for

24  him to relate what he saw on the Internet.

25          THE COURT:  All right.  I'll sustain the

 1  objection.

 2      Next question, please.

 3          MR. ITTLEMAN:  Sure.

 4  BY MR. ITTLEMAN:

 5  Q     After you went on the Internet, did you call the KEL

 6  Attorneys?

 7  A     Yes.  Yes, sir.  Okay.  My wife, okay, she was the one

 8  who contacted, first of all, KEL Attorneys.

 9  Q     Do you recall who at the KEL law firm you spoke to?

10  A     Mr. Nathan Brown.

11          THE COURT:  Just a moment.

12      He said he didn't make the call, so he wouldn't have

13  spoken.

14          MR. ITTLEMAN:  Okay.

15  BY MR. ITTLEMAN:

16  Q     And at any point did you speak to the KEL Attorneys?

17  A     Yes, yes.  The same time, okay, when my wife was

18  talking with the phone, I was beside her.  We were driving.

19  Okay.  And she was talking to Mr. Nathan Brown.  And after

20  that, after she finish her talking with Mr. Nathan Brown, I

21  talk, okay, with same moment, okay, with Mr. Nathan Brown.

22  Q     So your wife --

23  A     She initiated the call.

24  Q     Your wife spoke to Mr. Brown and you spoke to

25  Mr. Brown.

Direct Examination - Syed Hasnain

1   A      That's true.

2   Q      And had a conversation?

3   A      Yes, sir.

4   Q      Okay.

5          MR. ITTLEMAN:  In part of the package that I had

6   but I was not able to staple it and provide it in the

7   package.  So if the Court wants, maybe we could take a break

8   so I can get all these exhibits together and give it to the

9   witness.

10         THE COURT:  You will be able do it over the break?

11         MR. ITTLEMAN:  Yes, ma'am.

12         THE COURT:  You will?

13         MR. ITTLEMAN:  Yes, ma'am.

14         THE COURT:  Okay.  Ladies and gentlemen, in the

15  interest of time management, we'll take our break a little

16  early.  We'll take a 20-minute break and be back at 5 of 3,

17  I hope that is.  Five of 3.

18                  (Recess for the jury)

19         THE COURT:  Mr. Ittleman, I'm going to encourage

20  you to go a little more quickly.  Your questions, there are

21  long pauses.  You're having to go through papers, which I

22  understand you have got a there.  But it's just taking --

23  I'm worried.  You all said three days.  That's all we have,

24  is three days.

25         MR. ITTLEMAN:  We're going to fly through -- once

Direct Examination – Syed Hasnain

1   we get all these documents into evidence, we're going to fly

2   through, Your Honor.  It's going to be very quick.

3              THE COURT:  All right.  I'll see you at five of.

4                   (Recess for the staff)

5                   Jury present -- 2:55 p.m.

6              THE COURT:  We're ready to proceed, Mr. Ittleman.

7              MR. ITTLEMAN:  Thank you.

8   BY MR. ITTLEMAN:

9   Q    You had mentioned that you got in contact with the KEL

10  Attorneys.

11  A    Yes, sir.

12  Q    I now have given you another stack of stipulated

13  exhibits.  I'm going to ask you to go to Exhibit No. 6.

14  A    Yes, sir.

15  Q    You had mentioned Mr. Brown?  Nathan Brown?

16  A    Yes, sir.

17  Q    Okay.  Can you tell me what this document is?

18  A    Sir, this document is -- reflect, okay, the

19  conversation which we had with Mr. Nathan Brown.

20  Q    Okay.  And what was the date of that conversation?

21  A    It was November 25, at 2:34 p.m.

22  Q    Okay.  Now, Mr. Brown is telling you certain things,

23  correct --

24  A    Yes.

25  Q    -- in this e-mail?

1   A      Yes, sir.

2   Q      Do you know whether Mr. Brown is a licensed attorney

3   in the state of Tennessee?  Do he ever say to you that he's

4   a lawyer in Tennessee?

5   A      No.

6   Q      What is he saying to you in this e-mail?

7              MR. WITHERS:  Your Honor, I have to object.  The

8   e-mail speaks for itself.

9              THE COURT:  Yes.

10        Counsel, ask specific questions.  If you have up it on

11  the screen, then the jury can read --

12             MR. ITTLEMAN:  Sure.

13  BY MR. ITTLEMAN:

14  Q      Mr. Hasnain, Mr. Brown is saying to you, is he not, in

15  the e-mail, that -- what the ramifications are of not

16  responding to a foreclosure complaint, correct?

17  A      Yes, sir.

18             MR. WITHERS:  Your Honor.

19             THE COURT:  Yes.

20             MR. WITHERS:  That's leading.

21             THE COURT:  I beg your pardon?

22             MR. WITHERS:  That's leading.  He suggests the

23  answer.

24             THE COURT:  Well, it is leading, counsel.

25             MR. ITTLEMAN:  Sure.

 1          THE COURT:  Go ahead.

 2  BY MR. ITTLEMAN:

 3  Q     Mr. Hasnain, the second paragraph of this e-mail from

 4  Mr. Brown --

 5  A     Yes, sir.

 6  Q     -- did you tell Mr. Brown, during the conversation,

 7  that you were the subject of a foreclosure lawsuit?

 8  A     Yes.

 9  Q     Okay.  And Mr. Brown is saying to you that --

10          MR. WITHERS:  Your Honor, that's the same problem

11  with counsel's trying to tell him what this document is.

12  Getting him to --

13          THE COURT:  Yes.  Counsel, it appears that it's

14  true although better form would be to let the question be

15  stated in its total, but it looks like it's going there.

16  BY MR. ITTLEMAN:

17  Q     What did -- summarize for me what Mr. Brown was saying

18  to you in this e-mail.

19          THE COURT:  Counsel, I suggest that we take one

20  minute and let the jury read this so that we don't keep

21  going around and around and around on this.

22          MR. ITTLEMAN:  Thank you.

23  BY MR. ITTLEMAN:

24  Q     Mr. Hasnain, was a lawsuit filed against the Learning

25  Connections in Circuit Court?  Do you know?

Direct Examination - Syed Hasnain

```
 1  A     No.

 2  Q     Okay.

 3        THE COURT:  Okay.  I don't know if the answer is,

 4  no, it wasn't, or I don't know.

 5  BY MR. ITTLEMAN:

 6  Q     Do you know whether a lawsuit was filed again the

 7  Learning Connections?

 8  A     I don't know, I would say.

 9  Q     You don't know?

10  A     Yes, sir.

11  Q     Okay.  Do you know what the difference is between a

12  notice of sale and a lawsuit in circuit Court?

13  A     Nobody explained to me.

14  Q     Now, what happened after you and your wife spoke to

15  Mr. Brown?

16  A     After talking to Mr. Nathan Brown, and -- we asked

17  him, okay, we'd like to speak, okay, with any of their

18  attorneys.  And he direct us, okay, to one of their

19  director, Mr. Mooney, in his office, because we want to feel

20  comfortable and we wanted to make sure that KEL Attorneys

21  will stop the foreclosure or they'll give us -- they'll get

22  enough time from the Fifth Third Bank.

23  Q     Okay.

24  A     And after talking to Mr. Mooney, okay, wired the money

25  in his account.
```

Direct Examination - Syed Hasnain

1  Q    Did you hire KEL to represent the Learning

2  Connections?

3  A    Yes, sir.

4  Q    There's a stipulated Exhibit No. 51 in your package.

5  A    Yes, sir.

6  Q    Did you hire the KEL law firm prior to the foreclosure

7  sale date of December 9, 2009?

8  A    Yes, sir.

9  Q    And after it says KEL, it says that's -- the law firm

10  was retained for a purpose.

11     Do you see that?

12     What purpose was KEL retained for?

13  A   My main purpose was, okay, to --

14  Q    Not your main purpose.

15     What does the document say that the purpose of its

16  agreements with you was?

17  A    We transferred into the commercial corporate

18  direction.

19          MR. WITHERS:  Your Honor --

20          THE COURT:  Just a moment, please.

21          MR. WITHERS:  I think, again, the document speaks

22  for itself.  I don't know why the client is being asked to

23  describe what the document says.

24          THE COURT:  Counsel, yeah, I think the better

25  practice here would be, if you can just -- you can point,

 1  actually touch that and show the jury where you want it to

 2  read, want them to read, if there's a paragraph.

 3      And then if you have a question, a factual -- a

 4  question that's going to elicit factual information within

 5  the competency of this witness, you can ask the question.

 6  BY MR. ITTLEMAN:

 7  Q    You understood that it's -- that you, you, and when I

 8  saw you, the Learning Connections, was hiring the KEL

 9  Attorneys for the purpose of defense work associated with a

10  commercial foreclosure action effective on the following

11  date.  December 9 -- December 9, correct?

12  A    That's 100 percent true, sir.

13  Q    All right.  Now, you, Syed Hasnain, were not involved

14  in a commercial foreclosure action, correct?  It was the

15  Learning Connections.

16  A    Yes, sir.

17  Q    Now, directing your attention to stipulated Exhibit

18  48.

19      Do you see Exhibit 48?

20  A    Yes, sir.

21  Q    There is a check here, correct?

22  A    Yes, sir.

23  Q    And you were the author of the check?

24  A    I was, yes, sir.

25  Q    And the date of the check was December 2, 2009,

1    correct?

2    A    That's very true, sir.

3    Q    Okay.  And how much was the check for?

4    A    The check was for $2,000.

5    Q    Is that the amount of money that KEL requested in

6    their retainer agreement?

7    A    Actually, the first talk they said $2,000, then they

8    called me back, okay, and said was $4,000.  I said I would

9    send them another $2,000.

10   Q    And that's the second check?

11   A    Yes, sir.

12   Q    1029?

13   A    Yes, sir.

14   Q    For $2,000?

15   A    Yes, sir.

16   Q    And the first check, is that prior to the foreclosure

17   date or after the foreclosure date?

18   A    Before that.

19   Q    Now, when the Learning Connections hired the KEL

20   Attorneys --

21   A    Yes, sir.

22   Q    -- and you and your wife were talking to the KEL

23   Attorneys, correct?

24   A    Yes, sir.

25   Q    Do you recall any conversations you had with the KEL

1   attorneys regarding what they were going to do for you?

2          MR. WITHERS:  Your Honor, we would object to that

3   as hearsay, unless they can indicate --

4          THE COURT:  Counsel, lay a predicate.  It won't be

5   hearsay if you can lay the predicate with whom he was

6   speaking, and, you know, relative time, and then it's

7   admission of a party opponent, if you lay the predicate.

8          MR. ITTLEMAN:  Okay.

9   BY MR. ITTLEMAN:

10  Q    Do you recall speaking to someone at the KEL law firm

11  after you formally retained them?

12  A    Yes, sir.

13  Q    And do you recall who you spoke to?

14  A    I talked to Karla Rogers also.

15  Q    What did Karla Rogers say to you regarding the

16  foreclosure?

17  A    It was -- you know, it was December 5th or 6th.  I

18  cannot recall the date.  She called me and she said to me,

19  okay, that all the documentation -- she asked me to send her

20  the documentations, and she said to me, okay, the documents

21  are required, okay, in the office on December 15th, which

22  was after the foreclosure date.

23  Q    Okay.  Let's start going through some of the documents

24  that the KEL law firm asked you to provide them.

25          You mentioned Ms. Rogers, correct?

Direct Examination – Syed Hasnain

1  A      Yes, sir.  Karla Rogers.

2  Q      Please refer to stipulated Exhibit No. 9.

3         It should be on your screen, sir.

4  A      Yes, sir.

5  Q      You see it?

6  A      Yes, sir.

7  Q      Ms. Rogers was asking you to fill out certain

8  information, correct?

9  A      Yes, sir.

10  Q      And did you provide that information?

11  A      Sir, I provide them on timely manners.

12  Q      And in fact, there was information being provided

13  prior to December 9, was there not?

14  A      That's true, sir.

15  Q      And directing your attention to stipulated Exhibit 11.

16  A      Yes, sir.

17  Q      You're confirming here on December 2nd that you're no

18  longer dealing with the Fifth Third Bank, correct?

19  A      Yes, sir.

20  Q      And that was per their request?

21  A      Yes, sir.

22  Q      At the request of the KEL attorneys?

23  A      Yes, sir.

24  Q      And you're also confirming that you have completed all

25  paperwork required for your law firm to stop the foreclosure

Direct Examination - Syed Hasnain

1    on December 9th.

2    A     Yes, sir.

3    Q     Okay.  You understood that for them to stop the

4    foreclosure, you would need to give them financial

5    paperwork.

6    A     Whatever the documents they ask me, yes, sir.

7    Q     And you wrote this e-mail because you were confirming

8    at that point that you complied with what they wanted.

9    A     Very true, sir.

10   Q     It's also true that what they wanted is found in

11   Exhibit stipulated Exhibit No. 12, correct?

12   A     Yes, sir.

13   Q     What they wanted was found in Exhibit 13, correct?

14   Stipulated Exhibit 13?

15   A     Yes, sir.

16   Q     And same thing with Exhibit 14, correct?

17   A     Yes, sir.

18          THE COURT:  It should be on screen, so you don't

19   have to go through the papers.  You should just be able to

20   look right there.

21          THE WITNESS:  Thank you, madam.

22   BY MR. ITTLEMAN:

23   Q     And also on Exhibit 15, correct?

24   A     Yes, sir.

25   Q     And in fact, you sent an e-mail to the KEL Attorneys

1   on December 8, 2009, correct?

2   A     Yes, sir.  I remember every single word, okay, for

3   this conversation, okay?  When I received a telephone call,

4   okay, and they said to me, okay, they have negotiated with

5   Fifth Third Bank and they have change the date and I need to

6   send them all the paperwork on December the 15th.  And I

7   asked the lady, when I was talking to the phone, I said, I

8   don't want to be make any mistakes in --

9   Q     Okay.  This e-mail on December 8th says, "We will be

10  sending all requested information on Thursday, by next day

11  delivery," correct?

12  A     Yes, sir.  Yes, sir.

13  Q     Okay.  So you will have request documents on Friday,

14  December 11th, by noon, correct?

15  A     That's very true, sir.

16  Q     Okay.  So you're telling them that you're going to

17  give them these documents by December 11th, correct?

18  A     Yes, sir.

19  Q     The foreclosure sale date is December 9th.

20  A     Yes, sir.

21  Q     Did the KEL Attorneys tell you that the foreclosure

22  sale date, what the status was regarding the foreclosure

23  sale date?

24        MR. WITHERS:  I'll object to that question, again,

25  hearsay without the proper predicate being laid.

1          THE COURT:  Well, the answer is either yes or no.

2     You may answer yes or no.

3          THE WITNESS:  Could you please repeat the question

4     again?

