```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3          Docket No. 6:11-cv-368-Orl-19-GJK

 4  . . . . . . . . . . . . .
    THE LEARNING CONNECTIONS,   :
 5  INC., A FOREIGN CORPORATION :
    AND SYED HASNAIN, AN        :
 6  INDIVIDUAL                  :
                                :
 7          Plaintiff           :        Orlando, Florida
                                :        February 29, 2012
 8                              :        9:00 a.m.
               v.               :
 9                              :
    KAUFMAN,ENGLETT & LYND,     :
10  PLLC F/K/A/ KAUFMAN, ENGLETT:
    & LYND, LLC, ET AL,         :
11                              :
            Defendant           :
12  . . . . . . . . . . . . .

13

14             TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE PATRICIA C. FAWSETT
15            UNITED STATES DISTRICT JUDGE

16

17  APPEARANCES:

18  For the Plaintiff:  Geoffrey Ittleman

19
    For the Defendant:  Richard Withers
20                      Jeffrey S. Kaufman

21
    Court Reporter:     Sandra K. Tremel, RMR/CRR
22                      407-245-3110

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.
```

```
1                      I N D E X

2

3   WITNESS              DIRECT    CROSS     REDIRECT

4   Chris Hunt             3        12         19

5   Jeff Kaufman          22        43         97

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2               (jury present -- 9:00 a.m.)

 3          THE COURT:  Good morning.  Well, you all look like

 4  you haven't had any serious adventures getting here, so

 5  we're glad you made it.

 6      Have any of you seen, heard, read or had any discussion

 7  or had any contact of any kind about this case other than in

 8  the courtroom?

 9      All right.  Thank you so much.

10      We are ready to continue with the presentation of

11  evidence by the defense.  Mr. Withers.

12          MR. WITHERS:  Thank you, Your Honor.  We would

13  call Chris Hunt as the defendant's first witness.  He's

14  waiting in the witness room, Ms. Cohen.

15          THE DEPUTY CLERK:  If you would raise your right

16  hand for me.

17                      (WITNESS SWORN)

18          THE WITNESS:  I do.

19          THE DEPUTY CLERK:  If you could please state your

20  full name and spell your last name for the record.

21          THE WITNESS:  My name is Christopher Hunt.  Last

22  name H-U-N-T.

23                      DIRECT EXAMINATION

24  BY MR. WITHERS:

25  Q    Mr. Hunt, what is your profession?
```

```
 1   A      I'm an attorney.

 2   Q      You practice here in the State of Florida?

 3   A      I do.

 4   Q      What law firm do you work for?

 5   A      I'm currently at the Wicker Smith firm here in

 6   Orlando.

 7   Q      That is not Kaufman Englett and Lynd?

 8   A      That's correct.

 9   Q      It's not related to Kaufman Englett and Lynd in any

10   way?

11   A      No.

12   Q      Not under an umbrella or anything like that?

13   A      No, not at all.

14   Q      Where did you work before you worked for Wicker and

15   Smith?

16   A      I was an attorney with the Kaufman Englett and Lynd

17   firm.

18   Q      What were your responsibilities?

19   A      At the time I was one of the senior managing attorneys

20   for the firm.

21   Q      Could you speak a little louder?

22   A      Absolutely.

23   Q      I'm hard of hearing.

24          So Mr. Hunt, were you occupying that position in the

25   period of, let's say, November of 2009 through March of
```

1   2010?

2   A     Yes.

3           MR. ITTLEMAN:  Objection, Your Honor, it's leading

4   the witness.

5           THE COURT:  Excuse me just a moment.

6       All right.  Technically, it is a leading question.

7   It's an ordinary question, but let's stick with sauce for

8   the goose.

9           MR. WITHERS:  Okay.

10           THE COURT:  So restate it, please.

11  BY MR. WITHERS:

12  Q     I mean, do you recall what you were doing during the

13  time period from November of 2009 through March of 2010?

14  A     At that time, I believe I was the managing attorney

15  for the firm.

16  Q     For Kaufman Englett and Lynd?

17  A     Yes.

18  Q     Sir, do you have any recollection of a case involving

19  these plaintiffs today, the Learning Connection, Inc. and

20  Mr. Syed Hasnain?

21  A     I remember the Learning Connection, yes.

22  Q     Okay.  And do you remember the circumstances of their

23  case arriving in our office?

24  A     Yes, I have a general recollection of that.

25  Q     All right, sir.  Can you review for us what the

1    process is when a case comes in, specifically a Tennessee

2    case, how it was handled in the Kaufman Englett and Lynd's

3    offices during your tenure as a managing attorney?

4    A    Sure.  When an out of state matter would come into KEL

5    it would have been routed to my office and assigned to one

6    of the associate attorneys for the day-to-day handling under

7    the supervision of Mr. Kaufman, Mr. Kaufman holds most, if

8    not all, of the out of state licensing for the KEL firm, and

9    Tennessee matters were specifically assigned to an attorney

10   Kerry Adams.

11   Q    All right, sir.  And did Miss Adams review with you

12   the progress on this case in the ordinary course of the

13   performance of your duties and hers?

14           MR. ITTLEMAN:  Objection, Your Honor.  That's

15   hearsay.

16           THE COURT:  Restate it, counsel.

17   BY MR. WITHERS:

18   Q    Were you aware of what was going on in the Hasnain's

19   case as part of the performance of your duties as the

20   managing attorney?

21   A    Yes.  Yes, Miss Adams would have discussed the case

22   with me.

23   Q    Okay, sir.  And, sir, can you tell me if the option of

24   a filing an injunction to stop the foreclosure sale was ever

25   considered by the firm?

```
 1  A    Miss Adams looked at that, yes, and she discussed with

 2  me the fact that there were no options.

 3            THE COURT:  Well, wait a minute.

 4            MR. ITTLEMAN:  Objection.

 5            THE COURT:  We're going to get a hearsay objection

 6  and he's correct, so I'll sustain the objection.  You need

 7  to know what this witness did and what this witness said.

 8  And if somebody else, I mean, you can represent to me if

 9  you're going to call somebody else to tell me, to tell us

10  the other side of the conversation, but from what our

11  discussion was last night I don't believe you are, so you

12  need find out what this witness said and what this

13  witness --

14            MR. WITHERS:  Your Honor, we submit that this

15  would be the part of business records exception, his

16  testimony is.

17            THE COURT:  Well, he can identify business

18  records, but that was a conversation you were asking about,

19  as I understand it.

20            MR. WITHERS:  Okay.

21            THE COURT:  So just rephrase it.

22  BY MR. WITHERS:

23  Q    Did you review the file at any time to determine what

24  was going on in it?

25  A    I did.
```

1  Q     And did you determine whether the filing of an

2  injunction to stop the foreclosure sale set for

3  December 9th, 2010 was an appropriate -- I'm sorry -- 2009,

4  was an appropriate step to take?

5  A     I did.  I looked at the information in the file and I

6  believed that the injunction was not a viable option at that

7  time.

8  Q     Okay.  Did you consider Tennessee law in making that

9  decision?

10 A     I would have, yes.

11 Q     Sir, did you have any opinion -- sorry.

12       Did you believe that filing a suit merely for the

13 purpose of creating a delay would be an appropriate action?

14       MR. ITTLEMAN:  Objection, Your Honor.

15       THE COURT:  Counsel, clearly leading, clearly.

16 Let's ask direct questions.

17       MR. WITHERS:  I'm sorry.

18 BY MR. WITHERS:

19 Q     Did you consider the possibility of -- possibly --

20 consider the possibility of filing suit?

21       THE COURT:  What did you consider?

22       MR. WITHERS:  Yes.

23 BY MR. WITHERS:

24 Q     What did you consider?

25 A     Well, we looked at the Tennessee law on the issue for

1    injunctions and it's been a while since I looked at

2    Tennessee law, frankly, but there were three to five avenues

3    for seeking injunctive relief in the state of Tennessee, and

4    from my review of the information of the facts in the file,

5    none of those five issues were available for our use.

6    Q     Was there any prohibition, of which you were aware,

7    concerning filing suit for the purpose of delay?

8    A     Yes.  It's not permitted in Tennessee or any other

9    jurisdiction, to my understanding.

10   Q     All right, sir, and, sir, did you have any contact

11   with the case subsequent to that time, not subsequent to

12   that time.  Let me get that straight.

13         Did your -- did your contact with the case continue

14   after the determination?

15             MR. ITTLEMAN:  Objection; leading.

16             THE COURT:  Well, we don't have the full question.

17   So let me have an understanding, Mr. --

18   BY MR. WITHERS:

19   Q     What did you do with respect to this case after the

20   determination was made to not file for an injunction?

21   A     That would have been discussed with Mr. Kaufman for a

22   final determination and how to proceed.  It is my

23   understanding that we did not seek injunctive relief.

24   Q     All right, sir.  Did you have any further contact with

25   this case?

```
 1  A     Not that I recall, no.
 2  Q     All right, sir.  Do you -- I'd like to show you, Your
 3  Honor, this is Plaintiff's Exhibit 17 in evidence.
 4            THE COURT:  All right.
 5  BY MR. WITHERS:
 6  Q     I'd like to show you a letter from Mr. Hasnain dated
 7  January 10, 2010.  Were you aware that this letter had come
 8  into the office?
 9  A     Yes.
10  Q     Okay, sir.  Did you know of any steps -- what was the
11  law firm doing for the Hasnains at the time this letter
12  arrived?
13            MR. ITTLEMAN:  Objection, Your Honor.
14            THE COURT:  What is the objection?
15            MR. ITTLEMAN:  That's hearsay.  This witness
16  testified as far as what his knowledge --
17            THE COURT:  Well, the witness must testify on
18  personal knowledge, or if it's going to be in the records
19  that are not admitted, they have to be qualified under the
20  business exception rules as he wrote them.  I mean, I'm not
21  going to do the treatise here on the ways to get in, but the
22  witness must speak on his own personal knowledge.  So state
23  the question again, please.
24  BY MR. WITHERS:
25  Q     Yes.  When this arrived, were you aware from your
```

```
 1  supervision of the file what the firm was doing for the
 2  plaintiffs at the time this letter arrived?
 3              MR. ITTLEMAN:  Same objection, Your Honor.
 4              THE COURT:  What is this same objection?
 5              MR. ITTLEMAN:  It's hearsay.
 6              THE COURT:  Well, I believe this witness can
 7  testify as to his knowledge, if he has personal knowledge of
 8  what was going on, but, again, if he's looking at documents
 9  to get this knowledge, then you're going to have to have
10  them qualified or they may be in evidence already.  I don't
11  know.  I'll sustain the objection.
12  BY MR. WITHERS:
13  Q    Okay.  Mr. Hunt, were you aware of your own personal
14  knowledge of what the firm was doing on behalf of the
15  plaintiffs when this letter arrived on -- after January
16  10th?
17  A    We would have been trying to contact the lender to get
18  a modification or to find some alternative means of
19  retaining this property.
20  Q    And do you know if those efforts were successful?
21  A    As I understand it, I think there was an offer that
22  was extended.  I don't remember whether it was a
23  modification of the mortgage or a repurchase agreement, but
24  it was some time after January as my recollection.
25  Q    And do you know if the plaintiffs accepted the
```

```
 1   repurchase option?
 2             THE COURT:  Yes or no?
 3             THE WITNESS:  I don't recall.
 4             MR. WITHERS:  Your Honor, I have no further
 5   questions for this witness.
 6             THE COURT:  Okay.  Thank you.
 7                      CROSS-EXAMINATION
 8             THE COURT:  Cross-examination, Mr. Ittleman?
 9             MR. ITTLEMAN:  Yes, ma'am.
10   BY MR. ITTLEMAN:
11   Q     Sir, isn't it true that you're not a licensed attorney
12   in the state of Tennessee?
13   A     Absolutely.
14   Q     That's a fact, correct?
15   A     That's true.
16   Q     And you're not an expert in Tennessee law, are you?
17   A     No.
18   Q     You're not an expert in wrongful foreclosures in
19   Tennessee?
20   A     No.
21   Q     You're not an expert in foreclosure defense issues in
22   Tennessee?
23   A     No.
24   Q     You're not aware of the fact that Trey Cain testified
25   yesterday regarding the procedures to make sure that
```

```
 1   borrowers are fully protected in state of Tennessee, are

 2   you?

 3   A     I don't know who that person is, so --

 4   Q     You don't know who Trey Cain is, right?

 5   A     No clue.

 6   Q     So you would have no reason to dispute anything he

 7   said yesterday, do you?

 8   A     I don't know.  I would have to see what he said.

 9   Q     Mr. Withers hasn't provided you with any documentation

10   that has your name on it, has he?

11   A     No.

12   Q     Do you know who C.S. is from the KEL attorneys?

13   A     That would probably be one of the paralegals.

14   Q     Yeah, the paralegal was not a lawyer, correct?

15   A     That seems abundantly clear, yeah.

16   Q     And the paralegal from your law firm or your former

17   law firm gave the clients legal advice?

18   A     That's not true.

19   Q     That's not true?  C.S. is the paralegal?

20   A     If it is Celeste I'm thinking of, yeah.

21   Q     Okay.  It wasn't your responsibility to supervise

22   C.S., was it?

23              THE COURT:  Just a moment, please.

24          Is the exhibit admitted?

25              MR. ITTLEMAN:  Yes.  It's stipulated to.
```

```
 1            THE COURT:  If you would kindly tell us the number
 2  before you put it up there.
 3            MR. ITTLEMAN:  I was about to.
 4            THE COURT:  The record's going to be a mess if I
 5  can't get you all to do that.
 6            MR. ITTLEMAN:  I was too fast, Your Honor.  I
 7  apologize.
 8            THE COURT:  Okay.  What is the number you got?
 9            MR. ITTLEMAN:  Yes, it's stipulated to as Exhibit
10  No. 80.
11            THE COURT:  This is a plaintiff's exhibit?
12            MR. ITTLEMAN:  Correct.
13            THE COURT:  Number 80.  All right.
14            MR. ITTLEMAN:  Yes, ma'am.
15            THE COURT:  Thank you.
16  BY MR. ITTLEMAN:
17  Q     It wasn't your responsibility to supervise C.S. or
18  Celeste, the paralegal at the KEL law firm, right?
19  A     Yes.
20  Q     It was your responsibility?
21  A     Yes.  Among many.
22  Q     So you're not a Tennessee lawyer and yet you were
23  supervising C.S., the paralegal?
24  A     Yes.
25  Q     She was providing legal advice to the plaintiffs?
```

```
1    A      That's not true.

2    Q      Regarding Tennessee law?

3    A      That's not true.

4    Q      And the events listing report from the KEL law firm,

5    does this appear to be one of the business records from your

6    firm, sir, as stipulating Exhibit No. 80?

7    A      It looks like records KEL would have kept, yes.

8    Q      Okay.  And this shows inbound call from client, the

9    clients, the plaintiff in this case, right?

10   A      Yes.

11   Q      From C.S., that's Celeste, the paralegal, right?

12   A      That's correct.

13   Q      The nonlawyer.  Right?

14   A      I think we established that.

15   Q      Okay.  And C.S. is explaining to the plaintiffs that

16   the state of Tennessee is a nonjudicial state, okay?  Isn't

17   that legal advice, sir?  Isn't it true that that's legal

18   advice?

19   A      I think it could be said that it is not legal advice,

20   frankly.

21   Q      Okay.  The state of Tennessee is a nonjudicial state

22   and that the KEL attorneys were not able to stop a sale date

23   and that when the plaintiffs hired the KEL law firm there

24   was a sale date already.

25   A      That is not the sale date.
```

```
 1   Q     Isn't it true that that's legal advice, sir?

 2   A     No.

 3   Q     And you were supervising that legal advice?

 4   A     No.  Miss Delgado was relating information that she

 5   obtained from the attorneys in the matter.

 6   Q     And what record do you have of that?

 7   A     That's standard operating procedure for KEL.

 8   Q     What record do you have of that, sir?

 9   A     That's the standard practice.

10   Q     You don't have a record of that, do you, sitting here

11   today?  Yes or no?

12   A     Me.  No.  Of course not.

13   Q     Okay.  It's not in that listing report, is it?

14   A     I'm sorry?

15   Q     It's not in the event listing report that's stipulated

16   as Exhibit No. 80, correct?

17   A     What's not in it?

18   Q     It doesn't say here I spoke to the supervising

19   attorney, the only licensed attorney to practice in the

20   state of Tennessee, Jeffrey Kaufman, and Mr. Kaufman wanted

21   me to relate to you what the law says in the state of

22   Tennessee.  That's not on that event listing report, is it?

23   A     I don't think so.  I didn't read the entire event

24   listing.

25   Q     This is the letter that Mr. Withers showed you, right?
```

```
 1  A      Can you push that down to the top so I can see?

 2             THE COURT:  Is this -- what number is this?

 3             MR. WITHERS:  Plaintiff's 17, Your Honor.

 4             MR. ITTLEMAN:  Stipulated Exhibit 17.

 5             THE COURT:  All right.

 6             THE WITNESS:  Does this tip up?

 7             THE COURT:  I'm sorry.  Is this different from

 8  what we just had up here?

 9             MR. ITTLEMAN:  No, it's the same letter.

10             THE COURT:  All right.  Excuse me, we had

11  Plaintiff's 80 up there and now we have Plaintiff's 17.  Is

12  that where we are?

13             MR. ITTLEMAN:  Uh-huh.

14  BY MR. ITTLEMAN:

15  Q      Sir, you don't know how Mr. Hasnain received or

16  learned of the order of injunction, do you?

17  A      I have no idea.

18  Q      You never spoke to Mr. Hasnain, did you?

19  A      I did not.

20  Q      And you're not aware of the fact that Mr. Hasnain

21  received a order of injunction over the Internet, are you?

22  A      I wouldn't know.

23  Q      It comes from the KEL attorneys, didn't it?  You don't

24  know that, do you?

25  A      I don't know that, no.
```

1  Q     And you don't know what Mr. Kaufman reviewed prior to

2  the foreclosure sale, do you?  You don't know what documents

3  he reviewed, do you?

4  A     He reviewed the findings that Miss Adams and I

5  presented to him.

6  Q     And what documents do you have that shows what

7  findings that you presented to him?  You don't have any, do

8  you?

9          THE COURT:  Well, wait a minute.  Two questions

10 you have made.

11 BY MR. ITTLEMAN:

12 Q     Isn't it true that you have no documents to show your

13 findings?

14          MR. WITHERS:  I'll object to that question since

15 this presumes the documents were created.

16          THE COURT:  Well, the witness is capable of

17 answering.  And you have redirect examination.  Overruled.

18          THE WITNESS:  No.  I wouldn't have those

19 documents.  I don't work for KEL anymore.

20 BY MR. ITTLEMAN:

21 Q     And you have no documentation that the KEL attorneys

22 communicated those findings to the plaintiffs, do you?

23 A     Of course not.  I don't work for them anymore.

24 Q     And isn't it true that communication with the client

25 is an important part of the representation of a client?

```
 1   A      That's something all attorneys know, yes.

 2   Q      Isn't this a fact?  Yes?

 3   A      Yes.

 4          MR. ITTLEMAN:  No further questions.

 5          THE COURT:  All right.  Thank you.  Redirect,

 6   Mr. Withers?

 7          MR. WITHERS:  Just briefly, Your Honor.

 8                     REDIRECT EXAMINATION

 9          MR. WITHERS:  Your Honor, we're still talking

10   about Plaintiff's 17.

11          THE COURT:  Thank you.

12   BY MR. WITHERS:

13   Q    Mr. Hunt, take a look at this.  Mr. Ittleman had asked

14   you about it very briefly.  I understood that the KEL

15   attorneys were to be filing an injunction to stop the sale.

16   A      I see that.

17   Q      To your knowledge, did anyone talk to Mr. Hasnain

18   about an injunction?

19          MR. ITTLEMAN:  Objection; hearsay, as well.

20          THE COURT:  I beg your pardon?

21          MR. ITTLEMAN:  That's hearsay.

22          THE COURT:  Well, it's asking him for his personal

23   knowledge, and he may answer.

24          THE WITNESS:  I have no personal knowledge that

25   anyone discussed an injunction with the client.
```

```
 1  BY MR. WITHERS:

 2  Q    Sir, in your experience, would it be typical for

 3  anyone other than an attorney to be discussing what avenues

 4  are going to be taken to represent to assist the client?

 5           MR. ITTLEMAN:  Objection.  That calls for an

 6  expert opinion.

 7           THE COURT:  Yes.  The witness has not been

 8  qualified as an expert.  He's here as a personal knowledge

 9  witness.  So we need stick to that.

10  BY MR. WITHERS:

11  Q    Limited to your experience as a managing attorney at

12  Kaufman Englett and Lynd, were you aware -- would it be the

13  firm's practice for someone other than an attorney to tell a

14  client about injunction?

15           MR. ITTLEMAN:  Objection; hearsay.

16           THE COURT:  The witness is being asked about the

17  practice of the law firm during the time he was a

18  managing --

19           MR. WITHERS:  Yes, ma'am.

20           THE COURT:  -- partner.  Correct?

21           MR. WITHERS:  Managing attorney.

22           THE COURT:  During the time he was the managing

23  partner, you established he was a managing partner.

24           MR. WITHERS:  Managing attorney.

25           THE COURT:  Or managing attorney.
```

```
 1              MR. WITHERS:  Yes, ma'am.

 2              THE COURT:  Are you asking him about that time?

 3              MR. WITHERS:  That's what I'm asking.

 4              THE COURT:  And you're asking him what the

 5   procedure in the firm was during that time?

 6              MR. WITHERS:  He was aware of the procedure.

 7              THE COURT:  He may speak to that on his own

 8   personal knowledge.

 9              THE WITNESS:  I'm sorry, can you restate the

10   question?

11   BY MR. WITHERS:

12   Q    Yes.  During your term as managing attorney, were you

13   aware of the firm's practice with regard to communication

14   with clients about lawsuits?

15   A    Yes.

16   Q    Okay.  And would, in your experience, would anyone

17   other than an attorney have been authorized to talk to

18   Mr. Hasnain about filing an injunction?

19   A    That is possible if an attorney were to talk to a

20   paralegal or an intake person who brought a question to them

21   or after reviewing the file.  Absolutely.  I have given

22   paralegals and under staff my opinions to convey to clients

23   hundreds, if not thousands, of times while I was at KEL.

24   Q    Do you think that would have happened in this case?

25   A    It's entirely possible, but I can't say.
```

```
 1  Q     Okay.  Do you know if Mr. Hasnain got this term

 2  "injunction" as counsel asked you off the Internet?

 3  A     I couldn't say.

 4  Q     Okay.  Okay.

 5           MR. WITHERS:  No further questions, Your Honor.

 6           THE COURT:  All right.  Mr. Hunt, thank you.  You

 7  may step down.

 8      Your next please, Mr. Withers.

 9           MR. WITHERS:  Yes, Your Honor.  Just a moment,

10  please.

11      Your Honor, we would call Mr. Kaufman.  Jeffrey

12  Kaufman.

13           THE DEPUTY CLERK:  If you could remain standing

14  facing the jury and raise your right hand.

15                    (WITNESS SWORN).

16           THE WITNESS:  Yes, ma'am.

17           THE DEPUTY CLERK:  Please have a seat.

18      If you could please state your full name and spell your

19  last name for the record.

20           THE WITNESS:  Jeffrey S. Kaufman, Jr.

21  K-A-U-F-M-A-N.

22                    DIRECT EXAMINATION

23  BY MR. WITHERS:

24  Q     Mr. Kaufman, you are one of the defendants in this

25  case?
```

```
 1   A      Yes, I am.

 2   Q      And you are a partner of the law firm of Kaufman

 3   Englett and Lynd?

 4   A      Yes.  I'm one of the founding members.

 5   Q      Okay, sir.

 6          And were you in that position during the timeframe of

 7   the representation of Syed Hasnain and the Learning

 8   Connections, Inc.?

 9   A      I have been in that position for almost 13, 14 years

10   now.

11   Q      All right, sir.  And, sir, what is the nature of your

12   practice?

13   A      I handle all the out of state work and work with

14   currently, not at the time, but currently now I do a lot of

15   the management duties.  I look over a lot of the attorneys

16   and things like that outside of -- out of state and things

17   like that.

18   Q      Can I ask you to speak a little louder?

19   A      I'm sorry.  I'm used to standing where you're

20   standing.

21   Q      All right, sir.

22          Mr. Kaufman, when did you first become aware of the

23   firm's representation of these plaintiffs?

24   A      Around I believe December 2nd through the 4th,

25   sometime in that area, 2009, I believe.
```

```
 1  Q    Okay, sir.  And how did you become aware of the firm's

 2  representation of these folks?

 3  A    The attorney Chris Hunt came to me and wanted to

 4  discuss an issue concerning this case.

 5  Q    What was that issue?

 6  A    The issue was whether we had any legal avenues that we

 7  could pursue forward with.

 8  Q    All right, sir.  And did you consult any authorities

 9  before making that decision?

10  A    Yeah.  We had the research; we had the case law.  They

11  provided that all to me.  We talked about it, and based on

12  the information we had in looking over the very strict

13  construction of Tennessee, it was decided that we would

14  continue to pursue with the negotiations after we got all

15  the documents we needed.

16  Q    And did the firm at that point start requesting

17  documents from the Hasnains?

18          MR. ITTLEMAN:  Objection; leading, Your Honor.

19          THE COURT:  Yes.  Counsel.

20  BY MR. WITHERS:

21  Q    What did the firm request, if anything, from the

22  Hasnains?

23  A    I don't have all the records in front of me right now,

24  but I know we made multiple document requests concerning we

25  needed the note mortgage, we needed any information they
```

1   could provide us.  And it took us I'll say even through

2   January to get all the data we needed before we could

3   contact the lender.