5     BY MR. ITTLEMAN:

6     Q    Did the KEL Attorneys tell you what the status was --

7     what the status was regarding the December 9 foreclosure

8     sale date?

9     A    They said they have stopped the foreclosure.

10          THE COURT:  No, wait a minute.  No.  The answer

11    was either yes or no, and then if it is yes, you need to lay

12    the predicate.  The objection will be well taken.

13          MR. ITTLEMAN:  Yes, ma'am.

14    BY MR. ITTLEMAN:

15    Q    So the answer is yes?

16    A    Yes.

17    Q    Do you recall who spoke to you about the December 9

18    foreclosure sale date?

19    A    There was a Karla Rogers.

20    Q    Okay.  And Karla Rogers works for the KEL Attorneys?

21    A    Yes, sir.

22    Q    And did she tell you that she was going to Hawaii or

23    anything, or was she --

24          MR. WITHERS:  Your Honor.

25

Direct Examination - Syed Hasnain

1  BY MR. ITTLEMAN:

2  Q    -- in the scope of her employment with KEL at the time

3  of the conversation?

4          MR. WITHERS:  Your Honor, that's a conclusion for

5  the --

6          THE COURT:  Okay.  Counsel, that has just caused

7  confusion.  You need to lay a predicate, when this was

8  stated and what exactly was said.

9  BY MR. ITTLEMAN:

10  Q    When was the conversation had with Ms. Karla Rogers?

11  A    It was on December 7th.

12  Q    And what was said?

13          THE COURT:  It was on December what day?

14          THE WITNESS:  It was December the -- if I'm not

15  making a mistake, December the 6th or 7th, when I received a

16  telephone call around noon.

17  BY MR. ITTLEMAN:

18  Q    What was said during that telephone conversation?

19  A    She said, okay, that they're relocation team.  They

20  have negotiated with the Fifth Third Bank and the

21  foreclosure is stopped.  And we need to send them, okay, all

22  the documentation by December the 15.  And therefore, okay,

23  I send them the thank you note also by e-mail.

24  Q    Now, did anything occur between December 15th to

25  Friday, January 8th, regarding -- 2010, regarding you and

Direct Examination - Syed Hasnain

1   the KEL Attorneys?

2   A     I received -- we received a telephone call.  It was on

3   January the 8th, I think.  Okay.

4   Q     January 8th, what year?

5   A     In 2009.

6   Q     2009 or 2010?

7   A     2010.  Sorry.

8   Q     Who did you receive the telephone call from?

9   A     Okay.  This was -- I cannot pronounce that person's

10  name.  Okay.  And she asked us, okay, to ask -- she asked us

11  what is the status for the -- for our building.

12  Q     I'm going show you stipulated Exhibit 17, page 2.

13  A     Yes.

14  Q     Does that refresh your recollection regarding who you

15  spoke to from the KEL Attorneys?

16  A     Yes, sir.  Now, I do, yes.

17  Q     And who was that person?

18  A     Okay.  Ms. Celesty.

19  Q     Okay.  And she's asked you for the status of the

20  building?

21  A     Yes, sir.

22  Q     And whether the commercial property was sold on

23  December 9th?

24  A     Yes, sir.

25  Q     And if so, for how much?

Direct Examination - Syed Hasnain

1   A      It was sold for $450,000.

2   Q      Right.

3          "If so, for how much."  Do you see that?

4   A      Yes sir.

5   Q      Okay.  So it's fair to say that in your conversations

6   with the KEL Attorneys, on January 8th, the KEL Attorneys

7   were not aware of the status of the commercial property?

8   A      Yes, sir.

9   Q      Okay.  Did you trust Fifth Third Bank at that time?

10  A      No, because we have a bad relationship with them,

11  okay.  I was giving them the checks.  I did everything.

12  Nobody would go to their own debt, which we have done.

13  Okay.  I don't think, okay, anybody can say you can take all

14  of my property and you can keep the lien on it.

15  Q      The question was whether you trusted Fifth Third Bank

16  at the time.

17  A      No.

18  Q      Okay.  Now, regarding the status, because you were not

19  aware of or because the KEL Attorneys were not aware of the

20  status of the commercial property on January 8, 2010, what

21  did you and your wife do at that point?

22  A      Okay.  We contacted, okay, to the -- like a trustees

23  of deeds, okay, in Rutherford County, and we went to find

24  out --

25  Q      Yeah.  Rutherford County is where?

1   A      Rutherford County is in Murfreesboro, Tennessee, where

2   the property was located, 162 Heritage Park Drive.  Our

3   property was located.  Commercial property was located.

4   Q      Okay.  And what did you learn after doing that search

5   in Tennessee?

6   A      We were shocked, okay?  The lady, okay, when she took

7   the information from my wife over the telephone, okay.  And

8   we -- she gave her name, okay, and the Learning Connections,

9   Mr. Fred Gentry's name, which was in the deed.  She says

10  just changed a day before, to the Fifth Third Bank.  And at

11  that point, okay, we contacted a KEL Attorneys, also, about

12  that situation.

13  Q      Let's talk about that situation.  And let's go to

14  stipulated Exhibit No. 19.

15         You see that?

16  A      Yes, sir.

17  Q      And you told us before that you share an e-mail with

18  your wife?

19  A      Yes.

20  Q      Okay.  And it's dated January 11, 2010 at 3:00,

21  correct?

22  A      Yes, sir.

23  Q      Now, it's true, is it not, that you were under the

24  impression that the KEL litigation team negotiated with

25  Fifth Third Bank, correct?

Direct Examination - Syed Hasnain

1   A     Yes, sir.

2   Q     And now the property was sold on December 9, 2009,

3   correct?

4   A     Yes, sir.

5   Q     Which you were not aware of?

6   A     Yes, sir.

7   Q     You didn't have much trust for Fifth Third Bank at

8   that point, right?

9   A     Not at all.

10  Q     What did you want the KEL Attorneys to do for you?

11  A     You know, this was my law firm and I had a respect for

12  them.  I hired them.  I trust them, okay, and this -- they

13  were just like -- for a father --

14          MR. WITHERS:  Your Honor --

15          THE COURT:  Yes.  The question is, what did you

16  want KEL to do.

17          THE WITNESS:  I wanted them to check with Fifth

18  Third Bank, okay, and they need to see how we can -- what

19  happened, okay?  So they need to find out and they need to

20  inform to us what the real picture.

21  BY MR. ITTLEMAN:

22  Q     Do you recall having any further -- you and your wife

23  having any further telephone conversations with the KEL

24  Attorneys at that time?

25  A     Yes.  Mr. Kaufman, okay, he called on my phone.

Direct Examination - Syed Hasnain

1  Q     Okay.  And before we get to what Mr. Kaufman says, do

2  you recall having a telephone conversation with the KEL

3  Attorneys on January 11, 2010?

4  A     Could you repeat the question, please?

5  Q     Do you recall having a telephone conversation with the

6  KEL Attorneys on January 11, 2010?

7  A     Yes.  We talked -- if I'm not making a mistake, we

8  talked to Ms. Kerry Adams, also.

9  Q     Okay.  And stipulated Exhibit 80.

10     And stipulated Exhibit 80, January 11, 2010, shows

11 that -- and this is from the KEL firm.  It's on your screen.

12 It shows that there was a call that you made to the KEL

13 Attorneys.

14 A     Yes, sir.

15 Q     Got a call from client.  See that?

16 A     Yes, sir.

17 Q     Now, page 2 provides the second half of the

18 description of that telephone call.

19 A     Yes, sir.

20 Q     Right.

21     Now, the person you spoke to, according to page 1, is

22 CS.

23     You see that?

24 A     Yes, sir.

25 Q     Now, do you know whether CS is a licensed attorney in

Direct Examination - Syed Hasnain

1    the state of Tennessee?

2    A      I don't know.

3    Q      Now --

4            THE COURT:  Who is CS?

5            MR. ITTLEMAN:  CS according to the KEL.

6            THE COURT:  Just a moment.

7        Mr. Hasnain, who is CS?

8            THE WITNESS:  That's Cecila, the lady we have --

9            THE COURT:  Is that Celesty?

10           THE WITNESS:  Celesty.

11           THE COURT:  Celesty?

12           THE WITNESS:  Yes.

13   BY MR. ITTLEMAN:

14   Q     Sir, do you know whether Celesty is a licensed

15   attorney in the state of Tennessee?

16   A      No.

17   Q      But yet --

18   A      But she is, right.

19   Q      But yet Celesty is explaining to you that the state of

20   Tennessee is a nonjudicial state and that the KEL law firm

21   was unable to stop the sale date and that when they hired --

22   when you hired them -- because when you hired them there was

23   already a sale date.

24   A      Yes, sir.

25

Direct Examination – Syed Hasnain

1    Q      That's what the KEL Attorneys told you.

2    A      Yes, sir.

3    Q      Did you trust the legal advice that the KEL Attorneys

4    were giving you?

5    A      Definitely, yes.  I trust them, okay, because they

6    were my attorney.

7    Q      You had no reason to believe that the KEL Attorneys

8    would lie to you at that time, did you?

9    A      Not at all.

10   Q      Did anyone from the KEL law firm at that time, around

11   January 11, 2010, tell you that the KEL Attorneys were

12   required to file a lawsuit to stop the foreclosure sale?

13          Did they tell you that?

14   A      To stop the foreclosure sale?

15   Q      Did they tell you that you were required to file a

16   lawsuit to stop the foreclosure sale?

17   A      No.

18   Q      Did you believe, on January 11th, 2010, that the KEL

19   Attorneys had done anything wrong or negligent?

20   A      No.

21   Q      Did you believe that Fifth Third Bank had done

22   something wrong?

23   A      Definitely.  They had been the whole year.

24   Q      If you thought in any way that the KEL Attorneys had

25   done something wrong, would you have allowed the KEL

Direct Examination - Syed Hasnain

```
 1   Attorneys to continue to represent you?
 2           THE COURT:  Counsel, that's speculation --
 3   BY MR. ITTLEMAN:
 4   Q     What happens --
 5           THE COURT:  -- of the fact.
 6   BY MR. ITTLEMAN:
 7   Q     What happened after January 11, between?
 8   A     After January 11, 2010, okay, I was still, okay, I had
 9   100 percent faith on KEL Attorneys.  Okay.  And I received a
10   letter, okay, this was the first letter, which I received
11   from Mr. Kaufman, which he sent, okay, to Fifth Third Bank
12   that he was representing to us.  Okay.  And they start
13   sending, okay, the -- I talked to with Ms. Kerry Adams and I
14   asked her what would be the best offer from us to buy back
15   this property from the Fifth Third Bank.  Okay.  Because I
16   want to -- this need to be a part of it, you know, but they
17   didn't really change the names on the deeds.  Okay.
18   Q     So would be it fair to say that you wanted the KEL
19   Attorneys to negotiate --
20   A     To negotiate, yes, sir.  And they were --
21   Q     Let me finish the question.
22         Would it be fair to say that the Learning Connections
23   wanted the KEL Attorneys to negotiate on behalf of your
24   company?
25   A     Definitely.  Definitely.
```

Direct Examination - Syed Hasnain

1  Q      I'm going to show you stipulated Exhibit No. 20.

2  Please find a copy of the letter signed by Mr. Kaufman

3  requesting the exact amount required by Fifth Third Bank to

4  purchase the property back -- to purchase back the property

5  in question.

6      Was that something that you authorized the KEL

7  Attorneys to do on your behalf?

8  A      Yes.  They were my attorney.

9  Q      Stipulated Exhibit 21.

10     Do you know who Mr. Stein was?

11 A      Mr. Stein was the -- he was representing the Fifth

12 Third Bank.

13 Q      Okay.  So this shows that he's passing the inquiry

14 along to Fifth Third Bank, correct?

15 A      Yes, sir.

16 Q      Stipulated Exhibit 24.  More e-mails from February 4,

17 2010?

18 A      Yes, sir.

19 Q      The reply from Fifth Third Bank, correct?

20 A      Yes, sir.

21 Q      Stipulated Exhibit 25.  Confirmation of offer of

22 $540,000 to Fifth Third Bank --

23 A      Yes, sir.

24 Q      -- to purchase the commercial property back, correct?

25 A      Yes, sir.

Direct Examination – Syed Hasnain

1   Q     "We will do everything to stop Fifth Third Bank even

2   if we have to file a lawsuit against the bank."

3         Correct?

4   A     Yes, sir.

5   Q     You still believe that the bank was the wrongful

6   party, correct?

7   A     Definitely, sir.

8   Q     That's why you wanted to file a lawsuit against them.

9   A     Yes, sir.

10  Q     As of February 5, 2010.

11  A     Yes, sir.

12  Q     Now, did Fifth Third Bank accept your offer?

13  A     No, sir.

14  Q     Did you receive rejection in writing from Fifth Third

15  Bank?

16  A     Not to my knowledge.

17  Q     This is stipulated Exhibit No. 27.

18        Do you recall receiving a letter via certified mail

19  from Fifth Third Bank?

20  A     Yes, sir.

21  Q     From the vice president and counsel, Linda Rausch?

22  A     Yes, sir.

23  Q     Page 3, it confirms, does it not, that you offered

24  $500,000, which was later appraised to $540.

25  A     Yes, sir.

Direct Examination - Syed Hasnain

1   Q      And that was rejected, correct?

2   A      Yes, sir.

3   Q      Do you recall having any conversations with the

4   Attorney Kaufman during that time?

5   A      No.

6   Q      Ask you to review stipulated Exhibit 29.  See that?

7   From the KEL Attorneys?

8   A      Yes, sir.

9   Q      Okay.  It's signed by Jeffrey S. Kaufman, Esquire?

10  A      Yes, sir.

11  Q      And it confirms that the law firm made several

12  attempts to negotiate with a lawyer from the bank, correct?

13  A      Yes, sir.

14  Q      After the property was sold on December 9, correct?

15  A      Yes, sir.

16  Q      Because you he hired them prior to the property being

17  sold.

18  A      Yes, sir.

19  Q      And that Fifth Third Bank was not willing to sell the

20  property back to the Learning Connections at a reasonable

21  price, correct?

22  A      Yes, sir.

23  Q      And now, the representation has been concluded as of

24  June 21, 2010.

25  A      Yes, sir.

Direct Examination - Syed Hasnain

1  Q     So as of June -- you received this letter from

2  June 21, 2010?

3  A     That's very true, sir.

4  Q     Okay.  So as of June -- late June of 2010, you have no

5  lawyer, correct?