4   Q    And did you then contact the lender?

5   A    Yes.

6           MR. ITTLEMAN:  Objection; that's leading, as well.

7           THE COURT:  I'll allow the witness to -- the

8   witness' answer to stand.

9           THE WITNESS:  Yes.  Kerry Adams contacted the

10  opposing counsel.

11  BY MR. WITHERS:

12  Q    All right.  And were you supervising Miss Adams at

13  this point?

14  A    Yes.  Tennessee law is different than Florida law.

15  Tennessee allows a licensed attorney licensed in other

16  states to practice law as long as they're supervised.  It's

17  different than Florida.  So the idea of supervision in the

18  practice of law is significantly different.  So I had to

19  supervise her, make sure she was doing everything correctly,

20  but she could do anything and act like an attorney just like

21  anybody else could as long as it's with proper supervision.

22          MR. ITTLEMAN:  Object, Your Honor.  I'm going to

23  object to any statements made by Mr. Kaufman that would

24  connote that he's an expert in Tennessee law.

25          THE COURT:  Well, counsel, I'm talking to

```
 1  Mr. Withers now, the witness may testify as a factual
 2  witness and explain why he did this or did that, did not do
 3  that, but he may not offer opinions.  And therefore, this
 4  last answer goes beyond what you asked.  The question was
 5  were you supervising Miss Adams at this point, and he could
 6  answer yes or no.
 7          THE WITNESS:  Yes, following the rules.
 8          THE COURT:  He went on.  So excuse me,
 9  Mr. Kaufman, I'm not finished.
10      So I will sustain the objection, you may restate the
11  question.
12  BY MR. WITHERS:
13  Q    Yes.  Was Ms. Adams, Kerry Adams, operating under your
14  supervision?
15  A    Yes.  Following the rules of the Tennessee codes.
16          MR. ITTLEMAN:  I'm going to object to those, as
17  well.  I mean, it's a yes or no.
18          THE COURT:  The witness should answer yes or no.
19  I'll sustain the objection.
20          THE WITNESS:  Yes.  The answer is yes.
21  BY MR. WITHERS:
22  Q    Okay.
23      Mr. Kaufman, did you utilize any types of authorities
24  from the state of Florida in determining what supervision to
25  provide to Miss Adams?
```

```
 1  A       We used based on Tennessee.

 2  Q       Yes.

 3  A       Okay.  Yes.

 4  Q       What did you use?

 5          MR. ITTLEMAN:  That goes to any expert testimony

 6  or any opinions.

 7          THE COURT:  I'll sustain the objection.  The

 8  questions need to be directed to this witness as to what he

 9  did.  Not what we did.  What others do.  What practice is.

10  He needs to talk about what he did.

11  BY MR. WITHERS:

12  Q    What did you do, Mr. Kaufman, in providing supervision

13  to Miss Adams?

14  A    I reviewed all the filings that she ever did.  I

15  reviewed choices that she made in this case, the

16  determination was made not to follow a litigation avenue

17  because it just wasn't there for us.

18  Q    And what led you to make that determination?

19          MR. ITTLEMAN:  Objection, Your Honor.  That again

20  calls for an expert witness.

21          THE COURT:  No.  He may testify as to what he did

22  and what he said and why he did that.  He may answer.

23          THE WITNESS:  As an attorney licensed in

24  Tennessee, I used the case law, I used the statutes, and I

25  used everything available that I had to make that decision.
```

```
 1  BY MR. WITHERS:
 2  Q     Okay.  And what was your determination after studying
 3  those materials with respect to the issue or the possibility
 4  of filing for an injunction to stop the foreclosure sale?
 5  A     Well, based on -- sorry.  I thought there was an
 6  objection.
 7       Based on the information we were provided there were
 8  five different avenues to choose from, that we made our
 9  choice from.  The first one dealt with --
10            MR. ITTLEMAN:  Your Honor, again, this goes to
11  opinions and expert witness.
12            THE COURT:  Mr. Kaufman, I believe you are
13  testifying as to what you actually did, is that correct?
14            THE WITNESS:  Yes.
15            THE COURT:  He may answer.
16            THE WITNESS:  I looked at the five different areas
17  you could go forward with.  It's kind of cute because you
18  can memorize it, it's PF Changs MS.  That's a little admin
19  to remember my -- meaning paid in full.  Was the loan paid
20  in full, and I determined it wasn't.  Fraud was the second
21  area where was fraud committed in the acquiring of the loan?
22  No.
23       C is consumer consideration, consideration determines
24  whether when they got -- when they got the loan, did they
25  get the money to buy the building?  They did.
```

```
 1      M, mistake, meaning that they -- there was a filing by

 2   mistake.  They didn't realize what they were signing.  They

 3   thought it might have been a will or something else.  And

 4   the last part is statute of limitations, which clearly it

 5   didn't fall under.  Now the data we had when I analyzed it,

 6   nothing they gave in any of their statements, any of their

 7   preliminary docks, fell under any of those five categories.

 8   BY MR. WITHERS:

 9   Q    Could the firm -- could you have directed the firm to

10   file suit just to buy time?

11   A    No.

12           MR. ITTLEMAN:  Objection, Your Honor.  That goes

13   to opinion.

14           THE COURT:  Well, the witness should be asked

15   whether he considered that or not.  Not whether he -- you

16   wade into the expert area.  I'll sustain the objection.

17   BY MR. WITHERS:

18   Q    Mr. Kaufman, did you consider the possibility of

19   filing an injunction to stop the sale for the purpose of

20   delay?

21   A    Absolutely not.

22   Q    Why not?

23   A    I don't want to answer without getting the objection.

24   Q    Well, let me ask you this.  Did you consult any

25   resources to assist you in making a determination as to
```

```
 1  whether filing suit to buy the Hasnains time was
 2  appropriate?
 3            MR. ITTLEMAN:  Again, he can testify as to facts
 4  but not opinion, Your Honor.
 5            THE COURT:  You may answer.
 6            THE WITNESS:  As an attorney --
 7            THE COURT:  Well, you were asked whether you
 8  consulted.
 9            THE WITNESS:  Yes.  I'm fully aware of the rules
10  of professional conduct in Tennessee.  I'm forced to look it
11  over.  As an attorney, they force you to read those.  Under
12  the modern rules professional conduct, as I know them, I
13  determined that I wasn't allowed to do that.  The second
14  issue was based on the case law that existed that I looked
15  at that said there is a six percent penalty if you filed
16  that way.
17  BY MR. WITHERS:
18  Q     Okay, sir.  So, Mr. Kaufman, the firm did not stop the
19  foreclosure sale?
20  A     No.
21  Q     Did it explore any -- under your supervision, were
22  other avenues explored?
23  A     Absolutely.
24  Q     What avenues?
25  A     In this case like all of our others, you have
```

litigation options and you have negotiation options and in

the scenario when there was no litigation options we went to

the negotiation options so when we received all the

documents, we contacted opposing counsel and they agreed on

a deal.

Q    And Mr. Kaufman, did you have any role in contacting

counsel for the Fifth Third Bank?

A    No, I didn't.

Q    Regarding this options?

A    No, Kerry Adams did.

Q    All right, sir.  I'm going to show you a letter

dated --

          MR. WITHERS:  This is Defense Exhibit 40, Your

Honor.  Which we would if there was no objection to it, we

would tender it into evidence.

     It's a letter from Stites and Harbison, Your Honor,

address to Mr. Kaufman.

          THE COURT:  Hearing no objection, it may be

offered.

BY MR. WITHERS:

Q    Mr. Kaufman, would you take a look at this letter,

please?

          THE COURT:  It may be admitted, not offered,

admitted, thank you.

          THE WITNESS:  Yes.

```
 1  BY MR. WITHERS:

 2  A     Okay.

 3  Q     So Mr. Kaufman, does this -- do you recall receiving

 4  this letter?

 5  A     Yes, I did.

 6  Q     Do you recall making it a correspondence to this

 7  attorney Stein?

 8  A     Yes, I authorized that.

 9  Q     All right, sir.  And in this letter what was the bank

10  offering to do?

11  A     My understanding of the offer letter, as the way it

12  existed, was that they were offering to basically allow us

13  to redeem the property for what was owed.

14  Q     Okay, sir.  And that was $611,242?

15  A     Yes, it was.

16  Q     Fifty-three cents?

17  A     Yes, it was.

18  Q     Okay, sir.  And they required according to this

19  letter, they required a 25 percent down payment?

20  A     Yes.  Which is when since they don't have a redemption

21  period, it was nice they were only asking for 25 percent

22  instead of paid in full.  They could have asked for it in

23  full.

24  Q     All right, sir.

25        Mr. Kaufman, Your Honor, we would next like to tender
```

1    into evidence Exhibit No. 41.  Defendant's Exhibit No. 41.

2          THE COURT:  Is this the same as in the exhibit

3    that's already been admitted?

4          MR. WITHERS:  I don't believe so.

5          THE COURT:  You can't put it on monitor,

6    Mr. Withers, until I rule.

7          MR. WITHERS:  Sorry.

8          THE COURT:  There is no objection to it, but I

9    don't want duplicate documents to come in.  This is a

10   different exhibit.

11         MR. WITHERS:  Yes, it is, Your Honor.

12         THE COURT:  All right.

13         MR. WITHERS:  I don't think this has been

14   admitted.

15         THE COURT:  Hearing no objection, 41 is admitted.

16   BY MR. WITHERS:

17   Q    Mr. Kaufman, just take a look at this letter.  And

18   before I ask you about this one, did you communicate the

19   bank's offer, Exhibit 4 -- did you communicate that to the

20   Hasnains?

21   A    Yes.  I authorized the communication.

22   Q    All right, sir.  And --

23         MR. ITTLEMAN:  Objection, Your Honor.  Authorized

24   the communication doesn't answer the question.  As to

25   whether it was communicated by Kaufman to the Hasnains.

```
 1              THE COURT:  All right.  The -- the question is,

 2   did you communicate to the bank?  The objection is well

 3   taken.  Restate, counsel.

 4   BY MR. WITHERS:

 5   Q    Yes.

 6   A    Sorry, I didn't understand the question.  I apologize.

 7   I thought you meant did I communicate the offer to the

 8   Hasnains.  I'm confused.  I'm sorry.

 9   Q    I wanted to know did you -- do you know if they got

10   the offer?

11              MR. ITTLEMAN:  Objection, Your Honor, hearsay.

12              THE WITNESS:  Who is "they"?

13   BY MR. WITHERS:

14   Q    The Hasnains.

15              THE COURT:  Counsel, just a moment, please.  Let

16   me control this.  The objection is sustained.  The question

17   that was asked was, Mr. Kaufman, did you communicate this

18   offer to the Hasnains?  Yes or no?

19              THE WITNESS:  No.

20   BY MR. WITHERS:

21   Q    Do you know if it was communicated to them?

22   A    Yes.  I instructed my people to do that.

23   Q    Did they fulfill those instructions?

24              MR. ITTLEMAN:  Objection, Your Honor.

25              THE COURT:  Well, do you know if they followed
```

```
 1  your instructions?

 2            THE WITNESS:  Yes, I do.

 3            THE COURT:  How do you know that?

 4            THE WITNESS:  Because we got a letter back denying

 5  it.  They turned us down.  The Hasnains turned down the

 6  offer.

 7            MR. WITHERS:  May I proceed, Your Honor?

 8            THE COURT:  Yes.

 9  BY MR. WITHERS:

10  Q    Mr. Kaufman, let me show you Exhibit 41.  Is that what

11  you were just talking about?

12  A    Yes.

13  Q    And so in this letter the Hasnains did not accept the

14  611,000 or the 25 percent down, and instead, they indicated

15  the terms under which they were willing to buy the property.

16            MR. ITTLEMAN:  Objection, Your Honor.  That's

17  leading.

18            THE COURT:  It is leading.  Counsel.

19  BY MR. WITHERS:

20  Q    What did the counter offer provide, Mr. Kaufman?

21  A    This is a counter offer, in my opinion, and the

22  counter offer was for $111,000 less than what they owed, no

23  down payment, in other terms 90 days foreclosing, 45 days to

24  provide preapproval.

25  Q    All right, sir.  And was that counter offer presented
```

```
 1   to the bank?

 2   A      Yes, it was.

 3   Q      And what did the bank say in response?

 4          MR. ITTLEMAN:  Objection, Your Honor.

 5          MR. WITHERS:  I'm sorry, let me withdraw that.

 6   BY MR. WITHERS:

 7   Q      Did the bank respond?

 8   A      Yes.

 9   Q      And did they accept the counter offer?

10   A      Absolutely.

11          MR. ITTLEMAN:  Objection.

12          THE COURT:  Sustained.

13          MR. ITTLEMAN:  It's hearsay.

14          THE COURT:  When counsel is standing, Mr. Kaufman,

15   do not answer until I hear what he is going to say.

16          THE WITNESS:  Okay.

17          THE COURT:  The question -- the question calls for

18   hearsay.  The objection is well taken.

19   BY MR. WITHERS:

20   Q      Do you know what became of the counter offer?

21   A      We received a letter from the bank turning it down.

22   Q      Okay.

23          THE COURT:  Is that letter in evidence?

24          MR. WITHERS:  This 41?

25          THE COURT:  No.  The letter he just described.
```

```
 1              MR. WITHERS:  Can I have a moment?

 2              THE COURT:  Yes.

 3              MR. WITHERS:  I think it is.

 4   BY MR. WITHERS:

 5   Q    Mr. Kaufman, did the repurchase occur?

 6   A    No, it didn't.

 7   Q    Okay, sir.  And to your knowledge, did the Hasnains

 8   accept the bank's offer?

 9   A    No, they didn't.

10   Q    Did the bank negotiation further on its terms?

11   A    No, they didn't.

12   Q    So Mr. Kaufman, the bank did not back off of its

13   demand for $611,000?

14              MR. ITTLEMAN:  Objection, Your Honor.  That's

15   hearsay.

16              THE COURT:  All right.  Counsel, you need to

17   establish how this witness knows whatever his answer is

18   going to be.  Did you have communication with the bank?  So

19   forth.  I don't understand why you're doing it this way when

20   I see here in your folder you have exhibits marked.  But far

21   be it for me to begin controlling the case this way, I'm

22   just saying it makes for tremendous difficulty when you're

23   approaching it this way, from an evidentiary point of view.

24              MR. WITHERS:  All right.

25   BY MR. WITHERS:
```

```
 1   Q     Mr. Kaufman, did you continue working on this case
 2   personally after the initial offer and counter offer?
 3               THE COURT:  Did you --
 4               THE WITNESS:  He jumped up.  I couldn't do
 5   anything.  He popped.
 6               THE COURT:  He sat down.
 7               THE WITNESS:  I'm trying to follow the rules.
 8        I believe we filed another counter offer for 540, which
 9   they didn't accept.  And that was the end of our
10   negotiations.
11   BY MR. WITHERS:
12   Q     All right, sir.  And at that point, well, let me ask
13   you to review another letter.  This one is dated
14   January 18 --
15               MR. WITHERS:  Your Honor, this would be Exhibit
16   39.
17               THE COURT:  Defendant's 39?
18               MR. WITHERS:  Yes, Your Honor.
19               THE COURT:  Are you offering it?
20               MR. WITHERS:  Yes, I am.
21               THE COURT:  Hearing no objection, 39 is admitted.
22   BY MR. WITHERS:
23   Q     Okay.  Mr. Kaufman, let me show you this letter and
24   ask you if you recognize it.  Can you read it?  Do I need to
25   focus it better?
```

```
 1   A     Is there a date on it?

 2   Q     Yes, sir.  The letter is dated January 18 at the top.

 3              THE COURT:  The question is, do you recognize this

 4   letter?  Yes or no?

 5              THE WITNESS:  No, I don't recognize it.

 6   BY MR. WITHERS:

 7   Q     Okay.

 8   A     I don't remember it.  I'm sorry.

 9   Q     All right.  Let me ask you to --

10              MR. WITHERS:  Your Honor, we'd like to submit

11   Exhibit 45 and 46 -- 45, first of all.

12              THE COURT:  Hearing no objection, Defendant's 45

13   is admitted.

14   BY MR. WITHERS:

15   Q     Mr. Kaufman, let me show you this letter and ask you

16   if you recognize it?

17   A     Yes, I do.

18   Q     Do you recall receiving that letter?

19   A     Yes, I do.

20   Q     Okay, sir.  Is that the rejection of the counter

21   counter offer that you testified to earlier?

22              MR. ITTLEMAN:  Objection, Your Honor, leading.

23              THE COURT:  Okay.  Just ask the witness what --

24   actually, it's here, he may answer the question.

25              THE WITNESS:  Yes.  It's the rejection letter.
```

```
1    BY MR. WITHERS:
2    Q      And what does the -- take a look at that last
3    sentence.
4    A      In which paragraph?
5    Q      Well, the first paragraph.
6    A      Yes.
7    Q      To your knowledge, did the bank ever institute
8    deficiency proceedings against the Hasnains?
9    A      No.
10   Q      Or against the Gentries?
11   A      No.  I'm not aware of that.
12   Q      Mr. Kaufman, since the bank did not attempt to, as far
13   as you know, attempt to enter, to seek a deficiency against
14   them, were you able to determine whether any further work
15   could be done to aid the Hasnains?
16   A      We were hired to deal with the property directly.  We
17   weren't hired to represent them in a deficiency.  We were
18   hired to protect the property, to try to get the property
19   back, to try to get whatever loan we could get for them.  It
20   had nothing to do with protecting them from deficiencies.
21   That was never the request made by the client to us.
22   Q      All right, sir.
23          Mr. Kaufman, did -- was there anything else Kaufman
24   Englett and Lynd could do for these clients?  When the
25   counter counter offer was rejected?
```

```
 1  A     No.  There was nothing, there was no litigation

 2  options, the -- they turned down the offer, the bank didn't

 3  want to hear any more offers we had.  They just wanted to be

 4  paid what they were owed.  And that was it.

 5         MR. ITTLEMAN:  Objection as to what the bank told

 6  Mr. Kaufman.

 7         THE COURT:  I will sustain the objection.  You

 8  need to lay a predicate, Mr. Withers.

 9         MR. WITHERS:  Okay.

10  BY MR. WITHERS:

11  Q     Sir, was the balance calculated on the debt?

12  A     Yes, it was.

13  Q     And was it the 611,000 some-odd dollar figure that

14  Harbison, that the Harbison attorney quoted?

15  A     Yes, sir.

16         MR. ITTLEMAN:  Objection; leading.

17         THE COURT:  Well, I'll sustain the objection.

18  What was the balance on the --

19  BY MR. WITHERS:

20  Q     What was the balance?

21  A     It was around 611,000 which included interest, back

22  payments, taxes they paid, liens, things like that they had

23  to cover.  That's why it's different than the original loan

24  amount because they -- it counted for 20 to 30 payments

25  missed, taxes not paid, lawyers' fees, everything that
```

```
 1   involved the foreclosure.
 2   Q     All right, sir.  Sir, were you aware at any time that
 3   in the course of reviewing the materials, were you aware of
 4   any offers made prior to the foreclosure sale?
 5   A     No.
 6   Q     I'm sorry.  Between the plaintiffs and the bank?
 7   A     We had no --
 8            MR. ITTLEMAN:  Objection, Your Honor.  I'm not
 9   sure if I understood the question.
10            THE COURT:  Well, do you understand the question?
11            THE WITNESS:  I understood the question.
12            THE COURT:  You may answer.
13            THE WITNESS:  No, we were never provided any
14   documentation that showed that there were any prior offers,
15   prior agreements, prior forbearance, prior e-mails to the
16   bank.  We assumed that we were the first ones to take a shot
17   at this.
18   BY MR. WITHERS:
19   Q     All right, sir.
20         Did you become aware of those matters during the
21   course of this lawsuit?
22   A     Yes.
23   Q     Okay.
24            MR. WITHERS:  Your Honor, I have no further
25   questions for the witness at this point.
```

```
 1              THE COURT:  All right.  Thank you.  We will have

 2    cross-examination, Mr. Ittleman.

 3                      CROSS-EXAMINATION

 4    BY MR. ITTLEMAN:

 5    Q     Sir, isn't it true that your last name is Kaufman?

 6    Correct?

 7    A     Kaufman?

 8    Q     With a K?

 9    A     Yes.

10    Q     You're the K in KEL?

11    A     Yes.  I'm one of the founding partners, yes.

12    Q     Okay.  And isn't it also true that you're the only

13    attorney with KEL that's licensed to practice law in the

14    state of Tennessee?

15    A     Absolutely.  Yes.

16    Q     All right.  And the KEL law firm has how many lawyers?

17    A     That's a good question.  We have anywhere from 65 to

18    75 at any time.

19    Q     Okay.  So if any one attorney was handling Tennessee

20    matters, you're responsible for them, isn't that right?

21    A     Yes.

22    Q     And how many paralegals does the firm have?

23    A     Conservatively 150 to 200.

24    Q     And should paralegals be providing legal advice to

25    clients?
```

1    A     If authorized by the attorney.

2    Q     Isn't it true that you're not an expert in foreclosure

3    defense work in the state of Tennessee?  Isn't that a fact,

4    sir?

5    A     No, it's not a fact.  I have my -- I have -- if you're

6    asking me is my expertise in foreclosure as a defense

7    attorney, yes, I do believe I am qualified as your expert.

8    Q     Okay.  But you're not an expert in this case, are you?

9    A     No.

10   Q     Okay.  And you're not qualified to give your expert

11   opinion in this case, are you?

12             MR. WITHERS:  Your Honor, I'm going to object to

13   that question.  It's irrelevant.

14             THE COURT:  The witness -- we have procedures,

15   ladies and gentlemen, in which the parties have to state to

16   each other if they're going to offer expert testimony, and

17   the defendants did not designate someone to be an expert in

18   this case, and therefore, I'm going to sustain objections to

19   Mr. Kaufman giving any kind of opinion except for what he

20   personally was involved in and did.  So he may answer the

21   question, but in the matter of fairness, I think it should

22   be explained as I did.  Go ahead.

23   BY MR. ITTLEMAN:

24   Q     Isn't it a fact, sir, that you're not an expert in

25   this case?

```
 1   A      No, I'm not.

 2   Q      And isn't it a fact that you're not an expert in

 3   foreclosure defense in the state of Tennessee in this case?

 4   A      In this case, no, I'm not.

 5   Q      Isn't it also a fact that you're not an expert in any

 6   issues regarding wrongful foreclosure actions in the state

 7   Tennessee in this case?

 8   A      Not in this case.

 9   Q      And yet the firm's providing legal advice to the

10   client through a paralegal, right?

11   A      I'm kind of confused about how you -- when you go from

12   I'm not an expert to these people are giving advice.  As a

13   lawyer, I'm allowed to do that.

14   Q      There's legal advice being provided by paralegals from

15   your law firm, correct?

16   A      They're relaying legal advice I gave them.

17   Q      Is there anywhere on here that C.S., who you agree is

18   not a lawyer.  Correct?

19   A      I agree.

20   Q      Is there anywhere on here that C.S. says in her notes

21   just spoke to Jeffrey Kaufman and he's authorized me to say

22   this?

23   A      It's never put in there.

24   Q      It says inbound call from client, right?

25   A      Which one?
```

```
 1  Q      The last one.
 2  A      Yes.
 3              THE COURT:  What are we on?  What is this exhibit?
 4              MR. ITTLEMAN:  Stipulated as Exhibit No. 80.
 5              THE COURT:  This is Plaintiff's 80?
 6              MR. ITTLEMAN:  Correct.
 7  BY MR. ITTLEMAN:
 8  Q      It doesn't say they spoke to you, does it?
 9  A      No, it doesn't.
10  Q      It says they spoke to the paralegal, right?  It's a
11  yes.
12  A      Which one are you talking about?  Are you talking
13  about the --
14  Q      I'm going to point to it, sir.
15  A      Okay.  Well, let me read it first so I understand what
16  you're asking me.
17         Okay, repeat your question.
18  Q      This is an inbound call from the client to your
19  office, right?
20  A      Yes.  September 28th, it is.
21  Q      Okay.  It doesn't say here that you spoke to the
22  client during this telephone conversation, does it?
23  A      On the 10/28, no, it doesn't.
24  Q      It says that she just, your or he, so she just found
25  out about the sale herself, right?  That's Mrs. Hasnain,
```

```
 1  right?
 2  A    That's what she said, yes.
 3  Q    And this is being communicated to C.S.  Correct?  Your
 4  paralegal?
 5  A    Yes.
 6  Q    Okay.  And then your paralegal communicates that
 7  Mrs. Hasnain is not happy with the way that the KEL
 8  attorneys have handled case.
 9  A    Yes.
10  Q    Okay.  And then the paralegal says, "Not sure what
11  deal they were referring to."  Right?
12  A    Yes.
13  Q    But according to you, you would have spoken to the
14  paralegal before that note went in, right?
15          MR. WITHERS:  Your Honor, I object.  That has not
16  been the testimony of the witness.
17          THE COURT:  He can answer the question.
18          THE WITNESS:  Actually, you're completely wrong.
19  You're absolutely wrong.
20  BY MR. ITTLEMAN:
21  Q    So she's --
22  A    I would like to answer that based on what the -- what
23  it says so I can follow through with my answer.  She -- she
24  was commenting on --
25  Q    Again, do you think you can get to that, sir?
```

1          THE COURT:  Just a moment.  I am confused here.

2   The question is I understand it, is had you talked to the

3   paralegal prior to the date of January 11, 2010?