6  A     Yes, sir.

7  Q     And you have no commercial property, correct?

8  A     No, sir.

9  Q     Did you wonder -- what did you do next?

10 A     Sir, we were very, you know -- like I like to show --

11 give -- I like to show that we were like feeling like, okay,

12 we're alone.  Okay?  Somebody will just threw you against

13 the rear.  Okay.  You don't know where you will be falling

14 down.  You have no idea, okay, that how Fifth Third Bank

15 will come behind you, okay, for their remaining of the

16 money.  They can come behind us, okay, they can come behind

17 my partners or anybody.

18     At that point, okay, we start looking, okay, to see,

19 okay, why we lost the property.

20 Q     And did you speak to anyone?

21 A     Okay.  I talked to some of my family friends and then,

22 okay, I contacted to you.

23 Q     Okay.  And did I provide you with legal advice at that

24 point?

25 A     Yes, sir.

Direct Examination - Syed Hasnain

1   Q      And what did you authorize me to do?

2   A      I authorized you, okay, to see, okay, what was the

3   reason that we lost our property.

4   Q      And what happened after that?

5   A      During that time we find out, okay, that the KEL

6   Attorneys, they did not do what they were supposed to do,

7   the job.

8   Q      And did you authorize my law firm to file a lawsuit on

9   behalf of your company?

10  A      Yes, sir.  Yes, sir.

11         MR. ITTLEMAN:  No further questions, Your Honor.

12         THE COURT:  All right, thank you.

13      We will have cross-examination.

14         MR. WITHERS:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16  BY MR. WITHERS:

17  Q      Good afternoon, Mr. Hasnain.  I want to go through

18  some of the aspects of your testimony and ask you questions

19  about them.

20  A      Good afternoon, sir.

21  Q      One thing that stands out right away, your Exhibit 30,

22  which is in evidence.  Let me stick it up here.

23      Do you recall your testimony about that?

24  A      Yes, sir.

25  Q      If I understand correctly, in 2007, when this

 1  statement was made, I'm sorry -- looks like it's -- yeah,

 2  September 2007, you had $139,924.21 in the bank.

 3  A      In my wife's account, yes, sir.

 4  Q      Right.  I noticed that too because it shows Nadir

 5  Hasnain doing business as Bright Academy.

 6  A      Yes, sir.

 7  Q      What that was?

 8  A      Bright Academy was another -- we were growing and we

 9  opened another branch of the -- under the name of Bright

10  Academy.

11  Q      Okay.  So this was not the Learning Academy's money?

12  A      Okay.  This was the part of the Learning -- like under

13  the same umbrella.

14  Q      What umbrella?

15  A      Like we have a branches but we deal with the different

16  names.

17  Q      So are you trying to tell us that all of these

18  businesses were all under the Learning Academy?

19          MR. ITTLEMAN:  Objection.  Misstates.

20          THE COURT:  It's a question he may answer.

21          THE WITNESS:  Under the Learning Academy, yes,

22  sir.

23  BY MR. WITHERS:

24  Q      Okay.  So the Learning Academy, Inc?

25  A      Yes, sir.

1  Q     Okay.  Now, sir, the borrower on the Fifth Third Bank

2  loan --

3  A     Yes, sir.

4  Q     -- was the Learning Academy, Inc.?

5  A     No, sir.  The Learning Connection.

6  Q     I'm sorry.  You're right, sir, the Learning

7  Connection, Inc.

8        Okay.  Not Learning Academy?

9  A     No, sir.

10 Q     And not this other outfit, Bright Academy?

11 A     No, sir.

12 Q     Okay.  Is it -- do I understand correctly that you had

13 no problem making your payments up until August of 2008?

14 A     Yes, sir.

15 Q     And is it true that no payments had been made on that

16 bank loan from August of 2008 up until the time you folks

17 contacted KEL Attorneys?

18 A     That's not true.

19 Q     Really?

20       Did you get credit for any of those payments?

21 A     They did not take the credit but we try.

22 Q     It's a simple yes or no.  We will get to the details.

23 A     Yes, that's true.

24 Q     Okay.  So when they sent you -- when the bank sent you

25 this letter in November of 2009, do you remember the one

1   counsel asked you about it on direct, they contended you

2   were in default.  That you had missed these payments.

3   A    That's right.

4   Q    And from their perspective, was that true?

5   A    That's right.

6   Q    Okay.  And you had not made those payments?

7   A    We attempt but they did not credit.

8   Q    Okay.  You attempted to but they wouldn't take them.

9   A    Yes, sir.

10  Q    For whatever reason.

11  A    Yes, sir.

12  Q    And you were -- at that point, you were also behind

13  not only on the mortgage payments but you owed real estate

14  taxes on the property.

15  A    I paid those taxes.

16  Q    Okay.  But at that time you had not paid them.

17  A    Yes, sir.

18  Q    Okay.  And the IRS had placed a lien against your

19  property at that time, correct?

20  A    We made payment, okay.  Yes, you are right.

21  Q    Okay.  So the bank is -- the way the bank's looking at

22  it, you're 17 months behind on your mortgage payments,

23  you've got unpaid real estate taxes, you've got an IRS lien

24  against the property, and insurance was a problem too,

25  wasn't it?

Cross-examination - Syed Hasnain

1  A     No.

2  Q     All right.  You had paid your insurance.

3  A     Yes.

4  Q     Now, sir, had the -- as of this August -- I'm sorry,

5  July of 2008, when the -- when the first month passed

6  without payment being made and accepted by the bank, okay?

7  After that time, did you try to negotiate some kind of deal

8  with the bank?

9  A     From July of 2008?

10  Q     After August of 2008 but before they sent you the

11  foreclosure letter, foreclosure notice in November of 2009.

12  A     Uh-huh.

13  Q     Did you try to come to some kind of an arrangement

14  with Fifth Third Bank?

15  A     Yes.  I sent them the check of $5,500.  Okay.  They

16  can deduct from my account every month electronically.

17  Q     All right, sir.  But when you say on the 5500, at the

18  time you sent it to them, you were actually a lot more than

19  5500 in arrears, weren't you?

20  A     That was the check, okay, that they deducted directly

21  from my account every month.

22  Q     All right, sir.  When they rejected your $5500

23  payment --

24  A     They did not reject.  They asked me, okay, to forge

25  the signature of our four partners -- the other two

1  partners.

2  Q      The letter that you showed us a while ago, your

3  attorney showed us --

4  A      Yes.

5  Q      -- said they were not going to accept that $5500

6  payment.

7  A      Because of the signatures from the other two partners.

8  Q      Okay.  So did not accept it.

9  A      Yes.

10  Q      All right.  So you're -- and, again, you're behind on

11  the mortgage payments as far as the bank is concerned.  They

12  offer you a deal to reinstate the mortgage, get everything,

13  everybody all happy with each other again, right?

14  A      Yes.

15  Q      Called a forbearance agreement.

16  A      Right, sir.

17  Q      Yes, sir.  And -- but your partners wouldn't sign

18  that, would they?

19  A      I want to make the connection for this.

20  Q      Sir, just a yes or no answer and then we will talk

21  about it.

22  A      Yes, they'll not be clear on everything, sir.

23  Q      I'm sorry.  I can't understand what you're saying.

24  A      Because of their -- because they were involved in the

25  accident, we not reach them.  So but my wife and I already

1    signed, and we said, okay, by the Express Mail, with all the

2    documentation that the bank was asking.

3    Q     Okay.  So --

4    A     It was then done by the 50 percent.

5    Q     Is it fair to say then that if Mr. and Mrs. Gentry had

6    signed that agreement, you would have gone on your merry way

7    with the operation of the learning center and we wouldn't

8    all be standing here today; is that fair?

9    A     If they were -- yes, if they, the Fifth Third Bank was

10   receiving, okay, those two person signatures, that would be

11   straight.

12   Q     Right.

13      So that was when they gave you the foreclosure letters

14   in early November of 2009.

15   A     Yes.

16   Q     Then you responded with the -- this Exhibit No. 3 --

17   A     Yes.

18   Q     -- which is in evidence.

19      Okay.  I guess we can't get it to go sideways.  I'll do

20   the best I can with this.

21           MR. WITHERS:  Lawyers and technology, Your Honor,

22   are two things that are seemingly inconsistent.

23   A     Yes.

24   Q     So, you made them three different offers, well two

25   different offers.  Option 1, and the second option, and then

1    the third option, which was, give us 90 days for us to get

2    the money from back home because, again, you will have

3    forgive me, sir, I don't know what this term I perform Hajj

4    means.

5    A      Yes, sir.

6    Q      I assume it's a religious term of some kind.

7    A      Yes, sir.  This is the time, okay, when the people

8    come from -- missions from all over the world.  They go to

9    Mecca in Saudi Arabia and they perform the Hajj.

10   Q      Yes, sir.

11          That's an annual event, isn't it?

12   A      Yes, sir.

13   Q      Okay.  And, sir, at this point you have this letter

14   from them, from "them" being the bank.  And their response

15   was that -- to you was that they weren't going to accept any

16   of these offers, correct?

17   A      That's true.

18   Q      "They" again being Fifth Third Bank.

19   A      Yes, sir.

20   Q      So at this point you're all these payments behind, you

21   have got a going operation and you want to keep it

22   operating, right?

23   A      Yes.

24   Q      Okay.  Now, sir, during the months, from August of

25   2008 until you got this letter of -- in November of 2009,

1   what did you do with the $5,400 a month that was supposed to

2   be used to pay the mortgage?

3   A      I was spending on the building.

4   Q      You were what?

5   A      We were spending on the building also.

6   Q      Oh, okay.  You were not putting it aside to pay the

7   mortgage off eventually?

8   A      Okay.  No, there was $8,000, which we're keeping, and

9   from there, okay, we're keeping some money on the side too.

10  Q      Okay.  But from that money that you were keeping --

11  A      Yes, sir.

12  Q      -- you were keeping it and then spending on the

13  building instead of -- or on something instead of paying

14  your mortgage.

15  A      We were spending on the building but we were keeping,

16  okay, the mortgage payment separately.

17  Q      You were not paying the mortgage payments though, were

18  you?

19  A      We want to pay.

20  Q      Sir, I'm sure you wanted to very much but you didn't

21  actually pay them, did you?

22  A      If I sent them a check, okay, and they're not taking,

23  okay, it means I did my part.

24  Q      And did you do that every month?

25  A      Okay.  I tried them to directly withdraw from my

1   account every month.

2   Q     Sir, sir, did you pay them?

3   A     They're not accepting.  Okay, what can I do?

4   Q     Is the answer, no, you did not pay them?

5   A     Yes.

6   Q     Now, sir, when you got this notice of foreclosure --

7   A     Yes, sir.

8   Q     -- this is the letter from the Stites Harbison law

9   firm that the counsel asked you about.

10  A     Yes, sir.

11  Q     You recognize it?

12          THE COURT:  What number, counsel?  So we're --

13          MR. WITHERS:  See if I can get it off their list

14  or maybe Mr. -- tell you what, I'm going to let -- with your

15  permission, Your Honor, I'm going to have Mr. Wilson get the

16  number so we can refer to it, that way I'll ask another

17  question that doesn't require an exhibit.

18          THE COURT:  Okay.

19          MR. ITTLEMAN:  It's 75.

20          MR. WITHERS:  Thanks, counsel.

21          MR. ITTLEMAN:  You're welcome.

22  BY MR. WITHERS:

23  Q     Now, sir, just one more -- going back to that

24  forbearance agreement --

25  A     Yes, sir.

Cross-examination - Syed Hasnain

1    Q    Was it your understanding that if everybody signed off

2    on that, that would settle your differences with the bank at

3    that time?

4    A    Very true.

5    Q    Okay.  Now, sir, in November of 2009, was the Learning

6    Connection, Inc. still licensed to operate 162 Heritage Park

7    Drive in Murfreesboro, Tennessee?

8    A    When?

9    Q    In November of 2009, when you got this -- both of

10   these letters, actually, the foreclosure letter and then the

11   offer that you made directly to the bank.

12   A    The Learning Connection?  Would you repeat that

13   question again.

14   Q    Was the Learning Connections, Inc. still licensed to

15   operate at 162 Park Drive in Murfreesboro, Tennessee --

16   A    No.

17   Q    -- on that day?

18   A    No.

19   Q    Sir, were there -- had -- I think I have asked you

20   these, I'm not going to -- sir, what was that IRS lien for?

21   A    What was the IRS lien for?

22   Q    Yes, sir.

23   A    Okay.  Because I was -- we were staying, okay, in

24   Waycross, Georgia.  And when the letter came, I didn't know,

25   okay, and after that we paid it.

Cross-examination - Syed Hasnain

1  Q      Okay.  That was for some kind of unpaid taxes?

2  A      Yes.

3  Q      And then the property taxes went unpaid for a while as

4  well, right?

5  A      Which property tax?

6  Q      The real estate taxes.  The Tennessee real estate

7  taxes on the building.

8  A      That was a part of the Fifth Third Bank, with the

9  loan.  It was included in the loan.

10  Q      All right, sir.  Well, if you weren't paying the loan,

11  then I guess the taxes weren't being paid, right?

12  A      Yes.

13  Q      Guess the same thing true of the insurance on the

14  building.

15  A      No, insurance was separate.

16  Q      Okay.  Sir, at that type, November 2009, was there any

17  other unpaid creditors of the Learning Connections, Inc.?

18  A      Not at all.

19  Q      Sir, had the Learning Connection been closed by any

20  state agencies prior to the November 2009 letter?

21  A      Our license expires in September of 2008.

22  Q      Okay.  Was there any other time at which the business,

23  the child care business was shut down by governmental

24  authorities?

25  A      If you are asking this question, okay, then I have to

1    go in a very -- too much in detail.

2    Q    Okay.  You can say yes or no?

3    A    Yes.

4    Q    Okay.

5         MR. ITTLEMAN:  Your Honor, I would -- if the

6    witness wants to provide an explanation, he should be

7    allowed to.

8         THE COURT:  No.  That's not necessarily so.

9    You will have redirect if you wish to bring it out.

10   Proceed.

11        MR. WITHERS:  Thank you, Your Honor.

12   BY MR. WITHERS:

13   Q    Mr. Hasnain, did you control the Learning Connections,

14   Inc.?

15   A    Do I control the Learning Connections?  In what sense?

16   Q    Well, in the sense of its operations.

17   A    In somehow, yes.

18   Q    In the sense of the business decisions it made.

19   A    Yes.

20   Q    All right, sir.  How about the Learning Academy?

21   A    Yes.

22   Q    Okay.  How about this other little outfit, I'm sorry.

23   Bright Academy?

24   A    Yes.

25   Q    So what function did Mrs. Hasnain serve in these

1  business, if any?  Was she part of operations?

2  A    Yes.

3  Q    Now, sir, you testified as to this extensive revenue

4  you had with your tax returns.