4          MR. ITTLEMAN:  No.  That's not the question.

5          THE COURT:  Well, that is what I understood you

6   said, had you talked to the paralegal prior to this date.

7   Right?

8          MR. ITTLEMAN:  It says, "Not sure what deal they

9   were referring to."  Let me lay the proper predicate, Your

10  Honor.

11         THE COURT:  All right.  Let's start over.

12  BY MR. ITTLEMAN:

13  Q    It says, "Not sure what deal they were referring to."

14  Correct?

15  A    Yes.

16  Q    According to the paralegal?

17  A    Yes.

18  Q    But according to you, you only speak to the paralegal

19  prior to the paralegal putting in these notes, correct?

20  A    No.  I don't talk to the paralegal before they put in

21  their own notes.

22  Q    Page 2.  The paralegal, you didn't speak to the

23  paralegal prior to putting in these notes, right?

24  A    I explained it to the --

25  Q    The paralegal is saying, I explained to -- the

```
 1  paralegal of your law firm is explaining to your client
 2  being supervised by you that the state of Tennessee is a
 3  nonjudicial state and that your law firm is unable to stop
 4  the sale date and that when they hired us they already had a
 5  sale date.
 6  A     Yes.
 7  Q     Right?  That's wrong, isn't it?
 8  A     No.  That's not wrong.
 9  Q     Well, Trey Cain is an expert in this case, correct?
10  A     He's been certified, yes.
11  Q     And according to Trey Cain who practices foreclosure
12  defenses in the state of Tennessee, it's his expert opinion
13  that that statement is wrong.
14          MR. WITHERS:  Your Honor, we will object.
15  Apparently, he's seeking -- now he's seeking expert opinion.
16          THE COURT:  Counsel, the form of the question is
17  inappropriate, and I'll sustain the objection.  Although, if
18  you pose that question in an appropriate way, I will allow
19  the witness to answer it.
20  BY MR. ITTLEMAN:
21  Q     You're not an expert in this case.  Right?
22          THE COURT:  Is he not certified to be an expert to
23  testify in this case.
24          MR. ITTLEMAN:  Right.  Trey Cain has been
25  certified to testify as an expert in this case?
```

```
 1              THE WITNESS:  Yes.

 2   BY MR. ITTLEMAN:

 3   Q     Trey Cain says that the advice provided by your law

 4   firm on January 11, on January 11, 2010, was wrong.  Isn't

 5   that right?

 6              MR. WITHERS:  Your Honor, I'm going to object to

 7   that question.  I think that mischaracterizes Mr. Cain's

 8   testimony.  Especially the totality of it.

 9              THE COURT:  Well, Mr. Ittleman, you have asked

10   this question, I'm going let the witness answer and explain

11   his answer.  And that will get him into the expert witness

12   testimony that you have been trying to keep out.  So you can

13   withdraw the question or not.

14              MR. ITTLEMAN:  I'll withdraw it.

15   BY MR. ITTLEMAN:

16   Q     Isn't it true that sitting here today that you have no

17   facts to dispute as a fact witness what the expert testimony

18   was yesterday?

19   A     I absolutely have an unbelievable amount of stuff to

20   cross your -- to dispute your witness.

21   Q     But you have no expert to dispute it, do you?

22   A     We don't have an expert, no.

23   Q     Nathan Brown is not lawyer, is he?

24   A     No.

25   Q     Yet he was providing legal advice to plaintiffs, isn't
```

```
 1   that right?

 2   A     Absolutely not.

 3   Q     Absolutely not?

 4   A     Absolutely not.

 5   Q     Okay.  Let's talk about that.

 6         I'm going to show you stipulated Plaintiff's Exhibit

 7   No. 6.  You would agree that because the state of Tennessee

 8   is a nonjudicial foreclosure state a lawsuit would not have

 9   to be filed, is that right?

10   A     Yes.

11   Q     And you would also agree that Nathan Brown was the

12   intake guy that spoke to the plaintiffs, isn't that right?

13   A     Yes.

14   Q     And just so I understand, he's not a lawyer, correct?

15   A     Absolutely not.

16   Q     Okay.  November 25, 2009, that's prior to the

17   foreclosure sale date, isn't that right?

18   A     Yes.

19   Q     That's two weeks prior.  Right?

20   A     Yes.

21   Q     This is an e-mail from Nathan Brown to Mr. and

22   Mrs. Hasnain, isn't that right?

23   A     Yes.

24   Q     And in the e-mail --

25             MR. WITHERS:  Your Honor, could we ask that this
```

```
 1  e-mail be positioned so we can read it?
 2           THE COURT:  Well, I need a number.
 3           MR. WITHERS:  Oh.
 4           THE COURT:  Of what is on the screen.
 5           MR. ITTLEMAN:  Stipulated Exhibit No. 6, Your
 6  Honor.
 7           THE COURT:  All right.  Thank you.
 8  BY MR. ITTLEMAN:
 9  Q     In this e-mail --
10           MR. WITHERS:  Your Honor, I can't read it the way
11  he's got it framed.
12           THE COURT:  Well, counsel, don't you have an
13  exhibit book?  You all were supposed to prepare those.  You
14  can look it up in your exhibit book.
15           MR. WITHERS:  All right.  Thank you, Your Honor.
16  I'm just concerned the witness may not be able to.
17           THE COURT:  Mr. Kaufman can tell us if he can't
18  read it.
19           THE WITNESS:  I can read it.
20           MR. ITTLEMAN:  Okay.
21  BY MR. ITTLEMAN:
22  Q     And in this e-mail Mr. Brown is providing Mr. and
23  Mrs. Hasnain the legal advice, isn't that right?
24  A     No.
25  Q     By not responding to a foreclosure action filed in
```

```
 1  circuit court you can unknowingly agree to a default
 2  judgment containing numerous additional fees that could be
 3  included in personal judgments against you?  Do you think
 4  that's something that a nonlawyer would know?
 5  A    It's a fact.
 6  Q    That's a fact?
 7  A    A fact.
 8  Q    That's a legal fact, isn't it?
 9  A    It's a fact that's common knowledge.
10  Q    That's common knowledge?
11  A    It's common knowledge in this -- well, you can keep
12  asking questions.
13  Q    So according to you, you don't have to go to law
14  school to know that fact?
15  A    No.
16  Q    You could unknowingly agree to a default of judgments,
17  do you think that the plaintiffs know what a default
18  judgment is?
19  A    I don't know what the plaintiff knows.
20  Q    Do you think this jury knows what a default judgment?
21  A    I don't know what the jury knows.
22          THE COURT:  Counsel, you are becoming
23  argumentative.
24  BY MR. ITTLEMAN:
25  Q    Isn't --
```

```
 1              THE COURT:  Excuse me, Mr. Ittleman, you're
 2    becoming argumentative.
 3              MR. ITTLEMAN:  I apologize.
 4              THE COURT:  You need to ask questions that elicit
 5    facts.
 6    BY MR. ITTLEMAN:
 7    Q    That's a legal issue, a default judgment, isn't that
 8    right?
 9    A    I can't say.
10    Q    And you were supervising him, right?
11    A    Yes.
12    Q    And you saw the other exhibit.  No litigation was ever
13    filed by Fifth Third Bank, isn't that right?
14    A    Absolutely.
15    Q    And yet the deed of trust was already submitted to
16    Mr. and Mrs. Hasnain and the Learning Connection, right?
17    A    I don't understand.
18    Q    There was already a notice of foreclosure submitted to
19    the Learning Connections and Mr. and Mrs. Hasnain.
20    A    Yes.
21    Q    That was communicated to the person that you were
22    supervising, isn't that right?
23    A    Yes.
24    Q    And that's not litigation, is it?
25    A    Absolutely not.
```

```
1    Q     And yet the person that you're supervising is

2    responding as if this matter is in litigation.  Isn't that

3    right?

4    A     No.

5    Q     Do you think that litigation in -- do you think that

6    litigation would be required to obtain a personal judgment

7    in the state of Florida?

8    A     I'm sorry, what?

9    Q     Isn't it true that litigation in the state of Florida

10   would have to be filed to obtain a personal judgment against

11   people?  You have to sue somebody to get a judgment, isn't

12   that right?

13   A     In Florida?

14   Q     In Florida.

15   A     Yeah.

16   Q     Sir, isn't it a fact that this is your standard letter

17   that you provide to all your clients in the state of

18   Florida?

19   A     Yes.

20   Q     And -- but this was not a state of Florida matter.

21   Correct?

22   A     No.

23   Q     This was a state of Tennessee matter?

24   A     Exactly.

25   Q     And yet you're providing -- the state of Florida is a
```

```
 1  judicial state, isn't that right?

 2  A     Absolutely, yes.

 3  Q     Right.  So you're giving the client legal advice as if

 4  the client's property was in Florida.  Isn't that right?

 5  A     No.  What happened was is that this was a standardized

 6  e-mail admitted -- included his follow-up with the client on

 7  the standardized e-mail.  He didn't realize that was a

 8  standardized e-mail.

 9  Q     Right.  That was under your supervision?

10  A     Yes.

11  Q     November 25?

12  A     Yes.

13  Q     Two weeks prior to the sale?

14  A     We hadn't been hired yet.  But yes.

15  Q     State of Florida.  You hadn't spoken to the Hasnains,

16  correct?

17  A     No, I hadn't.

18  Q     You're the licensed guy in the state of Tennessee?

19  A     Yes.

20  Q     Nathan Brown is working under you?

21  A     Yes.

22  Q     Nathan Brown doesn't know what Tennessee law is?

23  A     No, he doesn't.

24  Q     And yet you're supervising him and you hadn't spoken

25  to the plaintiffs, had you?
```

```
 1   A      No, I hadn't.

 2   Q      So Nathan Brown is operating as if this commercial

 3   property is in the state of Florida.  Isn't that right?

 4   A      No.  He made a mistake on the e-mail.  He sent the

 5   wrong e-mail.

 6   Q      He made a mistake on the e-mail, and he's supposing

 7   that this is -- that this commercial property is in the

 8   state of Florida.  Right?

 9   A      No.  He wasn't.  He was fully aware that this is a

10   Tennessee case.

11   Q      And what facts do you have to support that, sir?

12   A      The intake document.

13   Q      On November 25, what facts do you have to support

14   that?

15   A      On the intake document when he filled out the report.

16   Q      Is that on November 25, sir?

17   A      That would be on November 25, around there.

18   Q      What records do you have that you spoke to Nathan

19   Brown on November 25, sir?

20   A      I didn't speak to Nathan Brown on November 25.

21   Q      Okay.  So you didn't speak to Mr. Brown?

22   A      Right.  No, I didn't.

23   Q      Mr. Brown is providing legal advice regarding the

24   ramifications of --

25   A      No, he wasn't.  I have already testified that he
```

 1  wasn't.

 2  Q      And you didn't speak to Mr. Brown during that time?

 3  A      No, I didn't.

 4  Q      And there is nothing in that e-mail, isn't it right,

 5  that said anything about a foreclosure -- a lawsuit to stop

 6  a foreclosure sale?

 7  A      No, it didn't.

 8  Q      This e-mail from Nathan Brown to Mr. and Mrs. Hasnain,

 9  you're not on the e-mail, are you?

10  A      No, I'm not.

11  Q      Do you know what cc means?  Carbon copy?

12  A      Sure.

13          MR. ITTLEMAN:  I'm going back to stipulated

14  Exhibit 6.

15  BY MR. ITTLEMAN:

16  Q      You're not being cc'd on this e-mail, are you?

17  A      No, I wasn't.

18  Q      And yet you're supervising Mr. Brown?

19  A      Yes, I was.

20  Q      Kayla Rogers, another non-attorney in the KEL law

21  firm, isn't that right?

22  A      She's a paralegal, I believe.

23  Q      And yet stipulated Exhibit No. 9 Kayla Rogers is

24  telling the plaintiffs to sign a hardship letter.

25  A      No, she isn't.

```
 1   Q     She's not?

 2   A     She's requesting the information that we require.

 3   Q     Okay.  The information that you require.

 4   A     Yes.

 5   Q     That was not appropriate for the plaintiffs, isn't

 6   that right?

 7   A     Well, I don't understand that question.

 8   Q     I understand they didn't need a hardship letter, did

 9   they?

10   A     I don't know.  Did they?

11   Q     You were the supervisor.

12   A     Yes, of course.  They need to show why they couldn't

13   make payments.  That's part of trying to get the loan

14   modified.

15   Q     Okay.  Plaintiffs told you that they didn't need a

16   hardship letter, isn't that right?

17   A     Plaintiffs never told me anything.

18   Q     Right.  That's the problem.

19         THE COURT:  Well, now that is not a question.  The

20   jury should disregard the statement.

21   BY MR. ITTLEMAN:

22   Q     You're not being copied on this e-mail, are you,

23   Exhibit, stipulated Exhibit 9?

24   A     No.  That is an e-mail that paralegals send out to get

25   the required information we need in the future and some of
```

```
 1   it has information that covers both areas of commercial and
 2   residential.
 3   Q     Okay.  My question is, you were not being copied on
 4   this stipulated Exhibit 9?
 5   A     No, I was not copied on the discovery motion request.
 6   Q     Stipulated Exhibit No. 11, same thing, sir, is your
 7   name on this document?
 8   A     No, it's not.
 9   Q     You're a licensed attorney in the state of Tennessee.
10   Right?
11   A     Yes, I am.
12   Q     Legal advice is being furnished -- your name isn't
13   even on it.
14          MR. WITHERS:  Your Honor, Your Honor.  I object to
15   the question.  The client -- the attorney is testifying that
16   legal advice is being given.  That's a legal --
17          THE COURT:  Well, the question can be asked, but
18   we instead of having multiple questions, we should have one
19   question and one answer.  So I want a question on the floor.
20   What is it?
21   BY MR. ITTLEMAN:
22   Q     The first e-mail from November 30, 2009.
23   A     I'm sorry.  I'm looking at question No. 7.
24   Q     Okay.  I'm going to direct your attention to the
25   bottom.  I'm pointing to it.
```

```
 1   A      Okay.

 2   Q      November 30, 2009.

 3   A      Right.

 4   Q      Your law firm was requesting information from the

 5   plaintiffs, isn't that right?

 6   A      Yes.

 7              THE COURT:  Is this Exhibit 9?  Or 11?

 8              MR. ITTLEMAN:  It's 11.

 9              THE COURT:  Thank you.

10              THE WITNESS:  But I don't know if that information

11   is your question, it's -- we hadn't been hired yet, so it's

12   preliminary stuff.  He could just be sending us the contract

13   back.  It could be anything.

14   BY MR. ITTLEMAN:

15   Q      You don't know much of anything that's going on during

16   that time because you weren't being copied on the e-mails,

17   were you?

18   A      We weren't hired yet, no.

19   Q      Second e-mail, December 2, you were hired at that

20   point, weren't you?

21   A      Which part of that?  Which area are you asking me to

22   look at?

23   Q      December 2, 2009.

24   A      Yes.

25   Q      You completed all paperwork for your law firm to stop
```

```
 1  the foreclosure.  Right?

 2  A      Are you asking me what they wrote or what I wrote?

 3  Q      Isn't that what it says?

 4  A      Yes.  That's what it says.

 5  Q      Did your law firm stop the foreclosure?

 6  A      Yes.

 7  Q      We're no longer dealing with Fifth Third Bank?

 8  A      Yes.

 9  Q      They're relying on you.  Your all lawyers at this

10  point, right?

11  A      Yes.

12  Q      And they're sending this to Nathan Brown?

13  A      Yes.

14  Q      A non-attorney?

15  A      Yes.

16  Q      Your name is not on any of this?

17  A      No, it's not.

18  Q      Wednesday, December 2, e-mail from Nathan Brown to

19  Mr. and Mrs. Hasnain.  You were retained that point, your

20  name is still not on there, is it?

21  A      No, it's not.

22  Q      Prior to the -- prior to the sale, correct?

23  A      Yes.

24  Q      Still in time to file the complaint to stop the

25  foreclosure sale, is that right?
```

```
 1   A      No, it isn't.

 2   Q      You didn't have time do it?

 3   A      No, we didn't.

 4   Q      Anywhere on any of these e-mails does anyone from the

 5   KEL attorneys communicate that fact to the plaintiffs?

 6   A      On these e-mails, I don't see any.

 7   Q      Do you have anything that you're going to show us

 8   today that says that anyone from the KEL attorneys

 9   communicated to us that unfortunately this -- we cannot file

10   the complaint to stop the sale?

11   A      No.

12   Q      And isn't it true that lawyers are supposed to be

13   communicating with their clients?  Isn't that a fact?

14   A      There is communication that lawyers are responsible to

15   have with their clients, yes.

16   Q      But yet you weren't communicating with the clients all

17   during this time, were you?

18   A      Your Honor?  You can't be from stating why I don't

19   have to -- he's asking me a question on --

20          THE COURT:  He's asking for a yes or no answer.

21   You may explain it.  You were communicating with the clients

22   during this time, were you?

23          THE WITNESS:  My attorneys were communicating with

24   the clients.

25   BY MR. ITTLEMAN:
```

```
 1  Q     And you have no facts to support the fact that your

 2  attorneys were communicating with the clients, do you?

 3  A     I have a couple different records that show when my

 4  attorneys talked to the client.

 5  Q     And this was an emergency situation, was it not?

 6  A     They hired us late, yes, it would have been an

 7  emergency if we planned to file.

 8  Q     And you're, again, the licensed guy?

 9  A     Yes, I am.

10         THE COURT:  Counsel, that is enough.  That

11  question has been asked and answered so many times, it is

12  completely cumulative.

13  BY MR. ITTLEMAN:

14  Q     And you personally had no communications with your

15  client during that time, right?

16         MR. WITHERS:  It's been asked and answered too,

17  Your Honor.

18         THE COURT:  Well, he may answer.

19         THE WITNESS:  No.

20  BY MR. ITTLEMAN:

21  Q     Exhibit 13, same thing, sir.  December 8, clients are

22  already hired you, right?

23  A     Yes.

24  Q     You're not on the e-mail?

25  A     No, I'm not.
```

1   Q     Non-lawyers are communicating with the clients, right?

2   A     Yes.

3   Q     Do you think that when people hire law firms they want

4   some intake person to give them legal advice?

5              MR. WITHERS:  Your Honor, I object.

6              THE COURT:  Sustained.

7   BY MR. ITTLEMAN:

8   Q     Showing you stipulated Plaintiff's Exhibit 15.  See

9   the first one?  E-mail December 4, 2009?

10  A     Yes.

11  Q     It's one of your paralegals, right?

12  A     Yes.

13  Q     It's not you?

14  A     No, it isn't.

15  Q     You're not on there?

16  A     No, I'm not.

17  Q     E-mail from Mr. and Mrs. Hasnain to your paralegal,

18  correct?

19  A     Yes.

20  Q     December 8?

21  A     Yes.

22  Q     2009.  Right?

23  A     Yes.

24  Q     Again, you're not on there?

25  A     No, I'm not.

Q      Now, it says, does it not, "We are pleased that you're

making process in our case."  Right?

A      Yes.

Q      You don't know what progress that was, though, do you?

A      I have no idea.

Q      You're going to have the documents by Friday,

December 11, by noon?

A      That's what they say.

Q      That's after the foreclosure sale date?

A      Yes, it is.

Q      Was the KEL law firm communicating to the clients

you're going to lose your property during that time?

A      It wasn't our purpose that they were going to lose

their property.

Q      Doesn't the retainer agreement says foreclosure

defense associated with the sale date on December 9?

A      Yes.  Of course it does.

Q      But you don't think you were hired to stop the

foreclosure sale.  Is that your testimony?

A      Exactly.  We were hired to do -- to try to save the

property, which we got them an offer.

Q      Saving the property is not -- you don't believe that

saving the property is filing a lawsuit to stop the

foreclosure sale?

A      In this case, absolutely not.

```
 1   Q     No one from the KEL attorneys attended the sale, did

 2   they?

 3   A     No.

 4   Q     Our client thought he was protected during that time,

 5   right?

 6   A     I don't know what your client thought.

 7   Q     I know.  After all, you sent financial documentation

 8   after the foreclosure sale date, right?

 9   A     Yes.  We requested it.

10   Q     Nothing in stipulated Exhibit 16 that talks about the

11   foreclosure sale date, does it?

12         THE COURT:  All right.  This has not been offered

13   previously, no objection?

14         MR. WITHERS:  I think it's our exhibit, Your

15   Honor.

16         THE COURT:  It's Defendant's 16?

17         MR. ITTLEMAN:  No.  It's Plaintiff's Exhibit 16.

18         THE COURT:  Any objection?

19         MR. WITHERS:  Can I see it again?

20         MR. ITTLEMAN:  Sure.  May I approach?

21         THE COURT:  Yes, you may.

22         MR. WITHERS:  No objection, Your Honor.

23         THE COURT:  Plaintiff's Exhibit 16 admitted, no

24   objection.

25   BY MR. ITTLEMAN:
```

1   Q      Nothing in stipulated Exhibit 16 that talks about the

2   commercial sale date, does it?

3   A      I don't see it.

4   Q      You're not on any of these e-mails either, are you?

5   A      Absolutely not.

6   Q      Isn't it a fact, sir, that Mr. Hasnain received a

7   telephone call from your office on Friday, January 8,

8   stipulated Exhibit No. 17?

9   A      I don't know.  You will have to show me our status.

10  This is what he said in the letter.

11  Q      Do you have any reason to dispute the letter?

12  A      Yeah.

13  Q      They were asking for the status of the building.

14  A      They were also saying we were supposed to file an

15  injunction.

16  Q      You disagree with that, right?

17  A      I disagree with this letter.

18  Q      You disagree with the letter.  You disagree with the

19  filing the injunction, right?