5     Tell me, did the -- did any of those returns that

6  Mr. Ittleman asked you about in your direct testimony, did

7  any of those show that the company had income for the year,

8  had actually ended up with net gross taxable income of any

9  kind?

10 A    In every business, okay, we were falling on the

11 ground --

12 Q    Sir, please, just yes or no for now.

13 A    No.

14 Q    And in fact, the returns that you showed us today

15 show, if we believe them, that the businesses were operating

16 at a loss.

17    Isn't that true?

18 A    If you like, I'd like to explain to you few things.

19 Q    Sir, you can tell me if that's true or false, then we

20 go from there.

21 A    Yes.

22 Q    It's true?  The numbers are negative?

23 A    Yes.

24 Q    Okay.  Now, sir, when the banks sent you that

25 foreclosure notice in November of 2009 --

1  A      Yes, sir.

2  Q      -- did you feel like the bank was doing you wrong?

3  A      Definitely.

4  Q      Okay.  And did you think was unreasonable for them to

5  want their money?

6  A      No, it is not.  But I'd like to explain right here.

7  My --

8  Q      Sir, you will get your chance.  Please just focus on

9  the questions and answer them, and we can finish our

10  business tonight.

11  A      Does not explain to anybody, okay, why I feel, okay, I

12  am right and the bank was wrong.

13  Q      Okay.  But your attorney is going to give you that

14  chance.  Okay.  Right now I'm just trying to get these

15  simple questions answered so we can know what was going on

16  there.  Okay?

17  A      Yes.

18  Q      Am I understanding you to say that about the time that

19  foreclosure notice arrived in November of 2009, you had

20  funds available to pay off the mortgage?

21  A      I was trying to bring the funds from the back home.

22  Q      Let me be a little clear about that.

23         Was this money -- are you saying this money was

24  available to you?

25  A      Not the $500,000.

1   Q      Only $500,000?

2   A      Not the $500,000.   The bank was asking the full

3   amount.

4   Q      Right.

5          Well, now, Mr. Hasnain, you speak English very well.

6   A      Yes, sir.

7   Q      Do you read it and understand it from a comprehension

8   standpoint?

9   A      Yes.

10  Q      And when you signed that promissory note and the deed

11  of trust to the bank back in, what was it, 2006, did you

12  read it?

13  A      I was not on the loan.   I was a guarantor.   My wife

14  and Mr. Gentry was on the loan.

15  Q      Okay.   Nonetheless, did you happen to read it?

16  A      Yes.

17  Q      From the -- because you were a guarantor of that loan,

18  right?

19  A      I was the guarantor.

20  Q      Okay.   Now, sir, if that loan -- there was -- t he

21  promissory note that you signed said, did it not, what could

22  happen if you failed to make a payment?

23  A      Yes.

24  Q      Or if you failed to pay taxes or if you failed to

25  operate the business on the premises and several other

1  things.  And did you read those things before you went ahead

2  and went along with that loan?

3  A    It was, you know, routine of the banking, you know,

4  when you go for the -- to take any loan, okay.  It's already

5  common routine, the bank officer said what they're going to

6  do there and they're asking you to sign the documents.

7  Because nobody would be explaining to you, okay.  And we did

8  the same thing, okay, that the bank was giving us, okay?  In

9  fact, we did not have any closing attorney when we went

10 there.

11 Q    Okay.  If you want their money, you got to agree to

12 their terms, right?

13 A    Okay.  Definitely, okay?  Everybody that does the same

14 thing, you go to the bank.  Sir, you take the loan, okay?

15 Q    If you want their money, you have to agree to their

16 terms.

17 A    Definitely.

18 Q    Okay.  Now, sir, did you -- when you left the country

19 in August of 2008, did you make any arrangements for taking

20 care of the bills?

21 A    We had an assistant director, yes.

22 Q    Okay.  And did that assistant, did that assistant fail

23 to make the mortgage payments?

24 A    Okay.  She did not.

25 Q    She did not fail to make it?

198

1   A      Yes.

2   Q      Did someone else fail to make it?  August of 2008,

3   when you -- you know, when you and your family went

4   overseas.

5   A      Someone else?

6   Q      Anybody.

7          Did anybody make the payment while you were gone?

8   A      We have an assistant director.  She was supposed to

9   make the payments.

10  Q      But she did not, did she?

11  A      She did not.

12  Q      And so, sir, we -- try to make sure I have got your

13  position accurate.  As of the time you received the

14  foreclosure notice from the bank -- you say you received it

15  about November 15th or so.

16         Was that an accurate date?

17  A      Definitely.

18  Q      Okay.  And, sir, when was the first time you contacted

19  KEL?

20  A      It was November the 25th or 24th, if I'm not making a

21  mistake.

22  Q      All right, sir.  And at what point did you recall did

23  you actually secure representation by KEL?

24  A      If I'm not making a mistake --

25             MR. ITTLEMAN:  Object to form, Your Honor.

1          THE COURT:  I beg your pardon?

2          MR. ITTLEMAN:  Object to the form of the question.

3          THE COURT:  You need to stand when you speak.

4          MR. ITTLEMAN:  Object to the form the question,

5    Your Honor.  The retainer agreement is in the -- really

6    speaks for itself.  As far as --

7          THE COURT:  Well, I'll overrule that objection.

8    BY MR. WITHERS:

9    Q    If you remember.

10   A    If I'm not making a mistake, okay, after talking to

11   Mr. -- when I was talking to Mr. Nathan Brown and

12   Mr. Mooney, over the phone, okay, I gave them my credit card

13   information and they charge.

14       Okay.  Credit card shows the date on the banking

15   statements, but they got --

16   Q    Okay.

17   A    It was November 25th or 26th.

18   Q    Okay.  And the bank, they started asking you to send

19   them documents.

20   A    Yeah, I did.

21   Q    Now, sir, those requests for documents continued to

22   come to you, did they not, even after the sale of the

23   property on December 9th?

24   A    Yeah.

25   Q    KEL was still asking you to provide documents to them.

1  A      Yes.

2  Q      Okay.  Now, sir, did KEL, on your behalf, attempt to

3  negotiate a deal with the bank, with Fifth Third Bank?

4        I'm talking about after the foreclosure sale.

5  A      In January, yes.

6  Q      They were still working on it.

7  A      Yes.  They were, yes.

8  Q      Okay.  And they were still asking you to provide

9  information that they needed for some purpose.

10 A      Any time they need it, I always, you know, provide the

11 information, yes, sir.

12 Q      Sir, now you testified earlier that you gave them

13 everything they need but, in fact, they had to keep asking

14 you for documents, didn't they?

15 A      If I recall -- if I recall, after the December --

16 after December 12, okay -- no, December 12, December 13,

17 they did not ask me any documentation, then they asked me,

18 okay, in January, January the 11th.

19 Q      Okay.  All those dates you described are after

20 December 9th, of course.  Right?

21 A      Yes.

22 Q      Okay.  So but on January 10th, they are still asking

23 you for documents.

24 A      On January the 10th, okay, they asked me, okay, if I

25 can send them, okay, the copy of the deed.

1  Q     Deed of trust.

2  A     Deed of trust.

3  Q     Which is another term for mortgage.  Do you agree?

4  A     Maybe.

5  Q     Okay.  That's close enough.

6     Sir, I asked you to refer to your Exhibit No. 17 that's

7  in evidence.  And if it will help you, that is a letter from

8  you addressed to Mr. Ittleman.

9         THE COURT:  If you have it, you can just put it up

10  there.

11         MR. WITHERS:  I do and I will do that right now.

12  I got to pull the staples out first.

13  BY MR. WITHERS:

14  Q    All right.  So that's the first page of the letter.

15  And I'm just asking -- showing you that for purposes of

16  identifying.  Because I wanted to ask you about the second

17  page.

18     I'll put that down here right now.

19     Sir, I want you to take a good, close look at the first

20  paragraph and, specifically, the language that appears at

21  the sentence that starts at the end of the third line down.

22  Let me point.

23     See it there?  Where it says, "I was shocked."

24     Right?

25  A    Yes.

Cross-examination – Syed Hasnain

1  Q    Is that an accurate representation of the emotions you

2  felt at that time?

3  A    Definitely.

4  Q    Shocked?

5  A    I was definitely shocked.

6  Q    Okay, sir.  And then I want you to drop down another

7  two lines, and you state, "I understood that the KEL

8  Attorneys were to be filing an injunction to stop the sale."

9       Right?

10 A    Mr. Nathan Brown, okay, he said they that will be

11 starting a lawsuit.

12 Q    Sir, I'm just asking you to confirm what it says here.

13 A    Yes.

14 Q    Okay.  Now, that sale occurred on December 9th, so

15 obviously the foreclosure -- the suit to stop the

16 foreclosure would have had to have been filed before then.

17      Right?

18 A    I'm pretty sure the attorneys know their job.

19 Q    I'm sorry, I couldn't understand what you were saying.

20 A    I am sure the attorneys -- attorneys knows their jobs

21 and, therefore, I hired them.

22 Q    Okay.  You expect them, sir, when they're providing

23 you service, that they will render those services to you in

24 a competent manner.

25 A    Yes, sir.

1  Q      You expect that they will follow the law.

2  A      Definitely.

3  Q      You expect that they will follow the rules that apply

4  to attorneys.

5  A      Definitely.

6  Q      You understand that they are bound by rules that

7  require them to represent all clients in an ethical and

8  legal manner.

9  A      And provide the advice to their --

10  Q     Okay, sir.

11     At any time did you tell Nathan Brown or any of these

12  other people, that you had this money available to pay off

13  this loan?

14  A      I told Mr. Mooney over the phone.  We have a first

15  conversation with Mr. Mooney and Mr. Nathan Brown.

16  Q      Okay.  And when you were providing paperwork, the

17  financial paperwork to KEL, what did you provide them that

18  showed that you had this money available?

19  A      Mr. Nathan Brown and Mr. Mooney, when I talked to them

20  about the forbearance agreement and other things, they said

21  that if they need those information, our attorneys will be

22  calling to you, okay, you need to just provide us, okay, the

23  best way to go is the -- for the -- the best way to stop

24  this foreclosure is to go through the loan modification.

25  And then they send me, okay, those documents, which I

Cross-examination – Syed Hasnain

1   provide to them.  And I asked them, did they need any

2   information from me.  They said if they need, okay, our

3   attorneys will contact you.

4   Q     Okay.

5   A     But they didn't contact me.

6   Q     All right, sir.  Now, I think you've already

7   testified, but let's confirm, you knew Nathan Brown was not

8   a lawyer, right?

9   A     What did you say, sir?

10  Q     You knew that Nathan Brown was not a lawyer, right?

11  A     I didn't know that he's an attorney.  And he's a --

12  but I'm pretty sure that he was one of the legal law firms

13  officer.

14  Q     Right.  But do you recall, did you ever receive

15  anything saying that he was an officer of the law firm?

16  A     No.  I'm not saying, okay, but when you're talking to

17  somebody, okay, then you assume, just like Mr. Mooney.  I

18  don't know what Mr. Mooney does, okay?  When I asked

19  Mr. Nathan Brown that I would like to talk to an attorney,

20  he send me to Mr. Mooney.  So I expect, okay, the people who

21  are working as a director of KEL, they may be attorneys,

22  that they're -- so I don't know, sir.  I never asked them

23  those questions.

24  Q     So did you ever ask either of those gentlemen

25  something like, are you an attorney?

Cross-examination – Syed Hasnain

 1  A     No.

 2  Q     Okay.  Was it your expectation then that KEL would

 3  somehow stop the foreclosure sale?

 4  A     They assured me.

 5  Q     Please let me finish my question.

 6        Did you have expect that KEL would stop the foreclosure

 7  sale by some kind of legal services?

 8            MR. ITTLEMAN:  Objection, vague.

 9            THE COURT:  Do you understand the question,

10  Mr. Hasnain?

11            THE WITNESS:  No, I don't.

12            THE COURT:  Okay.  Rephrase.

13  BY MR. WITHERS:

14  Q     What does the law firm sell?

15  A     Hmm?

16  Q     What does a law firm sell?

17  A     Law firm sell, okay, they provide protection to the

18  client.

19  Q     They sell legal services, don't they?

20  A     Legal services, yes.

21  Q     Isn't that really the bottom line on what they do?

22  A     Yeah, legal services.  That's true.

23  Q     And so it was your expectation, that through their

24  legal services, they would somehow stop the foreclosure

25  sale.

Cross-examination - Syed Hasnain

1   A      Definitely.

2   Q      And delay -- delay the process long enough for you to

3   get some money and to pay off the mortgage.

4   A      Definitely.

5   Q      Okay.  Now, sir, isn't it true that after the

6   foreclosure sale, KEL Attorneys did, in fact, negotiate and

7   deal with the bank?

8   A      They did not make any deal at all.

9   Q      They did negotiate a deal with the bank that you

10  turned down, didn't they?

11  A      No.

12  Q      Sir, did you not have a demand from the bank to pay

13  them $611,000 to buy the property back?

14  A      That's true, okay.  That $600,000, but Ms. Kerry

15  Adams, she told me okay that she would be negotiating with

16  the bank to reduce the amount.

17  Q      Okay.

18  A      Because I had been talking to Ms. Kerry Adams not

19  Mr. Kaufman.

20  Q      All right, sir.  Did you -- did they offer to sell you

21  back the property for $611,000 for 25 percent down?

22  A      For 600 down -- $600,000 for 25?

23  Q      For $611,000.

24  A      Yes.

25  Q      Okay.  With 25 percent down.

1    A       Yes.

2    Q       So if you got in that 500,000, that was out there

3    somewhere, that would be more than enough to cover the

4    25 percent down, right?

5    A       My concern was --

6    Q       Sir, just -- please just yes or no.

7    A       Yes.

8    Q       Okay.  Sir, how did you respond to their offer to sell

9    it to you for 611,000?

10   A       My concern was, okay, that when I have hired a law

11   firm, they need to defend me because why I had to pay for

12   the penalties, okay, for which I was not supposed to pay.

13   Because the bank would start taking the payments from when I

14   was giving to them, then they'll be not $100,000 worth of

15   penalties.  Okay?  So the law firm, their job is, okay, to

16   make sure, okay, to protect me, okay, they were supposed to

17   file against Fifth Third Bank and negotiate with them.  Why

18   I have to pay $100,000 for the penalties?  When he was --

19   continues sending you the payments and you are not

20   depositing?  When somebody comes on my business, okay, if I

21   made a mistake, I give them a free service.  Okay.  I

22   apologize to them.  I say, sorry.

23   Q       Well, did you expect the bank to simply write off the

24   money that you failed to pay them?