20  A      We weren't going to file an injunction.

21  Q      Right.  Isn't it a fact, sir, that the first

22  conversation that you had with Mr. Hasnain occurred after

23  Mr. Hasnain sent letter?

24  A      No.

25  Q      And isn't it also a fact that --

```
 1   A      Sorry, he's continued on with the question.

 2            THE COURT:  I beg your pardon?

 3            THE WITNESS:  He's continued on with the question,

 4   I said no.  He said, "And isn't it?"  I don't know what that

 5   means.  It sounds like a compound.

 6   BY MR. ITTLEMAN:

 7   Q      Isn't it a fact that when you spoke to Mr. Hasnain you

 8   told Mr. Hasnain that your law firm wasn't representing him?

 9   A      No.

10   Q      You had no idea that you were representing him, did

11   you?

12   A      I never spoke to your client ever.

13   Q      We're talking about ethics now.

14   A      Yes.

15   Q      Do you think it's ethical to tell a client to

16   understate their income for purposes of receiving a loan

17   modification?  Is that ethical practice by your law firm?

18   A      No.  We don't do it.

19            MR. WITHERS:  Your Honor, let me object to the

20   question.  I think if he's talking about ethics it's getting

21   into that expert area again.

22            THE COURT:  Yes, it's correct.  But if you're

23   objecting, I'll sustain it.

24            MR. WITHERS:  I'm going to object.

25            THE COURT:  Actually, I believe that the plaintiff
```

```
 1  can waive that and open the door and if the plaintiff does,

 2  then of course there can be redirect examination.  So,

 3  technically, that was a erroneous ruling.  The witness may

 4  answer.

 5            THE WITNESS:  On the status of ethics?

 6  BY MR. ITTLEMAN:

 7  Q    I'm asking you as a fact witness sitting here today.

 8            THE COURT:  The question was, do you think it's

 9  ethical to tell a client to understate their income?

10            THE WITNESS:  Absolutely not.

11  BY MR. ITTLEMAN:

12  Q    Yet Nathan Brown told the client to understate their

13  income, isn't that right?

14  A    No, he didn't.

15  Q    And you wouldn't know that, would you, because you

16  weren't supervising Mr. Brown, were you?

17  A    Mr. Brown was told specifically not to do things like

18  that.  All of our intake people are told absolutely do not

19  tell the client to lie on documents.

20  Q    And you have no idea what Mr. Brown told Mr. Hasnain

21  at that point because you weren't involved, were you?

22  A    I have no idea what Mr. Brown said on the phone to

23  your client.

24  Q    That's right.  And you're responsible for whatever he

25  told my client, isn't that right?
```

```
 1   A     Yes.

 2   Q     And he told my client to understate the income, isn't

 3   that right?

 4   A     No.

 5   Q     You don't know?

 6   A     As far as I know, that's only what your client has

 7   told you.  I have no personal knowledge that he said that.

 8   Q     And yet it's your position that my clients didn't have

 9   enough money, isn't that right?  Missed payments, isn't that

10   right?

11   A     Based on your client's documents they provided us,

12   yes.

13   Q     And yet the clients are coming in and offering

14   $550,000 for this commercial property, isn't that right?

15   A     No.  When did they offer 550,000?

16   Q     Did they offer 540,000?

17   A     They counter offered and said they could get

18   financing.  It's on their sheet that you showed me.  That is

19   the tantamount based on them being able to get financing,

20   not that they had 540,000 in cash up front.

21   Q     Isn't it a fact that a party who has made a counter

22   offer at $540,000 is not a client who would qualify for

23   indigent or hardship status, sir?

24   A     I don't know.

25   Q     I know.
```

```
 1            THE WITNESS:  Objection, Your Honor.

 2            MR. WITHERS:  I couldn't hear what it was.

 3            THE WITNESS:  You stated "I know" after I spoke.

 4            THE COURT:  Okay.  Now wait a minute.  Nobody

 5  stood to make an objection.  So this didn't happen as far as

 6  I'm concerned.  Are you standing now?

 7            MR. WITHERS:  I'm standing now.

 8            THE COURT:  What is your objection?

 9            MR. WITHERS:  I'm going to object to any comments

10  by counsel.

11            THE COURT:  Counsel, you should not be making

12  comments.  You're there to ask questions.

13  BY MR. ITTLEMAN:

14  Q    Stipulated Exhibit No. 2.  November 23, 2009.  You

15  didn't know that the clients had resources internationally

16  to pay off this loan, did you?

17  A    Actually, they don't.

18  Q    And you have no facts in here today to testify to

19  that, do you?

20  A    Actually, I do.  The pay off amount was 611,000, not

21  529,000.  And there was no offer made by the bank to accept

22  a $529,000 offer.

23  Q    Isn't it true that they went to a title company to

24  obtain a pay off, sir?

25  A    I don't know what they did.
```

```
 1  Q     I know.  Strike that.  I'm sorry.

 2        THE COURT:  All right.  We're going to take our

 3  morning break.  Hopefully everybody will calm down.  Give

 4  you 20 minutes, please.  10, 11 and then everybody get lined

 5  up a little bit before that so we can get started promptly.

 6                    (Recess for the jury)

 7        THE COURT:  All right.  Counsel, Mr. Kaufman, you

 8  can get down from that uncomfortable place.

 9     You have been given the final draft of the jury

10  instructions with the headings out.  It should.  But I think

11  she forgot to put the number on it, so share.  It's draft 6.

12        THE DEPUTY CLERK:  That's correct.

13        THE COURT:  So check those out, because I think

14  we're getting close to the end here.  And I will give you a

15  break.  Go ahead.  I've got to get caught up on my notes

16  here.  So go ahead and take your break.  All right.

17        MR. WITHERS:  At some point I'd like to have a

18  dialogue with the Court about how far you're going to let us

19  go in our closing arguments relative to the statute of

20  limitations defense.  That's --

21        THE COURT:  What do you mean how far you can go?

22  Anywhere within the evidence.

23        MR. WITHERS:  Okay.  Well, but in describing what

24  the -- what the law is to the jury, are we allowed to do any

25  of that?
```

```
 1            THE COURT:  Well, you can say the jury

 2   instructions are going to instruct you blah-blah-blah.

 3            MR. WITHERS:  Okay.  That's all I wanted to know.

 4   Thank you.

 5            THE COURT:  Okay.

 6        Have a nice break.

 7                  (Recess for the staff)

 8                  Jury present -- 10:54 a.m.

 9            THE COURT:  We'll continue with the

10   cross-examination of Mr. Kaufman.

11   BY MR. ITTLEMAN:

12   Q    I want to make sure we're clear.  There's -- between

13   November 25 and December 9, there's all these e-mails that

14   are going between the clients and your law firm, correct?

15   A    Yes.

16   Q    Not one of which has your name on it, correct?

17   A    Yes.  Correct.

18   Q    All of which are being sent by non-lawyers in your

19   firm, correct?

20   A    Yes.

21   Q    And you had no idea as to what was going on at that

22   point, right?

23   A    I had an idea what was going on.  That's not fair to

24   say.  I just wasn't on the e-mail chain.

25   Q    Stipulated Exhibit No. 15.  An e-mail from a
```

1   paralegal, right?

2   A      Yes.

3   Q      December 4, 2009?

4   A      Yes.

5   Q      To Mr. and Mrs. Hasnain, right?

6   A      Yes.

7   Q      Documents are due on or before December 15, 2009, at

8   12:00?

9   A      Yes.

10  Q      What documents?

11  A      I'll have to look below.

12  Q      You don't know?

13  A      I don't know which she requested.  Probably our normal

14  documents.

15  Q      Okay.  And due before December 15 at 12:00?

16  A      They normally give the client a certain amount of

17  time, so 11 days, that's probably accurate.

18  Q      For what?

19  A      For whatever documents they had to provide.

20  Q      What was going on?  What were you doing to supervise

21  this e-mail that documents are due on or before December 15,

22  2009?

23  A      I don't supervise document collection.  The managing

24  attorney supervises that.  I manage him.  I make sure

25  everything is handled appropriately.  In this situation

```
 1  there were documents that were needed they hadn't provided
 2  yet.  I don't know which ones.
 3  Q    Isn't it true that the deadline on or before
 4  December 15, 2009, you have no idea why the law firm
 5  requested that deadline, do you?
 6  A    Yes, I do.
 7  Q    And what is your idea?
 8  A    Because -- what's my idea or what -- the way we handle
 9  things?
10  Q    No, no.  What do you know as to why the law firm
11  requested a deadline of December 15, 2009?
12  A    Because --
13  Q    What does your law firm handle request --
14  A    What?
15          MR. WITHERS:  Your Honor, that's a multiple
16  question.  We would object to that.  Do one at a time.
17          THE COURT:  All right.  One question at a time.
18  BY MR. ITTLEMAN:
19  Q    What facts do you have sitting here today as to why
20  your law firm was requesting that my clients provide you
21  with documents on or before December 15, 2009?
22  A    Because we normally use a date around 11 days or a
23  little more because clients are irresponsible with getting
24  us documents back so we put hard deadlines on them so they
25  comply.
```

```
 1   Q      They comply with what?

 2   A      They comply with the documents they're supposed to

 3   send in.

 4   Q      What facts do you have in this case as to why your

 5   paralegal that you were supervising was telling my clients

 6   that the documents are due on or before December 15, 2009?

 7   A      Because they are instructed to get them within a

 8   certain period of time.

 9   Q      I would ask the witness to answer the question as

10   stated.

11          THE COURT:  Okay.  Hold on, because my computer is

12   not up with me.

13      Okay.  The witness answered your question.  Next

14   question.

15   BY MR. ITTLEMAN:

16   Q      The witness is providing a general answer as far as

17   what the firm typically does.  I'm asking you a very

18   specific question.  What did the firm do in this case as to

19   why --

20   A      She was following the policy of the firm.

21   Q      Isn't it a fact that your paralegal, who is not a

22   lawyer, told my client that the foreclosure sale would stop

23   if my client provided the documents on or before

24   December 15, 2009?

25   A      I have no proof of that and wouldn't instruct her to
```

1  do that.

2  Q      Because December 15, 2009, is after the foreclosure

3  date?

4  A      Absolutely.

5  Q      You fired the clients on June 10, 2010, stipulated

6  Exhibit 29, isn't that right?  So you cut them loose, right?

7  A      Sorry.  Can I read this first?

8  Q      Absolutely.

9  A      Yes.  Representation ended in June 21 of 2010.

10 Q      Cut them loose?

11 A      Yes.  Representation ended.

12 Q      Never told them about the plan to stop the foreclosure

13 sale in Tennessee?  You personally?

14 A      No.

15 Q      The client, at this point, that you had a duty to

16 represent, is on their own, isn't that right?

17 A      I disagree.  I don't have a duty to continue

18 representing somebody.

19 Q      The only lawyer representing them, right?

20 A      My representation was over.

21 Q      You fired them so now they don't have a lawyer, isn't

22 that right?

23 A      I don't know if they decided to hire another attorney.

24 We exhausted all our efforts and we were finished.

25 Q      And they had no property at this point, right?

```
 1  A     I don't know what they had.  I don't know if they were
 2  still in the property.  I don't know if they got evicted.
 3  Q     And you don't know whether they did any investigation
 4  as to what Tennessee law provided after you fired them,
 5  right?
 6          MR. WITHERS:  Your Honor, I'll object to that
 7  question.  That requires speculation on Mr. Kaufman's part.
 8          THE COURT:  Well, he's asked whether he knows, it
 9  borders on argumentative, but I'll let Mr. Kaufman answer.
10          THE WITNESS:  Well, I sat here and I've heard
11  testimony what he's done.
12  BY MR. ITTLEMAN:
13  Q     And you have no reason to dispute that that happened
14  after June 21, 2010, do you?
15  A     What I have to dispute is that on January 9th he
16  was -- he stated in his letter that he was -- that he
17  thought we should file an injunction.  So yes, I was aware
18  that he did have problems with us not filing an injunction.
19  Q     Isn't it true that he found the word "injunction" over
20  the Internet, sir?
21  A     How do you I know where he found it?  He said he had a
22  conversation with his wife.  It might have came from her, it
23  might have come from the Internet.  In fact, he said it came
24  from you, too.
25  Q     And that you have no documentation to show that your
```

1  law firm ever stated the word "injunction" to my clients?

2  A     I know we didn't.

3  Q     And you have no expert testimony, I just want to make

4  sure because I'm suing you personally and your law firm, you

5  have no expert witness testimony to dispute the testimony

6  from Mr. Piedra who is an expert in this case, do you?

7  A     Actually --

8              THE COURT:  Just a moment.

9              THE WITNESS:  -- you opened the door that --

10             THE COURT:  Just a moment, please.

11      Counsel, as I explained to the jury, the defendants did

12  not designate a person to testify.  Your question is

13  ambiguous.  In the realm of possibility, he may answer

14  whether or not there is an expert.  But if you're asking him

15  is there going to be an expert presented here, then he may

16  answer that.  So while there's no objection, I think that

17  the question is confusing and may mislead the jury.  So the

18  next question is.

19      Please disregard the answer that Mr. Kaufman was making

20  before I could finish my sentence.

21  BY MR. ITTLEMAN:

22  Q     Piedra is a licensed CPA, right?

23  A     I assume.  You told me he was.

24  Q     He's been designated as an expert.  He's licensed a

25  CPA, right?

```
 1  A      I have no knowledge of it other than what he testified
 2  to.
 3  Q      He's been designated as an expert, as a forensic
 4  financial person, as well, isn't that right?
 5  A      The Court designated him as an expert.  Okay.
 6  Q      And your law firm does not have an expert to dispute
 7  his testimony, does he?
 8          MR. WITHERS:  Objection; asked and answered.
 9          THE COURT:  All right.  You're asking the
10  ambiguous question again.  In the realm of possibility there
11  may be such a person.  It was not stated -- it was not
12  designated in this case.  It's just a question that's
13  unfair.
14      I would say it is -- it's one that leans to confusing
15  and you may restate it in a way that the witness can answer
16  so that we know what you're asking him.
17  BY MR. ITTLEMAN:
18  Q      You're going to have witnesses in this case, correct?
19  Isn't that right?  To defend your law firm?
20  A      Are you asking me for future witnesses?  Or did we put
21  witnesses forward?
22  Q      I'm asking you, you cross-examined my expert witness
23  yesterday, didn't you?
24  A      Yes, I did.
25  Q      And you don't have an expert on -- you don't have an
```

```
 1  expert CPA, do you?

 2  A     Don't need one.

 3           MR. WITHERS:  Your Honor, I'll object.  Again,

 4  same objection.

 5           THE COURT:  I'll sustain it.  I think

 6  Mr. Ittleman, you're asking if the defendants are going to

 7  present an expert witness testimony in this case.  Is that

 8  what you're asking?

 9           MR. ITTLEMAN:  Right.  Yes.

10           THE COURT:  Are you just asking him in the

11  abstract are there expert witnesses that they could present?

12           MR. ITTLEMAN:  The question --

13           THE COURT:  Are there experts?

14           MR. ITTLEMAN:  The question was, Mr. Piedra has

15  been designated as an expert.

16           THE COURT:  Okay.  Asked and answered.

17           MR. ITTLEMAN:  Thank you.

18           THE COURT:  And so the next question is?

19  BY MR. ITTLEMAN:

20  Q     There's no expert designation on any financial

21  information in this case from your side, is there?

22  A     Absolutely not.

23  Q     Isn't it also a fact that plaintiffs cooperated with

24  all information requested by your law firm?

25  A     Absolutely not.
```

```
 1   Q      Defense Exhibit 7.  Do you fill that out?
 2            THE DEPUTY CLERK:  Your Honor, that exhibit hasn't
 3   been admitted.
 4            THE COURT:  Yes.  It's designated, there is no
 5   objection, but it should be offered before it's put on the
 6   screen.  It's not been identified previously.  Is there
 7   objection?
 8            MR. WITHERS:  No.  Actually, it's one we want in,
 9   Your Honor.
10            THE COURT:  I beg your pardon?
11            MR. WITHERS:  It's actually one we want in
12   evidence, as well.  So yeah.
13            THE COURT:  All right.  So Exhibit 7, you're
14   offering it?
15            MR. ITTLEMAN:  If it pleases the Court, we're
16   stipulating.
17            THE COURT:  Right.  You tell me it's stipulated,
18   but before you put it up there, I've got to make sure there
19   hasn't been a miscommunication.
20            MR. ITTLEMAN:  Right.  And I'm stipulating to all
21   the defendant's exhibits just to speed things along.
22            THE COURT:  All right.  Well, as to the exhibit of
23   the Plaintiff's, 7, there's no objection, it is admitted.
24            MR. ITTLEMAN:  Actually, Defendant's 7.
25            THE COURT:  Oh, well -- all right.  Defendant's 7,
```

1   then, is admitted without objection.

2   BY MR. ITTLEMAN:

3   Q      There's information on here, correct?   The borrower's

4   information.   Not the lender, the person who's borrowing the

5   money.

6   A      It looks like they're missing two borrowers.

7   Q      Lender loan information, right?   Fifth Third Bank?

8   A      It says borrower information.   You have Linda Gentry,

9   Fred Gentry.   Your clients aren't on it.   Actually, your

10  client plus his wife are not on that document.

11  Q      Exhibit 8.   Defense Exhibit 8.

12          THE COURT:   Any objection?

13          MR. WITHERS:   No, Your Honor.   May it please the

14  Court, probably the best thing to do would be just as --

15  he's going to go through these exhibits, ask the Court to

16  just admit Exhibit 6.

17          THE COURT:   Well, counsel, it's not your -- are

18  you telling me in your last statement, Mr. Ittleman, that

19  any exhibits on the defense list you want in?

20          MR. ITTLEMAN:   Yeah.

21          THE COURT:   All right.   That means that

22  exhibits -- we have to go through this in a formal way.

23  Defense Exhibit -- I'll have to write this here.   Five and

24  six, 12 through 17, 18 through 24, 25 through 32, 33 through

25  38, 42 through 44, 46 through 50, are admitted.   Is there

1  any problem with that?

2          THE DEPUTY CLERK:  They're duplicative.

3          THE COURT:  They're duplicative?

4          THE DEPUTY CLERK:  There's some that are

5  duplicates.

6          THE COURT:  Okay.  We're not going to do it that

7  way, then.  We do not have two of the same thing.

8          MR. ITTLEMAN:  Okay.

9          THE COURT:  So you all -- I asked you for a list

10  at the beginning of this trial of all the stipulated

11  exhibits that I could read to the jury.  I've yet to get it.

12  And so we will have to go through this process until you

13  give it to me.

14          MR. ITTLEMAN:  Sure.

15          THE COURT:  So I'm taking it, then, that exhibit,

16  let's see, what was the last one up, my screen here is not

17  working and I had asked Sherri to please get a tech in here

18  so that we can get this fixed.

19      This is Exhibit 8 that you want to have -- is that the

20  last one you asked for?

21          MR. ITTLEMAN:  Well, 7 was admitted, I believe,

22  and now we're on 8.

23          THE COURT:  7.  Okay.  Is that the one that's up

24  now, right now?

25          MR. ITTLEMAN:  8.  Yes.

```
 1              THE COURT:  8 or 7?

 2              MR. ITTLEMAN:  8 is going to be up.

 3              THE COURT:  But is 7 up?

 4              MR. ITTLEMAN:  7 was already done.

 5              THE COURT:  So 8 was already admitted.

 6              MR. ITTLEMAN:  Okay.

 7              THE DEPUTY CLERK:  The last one tendered, Your

 8   Honor, was Defendant's 7.

 9              THE COURT:  Okay.  The last tendered was

10   Defendant's 7 and that is stipulated to be admitted.

11              MR. ITTLEMAN:  Now we're going to Defendant's 8.

12              THE COURT:  All right.  Thank you.

13              MR. ITTLEMAN:  More information provided by the

14   borrowers, correct?

15              THE WITNESS:  Yes.

16   BY MR. ITTLEMAN:

17   Q     This was faxed to your office, right?  Waycross

18   College?  You see that?  Page 4?

19   A     I see it's a fax.  Yes.

20   Q     Waycross College.  Do you see that?

21   A     Yes.

22   Q     November 30, you see that?

23   A     Yes.

24   Q     Prior to the sale date, right?

25   A     Yes.
```

```
 1   Q     Any information that's missing?

 2   A     Goal modified loan, gave me time to finance through

 3   other bank or sell to a qualified buyer.  It's missing the

 4   loan balance and the loan number.

 5   Q     Okay.

 6   A     So the loan balance we discovered later was around

 7   600,000.

 8   Q     Plaintiffs are providing you with a piece of paper

 9   that says the property is worth $700,000, right?

10   A     Yes, it does.

11   Q     Plaintiffs were providing you with a piece of paper

12   that says the loan amount is $525,000.

13   A     It says the purchase price of $600,000.

14   Q     Original loan amount.  You see that?

15   A     Yes.  But it completes with the purchase price, so I'm

16   kind of confused.

17   Q     Pretty valuable property, right?

18   A     I don't know.

19   Q     Exhibit 34.  Stipulated Exhibit 34?

20            THE COURT:  Well, which is it, counsel?

21            MR. ITTLEMAN:  Defense Exhibit 34.

22            THE COURT:  All right.  That is -- Exhibit 34

23   admitted by stip.

24            MR. ITTLEMAN:  Thank you.

25   BY MR. ITTLEMAN:
```

1  Q      Another non-lawyer from KEL.  Paralegal Marcia Morino,

2  right?

3  A      Yes.

4  Q      She works for you.  Right?  Events listing report?

5  A      Yes, she works as a paralegal.

6  Q      You're supervising her, correct?

7  A      She was being managed by Chris Hunt, who I was

8  managing, so yes, I was managing her, yes.

9  Q      Okay.  So she's talking about what she needs to do for

10 Tennessee law and you're not directly supervising her,

11 right?

12 A      I'm going to disagree with that.  That's not --

13 Q      Through Chris Hunt, isn't that right?

14 A      That's a two-part question.  The first question is, as

15 you said, she was giving legal advice and here she's just

16 requesting documents.

17 Q      Are you supervising her directly, yes or no, sir?

18 A      I supervise her through Chris Hunt.

19 Q      It's a yes or no answer.

20 A      No.

21 Q      To see if there's any possibility of having the sale

22 set aside.  You see that?

23 A      Yes.

24 Q      There's no right of redemption in the state of

25 Tennessee, right?

```
 1   A      No.

 2   Q      This is December 15.

 3   A      Hold on a second.  The answer you're asking me is

 4   not -- there's no right of redemption.  But if there was a

 5   problem with the sale docks or anything they did we could

 6   have looked into it, yes.  There's always going to be a

 7   problem.  It doesn't mean that it was handled

 8   inappropriately.  Let's say the sale wasn't happening

 9   appropriately, I can get that -- you are absolutely right,

10   there is no right of redemption in Tennessee.  But that has

11   nothing to do with -- that has nothing to do as far as

12   looking at some problems that exist.

13   Q      Please just answer the question.

14   A      Okay.

15   Q      I'm going to ask it again.  Isn't it true that there

16   is no right of redemption in the state of Tennessee?

17   A      Absolutely not.

18   Q      All right.  Event date, December 15, 2009, right?

19   A      Yes.

20   Q      Your law firm knew that my clients lost a property as

21   of December 15, 2009.

22   A      We knew a sale date occurred.

23   Q      You knew that my client lost a property as of

24   December 15.

25   A      I knew there was a sale date and we would have the
```

1 chance to get them the property.

2 Q    Never bothered to tell the client, though, isn't that

3 right?

4 A    The client asked us to modify.

5 Q    Clients had to find out themselves, isn't that right?

6 A    They called us and they -- we looked into it.  But we

7 assume the sale happened.

8 Q    Mrs. Hasnain had to go to the state of Tennessee to

9 get the deed to show that she lost the property herself in

10 January of 2010.  Even though she hired you to protect the

11 property in November of 2009.

12 A    She hired us to get a modification for her.  And your

13 last statement it showed that they hired also -- they wanted

14 to hire us to get a modification.  Not to stop the sale.

15 Q    Plaintiff's stipulated Exhibit 51.  Here's your

16 contract, sir.

17 A    Yes.

18 Q    Where does it say modification in this contract?

19 A    There's actually a second part to the contract you're

20 not showing.  No, not in here.

21 Q    Where does it say modification in the contract?

22 A    They were in a second part to the contract that

23 explains that we will try to get modifications for them.

24 The answer you're asking for is, we're helping them with

25 their commercial foreclosure act, defense work, and part of

```
 1   the defense work is to modify the loan.  Or to get the

 2   property back or to get a repurchase.  That is the defense

 3   we're talking about.

 4   Q    Sir, where does it say modification in this contract?

 5   A    It's included in the defense.

 6   Q    Did anyone ever bother to tell the plaintiffs of that?

 7   A    Actually, the plaintiff sent us their document on --

 8   it's on document 7 that you just showed me that they asked

 9   us to do a modification.

10   Q    You had Nathan Brown communicating with the clients.

11   You had no involvement in this whatsoever, did you?

12              THE COURT:  Counsel, multiple questions.

13   BY MR. ITTLEMAN:

14   Q    You had no involvement in this whatever during that

15   time, did you?

16   A    No.

17   Q    So you didn't know what Nathan Brown agreed to, do

18   you?  Because you had no involvement.

19   A    I read the contract.  I'm looking at the stuff that

20   exists, that we normally handle, the same with every client.

21   It's the same doc.

22   Q    You don't know what Nathan Brown said to the

23   plaintiffs, do you?

24   A    I don't have a clue what Nathan Brown said to the

25   client.  I know what he was instructed to tell clients.  But
```

```
 1  I don't know what he told them.
 2  Q     Defense Exhibit 38.
 3             THE COURT:  Is this admitted on stipulation?
 4             MR. WITHERS:  Yes, Your Honor.
 5             THE COURT:  Document admitted.
 6  BY MR. ITTLEMAN:
 7  Q     You have another paralegal in your firm, right, Miss
 8  Morino?
 9  A     Yes.
10  Q     She's talking to the attorney.  Right?
11  A     Yes.
12  Q     So you have a non-lawyer talking to the lawyer?
13  A     Yes.
14  Q     He stated that the only way for the clients to buy the
15  property back is for full price plus cost of fees and
16  expenses.
17  A     Yes.
18  Q     You have no documentation, do you, that that was ever
19  communicated to the plaintiffs?
20  A     Yes, we do.
21  Q     What documentation do you have that this was
22  communicated to the plaintiffs?
23  A     The letter your client sent back to me saying that he
24  didn't want to take the offer.
25  Q     He provided you with a counter offer, correct?
```

```
 1  A     No.  He said he did not -- he -- he -- in the letter
 2  itself it says directly that he received the offer from the
 3  bank and he wants us to counter offer.  You provided that
 4  document, you just showed it to me less than a half-hour ago
 5  that said that they were aware of the bank's offer, but they
 6  want us to offer them $500,000.  So, yes, I'm fully
 7  absolutely positive that your client was aware of the offer.
 8  Q    That's not my question, sir.  Listen to the question.
 9  A    You said do I have proof, yes, I have your letter.
10        THE COURT:  Gentle, people.  We aren't here to
11  have a war with each other.  We're here to try to present
12  the jury with facts so that they can come to an informed
13  decision.
14     Now, let's see what the question was.  I'm not getting
15  my service people in here to straighten out my computer.
16  The question was, he provided you with a counter offer.
17  Correct?
18        MR. ITTLEMAN:  Do you want the original question,
19  Your Honor, if I may?
20        THE COURT:  Do you want to repeat it?  Yes, you
21  may.
22        MR. ITTLEMAN:  Thank you.
23  BY MR. ITTLEMAN:
24  Q    Stipulated Exhibit 38, conversation occurring between
25  the paralegal of your office, who's not a lawyer, and
```

```
 1  Mr. Stein, who's already took the property away from my
 2  clients, right?
 3  A     Actually, that's the attorney's notes.  Here, you're
 4  mistaken.  This wasn't done.  The K.A. attorney is writing
 5  notes.
 6  Q     Okay.  K.A., that's Kerry Adams, right?
 7  A     Yes.
 8  Q     Another lawyer at the KEL law firm?
 9  A     Yes.
10  Q     Who's not licensed to practice in Tennessee?
11  A     Exactly.
12  Q     The only way for the client to buy the property back
13  is for full price plus cost of fees and expenses?
14  A     Yes.
15  Q     And you didn't send one letter to the plaintiffs
16  telling them that the only way to buy this property back
17  from the bank was for the full price plus cost of fees and
18  expenses, do you?
19  A     I don't understand the question.  What is it now?
20  Q     I'll rephrase it.
21        You don't have one letter in your file that you ever
22  communicated the fact that the bank was telling you that the
23  only way for the plaintiffs to get their property back would
24  be to pay the full purchase price plus whatever cost of fees
25  and expenses there were?
```

```
 1  A      I don't have a letter in my file.

 2  Q      And you were supervising Miss Adams, right?

 3  A      Yes.  But I'm not aware that she didn't make a phone

 4  call.  I'm aware that the client was aware that the offer

 5  was given.

 6  Q      Show you Defendant's Exhibit 46.  Offer into evidence

 7  Defense Exhibit 46.

 8              THE COURT:  46?

 9              MR. ITTLEMAN:  46.  Yes, ma'am.

10              THE COURT:  I understand there will be no

11  objection to that.  46 will be admitted.  No objection.

12              MR. WITHERS:  Yes, Your Honor.  We will stipulate

13  to the entry of all the defense exhibits.

14              THE COURT:  But I have to go through this one by

15  one because you can't tell me which ones are duplicative and

16  which are not.  Go ahead, Mr. Ittleman.

17  BY MR. ITTLEMAN:

18  Q      $540,000 settlement offer.  Exhibit 46.

19  A      Yes.

20  Q      Doesn't talk about financing, does it?

21  A      The financing was in the other document that you sent

22  us.  That you provided me.

23  Q      Does this exhibit talk about financing, yes or no?

24  A      This is a follow-up on another offer.  I had sent an

25  offer for settlement.  The KEL attorneys will do strong
```

1  bargain.  So this a -- this talking about another offer.