25   A       No.  Not the penalties.  Okay.  From the time that I

Cross-examination – Syed Hasnain

1    was ready to pay the penalties, okay.  For the time, okay,

2    when I did not make payments.  But when I making the

3    payments, okay, at that time.  And my second issue was,

4    okay, that why I am going to be punished?  Because if there

5    is four partners and two partners just died in the accident.

6    And only the two are left, how is the bank ask me to bring

7    them back from the graveyard and ask them to sign?

8    Q    Right.  You had -- you had -- there were lots of

9    reasons why you didn't want to do the deal, but the bottom

10   line is you did not do the deal.  Right?

11   A    The bottom line is, okay, my KEL attorney was unable

12   to negotiate.

13   Q    But -- okay.  So you said no to the 600 and 11, you

14   offered $500,000, with no down payment, zero down.

15   A    Nowhere -- okay.  Nowhere KEL Attorneys advise me.

16   Q    Sir --

17   A    Nowhere -- no, let me to explain.

18   Q    Sir, you will get a chance in just a moment.

19        MR. WITHERS:  Your Honor, I have to ask for an

20   instruction.  I'm getting -- we're getting argumentation

21   here.

22        THE COURT:  All right.  The question is -- so you

23   said no to the -- you better restate it.  I'm not sure --

24        MR. WITHERS:  Okay.

25        THE COURT:  -- from what is on here.  What did the

Cross-examination - Syed Hasnain

1   documents say?

2   BY MR. WITHERS:

3   Q      Mr. Hasnain --

4   A      Yes, sir.

5   Q      -- you said they wanted $611,000 with 25 percent down.

6   You said no to that.

7   A      Yes, sir.

8   Q      Okay.  Then you made a counteroffer.  Your

9   counteroffer was $500,000, nothing down.

10  A      No.

11  Q      Okay.  What was your counter?

12  A      I talk Ms. Kerry Adams.  She was the one who was

13  advising to me.

14  Q      Did you approve of that counteroffer?

15  A      Yes, I approve to her.

16  Q      Okay, sir.

17         And how did the bank react to that counteroffer?

18  A      When I was receiving the e-mail responses from you,

19  okay, the bank did say no.

20  Q      The bank said no?

21  A      Yes.

22  Q      Okay.  And did the -- did you then authorize the

23  second counteroffer?

24  A      I advised her $540,000.

25  Q      $540,000, again with no down payment.

1  A    I didn't receive no down payment at all.  Nowhere I

2  see no down payment.

3  Q    Okay.  Did you offer a down payment in any amount?

4  A    They -- this is the first time you're asking me this

5  question.  I wish you could ask me this question, okay, in

6  2009.

7      2010, sorry.

8  Q    Sir, did you authorize a down payment?

9  A    If they were asking me to, yes, I would authorize

10 that.

11 Q    But was the amount you authorized?

12 A    I would authorize them 25 percent of the down payment.

13 Q    I'm sorry.  What?

14 A    25 percent of whole amount.

15 Q    25 percent of the whole amount.

16 A    Yes, sir.

17 Q    Okay.  Well, the bank wanted -- that's what the bank

18 wanted.  25 percent of 611,000.

19      So why didn't you accept that offer?

20 A    Which one?

21 Q    $25,000 down against a purchase price of 611,000.

22      MR. ITTLEMAN:  You misstated the offer.

23 Supposed to be 25 percent, not thousand.

24      THE COURT:  Ah, yes, counselor.

25      MR. WITHERS:  I stand corrected, that was

Cross-examination - Syed Hasnain

1   25 percent.

2            THE COURT:  What is the question?  Let's start

3   over again.

4   BY MR. WITHERS:

5   Q    Okay.  The offer from the bank -- well, we've already

6   covered that.  The first offer was 611 with a 25 percent

7   down payment.  You rejected that, in it's place, offered

8   500,000.  The bank rejected that and said the next offer was

9   from you 540,000, again nothing down.

10  A    I never said nothing.

11  Q    Well, your offer to the bank said nothing down, right?

12  A    This was -- yeah, I think here I feel now that my

13  attorneys made a mistake.  They was supposed to ask me how

14  much money I put as a down payment.

15  Q    And they did communicate to you, did they not, about

16  what the offer was going to be?

17  A    No.  No.  They asked me the offer but they never asked

18  me for the down payment.  Which you're asking to me right

19  now.

20  Q    Okay.  So, what understanding did you have, sir, of

21  how the legal process works in the state of Tennessee, prior

22  to hiring KEL to represent you?

23  A    I had no idea because I'm not a law student and I

24  never studied the law.

25  Q    Okay.  But you're a businessman.  So you know certain

1   things.  You know, for example, that if you have a mortgage,

2   you have to pay it.

3   A      Definitely.

4   Q      If you have taxes, you have to pay them.

5   A      Definitely.

6   Q      If you have children in your care, you have to make

7   sure they didn't get in dangerous situations.  You knew all

8   those things without anybody specifically telling you them.

9   A      For any business, okay.  When you do, okay, you have

10  to run A, B and C.

11  Q      Okay.  Sir, would you say that when you contacted KEL

12  that you regarded it as an emergency situation?

13  A      Definitely.  Okay.  We talk and we contact Mr. Mooney

14  also who is a director.  Otherwise, why I could just talk to

15  Mr. Nathan Brown, I could be satisfied.  But I want to make

16  sure there's someone who is on the higher position is

17  listening to my concerns and they are interested in what I'm

18  asking them and they can do the services which I'm looking

19  for.

20  Q      Well, sir, and you expressed to them at that time that

21  it was an emergency, you needed action.  Something fast,

22  right?

23  A      Definitely.

24  Q      Okay.  And this letter we just showed you, this is

25  again your Exhibit 17.  This second page essentially

1  expresses your -- in fact, characterizes and expresses your

2  dismay that the emergency was not satisfied, in a manner

3  satisfactory to you.

4  A     Could you ask me that question again?  Because I

5  was --

6  Q     This letter characterize this -- this excerpts from

7  the letter as indicating to Mr. Englett, of the KEL law

8  firm, your dissatisfaction with the firm's failure to

9  resolve this emergency situation to your satisfaction.

10  A     But -- but this was my law firm, okay?  I'm showing to

11  them, okay, what is my situation.

12  Q     Sir, shall I repeat the question?

13  A     Yes, sir.

14  Q     Does this letter, especially this excerpt here,

15  express your dissatisfaction with the way KEL failed to

16  handle this emergency situation to your satisfaction?

17  A     I'm asking him that way, yes.

18  Q     Now, sir, you expected that they would stop the

19  foreclosure, if they stopped it in a legal and ethical way.

20  Right?

21  A     I don't understand what is an ethical and unethical

22  issue.  If you could explain to me.

23  Q     You understand that, again, that lawyers are required

24  to do -- to provide services to their clients to achieve

25  legal ends.

Cross-examination - Syed Hasnain

 1  A     Yes.  But this is the first time I'm hearing from you.

 2  Q     Okay.  And you understand that in providing those

 3  services, lawyers are required to follow certain ethical

 4  rules that may not apply to other people.

 5         MR. ITTLEMAN:  Objection, Your Honor.  That's --

 6  BY MR. WITHERS:

 7  Q     You don't know?

 8         THE COURT:  Just a moment, please.  Let me hear

 9  what the objection is.

10         MR. ITTLEMAN:  That's beyond the scope of the

11  witness's expertise.

12         THE COURT:  All right.  The witness has so stated.

13  BY MR. WITHERS:

14  Q     Sir, do you know if there are bar rules in addition to

15  laws which govern attorneys?

16         MR. ITTLEMAN:  Same objection, Your Honor.

17         THE COURT:  You may answer yes or no.

18         THE WITNESS:  I have no idea.

19  BY MR. WITHERS:

20  Q     Okay.  Would it surprise you to learn that there are

21  some?

22         MR. ITTLEMAN:  Same objection, Your Honor.

23         THE COURT:  Sustained.

24  BY MR. WITHERS:

25  Q     So let me ask you, you've spoken to -- you have given

 1  me three names, I think, in your testimony, given us three

 2  names.  Kayla Rogers, Mr. Mooney, Nathan Brown.  And you had

 3  an e-mail you showed us early from a lady named Jeanette

 4  Harbison?

 5  A     There -- yes, and there were some other people also.

 6  Q     Were any of those people lawyers?

 7            MR. ITTLEMAN:  Objection, Your Honor.  A, they'll

 8  speak for themselves, and B --

 9            THE COURT:  The witness may be asked if he has any

10  information or knowledge, whether they were lawyers or not.

11            THE WITNESS:  No.

12  BY MR. WITHERS:

13  Q     You didn't know.

14  A     I had no idea.  I don't know.

15  Q     You knew that Kerry Adams was a lawyer, right?

16  A     Yes.  Because of her name.

17  Q     You were talking to a Christopher Hunt at the law

18  office.

19  A     I have no idea.

20  Q     Okay.  And you said you talked to Mr. Kaufman.  Did I

21  understand that correctly?

22  A     Mr. Kaufman, okay, he called me.

23  Q     He called you?

24  A     Yes, sir.

25  Q     Okay.  And what was the conversation?

```
 1   A     The conversation was, okay, that he said that I'm not

 2   his client.

 3   Q     Okay.  Was this after you got the letter in June of

 4   2010 saying --

 5   A     No.  It was in January -- January the 11th when I

 6   wrote that -- when I sent them a fax.

 7         Okay, he called me and he said that, you're not my

 8   client, because why are you saying -- you're representing to

 9   you?  Okay.  And then I had to explain to him, okay, because

10   sir, I am your client, okay.  And I gave him the

11   information, okay.  I had been talking to their offices

12   in -- and some other people, okay.  So -- and after that,

13   okay, he -- I think I was on point again, I can see, okay?

14   And he start asking me the questions, okay, and he said yes.

15   And --

16   Q     All right.  Sir, you had mentioned earlier in your

17   testimony that you did not trust Fifth Third Bank?

18   A     Definitely.  You know, because I have a bank -- you

19   know, a bad experience with them.

20   Q     Okay.  Now, sir, you received the letter from them

21   about -- oh, I guess, what, a couple weeks or maybe even

22   more than that, three or four weeks after the foreclosure

23   sale, from the attorney for the bank up in Cincinnati?

24   A     Yes.

25   Q     Okay.  That letter has been introduced into evidence
```

1   already.

2   A     Right.

3   Q     And in the letter she, the attorney, describes several

4   things.  And the letter, as I have often said, speaks for

5   itself.  But I want to ask you this.  Were you disappointed

6   when you got that letter?

7           MR. ITTLEMAN:  Objection, Your Honor.  Calls for

8   speculation.

9           THE COURT:  Well, it -- I don't know what the

10  relevance of that is, but --

11          MR. WITHERS:  I'll get there, Your Honor.

12          THE COURT:  All right.  I'll allow him to answer

13  then.

14          THE WITNESS:  If you are sick, okay, and yes --

15  okay.

16  BY MR. WITHERS:

17  Q     Yes?

18  A     Definitely, okay.  Everything was disappointed because

19  I want, okay, the bank to negotiate.

20  Q     Sir -- and in your correspondence to the bank, did you

21  accuse the bank of engaging in racist behavior?

22  A     I did against the -- Ms. Leslie Jones.

23  Q     Okay.  And did you accuse them of being anti --

24  against region, which I assume, based on your description of

25  the Hajj, would be Muslim?

1    A      Yes, sir.

2    Q      And you felt that that person had discriminated

3    against you on both those grounds?

4    A      Definitely and, therefore, I was asking the bank,

5    okay, they can -- they can assign any other -- they can

6    assign any other loan officer, who can understand me, who

7    can understand how I speak, who can talk to me, over the

8    telephone.  Because sometimes, yes, when I'm speaking, okay,

9    because I'm from -- I was not born in U.S., okay?  My

10   pronunciation, how I speak, cannot be like an American.

11   Okay?

12   Q      All right, sir.

13   A      So she did not have patience to listening to me.

14   Q      Sir, she's not here to defend herself, so we will --

15   let's move on to the next question.

16        So after you were notified, sometime in early

17   January 2010, that the property had been sold to the bank at

18   the foreclosure sale, you continued to work with KEL up

19   until the time you got the letter in June --

20   A      Yes.

21   Q      -- from Mr. Kaufman, basically said, we have done all

22   we can for you.

23   A      Yes.

24   Q      Okay.  And basically, as soon as you got that letter,

25   you started talking to Mr. Ittleman about suing us, right?

1    A      Not immediately.

2    Q      Not immediately?

3    A      Not immediately.

4    Q      How long after that?

5    A      After -- after a certain time.  After a few weeks.

6    Q      All right.  Because you recall, sir, that you

7    submitted an affidavit in support of your Motion for Summary

8    Judgment, in which you stated that you immediately sought

9    legal counsel when you found out that the foreclosure sale,

10   that somehow we had goofed and the foreclosure sale was our

11   fault.

12            MR. ITTLEMAN:  I'm going to object.

13            THE WITNESS:  When you understand from immediately

14   is not --

15            THE COURT:  Just a moment, please.

16            MR. ITTLEMAN:  I'm going to object to the

17   question.  I'd like to see the affidavit that counsel is

18   referring to.

19            THE COURT:  All right.  That was filed, I think,

20   by you.

21            MR. ITTLEMAN:  Correct.  But I'm not sure if it

22   states what counsel says it states.

23            THE COURT:  All right.  Let's get the document

24   out.

25            MR. WITHERS:  I certainly would like for everyone

 1   to see it, Your Honor.

 2          MR. ITTLEMAN:  Sure, I'd like to see it.

 3          THE WITNESS:  It could be immediately because

 4   nothing is in front of me right now.

 5          MR. WITHERS:  I know, sir.  We're getting it for

 6   you.

 7          THE COURT:  This document will be marked

 8   Defendant's 51.

 9      All right.

10   BY MR. WITHERS:

11   Q    All right.  Mr. Hasnain, let me put it up here.

12          THE COURT:  Well, it hasn't been admitted yet.  Is

13   there an objection to it?

14          MR. WITHERS:  I thought it was stipulated.

15          MR. ITTLEMAN:  I would be interested in

16   cross-examination.  I'm not sure of the relevance.  It's an

17   affidavit.

18          THE COURT:  Well, before anything is put on this

19   machine, it must be admitted.