2  Q     Right, because they wanted to negotiate.  Right?

3  A     I don't know what they want to do.  All I know is that

4  this is a document that references your past document.  What

5  it had, they're requesting -- they're requesting 45 days to

6  get financing and everything.  This document replies on the

7  other document.

8  Q     You're supervising what's going on during the

9  negotiations after you lost their commercial property,

10 right?

11 A     I didn't lose their commercial property.  We were

12 negotiating afterwards.  He lost his property.  I did not

13 lose his property.

14 Q     And the offer is $540,000?

15 A     That is the second offer.  His first offer was

16 $500,000, this is the second offer of 540.

17 Q     And there's nothing in here that talks about

18 financing.  Right?

19 A     It replies to another document that I don't know

20 about.  You haven't shown me the other document.

21 Q     Does this letter discuss financing, yes or no?

22 A     It doesn't discuss -- it discusses the other offer.

23 Q     Does it discuss financing, yes or no?

24 A     No.

25 Q     So you don't know how much money they could have come

1  up with, do you?

2  A     Do I know how much money they could have come up?

3  Absolutely not.  I don't know what they could come up with.

4          MR. ITTLEMAN:  No further questions.

5          THE COURT:  All right.  Thank you.  Redirect

6  examination.

7                    REDIRECT EXAMINATION

8          MR. WITHERS:  Thank you, Your Honor.

9  BY MR. WITHERS:

10  Q     Mr. Kaufman, at the risk of being somewhat repetitive,

11  I'd like for you to describe the sequence of offers and

12  counter offers that were made from KEL to Fifth Third Bank

13  or the attorney, and go through that for the jury so we're

14  clear on what actually happened.

15  A     Well, in January --

16          MR. ITTLEMAN:  I'm sorry.

17          THE WITNESS:  Is he standing up to object or

18  walking away?

19          THE COURT:  Are you objecting?

20          MR. ITTLEMAN:  No.  I was going to hand him his

21  exhibits.

22          THE COURT:  Okay.

23          MR. WITHERS:  Thanks.

24          THE COURT:  Did you ask about a particular --

25          THE WITNESS:  Sorry.  The question was, is what is

```
 1   the sequence of offers and --
 2   BY MR. WITHERS:
 3   Q     Counter offers and responses from the bank.
 4   A     Right.  Around I guess the middle of January, I don't
 5   recall the date, I would have to see it, we were able to
 6   contact the bank and get him --
 7           MR. ITTLEMAN:  I'm going to object to this -- any
 8   narrative answer to his question -- there's a document that
 9   they want to show, I mean, this is a leading narrative type
10   of answer to a leading question, Your Honor.
11           THE COURT:  All right.  Counsel, I will ask you to
12   ask this in a series of questions.  What was the first, what
13   was the second.  What happened, that sort of thing so that
14   opposing counsel can have fair opportunity to object.
15   BY MR. WITHERS:
16   Q    We're going to ask you the question, first of all,
17   Mr. Kaufman, what was the initial offer made by -- the
18   initial offer in this repurchase negotiation?
19   A    We contacted the -- we contacted Fifth Third and they
20   very quickly gave us an offer of what they put into it.
21   What the expenses were, what the costs, what the interest,
22   it was around 611,000.  That was the total they had in after
23   not getting paid interest, revenue, a bunch of stuff, that
24   they had in there that they -- because they hadn't been paid
25   in almost 20 months.
```

```
1   Q    All right.  And Mr. Ittleman showed you Exhibit 16, I
2   think, which is the e-mail response from Mr. Stein or the
3   report from, I'm sorry.  I mischaracterized it.  The report
4   from Miss Adams regarding her conversation with Mr. Stein
5   about redemption.
6   A    Could you show that?  I wish I could memorize these
7   documents but I just can't.
8   Q    Understood.
9        These are out of order so bear with me a moment while
10  I try to locate it.
11       This is always embarrassing, Your Honor, when this
12  happens.  But I apologize to the Court.  Here it is, the
13  number, referring to Defense Exhibit 38.  Mr. Kaufman, was
14  that information communicated to you?
15  A    Yes, it was.
16  Q    Did it give you any indication of how the Hasnains
17  could have reacquire the property?
18            MR. ITTLEMAN:  Objection; calls for speculation.
19            THE COURT:  The witness is an active attorney in
20  this case, and he may testify as to what he did and why, and
21  so he may testify if he -- I'm still unclear if he knew this
22  at the time.
23            MR. WITHERS:  Yes, he did.
24            THE COURT:  What he decided to do and why he
25  decided to do it.
```

```
 1  BY MR. WITHERS:
 2  Q    Mr. Kaufman, on January 12, 2010, were you aware of
 3  the information that's contained within this excerpt from
 4  the database?
 5  A    Either that day or the next day, but yes, I was aware
 6  of it.  I was pleased.
 7  Q    Would you read it to us, please, sir?
 8           THE COURT:  Well, counsel, it should be up here.
 9  We don't need that.
10           MR. WITHERS:  Okay.
11  BY MR. WITHERS:
12  Q    Mr. Kaufman, did you have any reason to doubt that the
13  bank, the bank statement contained within this note?
14           MR. ITTLEMAN:  Objection, your Honor.  It's
15  speculation.
16           THE COURT:  You may answer yes or no.
17           THE WITNESS:  I thought it was accurate.
18  BY MR. WITHERS:
19  Q    And, sir, was that reflected of the negotiations that
20  the firm had had with the bank?
21           MR. ITTLEMAN:  Objection, Your Honor.
22           THE COURT:  I beg your pardon?
23           MR. ITTLEMAN:  Leading.
24           THE COURT:  He may answer.
25           THE WITNESS:  Yes, that's exactly what we were
```

```
 1   trying to do.  We were trying to get him the value of the
 2   property.  That was his goal.  He wanted the property.  And
 3   he owed money on the property and we got them after the sale
 4   to agree to a repurchase.  I mean, that's a win.
 5   BY MR. WITHERS:
 6   Q     Sir, was the bank under any obligation to allow a
 7   repurchase?
 8   A     No.  The -- to be -- the two original missed payments
 9   was an automatic breach of the contract and it accelerated
10   the mortgage.  And note.  That said, they could collect all
11   the money immediately.  And, yes, they were in breach in
12   August of '08.
13         MR. ITTLEMAN:  Your Honor, this is expert witness
14   testimony.
15         THE COURT:  I disagree.  He may answer.
16         THE WITNESS:  They were absolutely in breach of
17   the contract.  They didn't comply to the contract and that's
18   what the mortgage was.  And that they had a right to
19   foreclose.  And when they foreclosed, it was our duty to
20   negotiate with them to get them the deal.  And we did.  We
21   got them an offer and was the offer was less than six weeks
22   after they hired us.
23   BY MR. WITHERS:
24   Q     Mr. Kaufman, did KEL any time have an obligation to
25   pay the mortgage?
```

```
 1   A      No.
 2   Q      Was Kaufman Englett and Lynd responsible for the
 3   Hasnains and the Learning Connection being 17 months behind
 4   in their payments when they first came to you?
 5   A      No.
 6   Q      Was the bank obligated to accept their $500,000 offer?
 7   A      No.  They were in breach.
 8   Q      Was the bank obligated to accept their $540,000 offer?
 9   A      No.
10   Q      Did the bank state what its terms were?
11   A      The bank made it very clear in all of our negotiations
12   that they would only accept the full price that they were
13   owed, which was around $611,000.  It wasn't 520, it wasn't
14   540, it was $611,000, and they never gave us any number
15   different.
16   Q      When was the law firm actually hired?
17   A      We were hired on December 2nd, in the contract it
18   says, it said based on when we got paid.  We had a check
19   that was cleared in on December 2nd, which was 7 days before
20   the sale.
21   Q      All right, sir.  And so at the time of the
22   communications that counsel asked you about between Nathan
23   Brown and the Hasnains occurred, were they even clients of
24   the firm?
25   A      On December 2nd they were.  He showed me some e-mails
```

1   where Nathan was still trying to get documents, but before

2   that, they were just preliminary clients.

3   Q       All right, sir.

4           During this time were the paralegals -- what

5   limitations were placed, if any, on the paralegals' ability

6   to communicate with clients?

7   A       The firm is split up.  There's an intake division

8   where they collect docks and they get the contract.  And

9   they collect whatever they can in the initial package, and

10  then it goes to the data entry.  They put the information in

11  and then the lawyers and their paralegals get it.  But the

12  paralegals don't handle anything until they become an actual

13  client.  We're not hired.  We haven't taken responsibility

14  for the case.

15  Q       All right, sir.  Now, Mr. Ittleman asked you about the

16  deadline that was included in the e-mails from our client,

17  from our paralegal requesting a -- requesting documentation

18  by a certain date.  Do you recall that testimony?

19  A       Yes, I do.

20  Q       Is that the normal procedure of the law firm?

21  A       Yes.  We have -- our clients sometimes are not very

22  responsible, and forcing them to get us documents is the

23  biggest problem because then you have to get new documents

24  when these expire because the bank has certain rules on what

25  types of documents to get.  So we always split -- we always

1  have an expiration date.  It will say please provide us by

2  the 15th or 10 days or 7 days.  In fact, we even have

3  automated e-mails now that go out to constantly remind

4  clients because we can't represent them unless we get the

5  documents.  We can't go to court, we can't litigate it, and

6  it very difficult for us to be able to represent a client

7  who doesn't provide us with the documents.

8  Q     All right, sir.  And was that the situation in this

9  case?

10  A     Yes.  Absolutely.  There's no hard and fast date on

11  the 15.  I mean, Tennessee, the property was sold, now the

12  goal is to negotiate it.

13  Q     Now, Mr. Kaufman, counsel asked you for what you

14  thought about an ethical situation.  So I think Your Honor

15  that despite the Court's --

16         THE COURT:  Ask the question.  I'll hear it.

17  BY MR. WITHERS:

18  Q     Mr. Kaufman, do you have an opinion as to whether it

19  would have been ethical for the law firm to file a lawsuit

20  seeking an injunction to stop the foreclosure sale?

21         MR. ITTLEMAN:  Objection, Your Honor.  It's beyond

22  the scope of this witness's --

23         THE COURT:  Overruled.

24         THE WITNESS:  Yes.  No.  Based on the rule of law,

25  based on everything that we followed, based on those five

```
 1  things I brought up with you, he was not entitled to that
 2  injunction.  Now, whether some chancellor might say, well,
 3  I'll take a look at it, that's not the test.  The test is
 4  whether they comply and I'm paid to follow the law.  They do
 5  not get to buy my integrity.  They don't get to buy my
 6  morals.  They don't get to buy my services to violate the
 7  law.  And in this case, it was determined that he was not a
 8  good candidate for litigation.
 9  BY MR. WITHERS:
10  Q     Well, sir, would it have been appropriate, ethically
11  speaking, to -- for the firm to have filed suit to buy time?
12  A     No.  You have to have a legal purpose.  Delay is not
13  it.  I could be suspended.  I could be disbarred.  I could
14  be, you know, sanctioned.  In the state of Tennessee, we
15  could be fined 6 percent of the actual judgment, which would
16  be $30,000 for doing it.
17  Q     All right.
18  A     There are rules, and we have to follow them.
19  Q     And do you believe that the firm followed those rules
20  in this case?
21  A     One hundred percent.
22  Q     Sir, you heard the testimony yesterday of Mr. Cain as
23  it related to the ethical matters.  Ethical issues.
24  A     Yes.
25  Q     Under the Tennessee ethics code.
```

```
 1   A      Yes.
 2   Q      Do you have an opinion as to whether his testimony as
 3   to what he thought should have been done would have
 4   comported with those ethical rules?
 5   A      His testimony that he would stretch it, that he
 6   believes he could stretch this issue, he could walk on the
 7   line but he said that when we cross-examined him, he made
 8   clear that only one area of the five he might be able to
 9   file under and that would be a stretch.  He would be
10   redefining a legal term.
11          MR. ITTLEMAN:  I'm going to object to this.  This
12   goes beyond the scope of the ethical issue.
13          THE COURT:  Well, I'm going to allow the witness
14   to -- the witness testimony to stand.  But you are going
15   right to the edge.
16          MR. WITHERS:  I will back up from it, Your Honor.
17   BY MR. WITHERS:
18   Q      Mr. Kaufman, in retrospect, do you believe that the
19   firm could have done anything different for the Hasnains
20   within the law, within the ethical rules than what it did?
21   A      Not a thing.  Within the six weeks of being hired, we
22   got him his deal.  Six weeks.  I don't know how any firm
23   could do better than that.
24   Q      All right, sir.
25          MR. WITHERS:  No further questions for this
```

1  witness, Your Honor.

2          THE COURT:  All right.  Thank you.  Mr. Kaufman,

3  you may step down.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  Your next witness?

6          MR. WITHERS:  Your Honor, we will have no other

7  witnesses.  We would like to move our exhibits into

8  evidence.  What I would propose is that if the Court would

9  allow us to prepare that list you asked us to prepare on

10  Monday during the lunch break so we can make sure there's no

11  duplicates admitted.  We would like to have all our exhibits

12  admitted.

13         THE COURT:  All right.  The defense rests.  I'll

14  let you do that over lunch.  Is there going to be rebuttal?

15         MR. ITTLEMAN:  Rebuttal?

16         THE COURT:  Evidence.

17         MR. ITTLEMAN:  No.

18         THE COURT:  Plaintiff, no rebuttal?

19         MR. ITTLEMAN:  No.

20         THE COURT:  All right.  Well, it's quarter of 12.

21  That's good news.  We're pretty much on time.  I'm going to

22  work with them a little bit.  Why don't you all take lunch

23  to 1:15.  I think we'll get this case presented to you

24  today.  We'll go into closing arguments and I'll do some

25  matters out of your presence, and then you will get to

```
 1  retire to begin your deliberations.  So have a nice lunch.

 2           (Jury out for luncheon recess at 11:43 a.m.)

 3           THE COURT:  Do you want reassert your motion?

 4           MR. WITHERS:  Yes, Your Honor.  I'd like to move

 5  for a directed verdict.  You have now heard the testimony of

 6  Mr. Hasnain as to when he had knowledge of the issue of the

 7  potential that there was a problem that maybe we had dropped

 8  the ball or done something wrong.

 9           THE COURT:  Well, his testimony was it was in

10  June.  So I will deny the motion unless you have any other

11  new ground, but I'm just trying to take care of it.

12           MR. WITHERS:  It seems -- Your Honor, it seems to

13  me that his testimony relative that letter and its content

14  is -- should be --

15           THE COURT:  You know -- I thought you were going

16  to finish more quickly.  Go ahead.

17           MR. WITHERS:  I'm finished.

18           THE COURT:  No.  I want you to -- I'm afraid she

19  didn't get the last -- I thought you had finished and I

20  jumped in.

21           MR. WITHERS:  Your Honor, I would respectfully

22  argue that his testimony regarding the letter of

23  January 10th, 2010, indicates and proves that he had

24  knowledge that something had gone wrong, that we hadn't done

25  what he had expected us to do, and I submit to Your Honor
```

1  that under Tennessee law that is sufficient to invoke the

2  running of the statute of limitations.

3          THE COURT:  All right.  Considering his testimony,

4  it appears to me at this juncture that I will be walking

5  into the area of making a determination of fact on

6  conflicting evidence, and for that reason, I will deny the

7  motion.

8      Is there anything else before I let you all get this

9  final list to me and you got the jury instructions, is there

10 anything else with them?

11         MR. WITHERS:  They appear to be satisfactory to

12 us, Your Honor.

13         THE COURT:  All right.  Mr. Ittleman?

14         MR. ITTLEMAN:  We're fine.

15         THE COURT:  All right.  So you made arrangements

16 for Sherri for your notices?  For your final argument?  For

17 closing argument?

18         MR. WITHERS:  Yes.

19         THE COURT:  Everybody's set?

20         MR. ITTLEMAN:  Yes.

21         THE COURT:  So A little before 1:15, you need tell

22 Sherri you're ready to give me this list so I can look it

23 over.  And then I'm going to read that to the jury and then

24 ask you both if you now rest.  And you will answer yes, I

25 hope.  Otherwise, I'm not going to give you another chance.

```
 1   I'll just read it, and then we'll get the podium, we will

 2   get the podium set up, Sherri, over the lunch break.  Okay?

 3   All right.  Anything else before we adjourn for lunch?

 4            MR. WITHERS:  I don't think so Your Honor.

 5            THE COURT:  All right.  We will see you then a

 6   little before 1:15 p.m.

 7              (Recess for the staff at 11:46 a.m.)

 8            THE COURT:  We will take care of these preliminary

 9   matters and then --

10        All right, gentle people.  Do you have the stipulated

11   list?

12            MR. WITHERS:  We do, Your Honor.

13            THE COURT:  Of the exhibits -- Does Sherri have

14   it?

15            MR. WITHERS:  She has the exhibits, Your Honor.

16            THE COURT:  Do you have the list, too?

17            MR. WITHERS:  I have the list.

18            THE COURT:  I need the list to read.  Okay.  Are

19   these defendant's exhibits or plaintiff's exhibits?

20            MR. WITHERS:  They are our exhibits.

21            THE COURT:  Defendant's.

22        All right.  You have seen this, Mr. Ittleman?

23            MR. ITTLEMAN:  Yes, ma'am.

24            THE COURT:  Okay.  And it's agreeable?

25            MR. ITTLEMAN:  Yes, ma'am.
```

```
 1            THE COURT:  All right.  Now, Sherri tells me and
 2    I've noticed as you put these documents on the Elmo that
 3    there is writing on them and highlighting and she tells me
 4    that you have agreed that that is okay to put them in that
 5    way, is that correct, Mr. Ittleman?
 6            MR. ITTLEMAN:  Yes, ma'am.
 7            THE COURT:  Mr. Withers?
 8            MR. WITHERS:  Yes, Your Honor.
 9            THE COURT:  Okay.  We're set.  Podium is set.
10       Time is set.  We're ready for the jury.
11                    Jury present -- 1:15 p.m.
12            THE COURT:  Ladies and gentlemen, the parties have
13    stipulated that the following exhibits of the defendants
14    will be admitted, that is Defendant's Exhibit 6, 42, 43, 44,
15    and 47.  Correct, Mr. Ittleman?
16            MR. ITTLEMAN:  Yes, ma'am.
17            THE COURT:  And Mr. Withers?
18            MR. WITHERS:  Yes, Your Honor.
19            THE COURT:  All right.
20       Ladies and gentlemen, we are at the final phase of the
21    proceedings and let me make sure that there is no more
22    evidence, Mr. Ittleman, is there any further evidence to be
23    presented?
24            MR. ITTLEMAN:  No, Your Honor.
25            THE COURT:  And Mr. Withers?
```

1           MR. WITHERS:  No, Your Honor.

2           THE COURT:  Okay.  So now we are going to have the

3    presentation to you of the attorneys' closing arguments.  I

4    have given each side up to 45 minutes for closing argument.

5    The plaintiff has reserved 20 minutes of that to come back

6    following the defendant's argument to give rebuttal

7    argument.  The defendants do not get another opportunity to

8    get up and speak to you, so it's the plaintiffs, defendants

9    and then plaintiff comes back with a rebuttal argument.

10          And again, let me caution you that you are the triers

11   of facts and sometimes in the passion of the moment the

12   attorneys will argue things that you don't think was in the

13   evidence or that you don't think ought to be interpreted

14   that way, that is your function to make the determination of

15   the evidence and how it should be interpreted.

16          I know attorneys avoid doing that.  If it happens,

17   there are often objections and so forth that I have to rule

18   on but sometimes that does happen.

19          Following the closing arguments, I will give you

20   instructions on the law.  And it's my hope after I hear if

21   there are objections that I can give you each a typewritten

22   statement of what I read to you.  But I have to charge you

23   orally so I'll try to get that fixed up after I finish.  You

24   can probably start your deliberations before I get to that

25   point and then you will retire to begin your deliberations

1   as a jury.

2       So we will begin with the closing argument on behalf of

3   the plaintiffs by Mr. Ittleman.

4           MR. ITTLEMAN:  Thank you, Your Honor.

5       Mr. Withers, Good afternoon.

6       First of all, we want to thank you, all of you.  I see

7   that you, all of you have taken copious notes during the

8   trial, we appreciate the time spending away from what you do

9   on a daily basis, and spending time considering this case in

10  the past three days.

11      I want to talk to you a little bit about the role of a

12  lawyer.  An attorney is a counselor; an attorney is a

13  advocate.  As a lawyer, you're supposed to be providing your

14  clients with proper legal advice.  Communication and

15  providing your clients with that proper legal advice is

16  essentially.  That's what lawyers do.  Clients put their

17  faith and their trust in their lawyers, lawyers have

18  important obligations to make sure that their client's needs

19  are being satisfied.  The Learning Connection, Inc. is a

20  plaintiff in this case.  They were desperate for legal

21  representation.  They were trying to make payments on a loan

22  for their commercial property, but Fifth Third Bank was

23  refusing to accept its payments.  A notice of foreclosure

24  was sent out by Fifth Third Bank to the Learning

25  Connections.  You heard testimony from our expert witness,

1   Trey Cain, he is a licensed attorney in the state of

2   Tennessee, he's been tendered as an expert witness in

3   wrongful foreclosure actions and in foreclosure defense

4   actions.

5       Mr. Cain testified that the Learning Connection had a

6   ridiculously short amount of time, three weeks, to save

7   their commercial property from the time that Fifth Third

8   Bank sent them the notice to the time of the commercial

9   sale.  Something had to be done, and it had to be done fast.

10  The Learning Connections would be unable, under Tennessee

11  law, to redeem or take back their property after the sale

12  date for December 9.  It was even more important that

13  something had to be done, and it had to be done fast, and it

14  had to be done thoroughly.  Learning Connections tried to

15  resolve the matter themselves, but they couldn't do it.

16  They knew that the sale was occurring in three weeks.  There

17  was not much time.  They reached out to a law firm that

18  markets themselves as a national foreclosure defense law

19  firm, specializing in foreclosure defense matters throughout

20  the country.  The KEL attorneys.  Mr. Kaufman, however, is

21  the only licensed attorney in the state of Tennessee in the

22  entire law firm.

23      Forty lawyers in this law firm you have one person

24  who's licensed to practice law in the state of Tennessee.

25  The Learning Connections put their trust in what they

1  believed that the KEL attorneys were telling them.  They put

2  their faith and trust in the defendants.  And the defendants

3  breached the trust that the Learning Connections gave them.

4  Their conduct was professional malpractice.  Their conduct

5  is conduct that fell below the standard of care in the

6  Tennessee community as testified to by Trey Cain, our

7  expert, they have no expert to refute what Mr. Cain has

8  testified to as to what was required to be done.