20      Do you offer?

21          MR. WITHERS:  I do.

22          THE COURT:  Okay.  Is there objection?

23          MR. ITTLEMAN:  Yes.  Relevance.

24          THE COURT:  The relevance?  I'll overrule the

25   observation.  The affidavit will be admitted.  Defendant's

```
 1  51.
 2            MR. ITTLEMAN:  And just for the record, it's also
 3  hearsay, Your Honor.
 4            THE COURT:  This is an affidavit your client
 5  signed is hearsay?
 6            MR. ITTLEMAN:  They have the -- he would have the
 7  opportunity to cross-examine the client with respect to -- I
 8  understand that it could be used as cross-examination.  I'm
 9  not sure if it's for evidentiary value, but --
10            THE COURT:  Are you objecting that it's out of his
11  case?  He shouldn't offer an exhibit on the plaintiff's
12  case, is that what it is?
13            MR. ITTLEMAN:  No.
14            THE COURT:  All right.  If you are not doing that,
15  I'm going to allow admission at this time.
16            MR. ITTLEMAN:  Thank you.
17            MR. WITHERS:  Thank you, Your Honor.
18     Your Honor, I ask the Court to bear with me as we go
19  through this.  This is a multiple-page affidavit.  And it's
20  kind of important stuff in this case.
21            THE COURT:  Well, let's not have an editorial
22  comment --
23            MR. WITHERS:  Your Honor --
24            THE COURT:  -- just a question.
25            MR. WITHERS:  I'm sorry.  I'm sorry.
```

Cross-examination - Syed Hasnain

1  BY MR. WITHERS:

2  Q    Now, Mr. Hasnain, I want you to look at the paragraph

3  number 3.  I'm going to try to zoom this thing in.

4      This is about the filing of your claim for professional

5  malpractice against us.

6      You state, "On January 8, you were told that Tennessee

7  law does not provide for a procedure to stop the sale."

8  A    Right.

9  Q    Who told you that?

10 A    Okay.  Mr. Ittleman.

11 Q    Mr. Englett?

12 A    No.  My -- which one are you saying, sir?

13 Q    I'm talking about paragraph number 3, sir, the second

14 line where it says, "I was told on January 8, 2010."

15 A    It was from Ms. Kerry Adam.  Kerry Adams.

16 Q    Okay.  So on that date, as of then, you had a

17 statement from a KEL attorney saying that you couldn't file

18 suit to stop the foreclosure sale?

19 A    Ms. Kerry Adam, yes, sir.

20 Q    Okay.  And then you state later on, that somehow,

21 June of 2010, you learned that there was a procedure, right?

22 A    Yes.

23 Q    And then you immediately sought the services of

24 Mr. Ittleman.  That's June of 2010.

25     Let me show you the rest of it, just to kind of refresh

 1  your memory.

 2      Right?

 3  A    Which one?

 4  Q    Well, sir, the previous page where it states that you

 5  learned in June 2010.

 6      Shall I show you that again, sir?

 7  A    Yes, after.  Yes.  June 2010.

 8  Q    It says, then, in June 2010 you learned for the first

 9  time.

10  A    That's true.

11  Q    That there was a way, procedure to stop and enjoy the

12  sale, and then you immediately contacted him.

13  A    Yes, that's -- that's right.

14  Q    Okay.  So we have got that all correct.

15  A    That's right.

16  Q    And then item number 4.  It recites, Nathan Brown told

17  you what you would have to do, why you would need a hardship

18  letter and basically about a loan modification.

19  A    That's very true, because I want to understand that

20  when I'm submitting the paper, okay, I need to get that

21  advice from my legal counsel.

22  Q    Okay, sir.  And so you were told -- doesn't say

23  anything about a lawsuit.  It says loan modification.

24  Right?  I mean, these are your own words.

25  A    That's right.

Cross-examination - Syed Hasnain

1  Q     Okay.  And --

2  A     That's right.

3  Q     And follow through on presenting the hardship letter.

4  And it states here, then, further down in paragraph 5 in

5  your affidavit states, that you informed the defendants that

6  you had the ability to pay $500,000 to the bank to retain

7  the property.

8  A     That's very true.

9  Q     Right.

10       Was this the 500,000 you were going to get from your

11 family over in Pakistan?

12 A     From Bangladesh, yes, sir.

13 Q     From Bangladesh.

14       So you were not clear in the affidavit.  It says

15 that -- paragraph 6, that you made a decision to operate the

16 Learning Connections through a separate entity called the

17 Learning Academy.

18 A     Right.

19 Q     Now I asked you earlier if you controlled both of

20 those companies and you agreed that you did.  Controlled

21 operations.

22 A     Right, sir.

23 Q     Yeah.  I didn't get the reason why you needed to

24 switch from one to the other.

25 A     Because the business of the Learning Connection -- the

Cross-examination - Syed Hasnain

```
 1  Learning Connection, Nadira was the director of that.  In
 2  order to bring another person as a director, okay, we
 3  decided, okay, that, yes, we can bring, okay -- we can
 4  bring, okay, Ms. Debra Cameron, okay, and we can get another
 5  new name for the company.  Because we have some issues,
 6  okay, with the Department of Human Services and we want to
 7  get -- to have a new name, okay, and new face.
 8  Q    What was the issue with the Department of Human
 9  Services?
10  A    The issue was -- okay, I am a perfectionist.  Okay.  I
11  fight for the truth.
12       There were two teachers in the one room, just like this
13  big room.  They were two teachers, okay, and the room was
14  divided, okay, with just one boundary.  Each teacher was
15  supposed to handle five children and the both teachers were
16  there.
17       When the counselor from the Department of Human
18  Services, she came, she said, okay -- she give us, okay, the
19  violation.  She said, one teacher has six children when the
20  other teacher has the four children.
21  Q    Sir, did you -- did you also have a problem with that
22  agency about a child wandering off the premises?
23  A    This I already explain to you.
24  Q    Okay.  Please do.
25  A    I'm going to explain to you.  I'll explain myself.
```

Cross-examination - Syed Hasnain

1  Q      Okay.

2  A      Yes.  Because I am not going hide anything from

3  anyone.  Okay.  Because we did not -- we -- all the time we

4  give our good services to our students.  No child care

5  center give -- offer those kind of services which my wife

6  and I was giving to them.  Nobody give the regular -- the

7  fresh food to the children.  Nobody would provide, okay,

8  the -- in the backside of the property.  We were keeping,

9  okay, to feed the children food because we have a form

10 system and everything.

11     I was with those teachers.  I talked to those teachers.

12 Okay.  My concern was if the teachers were not there, then

13 the Department of Human Services can give them the -- punish

14 them.

15     The both teachers were there, okay?  So why, okay?  One

16 teacher have six children be taking care, and the other

17 teacher -- at that time the other teacher would be taking

18 the four children.  It start from there.

19     And I went, and I said to my wife, no, don't sign,

20 okay, on the violations.  Otherwise you can just sign and

21 these are the procedure for the correction.  Okay.  But in

22 my explanation was, there is nothing to correct, in this

23 situation.  Because the both teachers were in the room.

24 Okay.  The counselor saying because two teachers, both

25 teachers were in the room.

1   Q      Mr. --

2   A      But the portion was the ratio.

3   Q      Sir, did that have anything to do with why you changed

4   the name --

5   A      Yes.

6   Q      -- of the company?

7   A      Yes, sir.

8   Q      Okay.  So you could then hold yourself out --

9   A      It was because a number of issues, I'll will say.

10  Q      Let me finish, sir.  You can correct me if I'm wrong.

11       So you were then able to hold that business out to the

12  community as the Learning Academy rather than the Learning

13  Connection?

14  A      Okay.  There was -- yes.  What I'm trying to say is,

15  okay, that we don't want to get to argue too much with the

16  Department of Human Services.  And we decide, okay, we need

17  to go with the -- under the new name, okay, and we need to

18  have -- but it still can be providing the same services.

19  Q      With the same people providing the services, right?

20  A      With the same people, yes.

21  Q      Just a different name.

22  A      Yes.

23  Q      And a different license from the state.

24  A      Different license.

25  Q      Because the old one had a little bit -- had some

Cross-examination - Syed Hasnain

```
 1  problems attached to it, right?
 2  A     The problem was attached, okay, from the Department of
 3  Human Services because we challenge them.
 4  Q     Right.
 5        And it handled in the police department in
 6  Murfreesboro, too, right?
 7  A     Let me explain the situation.  Okay.  That when we
 8  refused for the violation, okay, we had -- at that time,
 9  okay, we said we don't want to be able to sign and we
10  challenge them, okay, to the counselor.  The stages, you
11  have to go from one stage to another stage, okay.  So we
12  went, okay, on all of those stages.  And it's very painful,
13  jury.  It's very painful to express right now, okay.  That
14  you will be surprised, okay.  That the teacher, we feel
15  sorry for her and give her a job.  Okay.  She said she
16  wanted to go and she needed money.  And my wife give her the
17  job.  And she was involved with the -- take the children
18  out, so they make the big drama.
19  Q     I'm not sure you answered my question, sir.
20        Basically, your problem was with the division of health
21  services -- Department of Health Services.
22  A     Yes.
23  Q     Right?  Okay.
24        And, sir, was that a problem as far as your
25  relationship with your customers was concerned?
```

Cross-examination – Syed Hasnain

1   A      No.  The customers were very good.  They're still okay

2   because the parents knows our services, okay.  We have not a

3   single issue about that.  Okay.  We were running the three

4   daycare centers in the same area.

5   Q      Did any of those parents or customers know that you

6   did not pay the mortgage at that point for 17 months?

7   A      This is none of their business.  In any business, you

8   don't go and you tell.  You don't go and you don't tell your

9   customers, okay, that you have this -- you're having a

10  problem with, okay, with your loan.  Okay.  This is a

11  very -- so why I have to tell, okay, and post that I'm

12  having a problem, okay, with Fifth Third Bank?

13  Q      Well, sir, doesn't the State of Tennessee require a

14  child care center to be financially responsible?

15  A      Yes.  We can provide the services.  We can provide the

16  information of the Department of Human Services but not to

17  the parents.

18  Q      Okay.  And so the fact that you were not making your

19  mortgage payments would not reflect --

20  A      In my opinion --

21  Q      -- would not reflect any kind of financial problem?

22  A      In my opinion, I was making the payment.  But if I am

23  giving the payment to somebody and they're not depositing in

24  their account, then they're responsible, why they're not

25  depositing that money.  If the money was -- came from the

Cross-examination - Syed Hasnain

1   bank, at that time I will feel guilty.

2   Q     Now, sir, did you -- every single month, did you

3   tender the mortgage payment to the bank?

4   A     Can you repeat your question?

5   Q     Did you every single month, those 17 months where

6   there was no payment made, between August of 2008 and the

7   foreclosure sale, did you every single month tender that

8   $5,000 payment to the bank?

9   A     I gave them that electronic.  I give them electronic

10  check, okay.

11  Q     Sir.  Sir.  I don't see anything in your loan

12  documents that indicates that a loan and then electronic

13  transfer is payment.

14  A     No.

15  Q     I'm imposing the question to you, is it fair to say

16  that during those 17 months and then the extra time

17  afterwards, you did not pay the bank and they didn't accept

18  it?

19          MR. ITTLEMAN:  Object to the form.  This has been

20  asked and answered.

21  BY MR. WITHERS:

22  Q     May answer.

23  A     I don't understand the question again.  What?  I'm

24  sorry.

25

1    Q       Let me make it easy for everybody.

2    A       Yes, sir.

3    Q       Did you write a check to that bank every month during

4    those 17 months?

5    A       Not every month.  I did in the beginning, okay, and

6    then I sent, okay, to the -- I even faxed it to the bank.

7    They refused to take them.  Then I sent the check over to

8    the Fifth Third, the president of the Fifth Third Bank.

9    Nobody go to the president's office.  I said to them, I'm

10   ready to apply in your office.  Would you be asking me?  I'm

11   ready to sign on the documentation.

12   Q      Sir, all I asked you was if you wrote a check every

13   month and tendered to them.  That's like sending it to them.

14   A      Okay.  No.

15   Q      Okay.

16           MR. WITHERS:  Your Honor, I don't have any more

17   questions at this time.

18       Of course, we retain the right to call Mr. Hasnain as a

19   witness on defense.

20           THE COURT:  Well, you may confer with him quickly.

21           MR. WITHERS:  As usual, Your Honor, the financial

22   guy is smarter than the plain old lawyer.

23           THE COURT:  Okay.

24   BY MR. WITHERS:

25   Q      Mr. Hasnain, I have a couple more questions for you

1    related to finances.

2    A     Yes, sir.

3    Q     Okay.  Sir, do you recall at some point your attorney,

4    on your behalf, retaining an accountant to do an examination

5    of your records in order to prepare a calculation in

6    damages?

7    A     Who?  Which one are you talking about?

8    Q     Mr. Piedra?

9    A     Huh?

10   Q     Mr. Piedra.

11   A     Yeah.

12   Q     You do?  Okay.

13        And do you remember Mr. Piedra requesting certain

14   documents from you in order to be able to finish his

15   opinion?

16   A     Right.

17   Q     And he asked for tax returns for 2009 and '10?

18   A     Right.

19   Q     -- did you provide those?

20   A     I did not provide because I did not file for 2009 and

21   '10.

22   Q     You didn't file for '9 or '10?

23   A     Yes.  Not for the business.

24   Q     Okay, sir.

25        And did he request an appraisal of the property?

Cross-examination – Syed Hasnain

```
 1  A     Appraisal for property?  No, sir.

 2  Q     The property in Murfreesboro, did Mr. Piedra request

 3  you to get appraisal on it?

 4  A     Not appraisal.

 5  Q     Okay, sir.  And did he request any other financial

 6  information from you?

 7  A     Definitely.

 8  Q     And did you provide everything he asked for?

 9  A     I provide everything.

10  Q     Everything he asked for?

11  A     Yes.

12        MR. WITHERS:  Thank you, sir.

13     No further questions.

14        THE COURT:  All right.

15     Redirect, Mr. Ittleman?

16        MR. ITTLEMAN:  Sure.

17                    REDIRECT EXAMINATION

18  BY MR. ITTLEMAN:

19  Q     Counsel asked you a couple questions, you recall,

20  about the affidavit that you signed?

21  A     Yes, sir.

22  Q     Now, it's true, is it not, that you performed an

23  investigation as to why you lost the commercial property

24  prior to coming to see me?  Correct?

25  A     Yes.
```

Redirect Examination - Syed Hasnain

1    Q     Okay.  And who did you speak to prior to seeing me?

2    A     If -- before talking to you, I talk to one of our

3    family member also.

4    Q     And who is that?

5    A     Mr. Stan Singleton.

6    Q     When do you recall speaking to Mr. Singleton?

7    A     Okay.  It was last week of June.

8    Q     Okay.

9    A     Third week of June, something like that.

10   Q     Okay.  And what did Mr. Singleton --

11         MR. WITHERS:  Whatever he said it was, I object as

12   being hearsay.

13         THE COURT:  Yes, hearsay, it appears.

14   BY MR. ITTLEMAN:

15   Q     You say here in your affidavit, "It was not until

16   after the defendants send me the letter in June of 2010"

17   that you learn for the first time there was actually a

18   procedure in the State of Tennessee to stop -- to stop or

19   enjoin the sale.