9       Going back to what happened.  The Learning Connections

10  reached out to the KEL attorneys on November 25, 2009, they

11  spoke to the KEL attorneys intake guy, Nathan Brown, not a

12  lawyer, Mr. Brown is sending them information that's

13  incorrect.  Default judgments, what happens if you don't

14  respond to a complaint, none of which applied.  We're in

15  Tennessee.  We're not in Florida.

16       The law firm acted like we were in Florida but we're

17  not.  We're in Tennessee.  Tennessee procedure is that the

18  bank doesn't have to file a lawsuit.  Yet, the response from

19  Mr. Brown says that if you don't file a response to the

20  lawsuit, you're going to be in default.  That's not right.

21  That's not correct.  This happened on November 25, 2009.

22  The standard of care between November 25, 2009, to

23  December 9, 2009, was woefully insufficient.  It was not

24  met.  What should have been happened at the time of the

25  telephone call from my clients to the KEL attorneys, the KEL

attorneys were aware that this property was located in the
state of Tennessee, Mr. Kaufman should have got on the phone
with them immediately.  He should have told them what the
procedure is in the state of Tennessee.  The procedure is
you obtain the financial information, number one.  You reach
out to the bank, if you could work something out, fine.  If
not, you have the financial information.  There's no
question that my clients had the ability to pay, you heard
evidence from Mr. Piedra, they had no expert to refute any
of it.  The expert witness, the expert testimony from
Mr. Piedra is clear.  This a profitable commercial property
in the state of Tennessee.  Prime real estate.  The parents
who were sending their children to this daycare center were
all professionals.  They would drop their children off and
they would go to work.  This daycare center was licensed to
have 99 children.  Each child, okay, was required to pay per
week to the Learning Connections.  The revenues and the
stream of income is something that was the reason that
Learning Connections purchased the commercial property in
the first place.  You heard the evidence from Mr. Hasnain
and Mrs. Hasnain.  They both told you that's why they
purchased this property.

    Going back to what should have been happened.  Starting
on November 25, Nathan Brown never should have been in the
picture and if he was in the picture, he should have said,

1    Mr. Kaufman, we need your assistance, and we need it now.

2    We have an emergency situation.  There's a fire and it needs

3    to be put out.  What is the emergency?  We have two weeks to

4    make sure that these people that they are putting their

5    trust in this law firm that we do everything that we can to

6    make sure that our clients don't lose this property.  And if

7    they decide not to use our law firm, fine.  But we need to

8    tell them right away what the procedure is.  One,

9    communicate with the clients.  Tell them what the procedure

10   is.  Every client wants to know what the procedure is.  They

11   put their trust in their lawyers to make sure that their

12   lawyers are telling them what the procedure is to make sure

13   that they can save whatever it is that they're hiring these

14   lawyers to do.

15       The Learning Connections put their trust in the KEL

16   attorneys and Mr. Kaufman to tell them what to do.

17       They failed in that regard.  They failed to advise the

18   Learning Connections what the procedure is.  They failed to

19   advise the Learning Connections what to do.  The second

20   prong as to the standard of care when you're faced with

21   these circumstances in the state of Tennessee is to provide

22   the proper financial documentation.  It's not to tell your

23   client to understate their income and earnings.  It's to

24   tell your client you need to provide us with accurate

25   financial information so we can file a lawsuit to stop the

1    sale as a last resort.  As a first resort, we are going to

2    try to negotiate with the bank.

3         This is the procedure, there is no question.  You heard

4    testimony from the experts, the testimony is undisputed.

5    What did we hear from the defendants?  We heard that

6    Mr. Kaufman who's the only licensed practicing attorney in

7    the state of Tennessee had no idea what was going on from

8    November 25, 2009, to December 9, 2009, with regard to my

9    clients.  He was not copied on any of the e-mails.  The

10   e-mails were requesting this vague financial information.

11   In fact, the law firm told my clients to understate the

12   amount of money they had so they could obtain a loan

13   modification.  A loan modification, however, is not the

14   standard of care in Tennessee.  The standard of care is the

15   bank has all the power.  In order to make sure that there's

16   a level playing field, the lawsuit to stop a foreclosure has

17   to happen.  That's what you heard from the expert Trey Cain.

18        Not only did nothing happen between November 25 and

19   December 9, 2009, but there was absolutely no communication

20   from Mr. Kaufman to either one of my clients or the company

21   explaining the procedure, explaining the ramifications for

22   not filing the lawsuit to stop the foreclosure sale.  They

23   want you to believe that the scope of their representation

24   was limited to modification.  Where is that?  Where is that?

25   My clients had the reasonable expectation that they were

1  going to follow Tennessee law and the defendants woefully

2  failed in that regard.

3      They want to tell you about ethics.  And then they want

4  to tell you that it's ethical to represent to a client that

5  they should understate their income?  And then they want to

6  tell you that the clients didn't have the ability to pay

7  because they missed these payments that the bank wouldn't

8  accept, and then they want to turn around and tell you,

9  well, in actuality, the plaintiffs were offering $540,000

10 after the commercial property had already sold because my

11 clients had no idea what the law was in the state of

12 Tennessee.

13      That's called "attorney malpractice."  That's called

14 not following the standard of care in Tennessee.

15      The conduct of having all these non-lawyers at KEL

16 running around and Mr. Kaufman having no idea what's going

17 on with his file, a multimillion dollar problem that my

18 clients had with two weeks to resolve the problem is called

19 "negligence supervision."  Mr. Kaufman has an obligation as

20 the only licensed attorney at that law firm in the state of

21 Tennessee to supervise those who are working on this file.

22 He failed in that regard.

23      You heard the evidence from the expert CPA.

24 Mr. Piedra.  There's no question that this company had the

25 ability to pay their mortgage.  There's no question based on

the expert testimony from Trey Cain and Trey Cain is an
expert in wrongful foreclosure matters.  That was a wrongful
foreclosure in the opinion of Trey Cain.  There's no
question that they had the ability to pay their mortgage.
The income stream from the daycare center was more than
sufficient to pay a lot of different things, and to allow
them to and to allow my clients to live off that income, as
well.

Mr. Piedra provided you with how he got to the damages
he got to.  As a result of the defendant's malpractice, and
as a result of attorney Kaufman's negligent supervision on
this file, my clients lost their livelihood.  They lost
their commercial property.  They lost their business.  They
lost their revenue stream.  They lost their income.

How much did they lose?  You heard it from Mr. Piedra.
The number is $784,360.  According to Mr. Piedra, he was
conservative.  It probably is a lot more but Mr. Piedra was
conservative.

The Court's going to instruct you what the law is on
professional malpractice, and the Court's going to instruct
you as to what the law is on negligent supervision.  We hope
that after you deliberate, that you find that this law firm
needs to understand that when they accept representation of
a client that they need to do their job.  And we would ask
for a judgment of 784,000.  Thank you.

1          THE COURT:  Thank you, Mr. Ittleman.  Rebuttal of

2    20 minutes is preserved.

3          MR. KAUFMAN:  May it please the Court.

4          THE COURT:  Yes.  On behalf of the defendant,

5    Mr. Kaufman.

6          MR. KAUFMAN:  Yes, Your Honor.

7       Good afternoon.  As you know my name is Jeff Kaufman.

8    I'm the founding partner of Kaufman Englett and Lynd.  I was

9    the Tennessee attorney proudly in charge of this case.

10         First off, I'd like to apologize to you.  There are

11   times that attorneys get heated and they act in ways that if

12   they actually saw carers in themselves, they would be pretty

13   disappointed.  And I know in this case I can look back and

14   pick a couple times I allowed myself to get agitated, and I

15   probably should have hold myself in check, and I do

16   apologize for that.  This is a very interesting situation

17   being the attorney and the defendant at the same time.  And

18   sometimes you allow that to get to you, and I apologize

19   again for that.

20         What I don't apologize for is one number.  It's a

21   number I want you to remember.  42.  That's how many days

22   from the time I got hired that I was able to provide them

23   with their deal.  Now you can do the math if you want,

24   that's six weeks.  Six weeks from the point of hiring that

25   my team, my paralegals, my attorneys secured an offer for

1   the total amount they owed.  He didn't want to take it.  He

2   turned it down.  That's the testimony.  And when on the

3   stand is asked why he turned it down, he claimed he wasn't

4   responsible, it was the Gentrys, if it wasn't for the

5   Gentrys we would have been okay.  If they signed that

6   forbearance agreement and I'm not going to pay for late fees

7   and I'm not going to pay all these things because it was the

8   Gentrys and not me.  This case is about blame.  And nothing

9   else.  We were hired, we got them the deal.

10      Successful case, success.  We should all be happy.  We

11  shouldn't be here.  But the client chose not to take the

12  deal because he didn't want to pay in full.  He wanted to

13  pay $500,000.  That was the original offer.  He counter

14  offered at 500 and the bank said we're not going to do that.

15  He counter offered at 540.  The bank didn't want to do that.

16      So who didn't take the offer?  My law firm didn't

17  cancel the offer.  My client did.  He's the one who refused

18  to take the deal.  That's what he wanted.  Blame is a very

19  interesting thing.  Who is responsible for his issues?  Now

20  if you followed this trial very closely you will discover

21  everyone else other than the plaintiff was responsible for

22  his problems.

23      Our corporation got dissolved.  Well, that was the

24  attorney who didn't file the documents.  We got a

25  forbearance agreement, eight months -- nine months

1  afterwards.  The bank gave it to him.  Here, take your
2  forbearance agreement, but their partners couldn't sign.
3  They didn't give us a reason.  They were sick.  Well, that
4  is not my issue.  He testified that everything would have
5  been fine if his partners would have done what they needed
6  to do.  But they didn't do it, and we don't know why.  We're
7  told, well, they're sick.  Well, how could they have gotten
8  power of attorney?  Could they have done anything?  No
9  testimony, just they were sick.  One person was injured, one
10 wasn't, we don't know.

11     They're shut down by the Department of Health.  Whose
12 fault is that?  Not theirs.  That was, that was the people
13 working for us.  We have kids walking the streets but those
14 are the people working for us.  That's not us.  We're not in
15 charge.  Wait, hold on, you are in charge.  The same way
16 they're trying to hold me responsible for my people, they're
17 responsible for theirs, they're responsible for their
18 partners, they're responsible for their employees, so when
19 all this failed, who was to blame?  I don't know.  We'll
20 blame the employees, we'll blame the attorney that didn't
21 file the documents.  Well, who's to blame for not filing
22 their taxes?

23     Now that's really big issue.  Expert testimony.  You're
24 going to get an instruction that an expert should be
25 considered the same as anybody else who testifies.  You

1   can't give them more credence.  Now all you have to do to

2   qualify as an expert is say, well, I do this and the judge

3   allows it, and it gives us an opportunity to question him.

4        Now their legal expert that they called they said in

5   foreclosure defense he was an expert.  They didn't say he

6   was an expert in commercial foreclosure defense.  And that's

7   what we're doing here.  This isn't a private residence.

8   This a business.  There are different rules.  And when asked

9   how many cases he had handled dealing with a commercial

10  defense foreclosure what did he say?  Two.  Two total cases.

11  Now he wasn't qualified as a commercial foreclosure but he

12  was on the foreclosure and he was supposed to know some

13  stuff.  Now he said everything he would do when they called

14  him originally.  And what happened?  We get the opportunity

15  to question him and to dispute what he has to say.  So we

16  ran over the five things that I ran over with you.  I

17  created that we have this cute little thing PF Chang MS.

18  Paid in full.  Was the loan paid in full?  Their witness

19  said no.  I can't use that one.  Fraud, no.  Can't use that

20  one.  Statute of limitations, no, can't use that one,

21  mistake, no, I can't use that one.  And then the last one

22  dealt with consideration.  When there has been a total

23  failure of consideration, a total failure of consideration.

24  Now, I explained what consideration was to you.

25  Consideration means that when you sign the loan you get the

1   money to use for the property.  Consideration doesn't mean

2   that they didn't accept payments later.  Don't confuse

3   yourself with that.  That's not what that means.

4   Consideration is a contract term and it means you have got

5   what you bargained for.  And they got it.  They got the

6   money.  They bought the property.

7       Now, opposing counsel wants you to believe that we were

8   hired on the 25th.  We weren't hired on the 25th.  We're

9   hired on the 2nd.  And when we cross-examined their witness

10  on that, all that great stuff he wanted to do on direct

11  testimony, what did he say?  He said, I would not have taken

12  the case.  Well, that's helpful.  He's the expert and he

13  would not have helped these people out.  Wouldn't have taken

14  it.  And when we asked him, well, can't you get a repurchase

15  agreement?  Have you ever done that before?  He said no.  I

16  have never heard of that before.  Their expert has never

17  heard of a repurchase agreement.  He's never done it in his

18  unbelievable amount of experience.  We did it.  42 days.

19      I was asked the question if I think he knows more than

20  me or I think he considers me an expert or is an expert, he

21  was an expert as far as testimony goes.  He's not a licensed

22  expert in the state of Tennessee.  He can't put expert under

23  his name.  In fact, in his advertisement he says "emerging

24  expert."  And he set the guidelines and it was a very

25  interesting how opposing counsel made him say what he would

1   do if he took the case.  Well, I would look at the note and

2   mortgage.  I'd go over everything with my client.  I would

3   do everything I was supposed to do.  So why didn't he do it

4   in this case?

5       He testified he never even looked at the note and

6   mortgage.  He's not an unbiased witness.  We're aware of

7   that, right?  He gets paid to be here.  $500 an hour to

8   testify for them.  And you don't possibly think that these

9   people testify and they're going to testify against their

10  clients.  They're not here to hurt their client.  They're

11  here because they have an opinion that benefits them.  And

12  they paid for that opinion.

13      It's very difficult to hear an attorney make comments

14  about your actions when he's never done it before.  He's

15  going to claim that you did it absolutely wrong.  My people

16  did not do what they were supposed to do.  We did something

17  he had never accomplished in his whole career.  But you know

18  something?  It's normal.  It's normal for us.

19      Now, opposing counsel suggests that we were hired to

20  represent the foreclosure.  Yes.  The foreclosure isn't a

21  simple action.  The foreclosure is all-encompassing in

22  negotiation.  In fact, the first documents they signed on

23  the 25th, they clicked off modification.  They didn't click

24  off foreclosure.  Now, opposing counsel mentioned that I

25  didn't get involved in this case before -- between the area

of 25th and December 9th.  Well, you heard testimony that I
was involved in making the decision to not file on the 4th.
I didn't promise I was going to file; I didn't say I was
going to file.  I looked at an option.  Never once did we
say we were going to do this.  There was nothing in writing
that said we're going to cancel the sale.

Now, the client says he thought we were going to do
this and every time a document came up that they didn't
agree with that he signed, he said, Nathan Brown told me to
do it.  Nathan Brown.  Now, you don't know what Nathan Brown
looks like.  He wasn't called.  But let's really look at
that.  Their testimony is and I'm not -- I've instructed our
people not to do anything like this.  I said on the stand, I
made it very clear, we don't do this, we don't tell people
to understate their stuff.  He said he understated all of
his values to get the loan because Nathan told me to do it.
So I filed fraudulent documents to receive a benefit.  You
can't look at it any other way.  Okay.  The guy who was
helping me out told me to file a false document.  A guy who
tells me to commit a crime told me to do it, so it's his
fault, not mine.

So in their own statement they admit they gave us some
fraudulent documents.  They understated income, they
understated value, they did all these things so that they
would get what they wanted.  Now there was no way I would

1    put up with that kind of nonsense.

2        But it was used as a defense every time, when it came

3    to a document that they submitted that was false that didn't

4    help their case.

5        Fast and thorough, you just heard that term.  I got

6    them a deal in 42 days.  Sounds pretty fast and thorough to

7    me.  Well, I think that you should have said more to the

8    client and you should have done -- 42 days, I got you the

9    deal.  Well, you should have communicated more with me, and

10   Jeff Kaufman should have talked to me more.  42 days, you

11   got the deal.  Well, I didn't want that deal.  I wanted to

12   pay less than what I owed.

13       There were documents put in front of you somewhere

14   created by the plaintiff, created, he created that solely to

15   litigate this case.  The documents he didn't create are the

16   '06, '07, and '08 tax returns.  That was done because he had

17   to file with the government.  We all have to file taxes.

18   Somehow the CPA says he doesn't have to.  I have never heard

19   that ever, where you -- you don't have to file your taxes.

20   I could be mistaken, I, you know, business owners aren't

21   responsible, and I asked him, he goes, well, yeah, you have

22   to file it but, you know, you have a three year.  I said,

23   well, what's the intention on this case?  Are they ever

24   going to do it, no.  So he relies on a document provided by

25   the person paying him that says I made this money in

September of '08, October of '08, you hear this company
called the Learning Academy.  They talk about the Learning
Academy.  Oh, this was the problem, we created this because
the old company had a stigma to it because of all the
problems they had with the fines and kids running down the
street, so we had to change the name.  That's exactly what
the plaintiff said in this case.  His wife said, well, I'd
like to change the name but he made it clear, well, I have
to be an honest man.  This is what happened.  He didn't
discuss that in direct.  He discussed it when we confronted
him with it.  When we asked him about the dissolution of his
company, oh, that's not happening.  Well, I'm sorry, it did
happen.  This is a document from the secretary of state of
Tennessee that shows your company is out of business.  Now
that's very interesting.  Because he wasn't legally allowed
to do business in Tennessee with any of his corporations
four months before he hired me.

     Their accountant says, oh, that doesn't matter.  We
have lots of corporations that go down.  The taxes, oh, that
doesn't matter.  A lot of people -- a lot of small
businesses don't file their taxes.  Bank statements, it
doesn't matter, I need your bank statements.  I guess for
$11,000 you feel pretty comfortable with those numbers.  And
I asked him why he feels comfortable with those numbers.  He
goes, because I believe my client.  Well, that's a good

```
 1   thing.  Belief is a great thing, but when I showed him that
 2   the Learning Academy and they were very proud of that, that
 3   showed that over to you, said, look, we were certified to do
 4   business on March of '09.  That's when we could take kids.
 5   I just want to deal in facts.  I don't want to screw around
 6   with you.  They have documents that they created.  Our taxes
 7   and a spreadsheet that their accountant relied on.  And said
 8   that the Learning Academy had been in August, I mean in
 9   September of '08, October of '08, November of '08, December
10   of '08, January of '09, February of '09, hold on.  Let me do
11   that again.  September, October, November, December,
12   January, February.  Six months of revenue from a company not
13   allowed to do business.  Well, they gave him the documents,
14   so he said that must be it.  He said maybe they were doing
15   it illegally.  For that company to be operational in seeing
16   kids, they would have to be breaking the law.  I guess we
17   can accept that.  I'll look into it.
18       The accountant when he first got hired said, I need
19   these, this information.  I need '06, '07, '08, '09, and
20   '010 of your business taxes.  I need all your bank
21   statements.  I need a property appraisal ASAP.  Now when he
22   didn't get, he goes, well, not a big deal.  I'll rely on
23   them telling me what it is.  Well, that's not what you're
24   here for.  You're here to look at facts.  When he came to us
25   they were 510 days behind on their mortgage.  That's 17
```

payments.  Now you're aware that they were responsible to make 60 payments throughout this loan, which means they failed to make 28 percent of their payments.  To a tune of $91,800.  When we got them the deal they were 552 days behind with 19 payments equaling 102,600 making up almost a third of the loan.

Both companies were dissolved, four months before they even hired us.  7 days, the magic number.  Opposing counsel has suggested that I was responsible for this case before they hired us.  Nathan Brown is an intake, was an intake counselor.  He gets the data, he gets the contract, and then he moves it forward.  That's the job.  He's not a paralegal. Now you're going to hear statements that the paralegal didn't know the sale took place.  No, she didn't get notice. In Tennessee you got to go get it.  But we knew the sale took place.  It was not part of our equation.  Part of our equation was negotiating with the bank, which we did.  Now, the plaintiff in this case, he showed you another offer he made before he hired us.  Where he was making offers to the bank and one of them was he would pay $600,000 and do whatever he needed to do.  Okay.  On January 13, I got him an offer of $611,000, the total he owed, and that was interest.  These were payments he missed.  Not the majority, it's not attorney's fees.  It's costs.  Issues like that. And I didn't make those up.  He did it.  You heard the

question asked to me, you lost this property.  I didn't lose
this property.  I gave it back to them.  Here, you can pay
now.  I don't want to pay that.  When I sent the offer to
them I really didn't mean it.  I wanted to pay 500,000.
Which is $111,000 less than what they owed.  That's just
greedy.  You have an opportunity to make up for this huge
error that you say you've tried to pay, now they put on no
testimony that they actually took these payments and put it
away.  Well, interesting math with that.  If they missed 19
payments, if they would have just put that money away, they
would have 102,000 in the bank.  Now, they have some
interesting numbers that he created for his accountant that
we have no evidence as far as banks statements or anything
else.  That he created solely off a spreadsheet.  That says
that he was getting $8,000 a month from the Learning
Academy.  Well, I can add that in, too, and I can add all
the months he was supposedly getting this rent, September,
October, November, December, January, February, March,
April, May, June, July, August, September, October,
November.  Okay.  That's $80,000 just for that one year.
Not including the extra five payments.  So it's around 125,
$130,000.  What did the bank ask for?  They asked for
25 percent down.  Well, I don't need an accountant to divide
611 by 4.  Four, one, two, gees, that comes out to around a
little over 150, maybe around 152,000.  $152,000.  And he

1   had the money.  That's what they keep saying.  He has the

2   money.  Now, he showed you an e-mail that said that his

3   brother-in-law in Pakistan or wherever was working with a

4   title company to do a mortgage for the property for, I think

5   it was 522,000, somewhere around that.  Well, maybe I'm

6   missing something, but how do you purchase a building for

7   522 when you owe 611?  The bank wasn't going to accept that

8   amount.  So it sounds like he might have been thinking about

9   a short sale.  Maybe.  But the bank didn't make that offer,

10  so I'm kind of confused what that number means.  But it's

11  another number they provided us for the trial, but we

12  weren't provided it in real life.

13      The first document they ever sent us in November 26 is

14  part of the original package.  If they want to hire us, they

15  have to send us this information.  That doesn't mean you're

16  a client, that means we need this information to go off of.

17  He has an original loan amount of 525, but he says the

18  property is worth 700,000.  I don't know.  I don't have a

19  property appraisal.  I have an accountant who says, well,

20  I'm going take the purchase price in '07 and I'm going to

21  build interest based on that.  Didn't their law expert

22  testify how properties depreciated?  And there's a good

23  possibility he said, very rarely does somebody come to him

24  when the property has equity.  Well, I don't know, they

25  never did it.  They just assumed that the property hadn't

```
 1  lost money.  They also tried to blame the bank.  That's why
 2  the bank's trying to keep it because the bank wants to make
 3  all the equity on it.  The bank just wanted what they were
 4  owed.  That simple.  That was the offer.  What we're owed.
 5      January 22, we get a document, we give the offer to the
 6  client.  We're pretty happy about it.  I was pretty happy
 7  about it.  I was doing great.  42 days.  Good for us.  Good
 8  job.  Good job, people, good job.  The client sends us back
 9  something he don't want to pay it.  I received the proposal
10  sale price for that property through Fifth Third Bank,
11  through your office.  I need your assistance to negotiate
12  the price.  The purchase price will be $500,000.  No down
13  payment.  90 days foreclosing, 45 days to provide a
14  preapproved letter.  Well, you heard counsel asking me about
15  the approval process and approved letters and everything
16  like that.  And I said, well, this is the offer we gave
17  them.  The bank told us to pound sand.  And they're allowed
18  to.  Their expert witness says he wished the laws were
19  better for borrowers in Tennessee.  I can wish, but that
20  doesn't mean that that's actually what it is.  In fact, he
21  said the laws are the best for the banks.  He said it's
22  nonjudicial, and it's one of the easiest states to foreclose
23  in.  The easiest.  Why?  Because you only get it in under
24  five things.  So most people look at the five issues and
25  sees if it fits in.  If it doesn't fit in, they try to
```

1  negotiate.  Which we did.

2      But they want you to believe in one little piece of

3  evidence he didn't put in, he said it might delay the

4  foreclosure and he might have grounds to delay it.  But he

5  didn't say he was going to win.  So what happens when you

6  lose, when you file a frivolous motion, where we guaranteed

7  to get the deal we got the client?  No.  In fact, legal fees

8  would grow, and the value of that buyout would be more.  And

9  I wouldn't guarantee that deal.  And their expert who wasn't

10  even aware of the rule concerning penalties on filing an

11  injunction, I have never seen that before.  We asked him

12  about the rules of conduct dealing with delay.  Well, there

13  should be, he wasn't sure.  He said, yeah, yeah, I think

14  there should be.

15      When you sit here and have to listen to that and know

16  that you can't get up and yell and scream and go, you don't

17  know how to do this, he knew what he wanted to say but when

18  it came time to prove his case like he would have to in a

19  court of law, he had nothing.  And that's what happened.