20   A     Yes, sir.

21   Q     How did you acquire that information?

22   A     Because when I was talking to you, okay, I got that

23   information.

24   Q     So the conversation that you and I had was the first

25   time you learned about the procedure to stop the sale?

Redirect Examination – Syed Hasnain

1    A    Yes, definitely.

2    Q    And isn't it true that you and I had a telephone

3    conversation prior to you coming to my office to see me?

4    A    Yes.

5    Q    And during that conversation, I advised you that there

6    was procedures to stop the foreclosure sale, correct?

7    A    Yeah.

8         MR. WITHERS:  Your Honor --

9         THE COURT:  Yes.

10        MR. WITHERS:  -- this is the strangest testimony

11   I've ever heard but I think it's leading the witness.

12        THE COURT:  It is leading but you need to be on

13   your feet sooner.

14        That was a leading question.

15        MR. ITTLEMAN:  Okay.

16   BY MR. ITTLEMAN:

17   Q    All right.  You state here, "After I learned there was

18   procedure," you immediately sought the services of me and my

19   law firm to file an attorney malpractice action, correct?

20   A    Which line you're expressing right here because --

21   Q    "After I learned there was such a procedure."  Right?

22   A    Yes, sir.

23   Q    You immediately sought the services of my law firm --

24   A    Yes.

25   Q    -- to file an attorney malpractice action.

Redirect Examination - Syed Hasnain

```
 1   A      That's right.

 2           THE COURT:  Making reference to Defendant's 51,

 3   correct?

 4           MR. ITTLEMAN:  Correct.

 5   BY MR. ITTLEMAN:

 6   Q      And that all occurred in March of 2010, correct?

 7   A      It was in June, right?

 8   Q      Now, you had discussed --

 9   A      I'm sorry.  Because there's two dates, I'm getting

10   confused.

11   Q      That's okay.

12          Counsel had asked you about the umbrella at the

13   commercial property.

14   A      Yes.

15   Q      Do you recall that testimony?

16   A      Yes.

17   Q      That there was various businesses under that umbrella?

18   A      Right.

19   Q      And what was the umbrella -- what was the name of the

20   corporation that you had all the other businesses under?

21   A      Okay.  The -- under the Learning Academy.  I -- this

22   was, you know, like take a break, we have to take a break

23   also, okay.  We have --

24   Q      Was "take a break" under the Learning Academy?

25   A      Okay.  Under the umbrella Learning Academy.
```

Redirect Examination - Syed Hasnain

1  Q     Okay.  And what other corporations were under the

2  Learning Connections Academy?

3  A     Yes.  I'm just -- I think Bright Academy was the name.

4  I'm getting confused, sorry.

5  Q     Going back to the letter that you sent to the law firm

6  on January 10th, 2010.

7              THE COURT:  Exhibit 17?

8              MR. ITTLEMAN:  One second.  I can pull --

9              MR. WITHERS:  17, Your Honor.

10  BY MR. ITTLEMAN:

11  Q     You had sent the letter on January 10th, 2010,

12  correct?

13  A     Yes.  This is my letter that I sent to them.

14  Q     Now, were you aware, as of January 10th, 2010, as to

15  whether your commercial property had been sold at

16  foreclosure?

17  A     Yes.  Okay.

18  Q     Isn't it true that you were asking the law firm for

19  information because you were not aware?

20  A     Yes.

21  Q     You also state that you understood that the KEL

22  Attorneys were to be filing an injunction to stop the sale

23  prior to December 9, 2009.

24  A     That's very true.

25  Q     And your -- didn't you believe that providing them

1   with the financial information was to stop the foreclosure

2   sale?

3   A      Whatever the documentation they asked, okay, for

4   financial documents, yes, those are the documents that

5   they're asking to stop the foreclosure sale.

6   Q      So you provided them with financial documentation, and

7   they were unable to stop the sale.

8   A      It's -- and the copies of the tax returns, yes.

9   Q      All which was provided to the KEL firm.

10  A      Yes.  Yes, sir.

11  Q      You don't know what injunction means legally, do you?

12  A      Not really.

13  Q      And just so I understand, if the KEL Attorneys had

14  told you that $550,000 and 25 percent down would get a deal

15  done with Fifth Third Bank, would that be something that you

16  would have authorized?

17  A      If they were saying that they could negotiate for

18  sure --

19          MR. WITHERS:  Speculative.

20          THE WITNESS:  -- definitely I'll do it.

21          THE COURT:  Just a moment, please.

22      What was the objection?

23          MR. WITHERS:  Speculative.

24          THE COURT:  I'll let the witness answer.

25          THE WITNESS:  If they were saying to me, Syed --

Redirect Examination - Syed Hasnain

 1   if they were advising to me as my attorney and they were

 2   saying, Syed, this is the bottom line, you cannot negotiate

 3   further, okay, then I would be accepting.  But I never ever,

 4   until today, received from the Fifth Third -- from the KEL

 5   Attorneys, that this is the end of the -- like this is the

 6   bottom line for me to negotiation.

 7        When I was talking to Ms. Kerry Adams, she was giving

 8   me the -- she was giving me the information, that, yes, they

 9   can negotiate on better price -- on better price -- for a

10   better price.

11             MR. ITTLEMAN:  Thank you.

12             THE COURT:  Tender the witness?  All right.

13             MR. WITHERS:  Can I have one?

14             THE COURT:  We will conclude for the day, then,

15   ladies and gentlemen, and George will pick up the notes and

16   give them to you tomorrow.

17        Is 8:30 a possibility, or is it just too hard?  Do any

18   of you drive from long distances?

19        You do.  Okay.  Then we will start at 9:00.  I don't

20   want to put you out.  I know the highway can get rough.  So

21   we will start at 9:00 sharp.  If you will just come in, go

22   to the place where you gathered downstairs today, look for

23   George, he will bring you all up.  You can leave things in

24   the jury room, if you want to bring drinks and food, that

25   sort of thing.  And we'll get started at 9:00.  And we will

1   be working here after you have go this evening, so have a

2   nice evening.  Be alert not to discuss or hear or read

3   anything about the case.

4              (Recess for the jury at 4:44 p.m.)

5              THE COURT:  All right.  Gentle people, please be

6   seated.  I'm going to keep you for a little while because I

7   need to get somewhere.

8       If you will pull out draft 3 of the jury instructions.

9   Let's look at pages 1 through 8, which are, I think, pretty

10  much taken from what you submitted except on page 8, I

11  haven't heard any stipulated facts yet.  So I would say that

12  should be taken out.

13      Is there objection?  Is there going to be stipulations?

14             MR. WITHERS:  I think there are going to be.

15             THE COURT:  Okay.  We leave it in for the time

16  being now then.

17             MR. WITHERS:  I'll ask to you leave it in.

18             THE COURT:  Okay.  Just take a minute to look

19  through these and see if there's anything that -- they're

20  pretty standard, and I think they pretty much came from your

21  submission.

22      And when I give them to the jury, I will not have

23  headings.  It will be just like an essay.

24      And then the duty to deliberate is on page 21, and 22

25  is to select the members of the jury.  One of these you did

 1  not have in your -- I think it was the last one.  But one of

 2  them I think you omitted.

 3       Any problem with those from anybody?

 4            MR. ITTLEMAN:  No, ma'am.

 5            MR. WITHERS:  Your Honor, they look pretty

 6  standard so far.

 7            THE COURT:  So far.

 8       Okay.  Now in the middle is the jury instructions that

 9  you sent me, had all sorts of typos and references.

10       I think Mr. Kaufman is the sole defendant on the

11  negligent supervision claim, but it was that claim you all

12  submitted had references to the law firm.  And I tried to

13  clean it up, but, you know, that's not really my job, that's

14  your job.  So I'm going to have you read -- it's really

15  pages 9 through 17.  That's the heart of the claims and the

16  defenses, so I'm just going to give you an few minutes here,

17  read through and just indicate to me, you can nod your head

18  and say I'm finished, and I'll wait for both of you to read

19  through.

20       Mr. Withers, where are you?  Were you reading 6?

21            MR. WITHERS:  I'm on page 19.

22            THE COURT:  Okay.  Then you are two pages than

23  I -- further than I told you to read.

24       So is there any anything that you see, Mr. Ittleman,

25  that you want to change -- excuse me.  Just a moment.

1      Is there anything you see, Mr. Ittleman, you want

2  changed?

3          MR. ITTLEMAN:  No, ma'am.

4          THE COURT:  Mr. Withers?

5          MR. ITTLEMAN:  I don't recall what we originally

6  sent you, and I apologize if it was not --

7          THE COURT:  Well, you will see, if you compare the

8  two --

9          MR. ITTLEMAN:  Okay.

10          THE COURT:  -- but --

11          MR. ITTLEMAN:  I don't have -- I don't know what I

12  reviewed but I don't think that they -- I recall trying to

13  find the case that talked about negligence provision.  I

14  don't believe I was able to do that, or I couldn't locate

15  the specific elements for that, I think, which is why I came

16  up with what I came up with but it looks fine, Your Honor.

17          THE COURT:  Mr. Withers.

18          MR. WITHERS:  Thank you, Your Honor.

19      Your Honor, if I may refer the Court to page 12, third

20  line down.  I think it should say, Mr. Kaufman is only

21  licensed to practice in Tennessee, attorney.

22          THE COURT:  All right.

23          MR. WITHERS:  And then further down, let's see,

24  the eighth line down, I think it really should say, Taking

25  title of commercial property through uncontested foreclosure

```
 1   sale.
 2              THE COURT:  All right.
 3              MR. ITTLEMAN:  Where?
 4              THE COURT:  That's page 12.
 5              MR. WITHERS:  Eighth line down.
 6              THE COURT:  Eighth line down, three words add in,
 7   the word sale after foreclosure.
 8              MR. ITTLEMAN:  Okay.  That's fine.
 9              MR. WITHERS:  And is that all we're talking about,
10   that limited part of the instructions?
11              THE COURT:  I told you to read pages -- go back
12   and tell you again, pages 9 through 17.
13              MR. WITHERS:  Right.
14              THE COURT:  Anything else?
15              MR. WITHERS:  Beyond that, I had some concerns
16   about the statute of limitations instruction.
17              THE COURT:  Okay.  But that's beyond where I have
18   asked you.
19       All right.  So now, the next thing to do is to read
20   pages 18 through 20.  Three pages.  Everybody fine?
21              MR. WITHERS:  Yes, Your Honor.
22              THE COURT:  All right.  Mr. Ittleman, anything?
23              MR. ITTLEMAN:  On the damages, Your Honor.
24              THE COURT:  Okay.
25              MR. ITTLEMAN:  I'm not sure if this was in my
```

 1  original jury instructions, covered damage for continuing

 2  business.

 3          THE COURT:  It may have been.  I have problems

 4  with the damages here.  So this is page 18 you're on?

 5          MR. ITTLEMAN:  Correct.

 6          THE COURT:  So damages, you're saying what to me

 7  now?  It's on the second paragraph, the third line?

 8          MR. ITTLEMAN:  Correct.  To recover damages for it

 9  doesn't really -- what we're saying is they lost the

10  commercial property and the day care center.  I'm not sure

11  where that instruction, what legal authority that is, but it

12  doesn't say the damages -- it's not only the daycare center,

13  it's also the actual property that they lost.

14          THE COURT:  The realty.

15          MR. ITTLEMAN:  Correct.  It's the commercial

16  property.

17          THE COURT:  Okay.  Damages, so how would you

18  phrase -- I'm going flip up and see what I can find that you

19  all said to me.  Then we'll -- I'm not there yet.  Just a

20  moment.

21          MR. ITTLEMAN:  The third paragraph, Your Honor, I

22  think is fine.

23          THE COURT:  One second, Mr. Ittleman.  I'm trying

24  to find this, and it's hard for me to pay attention to what

25  you're saying when I'm trying to find and -- there we go.

 1            MR. ITTLEMAN:  Sure.

 2            THE COURT:  Your damages on page 17 says, Thus no

 3    evidence of the value, such intangible things as pain and

 4    suffering, has been or need to be introduced.

 5            MR. ITTLEMAN:  Correct.

 6            THE COURT:  But I don't think there's pain and

 7    suffering in a malpractice.

 8            MR. ITTLEMAN:  Right.  Just compensatory damages.

 9            THE COURT:  Correct, so I took that out.

10            MR. ITTLEMAN:  Okay.

11            THE COURT:  Now let me just hear what else you

12    say.

13        Okay.  It's frozen, so let me listen to you and then

14    maybe it will unfreeze when I get there.  So what are you

15    saying to change here?

16            MR. ITTLEMAN:  Not just recover damages nor the

17    continuing business.  Again, I'm not sure where that came

18    from, if that's a standard instruction.  But it's not

19    just -- we played out in our complaint what we believe the

20    damages are as a result of what we contend to be the

21    attorney malpractice.  So I don't want to instruct the jury

22    on the element, limiting my claim by just saying the

23    continuing business.  I don't believe that's accurate.

24        We stated in paragraph 24 of our complaint, the loss of

25    property, the loss of the business, the loss of the money

1  that they reinvested back.

2          THE COURT:  I'm looking at page -- do you have

3  your instructions that you submitted, page 18?

4          MR. ITTLEMAN:  You know, I don't believe I do.

5          THE COURT:  Okay.

6          MR. ITTLEMAN:  I can -- I have my computer.  If

7  the Court allows, I can --

8          THE COURT:  Says to recover damages for continuing

9  business, it must appear that there was ongoing business

10  profits and that those properties were lost solely due to

11  injury.  The injury was caused by negligence of the

12  defendant.  If you are to determine party's damages, you

13  must compensate that party for the loss or harm that is

14  reasonably certain to be suffered in the future as a result

15  of the injury in question.  You may not include speculative

16  damages, which is compensation for future loss or harm or

17  possible conjecture and not reasonably certain.  And I think

18  that was it.

19          MR. ITTLEMAN:  As far as that.

20          THE COURT:  Yeah.  And so, what I'm asking you now

21  is, how would you rewrite this?  Don't worry.  I'm trying to

22  solve this problem, not hang somebody because they didn't do

23  something.

24          MR. ITTLEMAN:  I would just say --

25          THE COURT:  A loss of the real property, add those

247

 1   words?

 2          MR. ITTLEMAN:  For the continuing business, the --

 3   recover damages for the business, the -- and the commercial

 4   property.  I would just say for the business not continuing,

 5   the daycare center and the commercial property.

 6          THE COURT:  For -- to cover damages for the

 7   daycare center --

 8          MR. ITTLEMAN:  And the commercial property.

 9   And --

10          THE COURT:  And the commercial real property,

11   right.