20      You have heard a lot of comments about the umbrella.  I

21  love the umbrella.  God, I love the umbrella.  I sat here

22  day in and day out and I wanted to scream about this

23  umbrella.  Oh, it was an umbrella company.  Well, the only

24  thing that accountant said that was worth anything was no

25  umbrella means a sub corporation of that company.  The

```
 1  Learning Connection and the Learning Academy are two
 2  separate corporations.  He stated that.  And I asked him and
 3  he goes, well, we can pop them all open when they wanted to.
 4  But when I really questioned him, he goes, well, no, no
 5  there was a name change.  Like, why didn't you say from the
 6  beginning?  Why did you have to pretend that this -- that
 7  you knew that this business was not operational anymore.
 8  You knew they hadn't filed their taxes.  You knew companies
 9  have to file their taxes, and you're going to say the whole
10  time, well, I believe my client.  I asked him if I was
11  buying the property from you and you had to go get this
12  information from him, would this be okay?  Well, there are a
13  lot of variables, I don't want to hear about your variables.
14  I want to hear about facts.  '06, '07, '08.  Not profitable.
15  Well, there was some issues.  There are always issues when
16  they go against them.  Nathan Brown told me to lie.  And I
17  have heard this over and over.  Nathan Brown instructed me
18  to lie and I lied.  Now, I don't know if Nathan Brown ever
19  said anything like this, but one thing I can be sure of is
20  these documents are fraudulent.  He provided me and the bank
21  with fraudulent documents.  And his reason for it is, he
22  said we told him to, for his benefit.  And that's what
23  the -- it's unethical to do.  Of course it's unethical to
24  have an agent working for you who would tell somebody to
25  lie.  That's a given.  I know that.  That's why we instruct
```

1  them not to.  We instruct them to get the accurate

2  information.  We're good at what we do.  We can go forward

3  with what we have.

4      But the only thing that's clear is that he falsified

5  documents.  And we want to believe in this case that the

6  documents he created on his own to give to his experts that

7  he provided solely to me are accurate.  I still can't get

8  around how you can run a profitable business when you aren't

9  allowed to be in business.  For five months.  You don't get

10 your certification until March but somehow you're seeing

11 people.  All the evidence we had of that is what the client

12 said.

13     I've mentioned to you before I would only discuss the

14 facts.  I'm only going to do that with you.  I'm not going

15 to create numbers.  Every number I have given you is dead on

16 accurate.  You don't have to open a book.  You don't have to

17 get an idea, it's basic math.  We're good at that.  We

18 understand basic math.  That's what we do every day.  Breach

19 of contract.  That's what a foreclosure is.  We call it

20 foreclosure because it's a nice name.  But it's a breach of

21 contract.  You agree to abide by the rules of the contract.

22 And this note mortgage which their expert for some reason

23 decided it wasn't important to read, I don't know how that

24 happens.  I'm still sitting here going you're getting paid

25 thousands of dollars and you can't even read the evidence,

1   um, if you're late even by one payment they can accelerate
2   the loan.  And acceleration means moving everything forward.
3   It means you owe it all.  Well, well, it wasn't my fault.
4   Don't care.  You signed the contract.  Well, he was sick.
5   Don't care.  This person won't sign the forbearance
6   agreement.  Don't care.  Now it seems unfair; it seems not
7   right.  So change the law.  Go in there and change the law.
8   Get in front of Congress, do what you need to do.  But the
9   law is the law and I'm an attorney, and I have to follow the
10  law.
11      There's affirmative defense that you're going to hear
12  about, it's referred to the "statute of limitations."  And
13  it's going to be in your jury instructions.  Now, you have
14  probably been asking yourself for days now, why did they
15  keep trying to find out when the plaintiff knew that wrong
16  occurred?  What's the difference between January and June?
17  What is the big difference?  In the letter it said I thought
18  you were going to file an injunction.  If you believe that
19  to be true, and that he wrote a true statement like that,
20  then the date where he thought he was injured is January of
21  2010.  The statute of limitations for Tennessee malpractice
22  is one year.  And it's a very strict one year.  And that is
23  why you heard all this evidence concerning injunctions.  Oh,
24  I didn't know what an injunction was until June.  Well, you
25  wrote us in January and you said you thought we would file

1   an injunction.  You're shocked, you were mad at us.  You

2   couldn't believe we didn't know the information.  You were

3   upset with us.  If those are true, that's when it starts.

4       That's why June is a very great date.  Now there are

5   two documents you were shown.  One was an affidavit filled

6   out by the plaintiff that said I didn't know anything until

7   June and then we had the letter he wrote in January that

8   said he expected us to do the injunction.  Now we have asked

9   him a ridiculous amount of time does he know when the

10  injunction was.  And even he was crossed by the Judge to ask

11  when the injunction was.  And even then he said, I'm not a

12  lawyer, I'm not a English professor.  Well, he's a

13  professor.  Just not English.  He's a trainer for 5,000

14  people.  He got up and said, you know, how many boards he's

15  been on, how many directors he's been on.  So after three

16  days of trial for him to say up there, well, I'm not too

17  certain what an injunction is, after sitting here and

18  hearing the experts, hearing everyone else talk about

19  injunctions, that's what the statute of limitations is

20  about.  When he knew that he thought he was damaged.  And in

21  his letter in January he says, I'm shocked.  I'm upset with

22  you.  I thought you were going to file an injunction.  Now,

23  I've heard some weird answers from people through this

24  trial, the expert, well, I never would have taken the case.

25  Well, then, what's your point?  You have no opinion?  Step

1   down.  Walk away.  Walk out the door.  You don't want to

2   help people because it's too late?  Hit the door.  My

3   company helped this person out.  When their expert under the

4   same circumstances would have refused.  And he said he would

5   not have taken the case.  Well, good for you.

6   Congratulations.  A client came to you in need and you

7   walked away.  We took the case.  We helped him out.

8          THE DEPUTY CLERK:  Counsel, five minutes

9   remaining.

10          MR. KAUFMAN:  Thank you.

11      Concerning experts, it was brought up on multiple

12  occasions why we didn't call you.  You didn't call an expert

13  to dispute my expert.  No.  I did that.  I didn't need to

14  hire somebody to say what I wanted them to say.  I disputed

15  your evidence.  I disputed your attorney, who, in the end,

16  walked away from you and said I would not have helped this

17  person out under the same circumstances.  The accountant,

18  I'm putting my faith in what the client told me.  So you

19  didn't get the bank statements, you didn't get the stuff.  I

20  don't need an expert to cross-examine and show the flaws in

21  his methodology.

22      There's an old adage: an attorney who represents

23  himself has a fool for a client.  I spent the last couple of

24  months having to decide if that's -- that was true or not

25  and what I was going to do.  We represent people who are

1   suffering against multibillion dollar banks, and we win.  If

2   somebody's going to make an accusation about me, I'm going

3   to stand up and fight.  Thank you.

4          THE COURT:  All right.  Thank you, Mr. Kaufman.

5      Rebuttal, Mr. Ittleman.

6          MR. ITTLEMAN:  Thank you.

7      You have heard a lot of numbers, the number that we

8   want you to remember is two weeks.  November 25, the date

9   that there was first contact with the KEL law firm.  The

10  machine that is KEL and how they handle and process people

11  who hold them for legal help, the answer is, they don't.

12  They give it to some guy who's not a lawyer.  The person who

13  is not a lawyer is telling them things that have no -- that

14  do not apply in this case.  The plaintiff believed the

15  information.  The people on the Internet say they are a

16  national law firm, licensed in the entire country.  20

17  states.  You call a lawyer, you need to speak to that

18  lawyer.  You need to get information, you need to get legal

19  advice, the lawyer needs to tell you what to do, the lawyer

20  needs to tell you what the law says, the lawyer needs to

21  communicate with you, none of which was done.  No

22  communication from Mr. Kaufman, no letters, nothing.  Intake

23  information from Nathan Brown.  That's what this case is

24  really about.  They want to give you all sorts of side shows

25  regarding the Learning Academy, the Learning Connections,

1  this was a daycare center.  The daycare center was

2  profitable.  The Learning Connections owned the property.

3  They can do with the property what they wanted to.  They

4  happen to have a daycare center that was located on the

5  property.  That was -- the daycare center was profitable

6  enough that they didn't have a problem.  He's giving you all

7  these numbers regarding missed payments.  That's why they

8  went to the foreclosure defense attorneys.  This is a

9  legitimate foreclosure defense matter.  This was a wrongful

10 foreclosure defense.  They needed help.  They trusted their

11 lawyers and their lawyers did not do their job.

12      They want to tell you about what they did do.  Well,

13 let's talk about that.  What they did do was after they

14 committed malpractice by not filing the lawsuit to stop the

15 foreclosure sale, after they committed malpractice, by

16 Mr. Kaufman not supervising his intake people, paralegals,

17 whoever is over there, after they failed to communicate to

18 the clients that the clients lost their commercial property,

19 after the clients had to find out by themselves without the

20 assistance of their lawyers who they already paid, that they

21 have lost the commercial property.  Now they want to get

22 involved.  Okay.  We're going to come in and save the day.

23 We can talk about that because I asked Mr. Kaufman a

24 question.  Mr. Kaufman, what evidence do you have that you

25 ever told these people that there was a hard number of

```
1   $611,000 and the bank was not going to accept a penny less,
2   where's your letter to the clients telling them that?   I
3   don't know.   I don't have it.
4        Negotiations are about communication with the clients.
5   Mr. Kaufman and his law firm failed in that regard, too.
6   Remember the testimony from Mr. Hasnain.   I didn't know that
7   they were telling me 25 percent down.   It's not until he was
8   sitting in that witness box.   Did the 25 percent was -- did
9   he know that the bank would have accepted 25 percent down?
10  I think that's something that he should have known in 2010?
11  It's true.   There was a lot of discussion about when this
12  lawsuit was filed with respect to the statute of
13  limitations.   Mr. Hasnain is not American.   He actually went
14  on the Internet, punched in stop sale, what comes up,
15  injunction.   Oh, let me put injunction into the letter.
16  That way there was never a letter from the KEL attorneys to
17  Mr. Hasnain or the Learning Connection telling them about an
18  injunction.   Something that he popped into -- he doesn't
19  know what that is.   He believed his attorneys.   He believed
20  the law firm.   The law firm is giving him erroneous legal
21  advice regarding Tennessee law from a paralegal.   The
22  paralegal is telling the clients, oh, well, we can't do
23  anything because when we got involved there was already a
24  sale date.   That's the point.   That's when you get involved.
25  And that's what Trey Cain testified to.   Trey Cain does not
```

```
 1   get involved in foreclosure defense or wrongful defense
 2   matters until there is the notice.  The notice of
 3   foreclosure.
 4        It was -- the legal advice was flat wrong.
 5        My clients authorized the defendants to negotiate.  To
 6   get them the best deal.  What's wrong with that?  500,000?
 7   Okay.  Maybe they thought that they could get it done for
 8   550, bank's offering a certain something, they're at five.
 9   Maybe somewhere in the middle.  How can a law firm sit
10   there, never communicates to the clients this is the last
11   and final offer, you need tell me what to do.  If you don't
12   want this property, you need to let me know right now.  If
13   you want to take the property, this is the best I can do for
14   you.  It may have taken them 42 days to get that offer, but
15   we're still sitting here today and that offer was never
16   communicated to my clients.  That that offer was a hard and
17   fast offer, that was non-negotiable.  My clients had no
18   idea.  That's called "malpractice."  It's called
19   "negligence" in the supervision of this case.  It's called
20   "passing the buck to lower level people and then blaming
21   others when you're the guy in charge."  That's wrong.  You
22   need to tell them that it's wrong.  They're not going --
23   they don't understand that it's wrong.  The only way that
24   they're going to understand that it's wrong is if you make
25   them pay.
```

```
1        Thank you.
2             THE COURT:  All right.  Thank you, gentle people.
3    Counsel, I'm going to give you -- a couple of headings were
4    left in the copy of these instructions that I gave you, so
5    this will be, I think, draft 7 that you will be given here.
6    We will use that one.
7        Members of the jury, I'll now explain to you the rules
8    of law that you must follow and apply in deciding this case.
9    When I finish you will go to the jury room and begin your
10   discussions, what we call "deliberations."  In deciding this
11   case, you must follow and apply all of the law as I explain
12   it to you whether you agree with the law or not, and you
13   must not let your decision be influenced in any way by
14   sympathy or by prejudice for or against anyone.  In this
15   case, individuals as well as corporations are involved as a
16   party.  The fact that a corporation is involved as a party
17   must not affect your decision in any way.  A corporation and
18   all other persons stand equal before the law and must be
19   dealt with as equals in a court of justice.
20       When a corporation is involved, of course, it may act
21   only through people as its employees, and in general, a
22   corporation is responsible under the law for any of the acts
23   or statement of its employees that are made within the scope
24   of their duties as employees of the company.
25       In your deliberations you should consider only the
```

evidence, that is the testimony of the witnesses and the
exhibits I have admitted into evidence, but as you can
consider the evidence, both direct and circumstantial, you
may make deductions and reach conclusions which reason and
common sense lead you to make; that is, you may consider
both direct and circumstantial evidence.

Direct evidence is the testimony of a one who asserts
actual knowledge of a fact, such as an eyewitness.  And
circumstantial evidence is proof of a chain of facts and
circumstances tending to prove or disprove any fact in
dispute.  The law makes no distinction between the weight
you may give to either direct or circumstantial evidence.

Again, you may consider both.

And remember that anything the lawyers say is not
evidence in this case unless the lawyer testified as a
witness.  And except for my instructions to you on the law,
you should disregard anything I may have said during the
trial in arriving at your decision concerning the facts.  It
is your own recollection and interpretation of the evidence
that controls.

Now, in saying that you must consider all of the
evidence, I do not mean that you must accept all of the
evidence as true or accurate.  You should decide whether you
believe what each witness had to say and how important that
testimony was and in making that decision you may believe or

1  disbelieve any witness in whole or in part.  Also, the
2  number of witnesses testifying concerning any particular
3  dispute is not controlling.  In deciding whether you believe
4  or do not believe any witness, I suggest that you ask
5  yourself a few questions.  Did the witness impress you as
6  one who was telling the truth; did the witness have any
7  particular reason not to tell the truth, did the witness
8  have a personal interest in the outcome of the case?  Did
9  the witness seem to have a good memory?  Did the witness
10 have the opportunity and the ability to observe accurately
11 the things about which he or she testified?  Did the witness
12 appear to understand the questions clearly and answer them
13 directly?  Did the witness's testimony differ from other
14 testimony or other evidence in?

15     You should also ask yourself whether there is evidence
16 tending to prove that the witness testified falsely
17 concerning some important fact, or whether there was
18 evidence that at some other time the witness said or did
19 something or failed to say or do something which was
20 different from the testimony the witness gave before you
21 during the trial.  You should keep in mind, of course, that
22 a simple mistake by a witness does not necessarily mean that
23 the witness was not telling the truth as he or she remembers
24 it because people naturally tend to forget some things or
25 remember other things inaccurately.  So if the witness has

1   made a misstatement, you need to consider whether that
2   misstatement was simply an innocent lapse of memory or an
3   intentional falsehood.
4       And the significance of that may depend on whether it
5   has to do with an important fact or with only an unimportant
6   detail.  When knowledge of a technical subject matter might
7   be helpful to the jury, a person having special training or
8   experience in that technical field is permitted to state an
9   opinion concerning those technical matters.  Merely because
10  such a witness has expressed an opinion, however, does not
11  mean that you must accept that opinion.
12      The same with any other witness, it is up to you to
13  decide whether to rely upon it.
14      In this case, each party asserting a claim or defense
15  has the responsibility to prove every essential part of the
16  claim or defense by a preponderance of the evidence.
17      That is sometimes called the "burden of proof" or the
18  "burden of persuasion."  A preponderance of the evidence
19  simply means that amount of evidence that is enough to
20  persuade you that a claim or contention is more likely true
21  than not true.  When more than one claim is involved and
22  when more than one defense is asserted, you should consider
23  each claim and each defense separately.  But in deciding
24  whether the fact has been proved -- but in deciding whether
25  any fact has been proved by a preponderance of the evidence,

1  you may consider the testimony of all the witnesses

2  regardless of who may have called the witness and all the

3  exhibits received into evidence regardless of who may have

4  produced that evidence.

5      If the proof fails to establish any essential part of a

6  claim or contention by a preponderance of the evidence, you

7  should find against the party making that claim or

8  contention.

9      Counsel, I don't know that this next sentence belongs

10 in here.

11         MR. WITHERS:  I don't think it does.

12         MR. ITTLEMAN:  I don't think it does.

13         THE COURT:  All right.

14     Plaintiffs assert two claims in this case.  The first

15 claim of the plaintiffs, the Learning Connections, Inc., and

16 Syed Hasnain, is that the defendants, Jeffrey S. Kaufman,

17 Esquire, and Kaufman Englett and Lynd, PLLC, committed

18 professional legal malpractice by failing to provide the

19 plaintiffs with a proper foreclosure defense to protect the

20 Learning Connections' interest in its commercial property

21 located in the state of Tennessee, approximately resulting

22 in damages to the Learning Connections, Inc.

23     Professional malpractice is a form of negligence

24 involving the failure to use reasonable care.  Reasonable

25 care on the part of an attorney is that degree of care which

1   a reasonably careful attorney would use in like

2   circumstances.  Negligence may consist either in doing

3   something that a reasonably careful lawyer would not do

4   under like circumstances, or in failing to do something that

5   a reasonably careful lawyer would do under like

6   circumstances.

7        An attorney who holds himself out as a specialist in a

8   field is held to a higher standard of care.  An attorney who

9   holds himself out as a legal specialist in a particular

10  field of law has the duty to present and use this care and

11  skill ordinarily used by other legal specialists in that

12  field of law practicing in the same or a similar location.

13       Professional perfection is not required.  A

14  professional is not negligent merely because of an

15  unsuccessful result or error in judgment.  It is negligence,

16  however, if that error of judgment or lack of success is due

17  to the failure to use the required care and skill as defined

18  in these instructions.

19       The plaintiffs, the Learning Connections and Syed

20  Hasnain, contend that they retained the defendants, Jeffrey

21  S. Kaufman and Kaufman Englett and Lynd, to ensure that the

22  defendants would provide the plaintiffs with a foreclosure

23  defense in response to the Learning Connection, Inc.'s

24  lender, Fifth Third Bank, NA, filing a notice of foreclosure

25  on the Learning Connection, Inc.'s interest in its

1    commercial property located in the state of Tennessee.  The

2    plaintiffs further contend that the plaintiffs had a valid

3    defense to the bank's conduct of attempting to foreclose on

4    a commercial property, but in order to assert the defense,

5    the plaintiffs contend that the defendants, Jeffrey S.

6    Kaufman, Esquire, and Kaufman Englett and Lynd, PLLC, were

7    required to but failed to file a complaint for injunctive

8    relief in the state of Tennessee.

9        The plaintiffs further contend that the failure of the

10   defendants to file the action for injunctive relief

11   permitted the bank to proceed with the foreclosure without a

12   defense, and resulted in the bank taking title to the

13   commercial property.

14       The plaintiffs contend that as a result of the

15   professional malpractice that the plaintiffs incurred

16   damages.  The plaintiffs further contend that the damages

17   were, one, the loss of the commercial property, two, the

18   loss -- the loss of the business that the plaintiff had

19   within the commercial property, three, the loss of the money

20   that the Learning Connections reinvested back into

21   improvements of the commercial property and its business

22   within the commercial property, four, the loss of the income

23   stream associated with the Learning Connections business,

24   and five, the loss of money that Mr. Hasnain paid to the

25   defendants in consideration for the defendant's providing a

1    foreclosure defense to the Learning Connections.

2        Defendants contend that they were not negligent in

3    failing to file for an injunction to stop the scheduled

4    foreclosure sale and that plaintiff would, in any event, not

5    have been successful in stopping the foreclosure sale and

6    ultimately keeping the commercial property that was

7    foreclosed either by removing it from foreclosure and

8    selling the property before the foreclosure sale occurred.

9        Defendants assert there was no ground to seek an

10   injunction under Tennessee law.  On this claim plaintiffs

11   must prove by the greater weight of the evidence that the

12   defendants, Jeffrey S. Kaufman and Kaufman Englett and Lynd,

13   PLLC, one, owed a duty to the plaintiffs to act with a

14   degree of skill, care and diligence exercised by similar

15   attorneys practicing in Tennessee, two, that the defendants

16   breached that duty, three, that the plaintiffs suffered

17   damages, and four, that the defendants breached of duty was

18   the proximate cause of plaintiff's damages.

19       Plaintiffs, the Learning Connections, Inc. and Syed

20   Hasnain, have brought a second separate claim against

21   defendant Jeffrey S. Kaufman, Esquire, for negligent

22   supervision.  Mr. Kaufman is the only licensed and

23   practicing Tennessee attorney within the defendant Kaufman

24   Englett and Lynd, PLLC.  The plaintiffs have alleged that

25   Mr. Kaufman knew or should have known that Mr. Kaufman would

have been required to file the complaint for injunctive
relief to avoid the Learning Connections' lender, Fifth
Third Bank, from proceeding with the foreclosure of the
commercial property and taking title to the commercial
property through an uncontested foreclosure sale.

     The plaintiffs have further alleged that the defendant
Jeffrey Kaufman neglected and failed to perform the
reasonable duty that he owed to the plaintiffs by failing to
supervise the other attorneys within the defendant, Kaufman
Englett and Lynd, PLLC, regarding the procedures required to
initiate the contested foreclosure proceedings within the
state of Tennessee, and the obtaining of the injunction that
would have been required to provide the proper
representation to the plaintiffs.

     In order to prevail on this claim, the plaintiffs must
prove the following as to defendant Jeffrey S. Kaufman by a
preponderance of the evidence.  One, that Mr. Kaufman owed a
duty of care to plaintiffs to act with the degree of skill,
care and diligence exercised by an attorney practicing in
Tennessee, two, that Mr. Kaufman breached that duty, three,
that the plaintiff suffered damages, and four, that
Mr. Kaufman's breach of duty was the proximate cause of
plaintiff's damages.

     Negligence is the failure to use reasonable care.
Reasonable care is that degree of care that a reasonably

```
 1  careful person would use under like circumstances.
 2  Negligence may consist either in doing something that a
 3  reasonably careful person would not do under like
 4  circumstances, or in failing to do something that a
 5  reasonably careful person would do under like circumstances.
 6      Negligence is a legal cause of damage, if it directly
 7  and in a natural and continuous sequence produces or
 8  contributes substantially to producing such damage, so it
 9  can reasonably be said that except for the negligence the
10  loss, injury or damage would not have occurred.  Negligence
11  may be a legal cause of damage even though it operates in
12  combination with the act of another, some natural cause, or
13  some other cause if such other cause occurs at the same time
14  as the negligence and if the negligence contributes
15  substantially to producing such damage.
16      If plaintiffs do not prove this claim by a
17  preponderance of the evidence, then your verdict should be
18  for Mr. Kaufman.
19      If, however, a preponderance of the evidence does
20  support the plaintiff's claim or claims, you will then
21  consider the defense raised by the defendant or defendants.
22      As to both of the claims of plaintiffs, the defendants
23  contend that the plaintiffs were negligent and that such
24  negligence was a legal cause of the plaintiff's injury.
25  This is what we call an "affirmative defense" and the burden
```

155

of proving that defense by a preponderance of evidence is
upon the defendants who must establish, first, that the
plaintiffs were also negligent, and second, that such
negligence was a legal cause of the plaintiff's own damage.

The defendants contend that Mr. Hasnain and the
Learning Connection were themselves negligent in, one,
losing their license to do business in the state of
Tennessee, two, failing to make mortgage payments to the
mortgage holder, three, waiting too long to employ legal
representation on the mortgage default, four, not
repurchasing the property after it had been foreclosed, in
deciding this case you must determine the fault, if any, of
each of the parties.  If you find more than one of the
parties at fault, you will then compare the fault of the
parties.

To do this, you will need to know the definition of
fault.  A party is at fault if you find that the party was
negligent and that the negligence was the legal cause of the
injury or damages for which a claim is made.

Fault has two parts.  Negligence and legal cause.
Negligence is the failure to use reasonable care.  It is
either doing something that a reasonable person would not do
or the failure to do what a reasonable person would do under
circumstances similar to those shown by the evidence.

A person may assume that every other person will use

1  reasonable care unless the circumstances indicate to the

2  contrary to a reasonable person.

3      The second part of fault is legal cause.  A legal cause

4  of any injury is a cause which, in natural and continuous

5  sequence, produces an injury and without which the injury

6  would not have occurred.  A single injury can be caused by

7  the negligent act or omissions of more than one person.  If

8  you find that a party was negligent and that the negligence

9  was the legal cause -- or was a legal cause of the injury or

10 damages for which a claim was made, you have found that

11 party to be at fault.

12     Mr. Hasnain and the Learning Connections, Inc. have the

13 burden to prove Jeffrey Kaufman and Kaufman Englett and

14 Lynd's fault.  And if fault is proven for -- the plaintiffs

15 have the burden to prove the damages that were caused by

16 such fault.