12          MR. ITTLEMAN:  Right.  Okay.

13       And I would also say, It must appear --

14          THE COURT:  Why don't you sit down because I'm

15   going to hear him then I'm going to hear you, you don't need

16   to stand.  And --

17          MR. ITTLEMAN:  Thank you.

18       The ongoing business profits.  If you have -- I don't

19   know if that's accurate, if you have -- you know, if you

20   have a property and you're paying your mortgage on it, and

21   someone takes it wrongfully, you don't have a business in

22   there, that's -- that would be separate.

23          THE COURT:  How would you change this?

24          MR. ITTLEMAN:  I would say, It must appear that

25   there were ongoing business profits for the daycare center

```
 1   and that's -- recover damages for the continuing business,

 2   it must appear there were ongoing business profits for the

 3   daycare center and that the injury was caused by the

 4   negligence of the defendants.  I would also say, to recover

 5   damages for the loss of commercial property, it must appear

 6   that, you know, again, that the negligence of the

 7   defendants -- I mean, we're going to explain to the jury

 8   tomorrow with our CPA how he's coming to what the equity of

 9   the property was, and -- I mean I'd just as soon take out

10   the entire paragraph, Your Honor, and just say, Mr. Hasnain

11   may recover damages for profit for the loss of the daycare

12   center and the commercial property.  If you are to determine

13   party's damages, you must compensate that party for the loss

14   or harm that's reasonably certain to be suffered in the

15   future as a result of the injury in question...

16       I think that's just standard in all the jury

17   instructions that the jury can understand.

18           THE COURT:  Okay.  In your submissions on page 17,

19   taken from your instructions I do believe, it says, words to

20   the effect, you should consider the following elements of

21   damage and no others.

22       So you're saying you're going tell this -- that's in

23   the standard instructions.  The standard instructions,

24   though, leave it open, what would be woven in there because

25   the cases are all different.
```

1           MR. ITTLEMAN:  Right.

2           THE COURT:  So when you say that, and no others,

3    you must list what can be considered, and I think we should

4    do that --

5           MR. ITTLEMAN:  Okay.

6           THE COURT:  -- because I don't want them going off

7    on some area -- I think we should have it -- but I do think

8    that what has been written here when we added, and the

9    commercial real property, makes this ambiguous.

10          MR. ITTLEMAN:  Right.  So I would break it up into

11   two sentences, Your Honor.  To recover damages for

12   continuing business, that are ongoing business profits.  And

13   then to recover damages for the loss of the commercial

14   property, it must appear that the plaintiffs had the

15   ability -- what we're going to say is that the plaintiffs

16   had the ability to pay the mortgage and that the negligence

17   of the defendants resulted in the amount of -- you know,

18   resulted in the loss of the commercial property.

19          THE COURT:  All right.

20     Mr. Withers, let me hear from you before I start

21   redraft here.

22          MR. WITHERS:  I think the instructions are fine as

23   they are.  If you introduce the element of the property into

24   it, then you're going have to ask what about the mortgage.

25   What about this mortgage that wasn't paid and was

1    foreclosed.  And that seems to me to go way beyond --

2          THE COURT:  Well, I don't know what's coming.  We

3    have someone who talks about the equity in the property,

4    then that's what the jury would do.  But let me try to

5    straighten this out before we leave.

6          MR. ITTLEMAN:  Those are your instructions, Your

7    Honor.  I think that they were a collaboration of myself and

8    Mr. Withers.  So I don't want to say that I necessarily

9    agree, but we were required to submit an agreed form of jury

10   instructions, which I -- what you have is what we agreed to.

11         THE COURT:  All right.  Here we go.

12      Let's don't worry about finding fault here and

13   comparative negligence in drafting these jury instructions.

14   Let's just do it.

15      Let me read to you slowly.

16      Page 18.  Middle paragraph, rewrite:  Mr. Hasnain, and

17   the Learning Connections, Inc., may recover damages for loss

18   of the commercial property and for profits lost as a direct

19   result of plaintiff's injury.  For Mr. Hasnain and the

20   Learning Connections to recover damages for, I should say,

21   loss of profits for the daycare center.

22         MR. WITHERS:  Which daycare center we talking

23   about?

24         THE COURT:  Well, it should be Learning -- I don't

25   know --

1          MR. KAUFMAN:  If they want to say that.

2          THE COURT:  You may not speak.  Read that local

3   rule.  Mr. Withers is speaking because he is handling this.

4   So Mr. Withers, I understand you're saying which of the

5   daycare centers is he --

6          MR. WITHERS:  Your Honor, you're pressing --

7          THE COURT:  And I think that they are both, so

8   far, what's been presented, they're related to the same

9   property and the same business, as I understand it.

10         MR. ITTLEMAN:  Correct.

11         THE COURT:  That's the plaintiff's contention.

12  But we're doing these jury instructions and we're going to

13  have another charge conference.  I'm doing this because I

14  have to find out if there are any serious areas I need to

15  get into legally.  We will have another charge conference

16  after I hear the evidence, and they may not look this way

17  but for right now that's what we're doing.

18     Okay.  Let me read this to you again.

19     Mr. Hasnain and the Learning Connections, Inc., may

20  recover damages for loss of the commercial property and for

21  profits lost as a direct result of plaintiff's injury.  For

22  Mr. Hasnain and the Learning Connections, Inc. to recover

23  loss of profits for the daycare center business, it must

24  appear that there were ongoing business profits for the

25  daycare center and that those profits were lost solely due

1   to the injury and that the injury was caused by negligence

2   of the defendant.

3            MR. ITTLEMAN:  Okay.  Then we have to say

4   something separate about the commercial property, I would

5   say as well.

6            THE COURT:  Well, what about it separately?

7            MR. ITTLEMAN:  Well, the Learning Connections to

8   recover damages, so say the commercial property, we would

9   have to prove that the negligence of the defendants resulted

10  in, you know, money lost by the Learning --

11           THE COURT:  Well, you don't get to hear until you

12  have already proven that.  That's in the earlier

13  instructions.  That's all been instructed.  So you do not

14  get to this point unless you have made that connection.

15  It's all through the earlier instructions.  They have to

16  prove these things, then you say --

17           MR. ITTLEMAN:  I mean, if the Court can certainly

18  instruct the jury, that I would have to prove that their

19  negligence resulted in the Learning Connections losing the

20  commercial property and what those damages are.

21           THE COURT:  You have to do that.  Page 16 says, If

22  the evidence proves negligence on the part of the

23  defendants, it was a legal cause of damages to the

24  plaintiffs, you should award the plaintiffs an amount of

25  money that will fairly and adequately compensate the

 1  plaintiffs for such damages, so they have to come to that

 2  point that you're talking about before you get here.  And

 3  that goes to explain that.  As I stated to you, I mention

 4  the commercial property -- loss of the commercial property.

 5           MR. ITTLEMAN:  Yes.

 6           THE COURT:  Okay.  Mr. Withers, did you want to

 7  say anything else?

 8           MR. WITHERS:  I'm troubled by the inclusion of

 9  unrelated or other companies who are not plaintiffs in this

10  case.  To put them at the -- in line to possibly receive

11  award seems to me to be incorrect, improper and probably

12  erroneous.

13           THE COURT:  Well, as I understand what has been

14  presented, the license changed but there was like a rent

15  between the Academy and the Learning Connections, because

16  the Learning Connections was on the note.

17           MR. WITHERS:  Maybe so, but the plaintiff in this

18  case is the Connections.

19           THE COURT:  Correct.

20           MR. WITHERS:  The other outfit shouldn't have the

21  right to -- right to seek damages.

22           THE COURT:  Well, it's not -- I mean is your issue

23  that you're raising with me to say lost profit of the

24  daycare, center business of the Learning Connections?

25           MR. WITHERS:  Yes, ma'am.

1           THE COURT:  That's what you want?

2           MR. WITHERS:  Uh-huh.

3           THE COURT:  Of the Learning Connections, Inc. and

4    then for the daycare center of the Learning Connections,

5    Inc.  Okay.  I'll add that in.

6        All right.  Let's -- any other problems, Mr. Ittleman?

7    With those last four pages?

8           MR. ITTLEMAN:  No, ma'am.

9           THE COURT:  Mr. Withers?

10          MR. WITHERS:  Nothing from the instructions.

11          THE COURT:  But you just told me that there was

12   something you were worried about with the statute of

13   limitations.

14          MR. WITHERS:  Oh, I'm sorry.  Yes.  On the statute

15   of limitations, I have to confess it's -- it's difficult to

16   conceive of a -- I guess it's a mixed question, but having a

17   jury decide that issue.

18          THE COURT:  It's usually not decided but we've got

19   an issue here, so far.

20          MR. WITHERS:  Okay.  I guess if it gets to the

21   jury --

22          THE COURT:  I think this comes directly from what

23   you all submitted to me but I may be wrong.  Let me see.

24          MR. WITHERS:  You know, it's -- what you have got

25   here is right.  I'm just not comfortable that it.

1          THE COURT:  Well, this is what was submitted.

2          MR. WITHERS:  Okay.

3          THE COURT:  By stipulation.

4          MR. WITHERS:  Then we will leave with it.

5          THE COURT:  Okay.  Anything else on these

6    instructions?

7       Okay.  What I want you to do is read these over more

8    carefully than you had time to do here, double check the

9    verdict form.  I thought you did a good job on the verdict

10   form.  It was very clear, layed it out and so forth, but she

11   had to type what you -- my judicial assistant had to type

12   what you gave me to put it into the computer so that we

13   could get in the right form here.  So double check and make

14   sure everything is okay.

15      Now, if you -- I will get in before 9:00 tomorrow, so

16   if you have issues that are going to affect the proceedings

17   and want to bring them up, do it before -- in sufficient

18   time before 9:00 that I can take care of them, so we can

19   start promptly at 9:00.  So if you know it's going to be

20   like 30 minutes of argument or something, let's go at 8:30.

21   Just tell Sherri.  We will meet earlier.

22          MR. ITTLEMAN:  I'm happy to start 8:30.

23          THE COURT:  Pardon?

24          MR. ITTLEMAN:  I'm happy to start at 8:30.

25          THE COURT:  Well, we can't because I had a juror

1  that said she just couldn't make it.

2         MR. ITTLEMAN:  Okay.  But you want us to be here

3  at 8:30?

4         THE COURT:  No.  I'm saying if you have an issue

5  so I don't have to have a bench conference with you, then I

6  am here early in the morning and I will come in and we can

7  solve it.  But don't wait till five of nine and say, I just

8  want to qualify this witness, Your Honor, because so and so.

9  I need to have time so that we can start at 9:00 to deal

10 with any issue that you all have brought up.

11        MR. ITTLEMAN:  I see.

12        THE COURT:  Please get your exhibits in order,

13 both sides, so that you can give them to Sherri and she'll

14 give them to the witness, or we can just put them up there

15 and then we won't have the walking back and forth.

16    And I think that's all I have.

17    Anything for the good of the order, Mr. Ittleman?

18        MR. WITHERS:  If I may.

19        THE COURT:  Just one moment.  Mr. Ittleman,

20 anything for the good of the order?

21        MR. ITTLEMAN:  No.

22        THE COURT:  Mr. Withers?

23        MR. WITHERS:  If we can get a preview of the

24 schedule for tomorrow so we can adjust --

25        THE COURT:  Well, you have Ms. Hasnain.

```
 1              MR. ITTLEMAN:  Well, I think Mr. Withers -- I'm
 2   not sure if Mr. Withers wants to question my client.
 3              THE COURT:  Well, there's no -- that's --
 4              MR. WITHERS:  Rulings don't provide for it.
 5              THE COURT:  He doesn't get.
 6              MR. WITHERS:  Re-re.
 7              MR. ITTLEMAN:  He did say.
 8              THE COURT:  Recross.
 9              MR. ITTLEMAN:  He did.  I think he did.
10              MR. WITHERS:  I did not, but I'll call him as a
11   witness.
12              THE COURT:  I didn't hear you say that.  When did
13   you say it?
14              MR. WITHERS:  Right when you --
15              THE COURT:  No, you said you wanted to have leave
16   to recall him in your case.
17              MR. WITHERS:  Right.  And when Geoffrey finished
18   the redirect, I did say that I would like --
19              THE COURT:  I completely missed that, so do you or
20   not?
21              MR. WITHERS:  If you let me do it, sure.
22              THE COURT:  Well, I prefer that you call him in
23   your case because I really don't like to get into that
24   recross business.
25              MR. WITHERS:  Yes, ma'am.
```

```
 1            MR. ITTLEMAN:  So I just have limited -- I assume
 2   whatever I cover today was the bulk of the evidence.
 3   Anything else is going to be covered by Mrs. Hasnain.
 4            THE COURT:  And then your two experts.
 5            MR. ITTLEMAN:  They'll be short, and then the two
 6   experts, which, again, most of the evidence is already in,
 7   so that should be relatively quick.
 8            THE COURT:  And then is that it for your
 9   witnesses?
10            MR. ITTLEMAN:  Correct.
11            THE COURT:  Okay.
12            MR. ITTLEMAN:  I may call Mr. Kaufman as a witness
13   as well, after the experts.
14            MR. WITHERS:  So we get basically what's left of
15   tomorrow and part of Wednesday to put on our case, instruct
16   the jury and wait for a verdict?
17            THE COURT:  Well, what do you mean?  How much do
18   you need?
19            MR. WITHERS:  Well, I mean, I have lots of
20   questions for Mr. Kaufman.
21            THE COURT:  Well, I have learned over years and
22   years, not to dance on the head of this pin with attorneys,
23   because they tell me one thing and the next thing I know,
24   it's like your opening statements, you know, much different
25   than that.  But you've got plenty of time.  He will probably
```

```
 1   finish by noon, do you think?

 2           MR. ITTLEMAN:  I would say mid-afternoon.

 3           THE COURT:  Mid-afternoon?

 4      So you've got -- you know, I can charge this jury in

 5   hardly any time.

 6           MR. WITHERS:  Yeah.

 7           THE COURT:  But your closing arguments is the time

 8   that gets eaten up.  That means your closing argument time

 9   gets less, because I want -- going have to get it to them.

10   But I think we're going at a good pace.  You've got --

11   asking your questions --

12           MR. ITTLEMAN:  I kind of anticipated this.  Some

13   questions were going to be -- allege more, but once we got

14   to a certain point, I anticipate it was going to go a little

15   quicker so...

16           THE COURT:  Okay.  All right.  If that is it, have

17   a pleasant evening and I'll look forward to seeing you

18   tomorrow morning.

19                     (End at 5:20 p.m.)

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2           I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6    s\Sandra K. Tremel      May 29, 2012

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25