17     If Mr. Hasnain and the Learning Connections failed to

18 do so, your verdict should be in favor of Jeffrey Kaufman

19 and Kaufman Englett and Lynd.  Likewise, Jeffrey Kaufman and

20 Kaufman Englett and Lynd have the burden to prove

21 Mr. Hasnain in the Learning Connections' fault.  If Jeffrey

22 Kaufman and Kaufman Englett and Lynd failed to do so, you

23 should find no fault on the part of Mr. Hasnain and the

24 Learning Connections, Inc.

25     If you find both parties to be at fault, you must then

1   determine the percentage of fault of each of them.

2        You must also determine the total amount of damages, if

3   any, proven by a preponderance of the evidence.  You must do

4   so without reducing those damages by any percentage of fault

5   you may have charged to that party.

6        It is my responsibility under the law to reduce the

7   amount of damages you dispense against any party by the

8   percentage of fault, if any, that you assign to that party.

9        A party claiming damages will be entitled to damages if

10  that party's fault is less than 50 percent of the total

11  fault in the case.

12       A party claiming damages who is 50 percent or more at

13  fault is not entitled to cover any damages whatsoever.

14       You have been instructed that if you find more than one

15  party at fault, you must apportion that fault accordingly.

16  In making that apportionment you should keep in mind that

17  the percentage of fault charged to a party is not measurable

18  solely by the number of particulars in which a party is

19  found to be at fault.

20       You should weigh the respective contributions of the

21  parties, considering the conduct of each as a whole, to

22  determine if one party made a larger contribution than the

23  others, and if so, by how much it succeeds that of the

24  others.

25       The percentage of fault depends on the surrounding

```
 1   circumstances of the case.  The conduct of each party may
 2   make that party more or less at fault depending on all the
 3   circumstances.
 4       In order to assist you in making that determination you
 5   may consider the following factors as well as other factors
 6   which you may find to be important under the facts and
 7   circumstances.  One, whose conduct directly caused more
 8   injury to the plaintiffs, two, how reasonable was the
 9   person's conduct under the circumstances, three, did the
10   party fail to use reasonable opportunity to reduce the risk,
11   four, was there a sudden emergency requiring a hasty
12   decision.
13       If the evidence proves negligence on the part of the
14   defendants that was a legal cause of damages to plaintiffs,
15   you should award the plaintiffs an amount of money that will
16   fairly and adequately compensate the plaintiffs for such
17   damages.
18       After considering the issue of the plaintiff's damages,
19   you are instructed that you should assess the amount you
20   find to be justified by a preponderance of the evidence as
21   full, just and reasonable compensation for all of the
22   plaintiff's damages no more and no less.
23       Compensatory damages are not allowed as punishment and
24   must not be imposed or increased to penalize the defendant.
25   Also, compensatory damages must not be based on speculation
```

1  or guesswork because it is only actual damages that are

2  recoverable.

3      You should consider the following elements of damage to

4  the extent you find them proved by a preponderance of the

5  evidence as being proximately caused by the negligence and

6  no others.  Compensatory damages include the value of the

7  lost real property, the value of the lost business, loss

8  profits from the business, and the money paid by plaintiffs

9  to defendants to represent them in the foreclosure action.

10     As to the amount of damages, a party seeking relief is

11  entitled to recover damages for a loss or harm as long as

12  there is some reasonable basis for estimating or

13  approximating the amount of the loss or harm.  A party

14  seeking damages may not be denied damages merely because the

15  amount of the loss or harm is uncertain or difficult to

16  determine.

17     If you find for one or both of the defendants, you will

18  not consider the matter of damages against that defendant.

19  Or defendants.

20     But if you find for the plaintiff or plaintiffs on one

21  or more of the claims against a defendant, you should award

22  the plaintiff or plaintiffs any amount of money that the

23  evidence shows will fairly and adequately compensate the

24  plaintiffs for damages caused by that defendant.  Or

25  defendants.

1    In the event you find against the defendants, the

2    plaintiffs are entitled to recover damages from that

3    defendant that will put the plaintiff in the same position

4    it would have been in if the defendant had not subjected the

5    plaintiff to harm.

6    I'm going to reread that and make a change here.  In

7    the event you find against a defendant or defendants, the

8    plaintiff or plaintiffs are entitled to recover damages from

9    that defendant or defendants that will put the plaintiff or

10   plaintiffs in the same position the plaintiff or plaintiffs

11   would have been if the defendant or defendants had not

12   subjected the plaintiff or plaintiffs to harm.

13   If you are to determine a party's damages, you must

14   compensate that party for the loss or harm that is

15   reasonably certain to be suffered in the future as a result

16   of the injury in question.  Again, you may not include

17   speculative damages which is compensation for future loss or

18   harm that although possible is conjectural or not reasonably

19   certain.

20   Further, if you find that the greater weight of the

21   evidence supports Mr. Hasnain and the Learning Connections

22   claim or claims, then you shall consider the additional

23   defense as raised by Jeffrey Kaufman and Kaufman Englett and

24   Lynd, which defendants must prove by a preponderance of the

25   evidence.  Defendants assert that Mr. Hasnain and the

```
 1   Learning Connections knew or by the use of reasonable care
 2   should have known before March 10, 2010, that they had been
 3   damaged and that there was a reasonable possibility that the
 4   injury or damage was caused by legal negligence.  If the
 5   greater weight of the evidence supports Jeffrey Kaufman and
 6   Kaufman Englett and Lynd as defense on this issue,
 7   Mr. Hasnain and the Learning Connections claim or claims is
 8   or are time barred, then your verdict would be for
 9   defendants.  If, however, the greater weight of the evidence
10   does not support Jeffrey Kaufman and Kaufman Englett and
11   Lynd's defense on this issue, you should consider the
12   following additional defense.
13        Defendant's assert that Mr. Hasnain and the Learning
14   Connection failed to limit or avoid damages that were
15   reasonably avoidable in light of the circumstances.  A party
16   who has been damaged has the duty to mitigate damages by
17   using reasonable diligence to avoid loss and minimize
18   damages.  A party may not recover for losses that could
19   not -- that could have been prevented by reasonable efforts
20   or by expenditures that might reasonably have been made.  If
21   you decide that Jeffrey Kaufman and Kaufman Englett and Lynd
22   are responsible for damages to plaintiffs, Mr. Hasnain and
23   the Learning Connection, Inc. are not entitled to recover
24   damages that Jeffrey Kaufman and Kaufman Englett and Lynd
25   prove could it have been avoided with reasonable effort or
```

1  expenditures by Mr. Hasnain and the Learning Connections,

2  Inc.

3       You should consider the reasonableness of Mr. Hasnain

4  and the Learning Connections' efforts in light of the

5  circumstances facing them at the time, including their

6  ability to make the efforts or expenditures without undue

7  risk or hardship.

8       Of course the fact that I have given you instructions

9  concerning the issue of plaintiff's damages should not be

10 interpreted in any way as an indication that I believe the

11 plaintiffs should or should not prevail in this case.  Any

12 verdict you reach in the jury room must be unanimous, in

13 other words, to return a verdict you must all agree.  Your

14 deliberation should be secret.  And you should never have to

15 explain your verdict to anyone.  It is your duty as jurors

16 to discuss the case with one another in effort to reach

17 agreement if you can do so.  Each of you must decide the

18 case for yourself but only after full consideration of the

19 evidence with the other members of the jury.  While you are

20 discussing the case, do not hesitate to reexamine your own

21 opinion and change your mind if you become convinced you are

22 wrong.  But do not give up your honest beliefs solely

23 because the others think differently or merely to get the

24 case over with.  Remember, that in a very real way, you are

25 the judges, the judges of the facts and your only interest

1   is to seek the truth from the evidence in the case.

2       When you go to the jury room you should first select

3   one of your members to act as your foreperson.  The

4   foreperson will preside over your deliberations and will

5   speak for you here in court.  A form of verdict has been

6   prepared for your consideration.  In this case, the issues

7   are some what complex and there are a number of separate

8   issues, and the special verdict form asks you to answer the

9   questions under the appropriate standard of proof, I'll now

10  read to you the questions on the special verdict form, which

11  you must answer the -- unanimously.  You will take this

12  verdict form to the jury room and when you reach a unanimous

13  agreement your foreperson should fill out the verdict form

14  in accordance with that agreement, date and sign it, and

15  then return it to the courtroom.

16      So here are the questions on the special verdict form

17  and it really takes you by the hand and leads you through

18  all that I have just read to you there.

19      It starts out, I'll just show it to you so you have an

20  idea of what it will look like.  It's a series of questions

21  to answer.  We, the jury, find as follows.  Question one.

22  Did the defendants breach a duty they owed to the plaintiffs

23  and commit professional attorney malpractice in the

24  representation of the plaintiffs?  Under that there's a

25  blank with yes, and a blank with no.

1           So your foreperson when you reach unanimous agreement

2      on that question, will check whatever blank you decide.

3           There's a little instruction that follows that.  It

4      says if your answer is no, then your verdict is for the

5      defendants.  If your answer is yes, please continue to

6      question 2 of the verdict form.

7           Question 2:  Did the defendant's professional

8      malpractice and the representation of the plaintiffs cause

9      damages to the plaintiffs.  Again, yes, and no, with a check

10     mark.  If your answer is no, then your verdict is for the

11     defendant, if your answer is yes, please continue to

12     question 3 of the verdict form.

13          Question 3:  Do you find Mr. Hasnain and the Learning

14     Connections to be at fault.  Jeffrey Kaufman and Kaufman

15     Englett and Lynd have the burden of proof.  This is a yes

16     and a no with blank in front of it.

17          If your answer is no, you have found Jeffrey Kaufman

18     and Kaufman, Englett and Lynd to be 100 percent at fault,

19     and therefore, you should skip question 4 and proceed to

20     question five.  If your answer is yes, proceed to question

21     four.  So it's just like a roadmap.  Just follow what it

22     says.  So if you answer question 4 it is, if you have found

23     both parties to be at fault considering all of the fault at

24     100 percent, what percentage of fault do you attribute to

25     each of the parties.  To plaintiffs, Mr. Hasnain and the

1   Learning Connections, Inc., and there's a blank with a

2   percentage mark, so you would put in something between zero

3   to 100 percent, and under that is defendants Jeffrey Kaufman

4   and Kaufman Englett and Lynd with a blank, again, a

5   percentage with the indication of zero to 100 percent.

6       And those total should add up to 100 percent if you

7   answer this question.

8       If you find Mr. Hasnain and the Learning Connections to

9   be 50 percent or more at fault stop here, sign this form and

10  return to the courtroom.

11      A plaintiff 50 percent or more at fault is not entitled

12  to recover damages.  If you find that Mr. Hasnain and the

13  Learning Connections, Inc. are less than 50 percent at

14  fault, then proceed to question five to answer that.  Here's

15  question five.  Please enter the amount of damages in

16  dollars and cents that the defendants cost the plaintiffs as

17  a result of the professional attorney malpractice.  Do not

18  reduce those damages by any percentage of fault you may have

19  assigned Mr. Hasnain and the Learning Connections, Inc.  It

20  is the responsibility of the judge after you return the

21  verdict to reduce the damages you award, if any, by the

22  percentage of fault you assign to Mr. Hasnain and the

23  Learning Connections, Inc., if any.

24      The burden of proof is on Mr. Hasnain and the Learning

25  Connections, Inc. and then there's a dollar mark and a blank

1   there.  If you are to answer that question you would put in

2   the amount that you have agreed to.

3       Question 6:  Did the defendant Jeffrey S. Kaufman

4   negligently supervise the other employees of the law firm of

5   Kaufman Englett and Lynd during the course of its

6   representation of the plaintiffs.

7       Now, counsel, in any event, the jurors would answer

8   question one and question six.  Correct?

9            MR. ITTLEMAN:  Yes.

10           MR. WITHERS:  Yes.

11           THE COURT:  Because your instruction under

12   question 1 is if you answer no, if you answer no, your

13   verdict is for defendants.  But they must answer question 6.

14           MR. ITTLEMAN:  Yes.

15           THE COURT:  So if your answer to that one is no,

16   your verdict is for the defendants on this claim and you

17   should skip questions 2 through 5 and answer question 6.

18   Correct?

19           MR. ITTLEMAN:  Yes, ma'am.  Thank you.

20           MR. WITHERS:  Right.

21           THE COURT:  Okay.

22           MR. WITHERS:  What's after 6?

23           THE COURT:  Pardon?

24           MR. WITHERS:  But then what's after 6?

25           THE COURT:  We're going to get there.

1          MR. WITHERS:  Okay.

2          THE COURT:  So the question 6 is:  Did the

3    defendant Jeffrey S. Kaufman negligently supervise the other

4    employees of the law firm of Kaufman Englett and Lynd during

5    the course of its representation of the plaintiffs, again,

6    blank yes, and blank no.

7       If your answer is no, then your verdict is for the

8    defendant Jeffrey Kaufman.  If the answer is yes, please

9    continue to question 7 of the verdict form.

10         Question 7 is:  Did the defendant Jeffrey S. Kaufman,

11   Esquire's negligent supervision of the other employees of

12   the law firm of Kaufman Englett and Lynd during the course

13   of its representation of the plaintiffs result in damages to

14   the plaintiffs.  Blank yes, and a blank in front of the no.

15   If your answer is no, then your verdict is for the defendant

16   Jeffrey Kaufman.  If the answer is yes, please continue to

17   question 8 of the verdict form.

18         Question 8 is:  Do you find Mr. Hasnain and the

19   Learning Connections, Inc. to be at fault.  And on this

20   Jeffrey Kaufman has the burden of proof.  A blank before yes

21   and a blank before a no.  If your answer is no, you have

22   found Jeffrey Kaufman to be 100 percent at fault, and

23   therefore, you should skip question 9 and proceed to

24   question ten.  If your answer is yes, proceed to question

25   nine.  If you have found both parties to be at fault

considering all the fault at 100 percent, what percentage of

fault do you attribute to each of the parties.

And it lists Mr. Hasnain and the Learning Connections,

Inc. and there's a blank with a percentage, and Jeffrey S.

Kaufman, there's a blank with a percentage.  And whatever

percentages you put in there if you answered that question

should add up to 100 percent.

If you find Mr. Hasnain and the Learning Connections to

be 50 percent or more at fault, stop here, sign this form

and return to the Court.

A plaintiff 50 percent or more at fault is not entitled

to recover damages.  If you find that Mr. Hasnain and the

Learning Connections, Inc. is less than 50 percent at fault,

proceed to question 10.

Question 10 is:  Please enter the amount of damages in

dollars and cents that the defendant Jeffrey Kaufman caused

Mr. Hasnain and the Learning Connections, Inc., a foreign

corporation, as a result of his negligent supervision of the

other employees of the law firm of Kaufman Englett and Lynd

during the course of the representation of the plaintiffs.

Do not reduce those damages by any percentage of fault you

may have assigned Mr. Hasnain and the Learning Connections,

Inc.

It is the responsibility of the judge after you return

the verdict to reduce the damages you award, if any, by the

```
 1   percentage of fault you assign to Mr. Hasnain and the
 2   Learning Connections, Inc.
 3        And here the burden of proof is on Mr. Hasnain and the
 4   Learning Connections, Inc., and under that question there's
 5   a dollar mark and a blank.
 6        And question 11 is:  Total damages and verdict amount
 7   at dollar amounts from question five, and question 10.
 8        Now, counsel, on this verdict form if the jurors answer
 9   no to question one, they would then skip everything and go
10   to question six, if they answer no to question six, they
11   would skip the remaining questions.  Correct?
12             MR. WITHERS:  Correct.
13             MR. ITTLEMAN:  Correct.
14             THE COURT:  That is not really so.
15             MR. ITTLEMAN:  Your Honor, after paragraph 6 it
16   says if your answer is no, then that's it.  If the answer is
17   yes, then please continue.
18             THE COURT:  Yes.  But we need to give the jurors
19   some direction.  So they would skip the remaining questions
20   except answer question 11?
21             MR. ITTLEMAN:  No.  They would just sign.  They
22   wouldn't need to because the --
23             THE COURT:  Well, you have to understand that if
24   they have answered anything in questions one through five,
25   you would want them to go to question 11 even though they
```

1  answered none of the question 6.  You see what I'm saying?

2          MR. ITTLEMAN:  If they answer -- I'm sorry.

3          THE COURT:  If they answer questions 2 through 5.

4          MR. ITTLEMAN:  Right.

5          THE COURT:  But they answer no to six, they would

6  have to go to question 11.

7          MR. ITTLEMAN:  Correct.

8          THE COURT:  So after question 6 if your answer is

9  no, then your verdict is for the defendant Jeffrey S.

10  Kaufman and you should skip questions 7 through 10.

11          MR. ITTLEMAN:  Okay.

12          THE COURT:  All right?

13          MR. WITHERS:  Yes, Your Honor.

14          MR. ITTLEMAN:  Yes, Your Honor.

15          THE COURT:  Okay.  Then, depending on if there are

16  damages found, question 11 would be answered.

17          MR. ITTLEMAN:  Right.

18          THE COURT:  Correct?  I'm going to have this

19  retyped.  Sorry.  We have been working on this, really,

20  every day you have been here, we have been working on it but

21  it's trying to get it all balanced.  Okay.  So gentle

22  people, I have my mark up copy.  I'm going to ask my

23  judicial assistant to get this straightened out.  We will

24  give you a copy of both.  You can check against my notes.

25  So that's the procedure I'm going to follow.  I'm going to

```
 1   let the jury get started.

 2        Is there any objection to the instructions as I

 3   provided them or the manner in which I stated them to the

 4   jury, Mr. Ittleman?

 5             MR. ITTLEMAN:  No, Your Honor.

 6             THE COURT:  Mr. Withers?

 7             MR. WITHERS:  No, Your Honor.

 8             THE COURT:  Okay.  Gentle people, I'll try to get

 9   this straightened out.  We will let you get started.  I need

10   to tell you one other thing that I forgot to tell you.

11        If you want to communicate with me at any time, you

12   should write your message or question down and pass the note

13   to the Court security officer.  He will bring it to my

14   attention.  There should be envelopes in there that you can

15   put your question in.  And I'll then respond as promptly as

16   possible, either in writing or by having you return to the

17   courtroom so that I can address you orally.

18        I caution you, however, with regard to any message or

19   question you might send, you should not tell me your

20   numerical division at any -- at the time.

21        And also, ladies and gentlemen, it is your job to

22   resolve questions of fact and the evidence and it's my job

23   to supply any issue, you know, clarification of the law.  So

24   if you write me questions about what did this witness say

25   and so forth, that's your job.  But if you are unclear about
```

 1   the law then, you know, write a question.  Sometimes you

 2   think you have written me something easy, and we are in the

 3   book and it takes us a long time to get an answer that we

 4   can give back to you, so it may not be by return mail if you

 5   do have a question.  I just wanted to alert you to that.

 6       And I think -- is everything okay in there, George?

 7             THE DEPUTY MARSHAL:  Yes.

 8             THE COURT:  When you elect your foreperson, please

 9   feel free to take breaks if you need to.  But the foreperson

10   should ensure that everybody is together, like if somebody

11   needs to use the restroom just stop because you all need to

12   be together.  I think George is wonderful, but he's not a

13   member of the jury, so you shouldn't involve him in any of

14   the discussions.  So, we will get you these in just a

15   moment.

16       You may retire.

17             (Jury deliberation began at 3:01 p.m.)

18             THE COURT:  If you will stay here in the

19   courtroom, she may do this sequentially, I may start with

20   changes on the -- well, actually, I'm going to ask you to do

21   the verdict form first and then I'll get this.  But I want

22   you all to look it over and I may not come back in here, if

23   there's a problem, just tell Sherri, but otherwise, we will

24   get a copy of the verdict form to the jury and copies of

25   these instructions to them.  So it should be just a moment.

```
 1              (Recess for the staff at 3:03 p.m.)

 2              MR. ITTLEMAN:  Geoffrey Ittleman on behalf of the

 3    plaintiffs.

 4       We agreed to the verdict form, the jury instructions

 5    and all the exhibits that have been admitted.

 6              MR. WITHERS:  I'm Richard Withers for the

 7    defendants and we likewise agree to the instructions,

 8    verdict form and exhibits that have been submitted to the

 9    jury.

10              THE DEPUTY CLERK:  Thank you so much.

11              THE COURT:  George, is this a note that was given

12    to you by the jury?

13              THE DEPUTY MARSHAL:  Yes, ma'am.

14              THE COURT:  All right.  I'll have it marked

15    Court's one.  I never had a note like this before:  Calendar

16    for 2008 to 2010.  I assume they want the calendar for 2008

17    to 2009 and 2010.  Don't you think that's what they're

18    asking for?

19              MR. ITTLEMAN:  Sounds reasonable to me.  That's

20    what I interpret.

21              THE COURT:  Okay.  Let me just give you -- I have

22    my judicial assistant printout these three pages from the

23    Internet.  So let's see if you all have any problem with

24    that, if not, I will just attach it to this note and send it

25    back.  Is that all right?
```

```
 1            MR. WITHERS:  Yeah.

 2            MR. ITTLEMAN:  Sure.

 3            THE COURT:  Okay.  Let me just -- George, we have

 4   to have these notes.  Don't throw anything away.  So I'm

 5   just going to staple this together.  I have to have that in

 6   the record.  All right, gentle people, we will see what's

 7   next.

 8       Thank you.

 9               (Recess for the staff at 4:12 p.m.)

10                (back on the record at 5:06 p.m.)

11            THE COURT:  Mr. Withers, hello.

12       The jury is asking all sorts of questions about:  Do

13   they get dinner, no.  And so I'm just going to call them in

14   and say it's time to go home because 5:00 we shut down here,

15   and the Marshal does not know how to manage a jury.  He's

16   never done one before, so I really want this to end today.

17   So I'm going to call them in.  They can come back tomorrow

18   at 9:00 and I'll explain all that to them with you all here.

19   So let's get them in.

20       Do you want to bring the jury in.

21                Jury present -- 5:07 p.m.

22            THE COURT:  They're all standing to honor you, so

23   get used it.  I tell my jurors don't expect it when you get

24   home.  It will cause problems.

25       So ladies and gentlemen, it's after 5:00, the
```

```
 1   courthouse really shuts down at 5:00.  The courtroom
 2   security officer has to leave by that time.  Somebody
 3   mentioned that a juror asked about dinner.  No, we cannot
 4   provide dinner.  I think it's -- you know, if you're close
 5   to a verdict, I certainly won't make you leave right now but
 6   if you aren't, I really think you need to probably take off
 7   today and come back tomorrow.
 8        So absent -- yes, ma'am?
 9             THE JUROR:  No, ma'am.  We are not close to a
10   verdict yet.
11             THE COURT:  Ms. Hollinger, are you the foreperson?
12             THE FOREPERSON:  I'm the foreperson.
13             THE COURT:  Okay.  Good, then, what I'd like --
14   you can be seated.  What I'd like is I'll ask you to come
15   back tomorrow at 9:00.  You all will look for George.  He
16   should be here in the morning.  And he will bring you up and
17   don't let the deliberations begin until everybody is here.
18   And yes, you may take breaks, you know, I let my jurors,
19   whatever your comfort needs are, I just ask that you not
20   discuss the case and that everybody be back together.  So if
21   you need to take a smoke break or just a 10-minute break to
22   clear your head or whatever, of course.  And are we able to
23   provide lunch anymore or is that gone?
24             THE DEPUTY CLERK:  We should be able to.  I would
25   need to check with George.
```

```
 1          THE COURT:  Let me check.  We used to be able do
 2   it but they have cut the funds, so you know.  We'll see how
 3   that goes tomorrow.
 4          THE JUROR:  We prefer that we just get our lunches
 5   because we need to walk around and clear so we can do that.
 6          THE COURT:  Well, with that, and what you should
 7   do tomorrow is tell George what your schedule is going to be
 8   and then he will communicate it so that the attorneys stay
 9   here in case you have a question or something like, so then
10   they can go take lump, too, and then they'll be back, so
11   have a pleasant evening and I won't have a formal convening
12   of court.  I'll just rely on the foreperson to capably
13   control it.  And we will just wait your decision.  So thank
14   you so much.  Have a safe trip home.
15          (jury excused for the evening at 5:09 p.m.)
16          THE COURT:  Thank so much for standing in.  I'm
17   going to let you all go unless you have got something to be
18   brought up?
19          MR. WITHERS:  No.
20          THE COURT:  So, I won't check in with you at 9:00,
21   but please be on a short leash, like five minutes away,
22   because if we have these questions, I need you here quickly
23   so we can get back to them.
24          MR. WITHERS:  Maybe I could bring my laptop and do
25   something while I'm sitting here.
```

1    THE COURT:  I thought I did an order allowing you
2    all to do that.
3         MR. WITHERS:  I think you did.
4         THE COURT:  And there is an attorney lounge here
5    and, you know, there -- the witness room is on either side
6    if you want to split up.  So.  And you can come in the
7    courtroom.
8         THE DEPUTY CLERK:  Your Honor, if they are going
9    to use Wi Fi, they have to sign the paperwork.
10        THE COURT:  Did you hear that?  If you want to use
11   Wi Fi there's paperwork.
12      All right.  See you tomorrow, then.
13                (Recess)
14              C E R T I F I C A T E
15        I certify that the foregoing is a correct
16   transcript from the record of proceedings in the
17   above-entitled matter.
18
19   s\Sandra K. Tremel        May 24, 2012
20
21
22
23
24
25